## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA

STATE OF GEORGIA
EX REL. SAMUEL S. OLENS
in his official capacity as
Attorney General of Georgia
40 Capitol Square, S.W.
Atlanta, GA  30334;

STATE OF WEST VIRGINIA,
EX REL. PATRICK MORRISEY
in his official capacity as
Attorney General of West Virginia
State Capitol Building 1, Room E-26
Charleston, WV 25305;

STATE OF ALABAMA
EX REL. LUTHER STRANGE
in his official capacity as
Attorney General of Alabama
501 Washington Ave.
Montgomery AL 36130;

STATE OF FLORIDA
EX REL. PAMELA JO BONDI
in her official capacity as
Attorney General of Florida
PL-01, The Capitol
Tallahassee, FL 32399;

STATE OF KANSAS
EX REL. DEREK SCHMIDT
in his official capacity as
Attorney General of Kansas
120 SW 10th Ave., 2nd Floor
Topeka, KS 66612;

COMMONWEALTH OF KENTUCKY
EX REL. JACK CONWAY
in his official capacity as
Attorney General of Kentucky
700 Capitol Avenue, Suite 118
Frankfort, KY 40601;

Civil Action No.

STATE OF SOUTH CAROLINA
EX REL. ALAN WILSON
in his official capacity as
Attorney General of South Carolina
1000 Assembly Street, Room 519
Columbia, SC 29201;

STATE OF UTAH
EX REL. SEAN D. REYES
in his official capacity as
Attorney General of Utah
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, UT 84114; and

STATE OF WISCONSIN
EX REL. BRAD D. SCHIMEL
in his official capacity as
Attorney General of Wisconsin
17 West Main Street
Madison, WI 53707;

        *Plaintiffs*,

v.

REGINA A. MCCARTHY
in her official capacity as
Administrator of the United States
Environmental Protection Agency; and the
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460; and

JO-ELLEN DARCY
in her official capacity as
Assistant Secretary of the Army (Civil Works); and the
UNITED STATES ARMY CORPS OF
ENGINEERS
441 G Street NW
Washington, D.C. 20314;

        *Defendants*.

## COMPLAINT

1.      This case involves an attempt by two agencies of the federal government to usurp the States' primary responsibility for the management, protection, and care of intrastate waters and lands.  The federal agencies' assertion of authority should be vacated and enjoined because it violates the Clean Water Act, the Administrative Procedure Act, and the Constitution.

2.      Under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act" or "CWA"), Congress granted to the Environmental Protection Agency ("EPA") and the Army Corps of Engineers ("the Corps") (collectively, "the Agencies") regulatory authority over "navigable waters," defined as "waters of the United States."  33 U.S.C. §§ 1344, 1362(7). At the same time, Congress decided that the States would retain their constitutional, sovereign responsibility over non-navigable, intrastate lands and waters.  Specifically, Congress instructed the Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources. . . ."  33 U.S.C. § 1251(b).

3.      The States of Georgia, West Virginia, Alabama, Florida, Kansas, Kentucky, South Carolina, Utah, and Wisconsin take extremely seriously their right and duty to protect the water and land resources within their borders, for the good of their citizens.

4.      In the last fifteen years, the Supreme Court has considered two cases involving the Agencies' assertion of regulatory authority over non-navigable, intrastate waters.  In both cases, the Court rejected the Agencies' position, which would have usurped the constitutional and statutory authority of the States. *See Solid Waste Agency of N. Cook Cnty. v. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*"); *Rapanos v. United States*, 547 U.S. 715 (2006).

5.      The present case involves the latest and most significant overreach by the Agencies, in violation of the rights of the States: the final Clean Water Rule.  Clean Water Rule:

Definition of "Waters of the United States," 80 Fed. Reg. 37,053–37,127 (June 29, 2015) ("the Final Rule").

6.    The Final Rule declares that large categories of intrastate waters and sometimes wet lands—from minor roadside ditches, to ephemeral streams, to creeks, ponds, and streams that lie where the Agencies believe water may flow once every hundred years—are either per se or potentially subject to federal jurisdiction.

7.    Contrary to the plain terms of the Clean Water Act and the Supreme Court's decisions interpreting that Act, the Final Rule asserts that the Agencies have virtually limitless power over non-navigable, intrastate waters.

8.    The Final Rule's expansion of federal authority over the States' core sovereign decisions regarding intrastate water and land use management also unconstitutionally exceeds Congress' Commerce Clause authority and violates the States' sovereign authority under the Tenth Amendment.  As the Supreme Court has concluded, Congress did not purport under the Clean Water Act to grant to the Agencies authority extending even to the boundaries of Congress' authority under the Commerce Clause. *See, e.g.*, *SWANCC*, 531 U.S. at 173–74.

9.    The Agencies' unlawful attempt to expand their authority to broad categories of non-navigable, intrastate waters and lands imposes great harm upon the States and their citizens. Once a water is determined to fall within the Agencies' authority, this determination eliminates the States' primary authority to regulate and protect that water under the State's standards, and imposes significant federal burdens upon the States.  Such a federal jurisdictional finding also places significant burdens upon homeowners, business owners, and farmers by forcing them to obtain costly federal permits in order to continue to conduct activities on their lands that have no significant impact on navigable, interstate waters. *See* 33 U.S.C. §§ 1342, 1344.

10.     Accordingly, the States ask this Court to vacate the Final Rule, to enjoin the Agencies from enforcing the Rule, and for any other relief this Court deems proper.

## THE PARTIES

11.     Plaintiffs, the States appearing by and through Samuel S. Olens, Attorney General of Georgia; Patrick Morrisey, Attorney General of West Virginia; Luther Strange, Attorney General of Alabama; Pamela Jo Bondi, Attorney General of Florida; Derek Schmidt, Attorney General of Kansas; Jack Conway, Attorney General of Kentucky; Alan Wilson, Attorney General of South Carolina; Sean D. Reyes, Attorney General of Utah; Brad D. Schimel, Attorney General of Wisconsin, are sovereign States that regulate land use management and water resources within their borders through duly enacted state laws administered by state officials and constituent agencies.

12.     Defendant, Regina A. McCarthy is the Administrator of the United States Environmental Protection Agency.  Defendant, United States Environmental Protection Agency ("EPA") is an agency of the United States within the meaning of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 551(1).  The Administrator and EPA are charged with administering many provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act" or "CWA").

13.     Defendant, Jo-Ellen Darcy is the Assistant Secretary of the Army.  Defendant, United States Army Corps of Engineers ("the Corps") is an agency of the United States within the meaning of the Administrative Procedure Act.  *See* 5 U.S.C. § 551(1).  The Secretary of the Army and the Corps are charged with administering many provisions of the Clean Water Act.  33 U.S.C. §§ 1251-1387.

14.     The relief requested in this action is sought against: the Defendants; the Defendants' officers, employees, and agents; and all persons acting in cooperation with the Defendants or under the Defendants' supervision, direction, or control.

## JURISDICTION AND VENUE

15.     This case arises under the APA, 5 U.S.C. §§ 701–706, and under the Constitution and laws of the United States.

16.     This Court has federal question jurisdiction under 28 U.S.C. § 1331.

17.     The Court may award declaratory and injunctive relief under the APA, 5 U.S.C. §§ 705–706, as well as 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

18.     Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because plaintiff State of Georgia is located in this judicial district. *See also* 33 U.S.C. § 1321(n) (granting U.S. district courts with jurisdiction over claims arising under 33 U.S.C. § 1321).

## FACTUAL ALLEGATIONS

### I.      The Clean Water Act

19.     Congress enacted the provisions at issue as part of the Federal Water Pollution Control Act Amendments of 1972.  33 U.S.C. §§ 1251–1387 (commonly known as the Clean Water Act or CWA).

20.     In the CWA, Congress granted to the Agencies limited authority to regulate the discharge of certain materials into "navigable waters" through permitting programs.  33 U.S.C. §§ 1341–1346.  The Act defines "navigable waters" as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

21.     The definition of "waters of the United States" significantly impacts at least three CWA programs that affect the States: (1) Water Quality Standards ("WQS") and Total

Maximum Daily Loads ("TMDL"); (2) National Pollutant Discharge Elimination System ("NPDES"); and (3) state certification.  80 Fed. Reg. 37,055 (June 29, 2015).

22.    *First*, States must establish Water Quality Standards ("WQS") or goals for each water body within the definition of "waters of the United States."  *See* 33 U.S.C. §§ 1311(b)(1)(C), 1313(e)(3)(A); 40 C.F.R. §§ 130.3, 131.3(i), 131.4(a).  States must revise WQS periodically based on relevant changes, and if the State's WQS do not comply with the CWA, EPA will create a WQS for the State.  33 U.S.C. § 1313(c)(3).

23.    For waters that fail to meet the WQS, the State must set Total Maximum Daily Loads ("TMDL") limiting the amount of a pollutant that can be discharged into the water while achieving the WQS.  40 C.F.R. § 130.7.  The State must then apply the TMDL to its water quality management plan and permitting programs.  *Id.*  The CWA also requires States biennially to submit a water quality report to EPA describing "the water quality of all navigable waters in such State" and analyzing the extent to which these waters provide for "the protection and propagation of a balanced population of shellfish, fish, and wildlife, and allow recreational activities in and on the water."  33 U.S.C. § 1315(b)(1)(A)–(B).

24.    *Second*, under the Clean Water Act, anyone seeking to discharge material into "waters of the United States" must obtain a permit from either the States or EPA, in the case of pollutants, or the Corps, in the case of dredge or fill material.  *See* 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(12).

25.    In most cases, the States are the primary administrative authority for the National Pollution Discharge Elimination System permitting program ("NPDES"), and they also help the Corps to administer the dredge and fill permitting program.  *See* 33 U.S.C. §§ 1342, 1344.

26.     "'The discharge of a pollutant' is defined broadly to include 'any addition of any pollutant to navigable waters from any point source,' and 'pollutant' is defined broadly to include not only traditional contaminants but also solids such as 'dredged spoil, . . . rock, sand, [and] cellar dirt.'" *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (plurality opinion) (citing 33 U.S.C. §§ 1362(12), 1362(6)).

27.     Obtaining a discharge permit is an expensive and uncertain process, which can take years and cost tens and hundreds of thousands of dollars.  *See* 33 U.S.C. §§ 1342, 1344 (describing the discharge permitting process).

28.     Discharging into the "waters of the United States" without a permit can subject an individual to civil penalties including fines up to $37,500 per violation, per day, and even criminal penalties. 33 U.S.C. §§ 1311, 1319, 1365; 74 Fed. Reg. 626–627 (Jan. 7, 2009).

29.     *Third*, all Clean Water Act permit applicants, whether for pollutants or dredge and fill material, must obtain a statement from the State in which the discharge will occur, certifying that the discharge will comply with the State's Water Quality Standards.  33 U.S.C. § 1341(a)(1).

## II.     The United States Supreme Court Rejects Twice In The Last 15 Years The Agencies' Assertions Of Authority Over Intrastate, Non-Navigable Waters.

30.     For a century before the CWA, the Supreme Court interpreted the phrase "navigable waters of the United States" in the CWA's predecessor statute to refer to "navigable in fact" interstate waters.  *The Daniel Ball,* 77 U.S. 557, 563 (1870).

31.     In 1974, the Corps issued a rule defining "navigable waters" as those waters that have been, are, or may be, used for interstate or foreign commerce. 39 Fed. Reg. 12,119 (Apr. 3, 1974).

32.     After a federal district court enjoined the initial rule, *see Natural Res. Def. Council v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975), the Agencies sought on remand to

expand their regulatory jurisdiction to include areas never before subject to federal permitting requirements. 40 Fed. Reg. 31,320 (July 25, 1975). Those 1975 regulations defined "the waters of the United States" to include navigable waters and their tributaries, as well as non-navigable intrastate waters that could affect interstate commerce. 40 Fed. Reg. 31,324–31,325 (July 25, 1975).

33.     In 1986, the Corps sought to expand its jurisdiction under the CWA yet further, to include traditional navigable waters, tributaries of those waters, wetlands adjacent to these waters and tributaries, and waters used as habitat by migratory birds that either are protected by treaty or cross state lines. 51 Fed. Reg. 41,206–60 (Nov. 13, 1986).

34.     In the last fifteen years, the Supreme Court has reviewed two aspects of the Agencies' definition of "waters of the United States." In both of those instances, the Court rejected the Agencies' assertion of authority over non-navigable, intrastate waters.

35.     In *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, 531 U.S. 159, 164 (2001), the Supreme Court rejected the Corps' assertion of jurisdiction over any waters "'[w]hich are or would be used as habitat'" by migratory birds. *SWANCC*, 531 U.S. at 164 (quoting 51 Fed. Reg. 41,217 (Nov. 13, 1986)). The Court in *SWANCC* explained that Congress did not authorize the Agencies to regulate "nonnavigable, isolated, intrastate waters," like seasonal ponds. *Id.* at 171.

36.     The Court added that regulation of such isolated waters would invoke "the outer limits of Congress' power," have the effect of "altering the federal-state framework by permitting federal encroachment upon a traditional state power," and raise "significant constitutional questions" regarding the Clean Water Act's constitutionality. *Id.* at 172–74.

Congress, the Court concluded, did not intend to create such difficult constitutional questions, or assert the outer boundaries of constitutional authority. *Id.*

37.     In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court also rejected the Agencies' assertion of authority over non-navigable, intrastate waters that are not significantly connected to navigable, interstate waters. *Rapanos* dealt with whether non-navigable tributaries of traditional navigable waters are within the Agencies' jurisdiction and, if so, in what circumstances. The Court's majority consisted of two opinions, both rejecting the Agencies' position.

38.     A four justice plurality opinion held that only "relatively permanent, standing or continuously flowing bodies of water," as well as secondary waters with a "continuous surface connection" to such relatively permanent waters, qualify as "waters of the United States." *Id.* at 739–42.  "Wetlands with only an intermittent, physically remote hydrologic connection," the plurality explained, do not fall within the Agencies' jurisdiction. *Id.* at 742.

39.     Justice Kennedy, writing for himself, explained that the Agencies' jurisdiction extends only to primary "waters that are navigable in fact or that could reasonably be so made" and secondary waters with a "significant nexus" to primary waters. *Id.* at 779.  To satisfy that nexus, the secondary waters must "significantly affect the chemical, physical, *and* biological integrity of" primary waters. *Id.* at 780 (emphasis added).

40.     Under Justice Kennedy's interpretation, the Agencies would not be permitted to assert jurisdiction over all "wetlands (however remote)" or "a continuously flowing stream (however small)." *Id.* at 776–77.  Justice Kennedy added that the Agency's position would impermissibly "permit federal regulation whenever wetlands lie alongside a ditch or drain,

however remote and insubstantial, that eventually may flow into traditional navigable waters." *Id.* at 778.

41.    The Eleventh Circuit held that Justice Kennedy's opinion in *Rapanos* is controlling as to the definition of "waters of the United States." *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007).   However, the Supreme Court has not yet decided that question. *See Jones Creek Investors, LLC v. Columbia Cnty.*, 2015 WL 1541409, at *24 n.8 (S.D. Ga. Mar. 31, 2015) (noting division of authority).

42.    Following the *Rapanos* decision, the Agencies issued a guidance document explaining the approach the Agencies would use to determine whether waters were subject to the CWA after *Rapanos*.   U.S. Envtl. Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008).   The Guidance asserted that the Agencies would exercise per se jurisdiction over: (1) "traditional navigable waters"; (2) "wetlands adjacent to traditional navigable waters"; (3) "non-navigable tributaries of traditional navigable waters that are relatively permanent where tributaries typically flow year-round or have continuous flow at least seasonally"; and (4) "wetlands that abut such tributaries." *Id.* at 1.   The Agencies also asserted case-by-case authority, as the Agencies deemed appropriate, over: (1) "non-navigable tributaries that are not relatively permanent"; (2) "wetlands adjacent to non-navigable tributaries that are not relatively permanent"; and (3) "wetlands adjacent to but not directly abutting a relatively permanent non-navigable tributary." *Id.*

**III.     EPA And The Corps Propose A Rule Redefining "Waters of the United States."**

43.     On April 21, 2014, the Agencies published in the Federal Register a proposed rule entitled "Definition of 'Waters of the United States' Under the Clean Water Act" (Proposed Rule). 79 Fed. Reg. 22,188–22,274 (Apr. 21, 2014).

44.     The Proposed Rule defined primary waters to include "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce" as well as "[a]ll interstate waters, including interstate wetlands" and "the territorial seas." 79 Fed. Reg. 22,188, 22,268–22,269 (Apr. 21, 2014).

45.     The Proposed Rule then declared that all intrastate "tributaries" of primary waters or "tributaries" of impoundments of primary waters are per se "waters of the United States." 79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).

46.     The Proposed Rule defined "tributary" as "a water physically characterized by the presence of a bed and banks and ordinary high water mark, as defined at 33 CFR 328.3(e), which contributes flow, either directly or through another water, to a" primary water. 79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014). The Proposed Rule defined water as a tributary even if it has man-made or natural breaks, "so long as a bed and banks and an ordinary high water mark can be identified upstream of the break." 79 Fed. Reg. 22,188, 22,269.

47.     The Proposed Rule then declared that all intrastate waters and wetlands "adjacent" to primary waters are per se waters covered by the CWA and subject to EPA and the Corps' regulatory authority. 79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).

48.     "Adjacent waters" were defined as waters "bordering, contiguous or neighboring" primary waters. The category includes "waters, including wetlands, separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." 79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).

49.     In turn, the term "neighboring" was defined to "include[] waters located within the riparian area or floodplain" of a primary water, impoundment, or tributary.  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).  "Riparian area" was defined as "an area bordering a water where surface or subsurface hydrology directly influence the ecological processes and plant and animal community structure in that area."  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).  And "floodplain" was defined as "an area bordering inland or coastal waters that was formed by sediment deposition from such water under present climatic conditions and is inundated during periods of moderate to high water flows."  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).

50.     The term "neighboring" also was defined to include "waters with a shallow subsurface hydrologic connection or confined surface hydrologic connection" to a primary water, impoundment, or tributary.  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).

51.     The Proposed Rule then permitted the Agencies to exercise authority over any other intrastate water—those not already included in a per se category or specifically exempted—that "alone or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to a" primary water.  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).  The test the Agencies proposed to apply was whether "similarly situated waters" "significantly affect[] the chemical, physical, or biological integrity" of a primary water.  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).  The Proposed Rule defined "significant nexus" as "significantly affect[ing] the chemical, physical, or biological integrity" of a primary water.  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).

52.     On October 8, 2014, the States of Georgia, West Virginia, Alabama, Kansas, and South Carolina submitted comments to the Agencies explaining that the Proposed Rule displaces State authority to comply with the Supreme Court's decision in *Rapanos*.  Letter from the

Attorneys General of Georgia, West Virginia, Nebraska, Oklahoma, Alabama, Alaska, Kansas, Louisiana, North Dakota, South Carolina, and South Dakota and the Governors Of Iowa, Kansas, Mississippi, Nebraska, North Carolina, and South Carolina, to Regina McCarthy, Adm'r, U.S. Envtl. Prot. Agency & John McHugh, Sec'y, U.S. Dep't of the Army (Oct. 8, 2014).

**III.    EPA And The Corps Finalize An Overbroad Final Rule Redefining "Waters of the United States," Which Is Significantly Different From The Proposed Rule.**

53.      On June 29, 2015, EPA and the Corps published in the Federal Register the final rule entitled "Definition of 'Waters of the United States' Under the Clean Water Act." 80 Fed. Reg. 37,053–37,127 (June 29, 2015) ("Rule" or "Final Rule").

**A.    The Rule's Per Se Coverage of All Tributaries Exceeds The Agencies' Statutory Authority And The Constitution.**

54.      The Final Rule defines primary waters to include "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide" as well as "[a]ll interstate waters, including interstate wetlands" and "the territorial seas." 40 C.F.R. § 230.3(s)(1)(i)–(iii).

55.      The Rule then declares that all intrastate "tributaries" of primary waters are per se jurisdictional waters. 40 C.F.R. § 230.3(s)(1)(v).

56.      The Rule defines "tributary" as "a water that contributes flow, either directly or through another water" to a primary water and "is characterized by the presence of the physical indicators of a bed and bank and an ordinary high water mark." 40 C.F.R. § 230.3(s)(3)(iii). A water is defined as a tributary even if it has man-made or natural breaks, "so long as a bed and banks and an ordinary high water mark can be identified upstream of the break." 40 C.F.R. § 230.3(s)(3)(iii).

57.    "Ordinary high water mark" is defined as "that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means."   40 C.F.R. § 230.3(s)(3)(vi).

58.    The Rule's definition of tributary sweeps within the Agencies' authority ponds, ephemeral streams, and even channels that are usually dry.  *See* 40 C.F.R. § 230.3(s)(3)(iii).

59.    The Rule's categorization of all tributaries of primary waters as "waters of the United States" violates the CWA, under both *Rapanos* tests.

60.    The Rule's coverage of all tributaries violates Justice Kennedy's test because the Rule places tributaries within the Agencies' regulatory authority without regard to a tributary's actual impact on the "chemical, physical, and biological integrity of" any primary water. *Rapanos*, 547 U.S. at 717.  For example, under the Rule, a tributary that only has a small amount of flow into a primary water, for short periods of time every year, is nevertheless within the Agencies' jurisdiction.  40 C.F.R. § 230.3(s)(3)(iii); *see also Jones Creek*, 2015 WL 1541409, at *26–28.

61.    The Rule's coverage of all tributaries violates the plurality's test because the definition includes a feature with *any* flow into a primary water, even if that flow does not constitute a "*continuous* surface connection." *Rapanos*, 547 U.S. at 742 (emphasis added).

### B.    The Rule's Per Se Coverage Of All Adjacent Waters Exceeds The Agencies' Statutory Authority And Violates The Constitution.

62.    The Rule defines primary waters to include "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce" as well as

"[a]ll interstate waters, including interstate wetlands" and "the territorial seas."  40 C.F.R. § 230.3(s)(1)(i)-(iii).

63.    The Rule then declares that all intrastate waters "adjacent" to primary waters, impoundments, or tributaries are per se waters covered by the CWA and subject to EPA and the Corps' regulatory authority.  40 C.F.R. § 230.3(s)(1)(vi).

64.    "Adjacent waters" are waters "bordering, contiguous or *neighboring*" primary waters, impoundments, or tributaries.  40 C.F.R. § 230.3(s)(3)(i) (emphasis added).  The category includes "waters separated by constructed dikes or barriers, natural river berms, beach dunes, and the like."  40 C.F.R. § 230.3(s)(3)(i).  It includes wetlands within or abutting the ordinary high water mark of an open water such as a pond or lake.  40 C.F.R. § 230.3(s)(3)(i).

65.    The term "neighboring" includes "all waters [at least partially] located within 100 feet of the ordinary high water mark of a" primary water, impoundment, or tributary.  40 C.F.R. § 230.3(s)(3)(ii)(A).  It also includes "waters located within the 100-year floodplain of a" primary water, impoundment, or tributary "and not more than 1,500 feet from the ordinary high water mark of such water."  40 C.F.R. § 230.3(s)(3)(ii)(B).  "Neighboring" also includes "all waters [at least partially] located within 1,500 feet of the high tide line of a" primary water "and all waters within 1,500 feet of the high tide line or within 1,500 feet of the ordinary high water mark of the Great Lakes."  40 C.F.R. § 230.3(s)(3)(ii)(C).  "High tide line" is defined as "the line of intersection of the land with the water's surface at the maximum height reached by a rising tide."  40 C.F.R. § 230.3(s)(3)(vii).  It includes "spring high tides and other high tides that occur with periodic frequency."  40 C.F.R. § 230.3(s)(3)(vii).

66.   The Rule exempts "waters being used for established normal farming, ranching, and silviculture activities" from the Agencies' jurisdictional authority on the basis of "adjacency." 40 C.F.R. § 230.3(s)(3)(i).

67.   Under these definitions, the Rule's per se coverage of all waters "adjacent" to primary waters, impoundment, or tributaries sweeps up large portions of water, wetlands, and even lands that are dry for most of the year.

68.   The Rule's per se coverage of all waters "adjacent" to primary waters, impoundments, or tributaries as "waters of the United States" violates the CWA, under both *Rapanos* tests.

69.   The Rule's coverage of all "adjacent" waters violates Justice Kennedy's approach because, among other problems: (1) the definition sweeps in waters "adjacent" to tributaries or impoundments, where the tributaries or impoundments themselves have no "significant nexus" to primary waters; (2) the definition sweeps in "bordering" waters with no "significant nexus" to primary waters; (3) the definition sweeps in waters within 100 feet of primary waters, impoundments, and tributaries and 100-year floodplain waters with no "significant nexus" to primary waters; and (4) the definition sweeps in waters within 1,500 feet of the high tide line of primary waters, impoundments, or tributaries with no "significant nexus" to a primary water. *Rapanos*, 547 U.S. at 779; *see also Jones Creek*, 2015 WL 1541409, at *26–28.

70.   The Rule's coverage of all "adjacent" waters violates the plurality's test because, among other problems: (1) the definition sweeps in waters "adjacent" to tributaries or impoundments with no "*continuous* surface connection" to primary waters; (2) the definition sweeps in "bordering" waters with no "*continuous* surface connection" to primary waters; (3) the definition sweeps in 100-year floodplain waters and lands with no "*continuous* surface

connection" to primary waters, impoundments, or tributaries; and (4) the definition sweeps in waters within 1,500 feet of the high tide line of a primary waters, impoundments, or tributaries with no "*continuous* surface connection" to primary waters. *Rapanos*, 547 U.S. at 742 (emphasis added).

71.     The Agencies' decision to exempt farmland from CWA jurisdiction based on "adjacency" alone and not also exempt farmland under CWA jurisdiction based on the definition of "tributaries" is arbitrary and capricious in violation of the Agencies' statutory duties under the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A).  Farmland should be exempt under both categories.

### C.     The Rule's Per Se Coverage Of Intrastate Waters Based Solely Upon Their Relationship With Non-Navigable Interstate Waters Exceeds The Agencies' Statutory Authority And Violates The Constitution.

72.     The Rule defines primary waters to include *any* interstate waters and wetlands, including non-navigable interstate waters. 40 C.F.R. § 230.3(s)(1)(ii).  The Rule then establishes per se jurisdiction over waters adjacent to primary waters. 40 C.F.R. § 230.3(s)(3)(i).  It also creates jurisdiction on a case-by-case basis for waters with a significant nexus to primary waters. 40 C.F.R. § 230.3(s)(1)(vii).  Accordingly, under the Rule, an intrastate water can fall within the Agencies' jurisdictional reach simply because of its relationship to a non-navigable interstate water.  *See* 40 C.F.R. § 230.3(s)(3)(i), (1)(vii).

73.     The Rule's categorization of intrastate waters as "waters of the United States" based solely upon their relationship to non-navigable interstate waters violates the CWA, under both *Rapanos* tests.

74.     The Rule's coverage of such intrastate waters violates Justice Kennedy's approach because he concluded that the CWA can cover, at most, only waters that have a

"significant nexus" with "waters that are or were *navigable* in fact or that could reasonably be so made." *Rapanos*, 547 U.S. at 759 (emphasis added).

75.     The Rule's coverage of such intrastate waters violates the plurality's approach because the plurality held that "a 'wate[r] of the United States'" must have some connection to "a relatively permanent body of water connected to traditional interstate *navigable* waters." *Rapanos*, 547 U.S. at 742 (emphasis added).  The plurality required a jurisdictional water to have some connection to a traditional interstate navigable water. *Id.*

> ### D.    The Rule's Case-by-Case Coverage Of Other Waters Exceeds The Agencies' Statutory Authority And Violates The Constitution.

76.     The Rule defines primary waters to include "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce" as well as "[a]ll interstate waters, including interstate wetlands" and "the territorial seas."   40 C.F.R. § 230.3(s)(1)(i).

77.     The Rule then permits the Agencies to exercise authority on a case-by-case basis over a water not covered by any other part of the Rule—*i.e.*, not already included in a per se category or specifically exempted—that, alone or in combination with other waters in these categories within the watershed that drains into the nearest primary water, are deemed to have a significant nexus to a primary water. 40 C.F.R. § 230.3(s)(1)(vii).

78.     Specifically, the Rule includes within federal jurisdiction, on a case-by-case basis, "all waters [at least partially] located within the 100-year floodplain of a" primary water that has a significant nexus with a primary water.  40 C.F.R. § 230.3(s)(3)(viii).  It further includes, on a case-by-case basis, "all waters [at least partially] located within 4,000 feet of the high tide line or ordinary high water mark of a" primary water, impoundment, or tributary that has a significant nexus to a primary water. *Id.*

79.     The test the Agencies will apply under the Rule is whether "similarly situated waters in the region" "significantly affect[] the chemical, physical, *or* biological integrity" of a primary water.   40 C.F.R. § 230.3(s)(3)(v) (emphasis added).   "Region" is defined as "the watershed that drains to the nearest [primary water]." 40 C.F.R. § 230.3(s)(3)(v).  The Rule then defines "significant nexus" as "significantly affect[ing] the chemical, physical, *or* biological integrity" of a primary water. 40 C.F.R. § 230.3(s)(3)(v) (emphasis added).  "Significant" means "more than speculative or insubstantial."  40 C.F.R. § 230.3(s)(3)(v).

80.     This case-by-case approach violates the CWA, under both *Rapanos* tests.

81.     The Rule's coverage of "similarly situated waters" that "significantly affect[] the chemical, physical, or biological integrity" of a primary water violates Justice Kennedy's test because Justice Kennedy would only permit the Agencies to assert jurisdiction over a water that "significantly affect[s] the chemical, physical, *and* biological integrity of other covered waters." *Rapanos*, 547 U.S. at 717.  (emphasis added).  In addition, Justice Kennedy's test would not permit aggregation of waters across amorphous "region[s]," as the Rule asserts the Agencies will do.  40 C.F.R. § 230(s)(3)(v); *see also Jones Creek*, 2015 WL 1541409, at *26–28.

82.     The Rule's coverage of "similarly situated waters" that "significantly affect[] the chemical, physical, or biological integrity" of a primary water violates the plurality's test because this coverage would include numerous intrastate waters without a "continuous surface connection" to a primary water. *Rapanos*, 547 U.S. at 742; 40 C.F.R. § 230(s)(3)(v).

## V.     The Rule Harms The States Of Georgia, West Virginia, Alabama, Florida, Kansas, Kentucky, South Carolina, Utah, and Wisconsin.

83.     The Rule expands the number of jurisdictional waters beyond EPA and the Corps' practices prior to the Rule—practices based upon the Agency's 2008 guidance document.

Notably, the guidance document itself asserted jurisdiction that was beyond the Agencies' statutory and constitutional authority, and has been repeatedly subject to case-by-case challenge.

84.     EPA concedes, as it must, that the Rule includes more waters than the Agencies' prior practice under the 2008 guidance. 80 Fed. Reg. 37,101 (June 29, 2015). The Agencies estimated the Proposed Rule would increase federal jurisdiction compared to prior practice by 2.7 percent. U.S. Evntl. Prot. Agency & U.S. Army Corps of Eng'rs, Economic Analysis of Proposed Revised Definition of Waters of the United States 12 (2014). The Agencies project a greater increase in federal jurisdiction under the Final Rule at 2.84 to 4.65 percent. 80 Fed. Reg. 37,101 (June 29, 2015).

85.     The Rule reaches more broadly than the guidance in several ways. It includes as primary waters all interstate waters and wetlands, rather than the smaller set of navigable waters. Correspondingly, more waters are connected to a primary water and thereby fall into the adjacent waters and other waters categories. *See* U.S. Evntl. Prot. Agency & U.S. Army Corps of Eng'rs, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* 1 (Dec. 2, 2008). The Rule also includes tributaries with any flow rather than the guidance's more limited coverage of only tributaries "that flow year-round or have continuous flow at least seasonally." *Id.* The Rule also sweeps in wetlands abutting a pond or lake's ordinary high water mark rather than only wetlands adjacent to or abutting a navigable water or non-navigable tributary. *Id.*

86.     As a result, the Rule imposes numerous significant and immediate costs upon the States.

87.     The CWA requires the States to enact Water Quality Standards ("WQS") for waters within the definition of "waters of the United States" and to revise the WQS as necessary.

33 U.S.C. § 1311(b)(1)(C), § 1313(e)(3)(A); 40 C.F.R. §§ 130.3, 131.3(i), .4(a).  For waters that fail to meet the WQS, States must set pollution limits, called Total Maximum Daily Loads ("TMDL") and apply the TMDL to the State's water quality management plan and NPDES permitting program.  40 C.F.R. § 130.7.  States develop WQS for categories of waters.  U.S. Envtl. Prot. Agency & U.S. Dep't of the Army, Economic Analysis of EPA-Army Clean Water Rule 15 (2015).  Because the Rule increases the number of waters subject to the CWA, the States must immediately determine which waters were added to the Agencies' jurisdiction and decide if current WQS apply to these additional waters.  33 U.S.C. § 1313(c)(4)(B).

88.     If current WQS do not apply for particular waters, the State then must issue new WQS or else accept EPA's WQS.  33 U.S.C. § 1313(c)(4).  If the State allows a WQS to become non-compliant with the CWA, EPA's duty to establish a WQS for the State is triggered.  33 U.S.C. § 1313(c)(4)(B).  The State must also issue a TMDL in the case of non-compliant waters.  40 C.F.R. § 130.7.  The process of implementing these changes is expensive and places a significant strain on limited state resources.

89.     The CWA also requires the States to prepare and submit to the EPA a biennial water quality report describing "the water quality of all navigable waters in such State" and analyzing the extent to which individual waters support wildlife populations and recreational activities.  33 U.S.C. § 1315(b)(1)(A).  The Rule places more water bodies within the definition of "navigable waters," and therefore, requires the States to conduct more water quality assessments at significant expense.

90.     In addition, the Rule has a significant effect on the States' administration of the NPDES permitting program.  See 33 U.S.C. § 1342; U.S. Envtl. Prot. Agency, Specific State Program Status, http://water.epa.gov/polwaste/npdes/basics/upload/State_NPDES_Prog_Auth.pd

f (last visited May 28, 2015). The States will receive additional federally-mandated NPDES permit applications for discharging pollutants into waters now federally regulated as a result of the Rule. 33 U.S.C. §§ 1311, 1342. The States will then be required to process these additional federally-mandated Clean Water Act permit applications.

91.     And finally, the CWA requires all federal permit applicants to obtain a state certification from the State in which the proposed discharge will occur. 33 U.S.C. § 1341. The Rule expands the number of activities requiring a permit, and thus, the number of permit applicants seeking certifications from the States.

92.     The Rule will also harm the States in their capacity as owners and regulators of the waters and lands of their State. For example, Georgia law provides that, "[t]he people of the State of Georgia are dependent upon the rivers, streams, lakes, and subsurface waters of the state for public and private water supply and for agricultural, industrial, and recreational uses." O.C.G.A. § 12-5-21(a). The law goes on to declare as State policy that "the water resources of the state shall be utilized prudently for the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters, and to require where necessary reasonable usage of the waters of the state." *Id.* In connection with these statutes, the State has enacted a range of laws regulating the State's waters. *See generally* O.C.G.A. § 12-5-20 *et seq.*

93.     West Virginia law provides that "[t]he waters of the State of West Virginia are claimed as valuable public natural resources held by the state for the use and benefit of its citizens." W. Va. Code § 22-26-3. Consistent with this statutory mandate, the State of West Virginia directly owns many waters and lands. The State of West Virginia also has a statutory duty to "manage and protect its waters effectively for present and future use and enjoyment and

for the protection of the environment." *Id.* The State has carried out this statutory duty diligently, by enacting numerous laws to protect the State's waters, both on public and on private lands. *See generally* W. Va. Code §§ 22-11-1 to -15.

94.     Alabama law provides that all "waters of the state, whether found on the surface of the ground or underneath the surface of the ground, are among the basic resources of the State of Alabama" and should be "conserved and managed to enable the people of this state to realize the full beneficial use thereof and to maintain such water resources for use in the future." Ala. Code § 9-10B-2(1), (3). In keeping with this mandate, the State of Alabama has a statutory duty to "provide for the prevention, abatement and control of new or existing water pollution." Ala. Code § 22-22-2.

95.     Kentucky law provides that "water occurring in any stream, lake, ground water, subterranean water or other body of water in the Commonwealth which may be applied to any useful and beneficial purpose is hereby declared to be a natural resource and public water of the Commonwealth and subject to control or regulation for the public welfare." Ky. Rev. Stat. Ann. § 151.120(1). The Commonwealth of Kentucky has the statutory duty to "promote and to regulate the conservation, development, and most beneficial use of the water resources." Ky. Rev. Stat. Ann. § 151.110(1)(a).

96.     Utah law provides that: "All waters in this state, whether above or under the ground, are hereby declared to be the property of the public, subject to all existing rights to the use thereof." Utah Code Ann. § 71-1-1(1). Consistent with this statutory provision, the State of Utah directly owns many waters and lands. The State of Utah also has a statutory duty to productively use this property for the public good, as its "Legislature shall govern the use of public water for beneficial purposes, as limited by constitutional protections for private

property." *Id.* § 71-1-1(3). The State has carried out this statutory duty diligently, by enacting numerous laws to protect the State's waters, both on public and on private lands. *See generally* Utah Code Ann. § 71-1-1 *et seq.*

97. The States' use and management of the waters and lands they own directly will now be subject to greater federal regulation under the Agencies' expanded jurisdiction under the Rule. If a water or moist land falls within the Agencies' jurisdiction, any discharges into that water or sometimes wet land will now require a discharge permit under federal standards. *See* 33 U.S.C. §§ 1311(a), 1342, 1344, 1362(12).

98. Moreover, any Georgia, West Virginia, Alabama, Florida, Kansas, Kentucky, South Carolina, Utah, and Wisconsin laws that applied to previously non-covered waters may now be preempted by the CWA with respect to those waters.

99. The Rule's displacement of state authority over water or sometimes wet land imposes harm upon the States, which can be remedied by an order from this Court. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) ("That Massachusetts does in fact own a great deal of the 'territory alleged to be affected' only reinforces the conclusion that its stake in the outcome of this case is sufficiently concrete to warrant the exercise of federal judicial power."); *Wyoming v. Hoffman*, 423 F. Supp. 450, 453 (D. Wyo. 1976) ("[P]rior to the adoption of the challenged regulations the individual states controlled dredge and fill activities in those waters which now require Section 404 permits but which were not subject to traditional navigational servitudes. The federal government, as a result of the regulations, now assumes this authority. If a final determination finds the regulations are invalid, the State would regain its authority to regulate these activities.").

100.    The States are squarely within the Clean Water Act's zone of interest, given that Congress specifically instructed the Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b).  By promulgating the Rule, the Agencies violated this statutory protection of the States' authority.

## CLAIMS FOR RELIEF

## COUNT ONE:

## Violation of the Clean Water Act And The Administrative Procedure Act

101.    The States incorporate by reference the allegations of the preceding paragraphs.

102.    All rules must be consistent with their authorizing statutes.  5 U.S.C. § 706(2)(A).

103.    The Clean Water Act only authorizes the Agencies to assert jurisdiction over "navigable waters," defined as "waters of the United States."  *See* 33 U.S.C. §§ 1344, 1362(7).

104.    The Rule's definition of Waters of the United States is contrary to the Clean Water Act, and is arbitrary, capricious, and an abuse of the Agencies' discretion.

105.    The Rule exceeds the Agencies' statutory authority by, among other things, asserting that: (1) all waters and sometimes wet lands that fall within the Rule's definition of "tributary" are per se and always within the Agencies' jurisdictional authority; (2) all waters and sometimes wet lands that fall within the Rule's definition of "adjacent waters" are per se and always within the Agencies' jurisdictional authority; (3) intrastate waters and sometimes wet lands can fall within the Agencies' jurisdictional authority based solely upon their relationship with non-navigable interstate waters; and (4) waters and sometimes wet lands that "alone or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to a" primary water or "significantly affect[] the chemical, physical, or biological integrity" of a primary water are within the Agencies' jurisdictional authority.

106.    Each of these aspects of the Rule violate both of the controlling tests announced by the Supreme Court in *Rapanos v. United States*, 547 U.S. 715 (2006).

107.    Moreover, the Rule asserts authority at the outer boundaries of Congress' authority in violation of the CWA. The Supreme Court has explained that courts will not "lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Thus, an agency interpretation of a statute that would cause the statute to extend to the outer limits of Congress' constitutional authority is impermissible, unless Congress clearly expressed such an intention. *Id.*

108.    Consistent with this principle, the Supreme Court has held that Congress did not invoke the outer bounds of its authority when it enacted the CWA. *See SWANCC*, 531 U.S. at 172. Accordingly, any interpretation of the CWA that goes to the outer bounds of that authority is unlawful under the CWA. *Id.*

109.    Because the Rule exceeds the Agencies' statutory authority under the Clean Water Act, the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**COUNT TWO:**

**The Rule Is Arbitrary And Capricious Under The Administrative Procedure Act**

110.    The States incorporate by reference the allegations of the preceding paragraphs.

111.    Rules cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The agency must provide an internally consistent and satisfactory explanation for its actions. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ala. Power Co. v. F.C.C.*, 311 F.3d 1357,

1371 (11th Cir. 2002); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987). It must treat similar cases similarly or "provide a legitimate reason for failing to do so." *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).

112. The Rule is arbitrary and capricious in asserting that: (1) all waters and occasionally wet lands that are within the Agencies' definition of "tributaries" are per se subject to the Agencies' authority; (2) all waters and occasionally wet lands that are within the Agencies' definition of "adjacent waters" are per se subject to the Agencies' authority; (3) intrastate waters and occasionally wet lands are subject to the Agencies' authority based on their connection to interstate waters; and (4) waters and occasionally wet lands that "alone or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to a" primary water or "significantly affect[] the chemical, physical, or biological integrity" of a primary water are within the Agencies' regulatory authority. 40 C.F.R. § 230.3(s)(3)(v).

113. Each of these aspects of the Rule is arbitrary and capricious.

114. Also, the Rule exempts "waters being used for established normal farming, ranching, and silviculture activities" from the "adjacent waters" category of per se "waters of the United States." 40 C.F.R. § 230.3(s)(3)(i). The Agencies explain that the exception is based on the Agencies' belief that jurisdictional determinations for farmland "should be made based on a case-specific basis instead of by rule." 80 Fed. Reg. 37,080 (June 29, 2015). Yet, the Rule does not exempt waters subject to farming activities from the per se "tributaries" category. *See* 40 C.F.R. § 230.3(s)(1)(v). The Agencies provide no explanation for this irrationally more harsh treatment of tributaries located on farm lands.

115.    The Rule is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## COUNT THREE:

### The Rule Renders The Clean Water Act In Excess Of Congress's Powers Under The Commerce Clause

116.    The States incorporate by reference the allegations of the preceding paragraphs.

117.    The Constitution grants to Congress the power "to regulate Commerce with foreign Nations, and among the several states."  U.S. Const. art. I, § 8.

118.    The Rule's assertion of jurisdiction—if it were adopted as the new meaning of the CWA—would exceed Congress' authority under the Commerce Clause because the Rule claims that: (1) all waters and sometimes wet lands that fall within the Rule's definition of "tributary" are per se and always under federal authority; (2) all waters and sometimes wet lands that fall within the Rule's definition of "adjacent waters" are per se and always under federal authority; (3) intrastate waters and sometimes wet lands can fall within the Agencies' jurisdictional authority based solely upon their relationship with non-navigable interstate waters; and (4) waters and sometimes wet lands that "alone or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to a" primary water or "significantly affect[] the chemical, physical, or biological integrity" of a primary water are under federal authority.

119.    The Rule thus renders the Clean Water Act in excess of Congress' authority under the Commerce Clause.  Accordingly, the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## COUNT FOUR:

### Violation Of State Sovereignty Under The Tenth Amendment

120.     The States incorporate by reference the allegations of the preceding paragraphs.

121.     Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. Const. amend. X.

122.     Among the rights and powers reserved to the States under the Tenth Amendment is the authority to regulate intrastate land use and water resources.  *SWANCC*, 531 U.S. at 174 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("regulation of land use [is] a function traditionally performed by local governments")).

123.     In the CWA, Congress expressed its intention to honor this constitutionally mandated primacy of the States over intrastate waters and lands, instructing the Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources. . . ." 33 U.S.C. § 1251(b).

124.     By adopting the Rule, the Agencies violated the States' Tenth Amendment rights, as recognized by the CWA, by asserting jurisdiction over extremely wide swaths of intrastate waters and lands.

125.     Specifically, the Rule's assertion of jurisdiction violates the States' Tenth Amendment rights because the Rule claims that: (1) all waters and sometimes wet lands that fall within the Rule's definition of "tributary" are per se and always under federal, not state, authority; (2) all waters and sometimes wet lands that fall within the Rule's definition of "adjacent waters" are per se and always under federal, not state, authority; (3) intrastate waters and sometimes wet lands can fall under federal, not state, authority based solely upon their

relationship with non-navigable interstate waters; and (4) waters and sometimes wet lands that "alone or in combination with other similarly situated waters, including wetlands, located in the same region, have a significant nexus to a" primary water or "significantly affect[] the chemical, physical, or biological integrity" of a primary water are under federal, not state, authority.

126.    The Rule violates the States' Tenth Amendment rights and is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).

## COUNT FIVE:

### Violation Of The Notice And Comment Requirements Of
### The Administrative Procedure Act

127.    The States incorporate by reference the allegations of the preceding paragraphs.

128.    The APA provides that before an agency conducts a "rulemaking," it must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c).   A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

129.    If a final rule is not the "logical outgrowth" of the proposed rule, the rule is invalid for a failure to provide adequate notice and opportunity to comment.  *Long Island Care At Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007); *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1058 (11th Cir. 2008).

130.    The Rule does not satisfy the logical outgrowth test because the Proposed Rule did not give interested parties sufficient notice with respect to the definition of adjacent waters and the inclusion of waters on a case-by-case basis.

131.    The Proposed Rule defined "adjacent" based on the location of waters within the riparian area or floodplain, or a hydrologic connection with a primary water, impoundment, or tributary.  79 Fed. Reg. 22,269 (Apr. 21, 2014).  In contrast, the Final Rule includes waters: (1) within 100 feet of a primary water, impoundment, or tributary; (2) within the 100-year floodplain and within 1,500 of the ordinary high water mark of a primary water, impoundment, or tributary; or (3) within 1,500 feet of the high tide line.  40 C.F.R. § 230.3(s)(3)(ii).  The Proposed Rule did not give adequate notice to the public of the Rule's inclusion of these waters within the Agencies' jurisdiction.

132.    The Proposed Rule included all waters on a case-by-case basis that are determined to have a significant nexus to a primary water.  79 Fed. Reg. 22,188, 22,269 (Apr. 21, 2014).  In contrast, the Final Rule includes waters within the 100-year floodplain of a primary water; within 4,000 feet of the high tide line or ordinary high water mark of a primary water, impoundment, or tributary; or within water type categories that have a significant nexus to a primary water.  40 C.F.R. § 230.3(s)(1)(viii).  The Final Rule's case-by-case category is also not a logical outgrowth of the Proposed Rule.

133.    The Final Rule also exempts waters on farmland from the per se jurisdictional "adjacent waters" category and not from the per se jurisdictional "tributaries" category.  *See* 40 C.F.R. §§ 230.3(s)(3)(i), (iii).  The Rule does not satisfy the logical outgrowth test because the Proposed Rule gave no indication that the Agencies were considering treating farmland differently as between the "adjacent waters" category and the "tributaries" category.

134.    The Final Rule asserts that the Agencies will use remote sensing information and historical data to identify the ordinary high water mark of a tributary and to infer flow from physical indicators of flow.  80 Fed. Reg. 37,076–77.  The Rule does not satisfy the logical

outgrowth test because the Proposed Rule gave no indication that the Agencies were considering using remote sensing and historical data to identify the ordinary high water mark and to infer that a water has sufficient flow. 79 Fed. Reg. 22,188, 22,202 (Apr. 21, 2014).

135.    The States are therefore entitled to relief under 5 U.S.C. §§ 702, 706(2)(A), (C), (D).

### COUNT SIX:

### Claim For Injunctive Relief

136.    The States incorporate by reference the allegations of the preceding paragraphs.

137.    A plaintiff must satisfy a four-factor test before a court will grant injunctive relief. A plaintiff must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

138.    An injunction is warranted and would serve the public interest because the Rule's expansion of federal regulatory authority over intrastate water and land resources impairs the States' ability to protect their resources in accordance with local needs, imposes significant costs on States, businesses and citizens, and introduces grievous uncertainty into land use and water management.

139.    The States and their citizens will be irreparably injured by the Rule.

140.    The Rule requires the States to expend resources assessing the applicability of the State's WQS to newly covered waters and potentially create new WQS or TMDL. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 130.7.  It also requires the States to administer an expanded

NPDES permitting program and issue additional state certifications for all federal permits. *See* 33 U.S.C. §§ 1341, 1342.

141.    The Rule also harms States and their citizens by transferring regulatory authority over state-owned resources to the federal government.   The Rule harms the States in their capacity as sovereigns with both the right and the obligation to ensure appropriate usage of State resources.   In addition, the statutory and constitutional limitations on the authority of federal agencies protect citizens from the intrusion of the federal government into areas—such as the preservation of local water and land resources—where local knowledge is critical to designing effective rules and policies.  The preservation of local water and land resources is such an area. By displacing local regulatory authority, the Rule impedes, rather than advances, efforts to improve water quality throughout the country.

142.    The Rule imposes numerous harms specifically on citizens.   The Rule imposes costs upon citizens because individuals and businesses must obtain federal permits, through a process that can take years and cost tens or hundreds of thousands of dollars. *See* 33 U.S.C. §§ 1342, 1344 (describing the permitting process).   Moreover, the Rule introduces additional uncertainty into the process by including vague definitions that fail to provide homeowners, business owners, or farmers with a clear answer as to whether a federal permit is required.  Thus, citizens are unlikely to know whether a federal permit is required until EPA exercises its judgment and seeks to impose criminal or civil penalties, including fines up to $37,500 per violation, per day. *See* 33 U.S.C. §§ 1311, 1319, 1365; 74 Fed. Reg. 626, 627 (Jan. 7, 2009).

143.    The States are therefore entitled to injunctive relief under 5 U.S.C. § 702.

## PRAYER FOR RELIEF

1.    Wherefore, the States ask this Court to enter an order and judgment:

A.      Declaring that the Rule is unlawful because it: (1) was issued in violation of the CWA and the APA; (2) is arbitrary and capricious in violation of the APA; (3) renders the CWA in excess of Congress' constitutional authority; (4) interferes with state sovereignty in violation of the Tenth Amendment; and (5) was issued in violation of the notice and comment provisions of the APA.

B.      Vacating and setting aside the Rule in its entirety.

C.      Issuing preliminary and permanent injunctive relief prohibiting the Agencies from using, applying, enforcing, or otherwise proceeding on the basis of the Rule;

D.      Remanding this case to EPA and the Corps, to permit the Agencies to issue a rule that complies with the CWA, the APA, and constitutional principles of federalism and dual sovereignty.

E.      Awarding the States costs and attorneys' fees pursuant to any applicable statute or authority; and

F.      Awarding the States such additional relief, including equitable injunctive relief, as the Court deems appropriate.

Respectfully Submitted,

  **s/ James D. Coots**
Samuel S. Olens
   *Attorney General* (No. 551540)
Britt C. Grant – *Lead Counsel*
   *Solicitor General* (No. 113403)
Timothy A. Butler
   *Deputy Solicitor General* (No. 487967)
James D. Coots
   *Sr. Asst. Attorney General* (No. 351375)
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
   *Counsel for Plaintiff Georgia*


Luther Strange
   *Attorney General*
Andrew Brasher
   *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609
   *Counsel for Plaintiff Alabama*
   *(pro hac vice to be filed)*


Derek Schmidt
   *Attorney General*
Jeffrey A. Chanay
   *Chief Deputy Attorney General*
Burke W. Griggs
   *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
   *Counsel for Plaintiff Kansas*
   *(pro hac vice to be filed)*


Patrick Morrisey
   *Attorney General*
Elbert Lin
   *Solicitor General*
Misha Tseytlin
   *General Counsel*
Erica N. Peterson
   *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
   *Counsel for Plaintiff West Virginia*
   *(pro hac vice to be filed)*


Pamela Jo Bondi
   *Attorney General*
Jonathan A. Glogau
   *Attorney for the State of Florida*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Jon.glogau@myfloridalegal.com
(850) 414-3300
   *Counsel for Plaintiff Florida*
   *(pro hac vice to be filed)*


Sean D. Reyes
   *Attorney General*
Parker Douglas
   *Chief of Staff & Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
pdouglas@utah.gov
(801) 538-9600
   *Counsel for Plaintiff Utah*
   *(pro hac vice to be filed)*

Jack Conway
  *Attorney General*
Sean J. Riley
  *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
sean.riley@ag.ky.gov
(502) 696-5650
  *Counsel for Plaintiff Kentucky*
  *(pro hac vice to be filed)*


Alan Wilson
  *Attorney General*
Robert D. Cook
  *Solicitor General*
James Emory Smith, Jr.
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, South Carolina 29201
bcook@scag.gov
(803) 734-3680
  *Counsel for Plaintiff South Carolina*
  *(pro hac vice to be filed)*

Brad D. Schimel
  *Attorney General*
Karla Z. Keckhaver
  *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 267-8901
  *Counsel for Plaintiff Wisconsin*
  *(pro hac vice to be filed)*

June 30, 2015