**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

STATE OF GEORGIA, *et al*.,

        *Plaintiffs*,

v.                                              Civil Action No. 2:15-cv-00079

REGINA A. MCCARTHY, *et al.*,

        *Defendants*.

## MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs move for a preliminary injunction order, enjoining the defendants from enforcing the Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015). A memorandum in support of the motion for a preliminary injunction is attached.

**s/ Britt C. Grant**

Samuel S. Olens
  *Attorney General* (No. 551540)
Britt C. Grant - Lead Counsel
  *Solicitor General* (No. 113403)
Timothy A. Butler
  *Deputy Solicitor General* (No. 487967)
James D. Coots
  *Sr. Asst. Attorney General* (No. 351375)
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
  *Counsel for Plaintiff Georgia*

Luther Strange
  *Attorney General*
Andrew Brasher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130

Patrick Morrisey
  *Attorney General*
Elbert Lin
  *Solicitor General*
Misha Tseytlin
  *General Counsel*
Erica N. Peterson
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
  *Counsel for Plaintiff West Virginia*
(admitted *pro hac vice*)

Gregory F. Zoeller
  *Attorney General*
Thomas M. Fisher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL

abrasher@ago.state.al.us
(334) 353-2609
    *Counsel for Plaintiff Alabama*
(admitted *pro hac vice*)


Pamela Jo Bondi
    *Attorney General*
Jonathan A. Glogau
    *Attorney for the State of Florida*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Phone: (850) 414-3681
Fax: (850) 410-2672
allen.winsor@myfloridalegal.com
    *Counsel for Plaintiff Florida*
(admitted *pro hac vice*)


Jack Conway
    *Attorney General*
Sean J. Riley
    *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, KY 40601
Sean.riley@ag.ky.gov
    *Counsel for Plaintiff Kentucky*
(admitted *pro hac vice*)


Sam M. Hayes
    *General Counsel*
Craig A. Bromby
    *Deputy General Counsel*
Andrew J. Norton
    *Deputy General Counsel*
NORTH CAROLINA DEPARTMENT OF
    ENVIRONMENT AND NATURAL RESOURCES
215 W. Jones Street
Raleigh, North Carolina 27603
sam.hayes@ncdenr.gov
craig.bromby@ncdenr.gov
andrew.norton@ncdenr.gov
(919) 707-8600

302 West Washington Street
Indiana Government Center - South, Fifth Floor
Indianapolis, Indiana  46204
(317) 232-6255
Tom.Fisher@atg.in.gov
    *Counsel for Plaintiff Indiana*
(admitted *pro hac vice*)


Derek Schmidt
    *Attorney General*
Jeffrey A. Chanay
    *Chief Deputy Attorney General*
Burke W. Griggs
    *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
    *Counsel for Plaintiff Kansas*
(admitted *pro hac vice*)


Sean D. Reyes
    *Attorney General*
Parker Douglas
    *Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
    *Counsel for Plaintiff Utah*
(admitted *pro hac vice*)


Brad D. Schimel
    *Attorney General*
Karla Z. Keckhaver
    *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 267-8901

*Counsel for Plaintiff North Carolina Department Of Environment and Natural Resources* (*pro hac vice* to be filed)

*Counsel for Plaintiff Wisconsin* (admitted *pro hac vice*)

Alan Wilson
  *Attorney General*
Robert D. Cook
  *Solicitor General*
James Emory Smith, Jr.
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, SC 29201
Phone: (803) 734-3680
Fax: (803) 734-3677
Bcook@scag.gov
  *Counsel for Plaintiff South Carolina*
(admitted *pro hac vice*)

July 21, 2015

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

STATE OF GEORGIA, *et al*.,

        *Plaintiffs*,

v.                                             Civil Action No. 2:15-cv-00079

REGINA A. MCCARTHY, *et al.*

        *Defendants*.

## MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

The Environmental Protection Agency ("EPA") and the Army Corps of Engineers ("Corps") (collectively "the Agencies"), have unlawfully seized broad authority over intrastate waters and lands, under the guise of enforcing the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* The rule at issue in this case—80 Fed. Reg. 37,054 (June 29, 2015) (the "WOTUS Rule" or the "Rule")—seeks to enlarge the meaning of the CWA's jurisdictional definition of "waters of the United States" to cover broad new categories of intrastate waters and sometimes wet lands. Like the Agencies' expansive positions in the past two Supreme Court cases on this question, this attempt to usurp the States' constitutional and statutory authority should be rejected as well.

Through the present motion, eleven sovereign States seek a preliminary injunction. The States have a substantial likelihood of success on the merits in their challenge to this Rule, both as a matter of the CWA and the Administrative Procedure Act ("APA"). Moreover, the Agencies' overreach imposes immediate and irreparable harm upon States, the balance of harms factor weighs in favor of Plaintiff States, and a preliminary injunction is in the public interest.

With regard to the CWA, the Rule expands the Agencies' authority far beyond what the Supreme Court has held is permissible, in violation of States' statutory and constitutional rights. As construed in this Circuit, the Supreme Court's decision in *Rapanos v. United States*, 547 U.S.

715 (2006), limits the Agencies' authority over intrastate waters to those with a "significant nexus" to navigable, interstate waters. But the Rule makes creeks, ponds, ephemeral streams, and channels that connect to interstate waters once every 100 years all *per se* subject to federal jurisdiction, without any showing of a significant nexus. And not satisfied with this capacious coverage, the Agencies also assert authority to determine, on a case-by-case basis, that an intrastate water is under federal jurisdiction based on any single chemical, physical, *or* biological connection to interstate waters. This approach not only violates *Rapanos*, but would have upheld the Migratory Bird Rule that the Supreme Court invalidated in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*").

As to the APA, the Rule creates arbitrary distinctions not even arguably presaged in the proposed Rule and thus never subjected to notice-and-comment rulemaking. Much of the final Rule determines the Agencies' jurisdiction based on arbitrary distances—100 feet, 1,500 feet, 4,000 feet—from various places that water may flow. But in the proposed rule, the Agencies gave no indication that they were considering adopting these distances as the heart of the Rule. This failure deprived commenters of the ability to inform the Agencies of the flaws with these particular distances, leading to a procedurally and substantively flawed rule. The Agencies repeated the same error at least two more times, adopting irrational approaches both to farmland and to historical tributaries, neither of which were subject to notice-and-comment rulemaking.

Absent preliminary injunctive relief, the Rule will impose substantial and irreparable harm upon States. By the Agencies' own estimates, the Rule will result in an increase in determinations of federal jurisdiction by 2.84 to 4.65 percent annually. 80 Fed. Reg. at 37,101. Even if one were to accept, *arguendo*, this drastic underestimation of the Rule's expansion, this would unquestionably impose irreparable harm upon States. An increase in the waters covered

under the CWA imposes additional, substantial obligations upon States under the CWA's Water Quality Standards ("WQS"), Section 404, and National Pollutant Discharge Elimination System ("NPDES") programs, requiring States to spend money they can never get back.  And beyond these financial burdens, the Rule—from the day it becomes effective in less than six weeks—will invade States' sovereign authority to regulate their intrastate waters and lands.

Finally, injunctive relief will serve the public interest.  The Rule's overbroad requirements will force homeowners, farmers, and small businesses to spend significant time seeking expensive federal permits; wasted and irretrievable efforts if the Rule is ultimately vacated.  A preliminary injunction will prevent these harms, while permitting this Court to adjudicate the Rule's legality.

## STATEMENT OF FACTS

### I.    The Clean Water Act And The "Waters Of The United States"

In enacting the CWA, Congress specifically recognized the States' "traditional and primary power over land and water use" in our constitutional system.  *SWANCC*, 531 U.S. at 174.  The CWA expressly states that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources."  33 U.S.C. § 1251(b).  Congress left to the States authority over intrastate waters, while giving to the Agencies regulatory authority over only "navigable waters," defined as "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

The definition of "waters of the United States" serves as the trigger for numerous provisions in the CWA, including obligations imposed upon the States.  A party that discharges into "waters of the United States" must obtain a permit under the NPDES program if the discharge is a pollutant, (*id.* § 1342), or under Section 404 for discharge that is dredge and fill,

(*id.* § 1344).  The process of obtaining a permit can take years and cost hundreds of thousands of dollars.  *See Rapanos*, 547 U.S. at 721.  Discharging into "waters of the United States" without a lawful permit can subject the discharging party to fines of up to $37,500 per violation, per day, as well as criminal penalties.  33 U.S.C. §§ 1311, 1319, 1365; 74 Fed. Reg. 626, 627-28 (Jan. 7, 2009).  States are directly involved in administering the NPDES and Section 404 permitting programs, as well as the CWA's WQS program.  33 U.S.C. §§ 1313, 1341, 1342; 40 C.F.R. § 130.7.  The scope of all three programs—and thus the volume of the States' responsibilities—is tied directly to the definition of "waters of the United States."  As explained in more detail below (*see infra* pp. 20-24), the WOTUS Rule's expansion of the "waters of the United States" will automatically impose substantial additional costs on States under these programs.

The Supreme Court has twice rejected the Agencies' overbroad interpretation of "waters of the United States."  In *SWANCC*, the Court rebuffed the Agencies' assertion of jurisdiction over water on the ground that it is used by migratory birds.  531 U.S. at 164.  In *Rapanos*, the Court rejected the Agencies' attempt to assert jurisdiction over all wetlands adjacent to interstate, navigable waters.  547 U.S. at 724 (plurality opinion).  The *SWANCC* and *Rapanos* decisions are discussed in more detail below.  *See infra* pp. 8-9.

## II.     EPA And The Corps Propose A Rule Redefining "Waters Of The United States."

On April 21, 2014, the Agencies published a proposed rule redefining "waters of the United States."  79 Fed. Reg. 22,188 (Apr. 21, 2014) ("Proposed Rule").  This proposal first classified all primary waters as including "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce," as well as "[a]ll interstate waters, including interstate wetlands" and "the territorial seas."  *Id.* at 22,268-69.  The Proposed Rule then declared that broad categories of additional waters are "waters of the United States."

Three aspects of the Proposed Rule's coverage of non-primary waters are important for the present motion. *First*, all "tributaries" of primary waters were *per se* "waters of the United States," with "tributaries" defined as features "physically characterized by the presence of bed and banks and ordinary high water mark ['OHWM'] . . . which contribute[] flow, either directly or through another water, to a" primary water. *Id.* at 22,269. *Second*, all waters "adjacent" to primary waters were *per se* "waters of the United States." *Id.* "Adjacent" included all waters and sometimes wet lands lying in a so-called "riparian area" or "flood plain." *Id. Third*, the Proposed Rule established a catchall category of waters potentially subject to the Agencies' authority on a case-by-case basis. These waters were to be considered "waters of the United States" if, "alone or in combination with other similarly situated waters, including wetlands, located in the same region, [they] have a significant nexus to a" primary water, meaning they "significantly affect[] the chemical, physical, or biological integrity" of a primary water. *Id.*

Numerous commenters, including States, submitted detailed comments objecting to all three of these categories, as exceeding the Agencies' CWA authority.[1]

## III.   The Agencies Publish Their Final WOTUS Rule, While Adopting Numerous Provisions Nowhere Presaged In The Proposed Rule.

On June 29, 2015, the Agencies published their final WOTUS Rule. The Rule retains the Proposed Rule's definition of primary waters, 33 C.F.R. § 328.3(a)(1)-(3), but includes several unexpected changes to non-primary waters. The Rule's effective date is August 28, 2015.

*First*, while the Rule retained "tributaries" of primary waters as *per se* waters of the United States, it changed what would be encompassed within the term. 33 C.F.R. § 328.3(a)(5).

---

[1] *See, e.g.*, Letter from the Attorneys General of Georgia, West Virginia, Nebraska, Oklahoma, Alabama, Alaska, Kansas, Louisiana, North Dakota, South Carolina, and South Dakota and the Governors Of Iowa, Kansas, Mississippi, Nebraska, North Carolina, and South Carolina, to McCarthy, Adm'r, EPA, & McHugh, Sec'y, Corps (Oct. 8, 2014).

Now, a tributary is "a water that contributes flow, either directly or through another water" to a primary water and "is characterized by the presence of the *physical indicators* of a bed and bank and an [OHWM]."  *Id.* § 328.3(c)(3) (emphasis added).  In the WOTUS Rule, the Agencies declared for the first time that "remote sensing sources" or "mapping information" will be used to detect these "physical indicators."  80 Fed. Reg. at 37,076-78.  In addition, the Agencies will use "desktop tools" for "hydrologic estimation of a discharge sufficient to create an [OHWM], such as a regional regression analysis or hydrologic modeling," to identify the presence of a bed, banks, and OHWM, or even the *historical* presence of a bed, banks, and OHWM where such physical characteristics are "absent in the field."  *Id.* at 37,077.  Accordingly, the Final Rule sweeps in not only isolated creeks, ephemeral streams, ditches, and usually dry channels, but also land features that have been dry for years and do not visibly include the very physical indicators central to the Agencies' definition of tributaries.  So if a typically dry land feature ever contributes even the smallest trickle into a navigable water—either directly or indirectly—that feature could be deemed a *per se* "water of the United States."

*Second*, the Rule declares that all "adjacent" waters are *per se* jurisdictional, while providing an entirely different definition of that concept than in the Proposed Rule.  The Rule defines "adjacent waters" as waters and wetlands "bordering, contiguous or neighboring" primary waters, even if they are separated from the primary water by man-made or natural barriers.  33 C.F.R. § 328.3(c)(1).  "Neighboring waters" include: (1) all waters any part of which is located within 100 feet of the OHWM of a primary water, impoundment, or tributary; (2) all waters any part of which is within the 100-year floodplain, and not more than 1,500 feet from the OHWM, of a primary water, impoundment, or tributary; and (3) all waters any part of which is within 1,500 feet of the high tide line of a primary water.  *Id.* § 328.3(c)(2).  Numerous

wetlands, ponds, and lakes, are now *per se* jurisdictional because they are partially within the floodplain or geographic vicinity of a primary water, or even a tributary of a primary water. The reference to 100-year floodplains, in particular, sweeps in small ponds, drainages, and wetlands that are connected to navigable waters, if ever, only after once-in-a-century rainstorms. Notably, the Agencies provided that "waters being used for established normal farming, ranching, and silviculture activities" are exempt from *per se* coverage as "adjacent" waters. *Id.* § 328.3(c)(1).

*Third*, the Rule drastically changes the waters subject to the Agencies' authority on a case-by-case basis. *Id.* § 328.3(a)(7)-(8). As relevant here, the Rule grants to the Agencies authority over the following waters, if the Agencies determine that they have a "significant nexus" to a primary water: (1) all waters any part of which are within the 100-year floodplain of a primary water; and (2) all waters, any part of which are, within 4,000 feet of the high tide line or OHWM of a primary water, impoundment, or tributary. *Id.* § 328.3(a)(8). A water has a "significant nexus" to a primary water according to the Rule if that water, "either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, *or* biological integrity of a [primary water]" based on "any single function or combination of functions performed by the water." *Id.* § 328.3(c)(5) (emphasis added).

## IV.    The Present Litigation

The States filed their complaint in this case on June 30, 2015, the day after the Rule was published in the Federal Register, *see* Dkt. 1, and now seek a preliminary injunction.

## ARGUMENT

The States are entitled to a preliminary injunction because "(1) [there is] a substantial likelihood of success on the merits of the underlying case, (2) the movant[s] will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant[s] in the

absence of an injunction would exceed the harm suffered by the opposing party if the injunction

is issued, and (4) an injunction would not disserve the public interest." *Odebrecht Constr., Inc.*

*v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1273-74 (11th Cir. 2013) (quotation omitted).[2]

## I.      The States Are Likely To Succeed On The Merits.

### A.      The WOTUS Rule Exceeds The Agencies' Authority Under The CWA.

The Supreme Court's decisions in *SWANCC* and *Rapanos* provide the touchstone for

evaluating the legality of the WOTUS Rule under the CWA.

The Court in *SWANCC* held invalid the Corps' rule asserting jurisdiction over waters

"[w]hich are or would be used as habitat" by migratory birds.   531 U.S. at 164.   The rule

exceeded the Agencies' authority, the Court held, because it covered "nonnavigable, isolated,

intrastate waters" such as seasonal ponds.   *Id.* at 171.   Rejecting an argument by the Corps, the

Court supported its determination with the fact that the Corps' interpretation would "alter[] the

federal-state framework by permitting federal encroachment upon a traditional state power"—

specifically, the States' "traditional and primary power over land and water use." *Id.* at 173-74.

The Court concluded that Congress had not, in the CWA, "express[ed] a desire to readjust the

federal-state balance in this manner" or to invoke the "outer limits" of its power.   *Id.* at 173-74.

In *Rapanos*, the Court rejected the Corps' assertion of CWA authority over intrastate

wetlands that are not significantly connected to navigable, interstate waters.   The Court's

majority consisted of a four-Justice plurality opinion and Justice Kennedy's opinion concurring

---

[2] The Agencies have suggested that a challenge to the WOTUS Rule may fall within the jurisdiction of the courts of appeals under 33 U.S.C. § 1369(b)(1).  *See* 80 Fed. Reg. at 37,104.  This is incorrect as a matter of law and this Court has jurisdiction to review the Rule under 28 U.S.C. § 1331.  *See Friends of the Everglades v. EPA*, 699 F.3d 1280, 1285-89 (11th Cir. 2012).  But out of an abundance of caution, the States yesterday filed a protective petition for review in the Eleventh Circuit, while asking that court to dismiss that petition.  *See Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve*, 551 F.2d 1270, 1280 (D.C. Cir. 1997).

in the judgment—the latter of which the Eleventh Circuit has held to be controlling.  *See United States v. Robison*, 505 F.3d. 1208, 1222 (11th Cir. 2007).  Justice Kennedy explained that the Agencies only have authority over waters that are navigable in fact and waters with a "significant nexus" to navigable waters.  547 U.S. at 779.  A water has a "significant nexus" if it "significantly affect[s] the chemical, physical, *and* biological integrity of" a navigable water.  *Id.* at 780 (emphasis added).  Under Justice Kennedy's approach, the Agencies are not permitted to assert jurisdiction over all "wetlands (however remote)" or "a continuously flowing stream (however small)."  *Id.* at 776-77; *see also id.* at 769 ("merest trickle, [even] if continuous" is insufficient).  Justice Kennedy also reasoned that an OHWM is an insufficient basis for jurisdiction over "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it."  *Id.* at 781.[3]

This Court's decision in *Jones Creek Investors, LLC v. Columbia County*, No. 111-174, 2015 WL 1541409 (S.D. Ga. Mar. 31, 2015), demonstrates the proper application of Justice Kennedy's test.  In that case, the plaintiff alleged that an intrastate pond and its tributaries were "waters of the United States" because of their impact on an interstate river.  *Id.* at *23-28.  Applying Justice Kennedy's test, this Court held that the plaintiff had not established CWA jurisdiction because it had not presented evidence showing a *significant* impact on the interstate river's "chemical, physical, *and* biological integrity."  *Id.* at *16 & *24-28 (emphasis added).

The WOTUS Rule violates the CWA, as interpreted by *SWANCC* and *Rapanos*:

1. *Per se* Coverage Of Tributaries.  The Rule's conclusion that all "tributaries" are *per se* jurisdictional violates the CWA.  Under the Rule, a tributary is "characterized by the presence of

---

[3] The States note that the Rule also violates the plurality's test because it covers numerous waters that are not "relatively permanent" and lack a "continuous surface connection" to interstate, navigable waters.  *Id.* at 739-42.

physical indicators of a bed and banks and an [OHWM]" and "contributes flow"—no matter how minimal—"either directly or through another water . . . , to a" primary water.  33 C.F.R. § 328.3(c)(3).  These indicators apparently need not be visible and will be detected by "remote sensing sources" or "mapping information," which sweeps in merely historical features, with no-longer-existing beds, banks, and OHWMs.  80 Fed. Reg. at 37,076-78.  The Agencies contend that all waters covered by this definition have a "significant nexus" to a primary water.

This is directly contrary to Justice Kennedy's *Rapanos* test.  Justice Kennedy reasoned that while having an OHWM "presumably provides a rough measure of the volume and regularity of flow," that physical characteristic alone is an insufficient basis for asserting the significant nexus necessary for CWA jurisdiction over "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it."  *Rapanos*, 547 U.S. at 781.  But the WOTUS Rule sweeps in *all* features with the physical indicators of a bed, bank, and OHWM, including the same remote and minor "drains, ditches, and streams" that Justice Kennedy said fall outside of the CWA's jurisdiction.  To borrow from Justice Kennedy's opinion, the Rule impermissibly covers numerous "continuously flowing stream[s] (however small)" and waters sending only the "merest trickle[s]" into navigable waters, so long as these trickles can be traced to any upstream feature that has the physical indicators of bed, banks, and OHWM.  *Id.* at 769 & 776-77.[4]  Indeed, the WOTUS Rule goes even further and appears to cover features with a bed, bank, and OHWM that "are absent in the field" but detectable by desktop tools.  80 Fed. Reg. at 37,077.  To the extent the Agencies are relying on their blanket

---

[4] S*ee also Jones Creek v. Columbia Cnty.*, 1:11-cv-00174, Pl.'s Mot. Recons., Dkt. 498, at *2 (arguing that "[p]ursuant to the [WOTUS] Rule, Jones Creek, Willow Lake, and their tributaries are all jurisdictional waters pursuant to the category for tributaries").

determination of a significant nexus, their understanding of that term is also inconsistent with Justice Kennedy's opinion, as discussed further below.

2. *Per se* Coverage Of All Adjacent Waters.   The Rule's conclusion that all "adjacent waters" are *per se* "waters of the United States" similarly violates the CWA.  The Rule sweeps in: all waters within 100 feet of a primary water, impoundment, or tributary; all waters within a 100-year floodplain and no more than 1,500 feet from an OHWM of a primary water, impoundment, or tributary; and all waters within 1,500 feet of the high tide line of a primary water.  33 C.F.R. § 328.3(c)(2).  This is unlawful in at least two important respects.

*First*, because the Rule's *per se* coverage of tributaries is unlawful, any part of a definition that relies on a relationship to tributaries must also be unlawful.  As explained above, the WOTUS Rule's *per se* coverage of all tributaries violates Justice Kennedy's test because it sweeps in waters and land features that send only the "merest trickle[s]" into navigable waters. 547 U.S. at 769.  It necessarily follows that waters with no more than a geographical relation to such "mere trickle" tributaries also lack a "significant nexus" to interstate, navigable waters.

*Second*, while the Agencies claim that all waters covered by the "adjacent waters" definition have a significant nexus to primary waters, that is simply not the case.  To take just the most obvious example, the Rule includes as *per se* waters those waters that are both within a 100-year floodplain and within 1,500 feet of a primary water.  33 C.F.R. § 328.3(c)(2).  Put another way, the Agencies claim automatic authority to regulate any small pond, drainage, or wetland because it might have a relationship with a primary water during a once-in-a-century rainfall.  That does not comport with Justice Kennedy's approach in *Rapanos*, which requires a greater degree of "assurance" that a water "significantly affect[s]" the "chemical, physical, and biological integrity" of a primary water.  547 U.S. at 780-81.  For example, applying that test

11

faithfully, this Court correctly concluded that an intrastate pond that contributed directly to an interstate water nevertheless lacked a "significant nexus" to that river, given the plaintiff's failure to show a *significant* impact on the river's "chemical, physical, and biological integrity." *Jones Creek*, 2015 WL 1541409, at *24 (quotation omitted).

Indeed, even the Agencies' own scientific experts cannot support the distance-based approach adopted in the final Rule. As the Agencies were forced to admit, EPA's Science Advisory Board concluded that "'the available science supports defining adjacency or determination of adjacency on the basis of *functional relationships*,' rather than 'solely on the basis of *geographical proximity of distance* to jurisdictional waters.'" 80 Fed. Reg. at 37,064. Yet, the Agencies not only based their adjacency category "solely" upon "geographical proximity," but went a step further and extended *per se* jurisdiction to numerous waters whose geographical proximity to interstate waters occurs, on average, once every hundred years.

3. Case-By-Case Coverage Based Upon A Speculative Nexus. The Rule's approach to case-by-case waters also violates the CWA. Under the Rule, the Agencies can assert jurisdiction over any waters within the 100-year floodplain of a primary water and also any waters within 4,000 feet of the high tide line or OHWM of a primary water, impoundment, or tributary. 33 C.F.R. § 328.3(a)(8). By EPA's own admission, these categories cover "the vast majority of the nation's water features." EPA, Economic Analysis of the EPA-Army Clean Water Rule 11 (May 2015) ("Economic Analysis"). This case-by-case analysis is conducted using what the Agencies claim is a "significant nexus" analysis. A water is deemed to be jurisdictional if the Agencies determine that the water, "either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, *or* biological integrity of a [primary water]," assessed based on the "functions performed by the water." Such "functions" include

"sediment trapping," "nutrient recycling," "pollutant trapping, transformation, filtering, and transport," "retention and attenuation of flood waters," "runoff storage," "contribution of flow," "export of organic matter," "export of food resources," and "provision of life cycle dependent aquatic habitat" for "species located in" primary waters. *Id.*

The Rule's approach to "significant nexus" determinations is inconsistent with Justice Kennedy's *Rapanos* opinion. Justice Kennedy required a careful, rigorous analysis, which would permit federal jurisdiction over an intrastate water only where that water "significantly affect[s]" the "chemical, physical, *and* biological integrity" of a primary water. 547 U.S. at 780 (emphasis added). In sharp contrast, the WOTUS Rule permits a truncated analysis. It requires only the finding of impact on "chemical, physical, *or* biological integrity," and further permits any such impact to be found based solely upon a single function such as "contribution of flow" and "export of food resources." 33 C.F.R. § 328.3(c)(5) (emphasis added).

The flawed nature of the WOTUS Rule's case-by-case approach is highlighted by its inconsistency with *SWANCC*. At issue in *SWANCC* was the Migratory Bird Rule, which the Corps justified on the ground that waters that host migratory birds have a significant impact on those birds and their ecosystems. "The Corps [had] found that approximately 121 bird species had been observed at the site [at issue in *SWANNC*], including several known to depend upon aquatic environments for a significant portion of their life requirements." *SWANCC*, 531 U.S. at 164. Notwithstanding the crucial importance of the *SWANCC* site to numerous bird species and their ecosystems, the Supreme Court held that this site—and others like it—did not have a "significant nexus" to interstate navigable waters, under the CWA. *Id.* at 167-74. In direct violation of this holding, the WOTUS Rule asserts that, standing alone, a significant "biological

effect"—including an effect on "life cycle dependent aquatic habitat[s]"—would place a water within the CWA's jurisdiction.  33 C.F.R. § 328.3(c)(5).

### B.    The WOTUS Rule Violates The Constitution.

The WOTUS Rule not only exceeds the Agencies' authority by sweeping into federal jurisdiction numerous isolated, intrastate waters and sometimes moist lands, but it violates the Constitution as well.  The Supreme Court in *SWANCC* rejected the Agencies' assertion that certain isolated waters were "waters of the United States" because, *inter alia*, this would "alter[] the federal-state framework by permitting federal encroachment upon" the States' "traditional and primary power over land and water use."  531 U.S. at 173-74.  The WOTUS Rule would cover not only the same waters the Court in *SWANCC* held were the States' sovereign lands, but also many other isolated, intrastate waters.  The Rule thus violates the States' sovereign rights under the 10th Amendment to manage and protect their intrastate waters, as they see fit.  *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (holding that taking control of a State's waters is a violation of the State's "sovereign interest").  And for much the same reasons, the WOTUS Rule would exceed Congress's authority under the Commerce Clause.[5]

### C.    The Agencies Adopted The WOTUS Rule In Violation Of The APA.

As relevant to this case, the APA establishes two analytically distinct, but critically related, requirements for agency rulemaking: one procedural, one substantive.

*First*, as a matter of procedure, an agency's final rule must be a "logical outgrowth" of the proposed rule, to ensure that the public was given an adequate opportunity to comment.  *See Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1058 (11th Cir. 2008); *see also* 5 U.S.C. § 553(b)(3).  The question is whether reasonable parties "should have anticipated that [the] requirement"

---

[5] The States will make these constitutional arguments in a more complete manner at the summary judgment stage.

embodied in the final rule might be adopted.  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983).  For example, in *Small Refiner*, EPA promulgated a rule restricting emissions with different standards for small refiners, including a "past ownership requirement" that EPA had not discussed in the proposal.  *Id*. at 548.  EPA "argue[d] that it gave general notice that it might make unspecified changes in the definition of small refinery."  *Id*. at 549.  The D.C. Circuit vacated the rule, explaining that the agency must inform the regulated parties of "the range of alternatives being considered with reasonable specificity."  *Id*.  Similarly, in *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1078 (D.C. Cir. 2009), the agency's proposal permitted parties in railroad cases to recommend comparing data from the most recent year.  The final rule, in contrast, allowed parties to select data from the past four years.  *Id.*  The D.C. Circuit vacated the rule, explaining that the agency "nowhere even hinted" that it was considering changing the number of years from which the parties could select. *Id.* at 1082; *accord Nat. Mining Ass'n v. MSHA*, 116 F.3d 520, 531 (D.C Cir. 1997).

*Second*, as a matter of substance, a final rule must be "set side" if that rule is "arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).  Under this requirement, the agency must show a rational connection between the facts it relies upon and its final rule, such that the rule is the "product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 & 52 (1983); *Ala. Power Co. v. FCC*, 311 F.3d 1357, 1371 (11th Cir. 2002).  As part of this reasoned decision-making, the agency must consider viable alternatives and explain why it rejected those alternatives.  *State Farm*, 463 U.S. at 42-43, 48-51; *see, e.g.*, *Delaware Dep't of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17-18 (D.C. Cir. 2015) ("[A]t the very least this alternative way of achieving EPA's objective . . . should have been addressed and adequate reasons given for its abandonment" (quotations omitted)).  The

prohibition against arbitrary and capricious rulemaking also mandates that the agency "treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Indep. Petroleum Assoc. of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).   In addition, if an agency's actions mark a change from prior practice, the agency must supply a "reasoned analysis" for the change. *Airmark v. FAA*, 758 F.2d 685, 692 (D.C. Cir. 1985).

Several central aspects of the WOTUS Rule are paradigmatic examples of regulatory failure.   The Agencies abruptly changed course from the Proposed Rule, without providing notice of the potential changes to the public.   This deprived the Agencies of the public's input on the new aspects of the Rule, which led to an arbitrary and capricious final WOTUS Rule.

<u>1. Defining Adjacent And Case-By-Case Waters Based Upon Arbitrary Distances</u>.

a. Perhaps the most glaring difference between the Proposed Rule and the final WOTUS Rule is the Agencies' unexpected imposition of arbitrary distances as a key feature of the final Rule.   The Agencies proposed to define "adjacent waters" as, *inter alia*, those within a riparian area or floodplain of an interstate water, or an impoundment or tributary of an interstate water. 79 Fed. Reg. at 22,269.   With regard to the case-by-case analysis, the Proposed Rule merely stated that the Agencies would assert federal jurisdiction over any water that, in the Agencies' judgment, had a "significant nexus" to a primary water.  79 Fed. Reg. at 22,269.

In the final Rule, the Agencies adopted an entirely different course, deleted some concepts, altered others, and then imposed arbitrary distance limitations.   With regard to adjacency, the final WOTUS Rule provides that the Agencies will assert *per se* jurisdiction over any water located within: (1) 100 feet of a primary water, impoundment, or tributary; (2) the 100-year floodplain and 1,500 feet of a primary water, impoundment, or tributary; (3) 1,500 feet of the high tide line of a primary water.   33 C.F.R. § 328.3(c)(2).   And as to the case-by-case

analysis, the final WOTUS Rule limits the Agencies' "significant nexus" inquiry to waters within the 100-year floodplain of a primary water, as well as waters within 4,000 feet of a primary water, impoundment, or tributary.  33 C.F.R. § 328.3(a)(8).

The Proposed Rule presaged none of these drastic changes, and thus none is the "logical outgrowth" of that Proposed Rule.  With regard to adjacency, the only indication the Agencies gave that they were considering a distance-based approach was the request, among a list of various questions, for comment in "support for or against placing geographic limits on what waters outside the floodplain or riparian zone are jurisdictional," and "distance limitations based on ratios compared to the bank-to-bank width of the water to which the water is adjacent."  79 Fed. Reg. at 22,208-09.  The Agencies "nowhere even hinted" (*CSX*, 584 F.3d at 1082) that they were considering imposing *per se* federal jurisdiction on waters based solely upon being: 100 feet from a primary water, impoundment, or tributary; within the 100-year floodplain and 1,500 feet of a primary water, impoundment, or tributary; or 1,500 feet of the high tide line of a primary water.  As to the case-by-case analysis, the Agencies provided absolutely no suggestion that they were considering a distance-based limitation at all; indeed, they included three and a half pages of *numerous other* potential changes they were considering.  79 Fed. Reg. at 22,214-17.  Accordingly, the Agencies' actions here are at best like those in *Small Refiner*, where EPA simply gave "general notice that it might make unspecified changes."  705 F.2d at 549.  As in *Small Refiner*, the Agencies certainly failed to inform the regulated parties of "the range of alternatives being considered with *reasonable specificity*."  *Id.* (emphasis added).

In many ways, the Agencies' failure here is far more significant than those at issue in *CSX* and *Small Refiner*.  The procedural defects in those cases imposed unexpected obligations only on discrete industries.  Here, the Agencies' failure to give sufficient notice will have broad

consequences for States, farmers, and small businesses, as the meaning of "waters of the United States" defines the scope of the CWA's requirements. *See supra* pp. 3-4. It was thus especially critical for the Agencies to give notice not only that they were considering a distance-based approach to defining CWA jurisdiction, but also the specific distances or, at minimum, range of distances that were being considered. The difference between 2,000 feet and 4,000 feet as applied to case-by-case waters, for example, could mean numerous additional acres that could be swept into the CWA's jurisdiction. The APA's notice-and-comment requirement mandates that the public be provided a fair opportunity to comment upon decisions of that magnitude.

b. Given the Agencies' failure to seek public input on the final WOTUS Rule's distance approach, it is unsurprising that the numbers adopted are entirely arbitrary, justified by *ipse dixit*. The Agencies' only explanation of their distance-based approach is that the various distances are "reasonable and practical boundar[ies]," consistent with unspecified "experience" and "the implementation value of drawing clear lines," and supported by a study of scientific literature finalized after the comment period. 80 Fed. Reg. at 37,085-91; *see also* EPA, Connectivity of Streams & Wetlands to Downstream Waters (January 2015). But the Agencies' experts specifically *rejected* the Agencies' distance-based approach. *See supra* p. 12. And nothing in either the Agencies' reasoning or the scientific literature justifies choosing the specific distances—1,500 feet, 4,000 feet, etc.—over any alternatives. Nor do the Agencies attempt to provide reasoned support for selecting the 100-year floodplain as opposed to, for example, a 50-year floodplain, as to either adjacency or case-by-case waters. The Agencies' reliance on bald assertions, as well as the failure to "address[] and [provide] adequate reasons" for refusing to adopt alternative distance limitations, are hallmarks of unreasonable decision-making. *Delaware*, 785 F.3d at 17-18 (quotations omitted); *see also State Farm*, 463 U.S. at 42-43.

<u>2. Treating Tributaries And Adjacent Waters on Farmland Differently.</u>

a. The Agencies also failed to provide notice of their decision to exempt waters on farmland only from the "adjacent waters" category.  In the final Rule, the Agencies provided that "waters being used for established normal farming, ranching, and silviculture activities" were exempt from *per se* jurisdiction under the Rule's adjacency category, but not the tributary category.  33 C.F.R. § 328.3(c)(1).  This came completely out of the blue.  The Agencies "nowhere even hinted" that they were considering treating farmland differently than other land, much less treating farmland differently as between the adjacency and tributary categories.  *See CSX*, 584 F.3d at 1082.  Had the Agencies made such a suggestion, the States would have strenuously argued that all waters on farmland should also be exempt from *per se* inclusion.

b. The Agencies' decision as to the farmland exemption also violates the APA's proscription against arbitrary and capricious rulemaking.  The Agencies' justification for this exemption is their recognition of "the vital role of farmers in providing the nation with food, fiber, and fuel."  80 Fed. Reg. at 37,080.  While the States agree entirely with this rationale, it would apply just as readily to exempting waters on farmland from the *per se* tributaries category.  Yet, the Agencies not only failed to exempt waters on farmland from this category, they gave no justification for failing to do so.  This violates the APA, both for failure to engage in "reasoned decisionmaking," *State Farm*, 463 U.S. at 52, and for refusal to "treat similar cases in a similar manner unless [the agency] can provide a legitimate reason," *Babbitt*, 92 F.3d at 1258.

<u>3. Changes In The Definition Of "Tributaries."</u>

a. Finally, the Agencies failed to give the public sufficient notice of their decision to include within their definition of tributaries waters and lands that do not actually possess a bed, bank, and OHWM, as observable on the ground.  In the proposal, the Agencies defined

"tributary" as a water with "a bed and banks and [OHWM]," (79 Fed. Reg. at 22,269), and they sought comment only on possible ways that the commenters would want to "clarify" that definition, in unspecified ways (79 Fed. Reg. at 22,203).  At the time of the proposal, the Agencies' published policy instructed Corps personnel to combine remote sensing imagery with "on the ground" field studies to identify an OHWM, and not to rely on remote sensing exclusively.[6]  But in the Final Rule, the Agencies unexpectedly changed course, requiring only the "presence of *physical indicators* of a bed and banks and [OHWM]" (33 C.F.R. § 328.3(c)(3) (emphasis added)), as determined by remote sensing technology, without any requirement for on-the-ground confirmation (80 Fed. Reg. at 37,076-78).  The Agencies "nowhere even hinted" that they were considering abandoning the Proposed Rule and prior practice, to permit detection of tributaries—including historical "tributaries" that no longer carry water—using remote sensing.

b. This unexpected change is also arbitrary and capricious, in violation of the APA.  The Agencies nowhere even acknowledged that they were changing course, let alone provided "reasoned analysis" for the change.  *See Airmark*, 758 F.2d at 691-92.

## II.   The States Will Suffer Irreparable Harm Absent A Preliminary Injunction.

A plaintiff must establish that it "will suffer irreparable harm in the absence of an injunction."  *Odebrecht*, 715 F.3d at 1273.  Here, the Agencies estimate that, in their judgment, the Rule will increase CWA jurisdiction by 2.84 to 4.65 percent (80 Fed. Reg. at 37,101) beyond pre-Rule practice.[7]  While the States believe this is a drastic undercounting of the Rule's

---

[6] Corps, Research and Development Center, A Guide to Ordinary High Water Mark (OHWM) Delineation for Non-Perennial Streams in the Western Mountains, Valleys, and Coast Region of the United States 39 (Aug. 2014), http://acwc.sdp.sirsi.net/client/search/asset/1036027.

[7] EPA & Corps, Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008), http://water.epa.gov/lawsregs/guidance/wetlands/upload/2008_12_3_wetlands_CWA_Jurisdiction_Following_Rapanos120208.pdf.

expansion (Stiles Decl. ¶6; Preston Decl. ¶7), the Agencies' conclusion is sufficient to establish the States' irreparable harm. By automatic operation from the Rule, the conceded increase in jurisdiction will cause States at least two independently sufficient categories of irreparable harm.

A. Harm To Sovereign Rights In Administering Local Waters And Lands. An action depriving a sovereign State of control over its own waters and lands violates the State's "sovereign interests," and thus constitutes irreparable harm if a State is not first given "a full and fair opportunity to be heard on the merits." *Kansas*, 249 F.3d at 1227; *accord Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) ("irreparable harm to state sovereignty and state management of land that will befall Alaska if state land begins to be taken into trust").

The Rule imposes just this sort of irreparable harm upon the States. The States have the constitutional right to maintain "traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 174. Consistent with this sovereign authority, the States manage and protect the lands and waters within their borders (*see* Ala. Code § 22-2-2; Ga. Code Ann. § 12-5-21(a); Ky. Rev. Stat. Ann. § 151.110(1)(a); Utah Code Ann. § 73-1-1(3); W. Va. Code § 22-26-3), while maintaining direct ownership over other intrastate land and waters (*see* Ky. Rev. Stat. Ann. § 151.120(1); Utah Code Ann. § 73-1-1(1); W. Va. Code § 22-26-3). By illegally seizing control over a substantial swath of intrastate waters and lands, the Rule infringes upon the States' "sovereign interest" to protect and use their territories, imposing irreparable harm. *Kansas*, 249 F.3d at 1227; *see also Wyoming v. Hoffman*, 423 F. Supp. 450, 453 (D. Wyo. 1976)

B. Unrecoverable Monetary Harm Resulting From Expanded CWA Programs. Monetary harms imposed by unlawful federal rules are irreparable. "In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable." *Odebrecht*, 715 F.3d at 1289

(collecting cases); *accord America's Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1354-65 (N.D. Ga. 2012), *aff'd* 742 F.3d 1319 (11th Cir. 2014). This principle is fully applicable when a party suffers economic harms flowing from unlawful rules issued by a federal agency. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (APA does not waive agencies' sovereign immunity for damages actions). Thus, the Eleventh Circuit in *Odebrecht* approvingly cited *Iowa Utilities Board v. FCC*, 109 F.3d 418 (8th Cir. 1996), which held that the plaintiffs established irreparable harm from allegedly unlawful FCC rules because they "would not be able to bring a lawsuit to recover their undue economic losses if the FCC's rules are eventually overturned." *Id.* at 426; *Odebrecht*, 715 F.3d at 1289; *see also Texas v. United States*, 787 F.3d 733, 768 (5th Cir.2015); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011).

The Rule requires States to expend resources immediately as to three CWA programs.

*First*, the WOTUS Rule requires States to expend resources as part of the CWA's WQS program. Under this program, States must regularly update WQS that establish the water quality goals for all "waters of the United States." 33 U.S.C. § 1313. The Rule's expansion of CWA jurisdiction will require States to identify newly jurisdictional waters within their borders (Pigott Decl. ¶8) to determine whether these waters meet an already existing WQS and what designated uses apply to those waters (Stiles Decl. ¶10; Goodmann Decl. ¶5). This is a "resource-intensive and time-consuming" process, which will cost the state of Kansas alone "significantly greater resources" than $300,000. Stiles Decl. ¶¶8, 10. In addition, if a water fails to meet the goals established in the WQS, the State must create a Total Maximum Daily Load ("TMDL"), indicating the amount of a pollutant that may be discharged into the water while seeking to satisfy the WQS. 40 C.F.R. § 130.7; *see also* Stiles Decl. ¶11. For example, because the Rule adds federal jurisdiction over ephemeral streams, which are not subject to WQS in Kansas, that

State will need to expend immediate resources establishing additional TMDLs.  *See* Stiles Decl. ¶¶6, 11.  Finally, States will need to expend additional resources to inventory and monitor the overall water quality of newly jurisdictional waters.  *See* Stiles Decl. ¶12.

*Second*, the Rule requires States to expend resources by forcing them to issue additional state certifications under the Section 404 program.  To discharge dredge and fill into "waters of the United States," a party must obtain a permit from the Corps under Section 404.  33 U.S.C. § 1344.  The permit application process also requires the applicant to obtain a certification from the State in which the discharge will occur, under Section 401, attesting that the discharge will comply with the applicable state WQS.  33 U.S.C. § 1341(a)(1).  Because the Rule expands the number of "waters of the United States," States will be required to expend additional resources under the Section 404 program to process and issue additional Section 401 certifications.  *See* Stiles Decl. ¶14; Pigott Decl. ¶9; Preston Decl. ¶8; Capp Decl. ¶5.  Indeed, EPA has estimated that the Rule will impose upon the States additional obligations of between $798,000 and $1.3 million, per year, under the Section 404 program alone.  Economic Analysis, at 19.

*Third*, the Rule requires "the State[s] to create, process, and issue additional NPDES permits."  Stiles Decl. ¶13.  To discharge pollutants into a "waters of the United States," a party must obtain an NDPES permit.  33 U.S.C. § 1342.  Every plaintiff State administers the NPDES permit program within its borders.[8]  Given that the Rule expands the number of "waters of the United States," more individuals and business will apply for NPDES permits, thereby requiring additional state expenditures to process those permits.  Stiles Decl. ¶13.  EPA has projected that

---

[8]    33 U.S.C. § 1342(b); U.S. Envtl. Prot. Agency, Specific State Program Status, http://water.epa.gov/polwaste/npdes/basics/NPDES-State-Program-Status.cfm.

the Rule will impose upon the States additional obligations of between $527,000 and $770,000, per year, under the NPDES program alone.  *See* Economic Analysis, at 25-29.

These substantial, unrecoverable expenditures are irreparable.  *See Odebrecht*, 715 F.3d at 1273.  Notably, because these are *public* resources, including public staff time, the irreparable harms mean States will be hampered in fulfilling their sovereign functions.  Stiles Decl. ¶15.[9]

## III. The Balance Of The Hardships And The Public Interest Weigh In Favor Of Granting The Preliminary Injunction.

The public would benefit greatly from the issuance of the preliminary injunction.  The Rule substantially expands one of the nation's most far-reaching environmental statutes.  If the Rule remains in effect during this litigation, farmers, homeowners, and small businesses will need to devote time and expense to obtaining federal permits, in order to comply with a rule that is likely to be invalidated.  Given that these permits can take two or more years to fully process and cost permit applicants hundreds of thousands of dollars (*Rapanos*, 547 U.S. at 721), these individuals and small businesses will have wasted massive resources, and delayed valuable projects, to seek permits that will become legally irrelevant if the Rule is invalidated.

The Agencies and public would not suffer any harms sufficient to justify withholding injunctive relief.  "[T]he public has no interest in the enforcement of what is very likely" an illegal rule (*Odebrecht*, 715 F.3d at 1273), especially when enforcement of that rule will require the expenditure of both federal and state "time, money, and effort" (*Fla. Businessmen for Free Enter. v. City of Hollywood,* 648 F.2d 956, 959 (5th Cir. 1981)).  The Agencies have been operating under their pre-Rule regime for more than six years (*see supra* p. 20), and can continue

---

[9] While the three categories of additional expenditures may not apply fully to *every* State—for example, some States administer state law NPDES-like programs for discharges of pollutants into isolated, intrastate waters—all three apply to at least some of the plaintiff States, as demonstrated by the declarations submitted with this motion.

to do so while this Court adjudicates the lawfulness of the Rule.  And, of course, all local waters and lands will remain safely under the protection of the sovereign States.  *See supra* p. 21.

## CONCLUSION

The motion for a preliminary injunction should be granted.

Respectfully submitted on 21st day of July, 2015,

**s/ Britt C. Grant**
Samuel S. Olens
  *Attorney General* (No. 551540)
Britt C. Grant - Lead Counsel
  *Solicitor General* (No. 113403)
Timothy A. Butler
  *Deputy Solicitor General* (No. 487967)
James D. Coots
  *Sr. Asst. Attorney General* (No. 351375)
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
Counsel for Plaintiff Georgia

Luther Strange
  *Attorney General*
Andrew Brasher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609
  *Counsel for Plaintiff Alabama*

Pamela Jo Bondi
  *Attorney General*
Jonathan A. Glogau
  *Attorney for the State of Florida*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Phone: (850) 414-3681

Patrick Morrisey
  *Attorney General*
Elbert Lin
  *Solicitor General*
Misha Tseytlin
  *General Counsel*
Erica N. Peterson
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
  *Counsel for Plaintiff West Virginia*

Gregory F. Zoeller
  *Attorney General*
Thomas M. Fisher
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
Indiana Government Center - South, Fifth Floor
Indianapolis, Indiana  46204
(317) 232-6255
Tom.Fisher@atg.in.gov
  *Counsel for Plaintiff Indiana*

Derek Schmidt
  *Attorney General*
Jeffrey A. Chanay
  *Chief Deputy Attorney General*
Burke W. Griggs
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL

25

Fax: (850) 410-2672
allen.winsor@myfloridalegal.com
  *Counsel for Plaintiff Florida*

Jack Conway
  *Attorney General*
Sean J. Riley
  *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, KY 40601
Sean.riley@ag.ky.gov
  *Counsel for Plaintiff Kentucky*

Alan Wilson
  *Attorney General*
Robert D. Cook
  *Solicitor General*
James Emory Smith, Jr.
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, SC 29201
Phone: (803) 734-3680
Fax: (803) 734-3677
Bcook@scag.gov
  *Counsel for Plaintiff South Carolina*

Sean D. Reyes
  *Attorney General*
Parker Douglas
  *Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
  *Counsel for Plaintiff Utah*

120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
  *Counsel for Plaintiff Kansas*

Brad D. Schimel
  *Attorney General*
Karla Z. Keckhaver
  *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 267-8901
  *Counsel for Plaintiff Wisconsin*

Sam M. Hayes
  *General Counsel*
Craig A. Bromby
  *Deputy General Counsel*
Andrew J. Norton
  *Deputy General Counsel*
NORTH CAROLINA DEPARTMENT OF
  ENVIRONMENT AND NATURAL RESOURCES
215 W. Jones Street
Raleigh, North Carolina 27603
sam.hayes@ncdenr.gov
craig.bromby@ncdenr.gov
andrew.norton@ncdenr.gov
(919) 707-8600
  *Counsel for Plaintiff North Carolina Department
  Of Environment and Natural Resources*
  (*pro hac vice* to be filed)

## CERTIFICATE OF SERVICE

I certify that on this 21st day of July, 2015, a copy of the foregoing Memorandum In

Support Of Motion For A Preliminary Injunction was served electronically through the Court's

CM/ECF system on all registered counsel.

 **s/ Britt C. Grant**

26