**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

STATE OF GEORGIA, *et al*.,

          *Plaintiffs*,

v.                                                                    Civil Action No. 2:15-cv-00079

REGINA A. MCCARTHY, *et al.*

          *Defendants*.

## REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Nothing in the opposition filed by the Environmental Protection Agency ("EPA") and the Army Corps of Engineers ("Corps") (collectively "the Agencies") rebuts the States' showing of the need for a preliminary injunction.  In their preliminary injunction motion, the States demonstrated that the WOTUS Rule will begin imposing substantial, irreparable harm upon the States and their citizens as soon as it is effective, three weeks from today.  Regarding the likelihood of success on the merits, the Rule violates the Clean Water Act ("CWA") under the Supreme Court's decisions in *Rapanos v. United States*, 547 U.S. 715 (2006), and *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), is not a "logical outgrowth" of the Proposed Rule, and is "arbitrary" in numerous respects.

In an extraordinary set of documents released last week by the U.S. House of Representatives Committee on Oversight and Government Reform, the Corps—one of the two Agencies that issued the Rule—forcefully articulated many of these same objections, and urged EPA in the strongest possible terms not to release the final WOTUS Rule.  In those documents, written after EPA had submitted the final Rule to the Office of Management and Budget, the Corps explained that the Rule "depart[s] significantly from the version provided for public

comment," "contradicts long-standing and well-established legal principles . . . especially the decisive *Rapanos* Supreme Court decision" (Ex. 1 at 1), and is "a textbook example of rulemaking that cannot withstand judicial review" (Ex. 2 at 5).  "It will be difficult, if not impossible," the Corps stated, "to persuade the federal courts that the implicit, effective determination that millions of acres of truly isolated waters . . . have a 'significant nexus' with navigable or interstate waters [under] *Rapanos* and *SWANCC*."  Ex. 2 at 10.

It is thus unsurprising that the Agencies' defense of the Rule before this Court is so anemic.  As the documents reveal, the Agencies have no credible answer for the States' arguments that the WOTUS Rule's central features are not a logical outgrowth of the Proposed Rule.  The Agencies do not address the States' notice-and-comment case law, cite no cases analogous to their actions, and completely ignore several critical arguments the States raised. This is sufficient, standing alone, to satisfy the States' obligation to show likelihood of success on the merits.  Similarly deficient is the Agencies' response to the States' arguments that several central features of the Rule are "arbitrary," in violation of the Administrative Procedure Act ("APA").  Regarding *Rapanos* and *SWANCC*, the Agencies fail to explain how the Rule could possibly be consistent with critical passages in those decisions.

Having no genuine argument to defend the WOTUS Rule on the merits, the Agencies make a play for delay, resting their opposition on arguments that the States suffer no irreparable harm due to the Rule, and that this Court lacks jurisdiction.  Both arguments are baseless under controlling case law.  Regarding irreparable harm, the Agencies make a scatter-shot series of assertions, including the incredible claims that federal regulation of intrastate waters and lands does not invade a State's sovereignty, that the Agencies' own economic analysis is "misleading," and that the States can and should abandon their own statutorily protected duties under the CWA.

And as to this Court's jurisdiction, the Agencies' position is contrary to the controlling decision in *Friends of the Everglades v. EPA*, 699 F.3d 1280 (11th Cir. 2012).

In sum, this Court should grant a preliminary injunction. The WOTUS Rule is unlawful and will not survive judicial review. And denying the States' motion for a preliminary injunction will waste public resources, as States and their citizens struggle to comply with a rule that will very likely be vacated at the end of years of litigation.

## ARGUMENT

**I.      The States Have Satisfied The Elements For Obtaining A Preliminary Injunction**

**A.      The Agencies Failed To Rebut The States' Showing Of Likelihood of Success On The Merits**

**1.      Central Aspects Of The Final WOTUS Rule Violate The APA's Notice-And-Comment Procedures**

The final WOTUS Rule is clearly not a "logical outgrowth" of the Proposed Rule, violating the APA's notice-and-comment requirement. *See Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1058-59 (11th Cir. 2008); *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009); *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). *First*, the Proposed Rule defined *per se* adjacent waters and case-by-case waters without any reference to numerical, geographical limitations. Doc. 32 at 16-17. Yet in the final Rule, the Agencies unexpectedly changed course, defining *per se* adjacent and case-by-case waters based upon five different geographical limitations. 33 C.F.R. § 328.3(a)(8), (c)(2). *Second*, the final Rule excludes waters on farmlands from the *per se* adjacency category, but not from the *per se* tributaries category. 33 C.F.R. § 328.3(c)(1). The possibility of differential treatment of waters on farmland as between the Rule's *per se* categories was never mentioned in the proposal. Doc. 32 at 19. *Third*, the final Rule permitted the Agencies to identify an ordinary

high water mark ("OHWM"), for purposes of the *per se* tributaries category, exclusively based upon "*physical indicators* of a bed and banks and an [OHWM]," (33 C.F.R. § 328.3(c)(3) (emphasis added)), as determined by remote sensing technology (80 Fed. Reg. at 37,076-78), a method not mentioned in the Proposed Rule.  Doc. 32 at 19-20.

Developments since the States filed their motion for preliminary injunction confirm that the final WOTUS Rule violates the APA's notice-and-comment requirement.  In the Corps memoranda published last week by a Committee of the House of Representatives, the Corps explained that "[t]he proposed rule did not propose any limitation for CWA jurisdiction comparable to the 4000 feet cut-off" for case-by-case waters. Ex. 2 at 4.  "Consequently," the Corps noted, "the public did not have the opportunity to evaluate that idea or to comment on it during the public comment period and thus the addition of this limitation likely violates the [APA]."  *Id.*  The Corps also added that internally EPA initially proposed adopting a 5,000-foot boundary but then arbitrarily changed course to 4,000 feet just three days later. Ex. 2 at 2.  The Corps explained that in its judgment, the 4,000-foot boundary "has no basis in science or law, and thus is 'arbitrary.'"  Ex. 2 at 2.  With regard to the *per se* adjacency category, the Corps advocated for a 300-foot boundary, not the boundaries in the final Rule.  Ex. 2 at 5.  And the Corps noted the Rule's treatment of farmlands in the *per se* categories was "indefensible" and "a textbook example of rulemaking that cannot withstand judicial review."  *Id.*

This internal exchange between the Agencies starkly demonstrates the inherent legal defects arising from the Agencies' decision to hide from the public that they were considering fundamentally altering the proposed Rule.  Behind closed doors, the Agencies vigorously debated whether a 4,000-foot boundary, a 5,000-foot boundary, or no boundary was appropriate for case-by-case waters, whether 300 feet, or some other boundary was appropriate for adjacent

4

waters, and whether any farmland exemption was appropriate. Yet the States and the public—*those that will have to comply with the Rule*—were provided no notice of these possible changes, and consequently lost their right to take part in the legally required conversation regarding the Rule. This flagrant and obvious violation of the APA is a "fundamental flaw," which "almost always requires vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (citation omitted).

The Agencies' attempts to defend the unexpected changes from the Proposed Rule to the final WOTUS Rule are entirely meritless.

*First*, with regard to the final Rule's unexpected adoption of arbitrary distances as the heart of the *per se* adjacent waters category, the Agencies merely note that they sought general comments on establishing unspecified "specific geographic limits" and "distance limitations." Doc. 50 at 15. This fails the requirement that the Agencies provide regulated parties with a "range of alternatives being considered." *Small Refiner*, 705 F.2d at 549. The Agencies do not even argue that their actions here are consistent with the D.C. Circuit's decision in *Small Refiner*. Indeed, the Agencies do not cite a single case, from any jurisdiction, supporting their claim that merely informing the public that the Agencies were considering adopting "distance limitations" permitted them to select *any* distance limitations whatsoever. And the Agencies offer no answer to the States' point that the failure here was far more consequential than in *Small Refiner* because of the impact of the Rule on States, farmers, landowners, and businesses. Doc. 32 at 18.[1]

---

[1] The Agencies note that "some commenters suggested that neighboring waters include all waters in the floodplain, while others suggested an area relative to the tributary size, or based on flood zone maps." Doc. 50 at 15 n.4. What is missing from this claim is any commenter discussing the *absolute distance limitations* that the Agencies adopted. Given the extremely high volume of interest in the Rule, the Agencies' failure to find any better support reinforces the States' argument that adequate notice was not given. In any event, "that some commenters actually submitted comments addressing the final rule is of little significance," given that "the agency

5

*Second*, the Agencies' position as to its geographical limitations on case-by-case waters is, if anything, even less defensible.  The Agencies point to their request for any suggestions that could "lead to greater clarity, certainty, and predictability."  Doc. 50 at 16.  The Agencies' argument boils down to the claim that they "gave general notice that [they] might make unspecified changes in the definition" of case-by-case waters.  *Small Refiner*, 705 F.2d at 549.  Or, as the Corps told EPA, "[t]he proposed rule did not propose any limitation for CWA jurisdiction comparable to the 4000 feet cut-off [for case-by-case waters]. . . .  Consequently, the public did not have the opportunity to evaluate that idea or to comment on it during the public comment period and thus the addition of this limitation likely violates the [APA]."  Ex. 2 at 4.

*Third*, regarding the States' argument that the Agencies failed to inform the public that they were considering exempting waters from farmland, the Agencies try to change the subject.  They assert that everyone knew farmland could be regulated in the *per se* tributaries category because it was previously so, but that is beside the point.  Doc. 50 at 16.  It is undisputed that the Agencies failed to give notice that they were considering exempting farmland waters from regulation, much less notice that they intended to treat farmland differently as between tributaries and adjacent waters.  This violation vacatur of the Rule.  *See Allina*, 746 F.3d at 1110.

*Fourth and finally*, the Agencies attempt to rebut the States' argument that the Agencies never informed the public that they were considering allowing the detection of tributaries—including "historical" tributaries—based upon remote desktop tools, by claiming that the

_____

must itself provide notice of [its] proposal."  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012) (quotations omitted); *accord Small Refiner*, 705 F.2d at 549 (agency "cannot bootstrap notice from a comment").  While comments may be "evidence" of notice, under some circumstances, "they may not provide the only basis upon which an agency claims to have satisfied the notice requirement."  *Miami-Dade*, 529 F.3d at 1059.

tributary definition is "almost identical to what was proposed." Doc. 50 at 16. But this "almost" concession admits that there was a change upon which the public had no opportunity to comment. *Compare* Proposed Rule, 79 Fed. Reg. at 22,269 ("tributary means a water physically characterized by the presence of a bed and banks and [OHWM]"), *with* Final WOTUS Rule, 80 Fed. Reg. at 37,105 ("tributary . . . is characterized by the *presence of physical indicators* of a bed and banks and an [OHWM]" (emphasis added)), *and* Final WOTUS Rule, 80 Fed. Reg. at 37,077 ("desktop tools are critical in circumstances where physical characteristics of bed and banks and another indicator of [OHWM] are absent in the field"). The States have explained that this change is extremely significant because it will sweep in land features that have been dry for years and whose indicators of flow are mere historical artifacts, unidentifiable by regulated parties. Doc. 32 at 6. The Agencies concede that they never informed the public that this fundamental change was being considered, in violation of the APA.

### 2. The WOTUS Rule Is Arbitrary And Capricious In Several Respects

In their motion for a preliminary injunction, the States argued that the WOTUS Rule violates the APA's prohibition on arbitrary and capricious rulemaking in at least three critical respects. The Agencies offer no meaningful answer to any of these arguments.

*First*, the States argued that the physical distance limitations that are the heart of the *per se* adjacency and case-by-case waters categories are "arbitrary" (5 U.S.C. § 706(2)(A)) and supported only by the Agencies' unfounded assertions. Doc. 32 at 16-18. The Agencies' own scientific experts explained that "'the available science supports defining adjacency or determination of adjacency on the basis of *functional relationships*,' rather than 'solely on the basis of *geographical proximity of distance* to jurisdictional waters.'" 80 Fed. Reg. at 37,064 (emphases added). The Agencies do not and cannot dispute that their own experts rejected their

approach.  Instead, they point to some record support for just *one* of the five distance-based approaches in the final Rule—the 100-foot boundary from primary waters, tributaries and impoundments—without showing that the record supports the other four distance-approaches. Doc. 50 at 16.  The Agencies also rely upon unspecified "experience and expertise" (*id.*) but such *ipse dixit* is insufficient under the APA because it rests on nothing more than appeals to authority.  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 48 (1983) ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . .").  In any event, as demonstrated by the Corps' recently released memorandum, the Corps considered several of the distance-based approaches contrary to its "experience" (Ex. 2 at 2, 5), and having "no basis in science or law, and thus . . . 'arbitrary'" (Ex. 2 at 2, 5, 9).

*Second*, the States argued that the Agencies' decision to treat waters on farmland differently as between the *per se* adjacency and *per se* tributaries categories, without providing explanation for this differential treatment, violated the APA because the Agencies failed to "treat similar cases in a similar manner" without providing a "legitimate reason."  *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996).  The Agencies provide no answer to the States' argument, implicitly demonstrating that they have no defense under the APA.

*Third*, the States explained that the Agencies provided no justification for changing from their prior practice of identifying an OHWM only after "on the ground" field studies, to permitting in the final WOTUS Rule the identification of OHWM using remote sensing technology alone.  Doc. 32 at 19-20 (citing 80 Fed. Reg. at 37,076-78).  The Agencies ignore this argument, failing to explain their departure from the prior practice of mandatory "on the ground"

verification of bed, bank, and OHWM.[2]  Again, the Agencies concede by non-response that this aspect of the final WOTUS Rule violates the APA.

### 3.    The WOTUS Rule Is Incompatible With *Rapanos* and *SWANCC*

In their motion for a preliminary injunction, the States demonstrated that the three central features of the final WOTUS Rule are inconsistent with the controlling decisions in *Rapanos* and *SWANCC*.  The Agencies' opposition only demonstrates that the WOTUS Rule exceeds the Agencies' authority under the CWA.

a. The States explained that the Rule's *per se* coverage of all tributaries unlawfully sweeps in even usually dry land features, so long as those features have the "physical indicators" of a bed, bank, and OHWM, and send *any* amount of flowing into primary waters.  Doc. 32 at 10.  This is entirely inconsistent with Justice Kennedy's controlling decision in *Rapanos*, which rejected CWA jurisdiction for "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it," including those that send merely the "merest trickle[s]" into navigable waters.  547 U.S. at 769, 776-77, 781.

In response, the Agencies argue that the requirement of a bed, bank, and OHWM ensures that all tributaries in the *per se* category will carry more than "minor water volumes" into the navigable, interstate waters.  Doc. 50 at 9-10.  This is simply false.  The Rule includes *no* requirement that the ultimate flow into the navigable water be anything more than a mere trickle.  To the contrary, the Rule specifically provides that a feature is *per se* jurisdictional if it sends *any* amount of flow, including "through another water," into a traditional water.   33 C.F.R. § 328.3(c)(3).  Put another way, the final Rule repeats the same error that Justice Kennedy

---

[2] Eng'r Research & Dev. Ctr., U.S. Army Corps of Eng'rs, A Guide to Ordinary High Water Mark (OHWM) Delineation for Non-Perennial Streams in the Western Mountains, Valleys, and Coast Region of the United States 39 (Aug. 2014), http://acwc.sdp.sirsi.net/client/search/asset/10 36027.

identified as fatal because the Rule includes no provisions to assure that the flow from the alleged tributary into the traditional water is more than a mere trickle. Rather than "interpret *Rapanos*" or "[a]ddress[] Justice Kennedy's concern[s]," (Doc. 50 at 8, 9) the Rule conflicts with that decision and ignores those concerns.

The Agencies also have no answer to the States' argument that the Rule's tributary category sweeps in many features for which it would be impossible to demonstrate a "significant nexus" under a dutiful application of Justice Kennedy's approach. *See, e.g.*, *Jones Creek*, 2015 WL 1541409. Or, as the Corps properly explained to EPA behind closed doors, the *per se* tributaries category is so broad that it "asserts jurisdiction" even "over many thousands of miles of dry washes and arroyos in the desert Southwest, even though those ephemeral dry washes, arroyos, etc. carry water infrequently and sometimes in small quantities." Ex. 2 at 4.

b.     The States argued that the *per se* adjacency category impermissibly covers small ponds, drainages, and wetlands, which have a relationship with primary waters—or their tributaries—only once a century. Doc 32 at 11. Even the Agencies' scientific experts, the States noted, concluded that mere "geographical proximity of distance" is an insufficient basis for concluding that a water has a significant impact on primary waters. *Id.* at 12.

The Agencies' only response is the assertion that the WOTUS Rule is based upon what is "*likely* in the *majority* of cases." Doc. 50 at 11 (emphases in original). This is unresponsive. The Agencies offer no argument or record citation to refute the States' points that: (1) the *per se* adjacency category is, in fact, based solely upon "geographical proximity of distance"; (2) the Agencies' experts rejected such a distance-based approach as scientifically unsound; and (3) the inclusion of 100-year floodplains means the Agencies have concluded that once-in-a-century rains are sufficient for a *per se* "significant nexus" determination. Indeed, the Agencies do not

cite anything in the record to support their conclusion that waters within a 100-year floodplain of a primary water or its tributaries, and within a geographical distance of the OHWM, have a "strong" influence on primary waters.  Doc. 50 at 11 (quoting 80 Fed. Reg. at 37,064).

c.   Finally, the States explained that the Rule's case-by-case category violates both *Rapanos* and *SWANCC* because it sweeps in waters having only a "chemical, physical, *or* biological" impact on primary waters.  Doc. 32 at 12-14 (emphasis added).  This is inconsistent with Justice Kennedy's approach, which requires a water to "significantly affect" the "chemical, physical, *and* biological integrity" of a primary water.  *Rapanos*, 547 U.S. at 780.  And the Rule would almost certainly result in jurisdiction over the site at issue in *SWANCC*, which housed "approximately 121 bird species," including several species that "depend upon aquatic environments for a significant portion of their life requirements."  *SWANCC*, 531 U.S. at 164. More generally, as the Corps explained to EPA, "[i]t will be difficult, if not impossible, to persuade the federal courts that the implicit, effective determination that millions of acres of truly isolated waters (which have no shallow subsurface or confined surface connection to the tributary system of the navigable or interstate waters) do in fact have a 'significant nexus' with navigable or interstate waters [under] *Rapanos* and *SWANCC*."  Ex. 2 at 10.

The Agencies' response to these arguments only underscores the Rule's illegality.  The Agencies first argue that they have broad authority to regulate a water that affects any of the "three forms of integrity, i.e., chemical, physical, and biological," of traditional waters.  Doc. 50 at 12.  But that is simply not what Justice Kennedy said is permissible.  *See Rapanos*, 547 U.S. at 780 (requiring a water to "significantly affect" the "chemical, physical, *and* biological integrity" of a primary water (emphasis added)); *accord Jones Creek Investors, LLC v. Columbia County, Georgia*, No. 11-cv-174, 2015 WL 1541409 *24-28 (S.D. Ga. Mar. 31, 2015) (failure to show

significant impact on the interstate river's "chemical, physical, and biological integrity").  The Agencies' claim is, in effect, that while Justice Kennedy said as much, he did not mean it.

The Agencies' response to the States' argument that the case-by-case category violates the rationale and holding in *SWANCC* is also legally insufficient.  The Agencies point to the Rule's preamble, which notes that "[n]on-aquatic species or species such as non-resident migratory birds . . . are not evidence of biological connectivity for purposes of this rule."  Doc. 50 at 11-13 (quoting 80 Fed. Reg. at 37,094).  Yet, this disclaimer is largely meaningless in light of the Rule's numerous, overbroad provisions as to what constitutes "chemical, physical, *or* biological" impact.  To take just one example, the Rule asserts jurisdiction based upon "dispersal" (80 Fed. Reg. at 37,063, 37,072, 37,094) a concept that involves "[p]lants and invertebrates" that "hitchhike" on waterfowl (including, presumably, migratory birds) (EPA, Connectivity of Streams & Wetlands to Downstream Waters 5-5 (2015)).  As the technical documents appended to the final Rule make clear, under the Agencies' approach, "[p]lants and invertebrates can also travel by becoming attached to or consumed and excreted by waterfowl," establishing jurisdiction under the Rule.  Technical Support Document for the Clean Water Rule: Definition of Waters of the United States 334 (2015).  Surely, the 121 migratory bird species that used the *SWANCC* site picked up many of these hitchhikers along the way.  Accordingly, the Agencies' assertion that their preamble shows fidelity to *SWANCC* because it specifically excludes reliance upon migratory birds is, frankly, disingenuous.

### 4.    The WOTUS Rule Violates The States' Constitutional Rights

The Agencies' refusal to accept *SWANCC* is also illustrated by their response to the argument that the Rule violates the States' constitutional rights.  In *SWANCC*, the Court rejected the Agencies' assertion of authority over a site that almost certainly would be covered by the

final WOTUS Rule, because it would intrude into the States' "traditional and primary power over land and water use." *SWANCC*, 531 U.S. at 173-74.  The final WOTUS Rule raises this same category of constitutional concerns, but to a *much* greater degree than the Migratory Bird Rule at issue in *SWANCC*, because the WOTUS Rule covers—in the Corps' own words— "millions of acres of truly isolated" intrastate waters.  Ex. 2 at 10.

The Agencies argue that asserting federal jurisdiction over these millions of acres of isolated, intrastate waters and lands could not possibly violate the States' constitutional rights because the Federal Government "regulat[ing] in an area traditionally subject to state regulation" *never* raises constitutional concerns under *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), and *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981).  Doc. 50 at 13.  But the Agencies' position cannot be squared with *SWANCC*.  Relying on the landmark decisions in *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000), the *SWANCC* Court made clear that overbroad assertions of federal authority over local waters and lands can and do raise significant constitutional questions. 531 U.S. at 173.  It was to avoid those constitutional questions that the *SWANCC* Court rejected the Corps' interpretation of the CWA.  *Id.* at 173-74.

**B.    The Agencies Have No Meaningful Answer To The States' Showing That They Will Suffer Irreparable Harm, Absent Immediate Injunctive Relief.**

In their opposition to the States' motion for a preliminary injunction, the Agencies do not and cannot dispute that the WOTUS Rule expands CWA jurisdiction.  After all, the Agencies concluded in the Preamble that the Rule increases CWA jurisdiction by 2.84 to 4.65 percent beyond pre-Rule practice (80 Fed. Reg. at 37,101), an estimate the States believe is a significant understatement (Stiles Decl. ¶ 6; Preston Decl. ¶ 6).

13

In light of the uncontested fact that the WOTUS Rule significantly expands the Agencies' assertion of jurisdiction over intrastate waters and lands, it is also indisputable that the States will suffer two independently sufficient categories of irreparable harm when the Rule becomes effective in three weeks.  The Agencies fail entirely to rebut the States' showing of immediate, irreparable harm as to either of these categories.

1. The WOTUS Rule's expansion of CWA jurisdiction will, as soon as the Rule is effective on August 28, 2015, deprive the States of their constitutional "sovereign interest" in managing and protecting their own intrastate waters and lands.  *Kansas v. United States*, 249 F.3d 1213, 1227, 1231 (10th Cir. 2001).  Before the WOTUS Rule, the States—not the federal government—determined when and to what extent numerous intrastate waters and lands would be protected, the procedures that would be followed to protect those waters and lands, and the penalties that would be imposed upon those who violate those protections.  Now, the federal government has taken control over these waters and lands; either directly, under the Section 404 program (33 U.S.C. § 1344), or by requiring the States to apply standards pursuant to federal law under the National Pollutant Discharge Elimination System ("NPDES") program (33 U.S.C. § 1342) and the Water Quality Standards ("WQS") program (33 U.S.C. § 1313).  This imposes *per se* irreparable harm upon the States.  *See Kansas*, 249 F.3d at 1227; *accord Wyoming v. Hoffman*, 423 F. Supp. 450, 453 (D. Wyo. 1976) ("[P]rior to the adoption of the challenged regulations the individual states controlled dredge and fill activities in those waters which now require Section 404 permits but which were not subject to traditional navigational servitudes. The federal government, as a result of the regulations, now assumes this authority.").

The Agencies respond that States retain the authority to impose additional, greater protections on intrastate waters and land than required by the CWA (Doc. 50 at 17-18), but this

14

is a red herring.  The CWA recognized that the States, not the federal government, have the "primary responsibilities. . . to plan the development and use . . . of land and water resources" within their own borders.  33 U.S.C. § 1251(b).  The touchstone of that sovereign right is the authority to protect waters and lands as the States so choose, which includes imposing regulations that are entirely different than the CWA would apply.  For example, Kansas has chosen not to regulate discharges into "ephemeral streams, those streams that only flow in response to random rainfall events."  Stiles Decl. ¶ 7.  The WOTUS Rule asserts federal jurisdiction over those ephemeral streams, thus displacing Kansas's sovereign judgment as to whether and how to regulate its local waters and lands.

Finally, while the Agencies proclaim that "federal regulation of water or land for the purpose of pollution control does not create a cognizable harm to 'state sovereignty'" (Doc. 50 at 18 n.5), the Supreme Court in *SWANCC* specifically rejected this approach.  It did so by holding that the Agencies' grab for authority over intrastate waters and lands encroaches upon the States' "traditional and primary power over land and water use."  *SWANCC*, 531 U.S. at 174.  Accordingly, the Agencies' argument that the States will suffer no sovereign harm is directly contrary to binding Supreme Court case law.

2. The WOTUS Rule's expansion of CWA jurisdiction will also impose substantial harms as part of three different State-administered CWA programs: the WQS program, the Section 404 program, and the NPDES program.  The Agencies' attempts to minimize the harms the States will suffer under those programs are unpersuasive.

a. WQS Program.  Under the WQS program, the States will be required immediately to identify new waters under the WOTUS Rule, survey those waters, establish WQS for new waters that do not fit within already existing WQS, designate uses applicable to those waters, and

establish Total Maximum Daily Load ("TMDL") for the discharge of pollutants into these new waters.  Doc. 32, at 22-23.  When the State of Kansas had to do a significantly *less* broad study of WQS, the study cost the State $300,000 per year.  "[S]ignificantly greater" resources will be required as a direct result of the WOTUS Rule.  Stiles Decl. ¶¶ 8, 10.

The Agencies claim that these significant efforts can await the completion of this litigation (Doc. 50 at 18), but this is false.  For example, the Agencies themselves point out that Kansas must submit to EPA its next biennial report by April 1, 2016, *less than eight months from now*.  *Id.* at 20.  Preparing this report will require Kansas to study and identify the newly jurisdictional waters.  Stiles Supplemental Decl. ¶ 5.  The Agencies' suggestion that Kansas can simply do nothing, in hopes of obtaining final relief sufficiently in advance of April 1, 2016, is unrealistic.  Consistent with this reality, the States already explained that these efforts must begin "immediately" (Stiles Decl. ¶ 9), or have already begun (Goodmann Decl. ¶ 5).  However, given the Agencies' assertion that these declarations somehow lack sufficient "assertion[s] of imminence" (Doc. 50 at 18), Kansas has submitted a supplemental declaration with this reply brief, making that immediacy point even clearer.  Stiles Supplemental Decl. ¶¶ 4-7.

Similarly meritless is the Agencies' position that the States can sit on their hands with regard to their other obligations under the WQS program.  For example, a refusal by a State to conduct a Use Attainability Analysis—and, as appropriate, establish TDMLs—for a newly jurisdictional water would delay the States' ability to issue Section 401 certifications for discharges into that water.  Stiles Supplemental Decl. ¶ 7.  This would cause substantial harms to the citizens of the States by delaying valuable projects.  What the Agencies suggest, in effect, is that the States abandon their responsibilities to their citizens under the CWA, delaying those citizens' ability to undertake valuable projects in a timely manner, until this litigation runs its

course.   The States cannot and will not do that.   Accordingly, Kansas has submitted a supplemental declaration emphasizing what should have been clear from its initial declaration: the State will need to undertake its WOTUS Rule-expanded WQS obligations immediately. Stiles Supplemental Decl. ¶¶ 4-7.

The Agencies also assert that the WQS obligations would impose no "additional costs" on the States.  Doc. 50 at 20.  The Agencies ignore Kansas's sworn statement that it was forced to expend $300,000 per year for a less complicated WQS analysis previously and expects to expend "significantly more" resources as a direct result of the WOTUS Rule.  Stiles Decl. ¶¶ 8, 10.  And while the Agencies' Economic Analysis[3] concluded that the States will not incur additional costs under the WQS program, that Analysis also acknowledged that the States will need to determine whether an existing WQS applies to a new water (Economic Analysis at 15), a process that obviously will impose costs upon the States.  Stiles Decl. ¶ 10; Goodmann Decl. ¶¶ 3, 5.  In any event, the Agencies' Economic Analysis cannot overcome the sworn, unrebutted declarations of a sovereign State, explaining the reasons why the WOTUS Rule will impose substantial costs upon that State.  *See* Stiles Decl. ¶¶ 8, 10; Stiles Supplemental Decl. ¶¶ 4-8.

b. Section 404 Program.   The Rule will force States to expend additional sovereign resources to issue Section 401 state certification permits under the Section 404 program.  The States submitted four unrebutted declarations explaining as much.  *See* Stiles Decl. ¶ 14; Pigott Decl. ¶ 9; Preston Decl. ¶ 8; Capp Decl. ¶ 5.  And the Agencies themselves estimated that the WOTUS Rule will impose between $798,000 and $1.3 million per year in additional costs upon the States for this program.  Economic Analysis at 19.  The Agencies now make four meritless arguments against this category of irreparable harm.

_____

[3] Economic Analysis of the EPA-Army Clean Water Rule (2015) ("Economic Analysis").

17

*First*, the Agencies suggest the States could charge their citizens higher fees to recoup the costs they will suffer because of the WOTUS Rule's expansion of the Section 401 certification program.  This is the identical argument that the Federal Government recently made in its request that the Fifth Circuit vacate a preliminary injunction against the Deferred Action for Parental Accountability ("DAPA") program, claiming that States could raise drivers' license fees to recoup the added costs of issuing licenses to DAPA immigrants.  The Fifth Circuit easily rejected this unprecedented argument, explaining that the "forced choice between incurring costs and changing its fee structure is itself an injury."  *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).  Indeed, the approach the Agencies suggest would require the States to harm their own citizens, who will then need to pay unrecoverable higher fees to get Section 401 certifications, in order to comply with a Rule that is likely to be held invalid.  *See Texas v. United States*, No. B-14-254, 2015 WL 1540022, at *8 (S.D. Tex. Apr. 7, 2015) (stating that such an approach is the "equivalent of having the Court order that the States (and their citizens) pay their own damages").  Tellingly, the only case the Agencies cite in this discussion (Doc. 50 at 21) is *Iowa Utilities Board v. FCC*, 109 F.3d 418 (8th Cir. 1996), which held that costs imposed by the federal regulations *were* irreparable.  *Id.* at 426.  Nothing in this case suggests that States fail to show irreparable harm from financial losses caused by federal regulations because States can simply charge higher fees and taxes.[4]

*Second*, the Agencies argue that the States can waive the Section 401 certification aspect of Section 404 permit applications.  Doc. 50 at 21-22.  The Agencies apparently urge the States to avoid the harms imposed by the WOTUS Rule by simply abandoning their responsibilities

---

[4] In any event, in many cases charging additional fees for the processing of Section 401 certifications would require the passage of State legislation, something that is not possible when the legislature is not in session and thus cannot immediately avoid irreparable harm.  Stiles Supplemental Decl. ¶ 9.

under the CWA.  Yet, as the Supreme Court has explained, "State certifications under [Section] 401 are essential in the scheme to preserve state authority to address the broad range of pollution."  *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006).  It would not cure the States' irreparable harms for the States to withdraw from the exercise of their own essential "state authority," an authority and duty placed upon them by federal law.[5]

*Third*, the Agencies attempt to run away from their own Economic Analysis, which they issued less than three months ago, claiming this Analysis "mis[led]" the public as to the Rule's costs.  Doc. 50 at 21-23.  The Section 404 program for discharges of dredge and fill is a robust, active regime in all of the States.  The Agencies cannot seriously claim that costs they estimated three months ago to be between $798,000 and $1.3 million *per year* are now "speculative," especially when four States submitted declarations in this litigation claiming just these harms.

*Fourth and finally*, the Agencies cite out-of-circuit authority for the claim that "compliance costs, without more, [do not establish] irreparable harm."  Doc. 50 at 23. Controlling authority in this circuit is to the contrary.  *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1273-74 (11th Cir. 2013) (adopting *Iowa Utils. Bd.*, 109 F.3d 418).  Indeed, the Agencies are forced to admit this fact with a "*but see*" citation.  Doc. 50 at 23 (citing *Am.'s Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1364 (N.D. Ga. 2012), *aff'd*, 742 F.3d 1319 (11th Cir. 2014)).  And even if the Agencies were correct that something "more" (Doc. 50 at 23) than the forced expenditure of unrecoverable costs is required to establish irreparable harm, that "more" certainly exists here because the forced expenditures and loss of employee time at issue are those of sovereign States and not merely private parties.

---

[5] The Agencies' citation to *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828 (3d Cir. 1995), is entirely inapposite.  In that case, the party claiming irreparable harm had entered into a contract authorizing that same harm, which is not remotely comparable to the States' simply carrying out their obligations under federal law.

c. <u>NPDES Program</u>.  The States demonstrated that they will incur additional costs in evaluating and issuing additional NPDES permits as a result of the WOTUS Rule.  Doc. 32 at 23-24.  Indeed, the Agencies estimated that the WOTUS Rule will cost the States between $527,000 and $770,000 *per year* under this program.  *See* Economic Analysis at 25-29.  The Agencies' only response is to repeat briefly the same meritless arguments they raise against the State's irreparable harms under the Section 404 program.  Doc. 50 at 23-24.  The Agencies' attempts to run away from their own Economic Analysis, urge the States to change their sovereign fee structures, and suggest that States simply abandon their statutory authority in the CWA's cooperative federalism scheme, do nothing to rebut the States' showing of irreparable harm.  *See supra* pages 14-19.

## C.   The Agencies' Arguments Regarding Public Interest And Agency Hardship Are Without Merit

The Agencies offer no response to the States' point that the public interest would be seriously undermined if individuals and businesses were forced to spend substantial sums of money, and to delay valuable projects, in order to comply with a rule that is likely to be vacated at the end of litigation.  Doc. 32, at 24-25.  Instead, they obliquely assert that the Rule should not be preliminarily enjoined because that Rule leads to "predictability and consistency."  Doc. 50 at 25.  Their contention is erroneous in at least two respects.  First, if the States are correct that the WOTUS Rule is likely to be vacated as illegal, no possible "predictability and consistency" justification could be served by requiring individuals and businesses to come into unnecessary compliance with the Rule.  Second, the Rule creates no "predictability and consistency" benefits because the Rule's catch-all category subjects "the vast majority of the nation's water features" to complicated, highly unpredictable case-by-case determinations.  Economic Analysis at 11.

**II.    This Court Has Jurisdiction Over This Case And Must Exercise That Jurisdiction To Prevent The States From Suffering Irreparable Harms**

In a transparent effort to delay this case, and to effectively deny the States' motion for a preliminary injunction, the Agencies urge that "jurisdiction should be addressed by the Sixth Circuit" in the first instance.  Doc. 50 at 5.  The Court should have no illusion as to what this means: potentially years of delay.  For example, in *Friends of the Everglades*, the Eleventh Circuit took *four years* from the filing of the petitions for review to decide that it lacked jurisdiction, sending the matter back to district courts.  As explained in the States' opposition to the Agencies' stay motion, a delay of months—let alone years—would effectively deny the motion for a preliminary injunction, imposing irreparable harm upon the States and the public.

Contrary to the Agencies' suggestion that this Court must defer to the Sixth Circuit's decision as to jurisdiction, it is well-established that this Court "has a 'virtually unflagging obligation'" to assert jurisdiction where it has that authority.  *Mata v. Lynch*, 135 S. Ct. 2150, 2156 (2015) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  Together, the Supreme Court and the Eleventh Circuit have reiterated that duty six times in just the past two years.[6]  The Agencies suggest that in cases involving an exclusive grant of jurisdiction to one court of appeals, all other federal courts must defer to a jurisdictional determination by that court of appeals.  But they cite no cases supporting that proposition.[7]  The

---

[6] *See Mata*, 135 S. Ct. at 2156; *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013); *Calderon v. Baker Concrete Const., Inc.*, 771 F.3d 807, 811 (11th Cir. 2014); *Jackson-Platts v. Gen. Elec. Capital Corp.*, 727 F.3d 1127, 1131 (11th Cir. 2013).

[7] The one case cited by the Agencies—*NRDC v. Abraham*, 355 F.3d 179 (2d Cir. 2004)—says nothing about *which* court should interpret a specific statutory grant of jurisdiction.  Rather, it merely states a rule of construction for *any* court to use interpreting such a statutory provision.

*only* basis for accepting the Agencies' pleas for delay would be a conclusion that this Court actually lacks jurisdiction. That, however, is not the case.

This Court has jurisdiction over challenges to CWA rules and other CWA final agency actions under the federal question jurisdiction statute, 28 U.S.C. § 1331, except in the narrow circumstances "specifically enumerated in" Section 509 of the CWA, 33 U.S.C. § 1369. *Friends of the Everglades*, 699 F.3d at 1285. EPA points to two categories of Section 509, which grant to the courts of appeals jurisdiction for direct review of final actions: (1) "approving or promulgating any effluent limitation or other limitation under [EPA's section 301, 302, 306, or 405 programs]," 33 U.S.C. § 1369(b)(1)(E); and (2) "issuing or denying any permit under [the section 402 NPDES program]," *id.* § 1369(b)(1)(F). In *Friends of the Everglades*, the Eleventh Circuit read the language of both provisions narrowly, holding that it did not have authority over the Water Transfer Rule, a rule that exempted certain transfers between navigable waters from effluent limitations and permitting requirements. 699 F.3d at 1286-88. The Eleventh Circuit explained that it lacked jurisdiction because the rule at issue was "not an effluent limitation," did not impose a "limitation" or "restriction" of any kind, and "neither issue[d] nor denie[d] a permit." *Id.* at 1286-87.[8]

Under *Friends of the Everglades*, the WOTUS Rule is clearly outside of the court of appeals' authority under Section 509(b)(1)(E) or (F). The WOTUS Rule defines the critical term "waters of the United States" for all CWA programs. The Rule is not an "effluent limitation" under Section 509 because it does not involve "any restriction established . . . on quantities,

---

[8] *Accord Bethlehem Steel Corp. v. EPA*, 538 F.2d 513, 518 (2d Cir. 1976) (rejecting Section 509 jurisdiction over approval of a state water quality standard); *City of Baton Rouge v. EPA*, 620 F.2d 478, 480 (5th Cir. 1980) (rejecting Section 509 jurisdiction over an order requiring compliance with an NPDES permit); *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1015–1018 (9th Cir. 2008) (rejecting Section 509 jurisdiction over action exempting three types of discharges from permitting requirements).

rates, and concentrations of chemical, physical, biological, and other constituents" of discharges. 33 U.S.C. § 1362(11). Nor is the Rule an "other limitation" for purposes of Section 509(E) because it "imposes no restrictions." *Friends of the Everglades*, 699 F.3d at 1286 ("Black's Law Dictionary defines a 'limitation' as a 'restriction'. Black's Law Dictionary 1012 (9th ed. 2009)."). And the Rule clearly "neither issues nor denies a permit." *Id.* at 1287. Rather, the Rule is a definitional provision—including some waters and excluding others from all CWA programs, including Corps-administered programs not listed in Section 509. Notably, the legality of the Agencies' definition of "waters of the United States" is a question that has been uniformly decided by district courts, in the first instance, and not by courts of appeals under Section 509. *See, e.g.*, *NRDC v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975) (district court vacating the Corps' original "waters of the United States" definition as inconsistent with the CWA); *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 186 (D.D.C. 2008) (district court vacating EPA's "waters of the United States" definition as inconsistent with *Rapanos*).

The Agencies point to *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977), and *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193 (1980) (per curiam), as well as out-of-circuit cases, to support their claim that this Court take a "practical" view of Section 509. Doc. 50 at 6 (quotation omitted). But this Court is bound by *Friends of the Everglades*, which came well after both of those decisions and even discussed *Crown Simpson* at length. More generally, no matter how "practical" a view of Section 509, there is no plausible manner to read a CWA-wide definition of "waters of the United States as an "effluent limitation," an "other limitation," or an action that "issues or denies a permit."

The Agencies' claim that *Friends of the Everglades* "does not control here" (Doc. 50 at 7) is little more than an unpersuasive effort to distinguish the case on its facts. The Water

Transfer Rule at issue in *Friends of the Everglades* was actually much closer to an "other limitation" for purposes of Section 509(b)(1)(E) than the WOTUS Rule, given that it excluded certain water transfers from the EPA-enforced programs enumerated in Section 509.  Yet, the Eleventh Circuit still found it lacked jurisdiction to review because the Water Transfer Rule was not a "limitation" under those programs.  *Friends of the Everglades*, 699 F.3d at 1286-87.  The WOTUS Rule is further afield from Section 509(b)(1)(E) than the Water Transfer Rule because it does not directly relate to the programs enumerated in Section 509, but rather governs the "waters of the United States" definition for the entire CWA.  So if the Water Transfer Rule fell outside the jurisdiction of the courts of appeals and within the review of the district courts, so too must the WOTUS Rule.  As such, it is this Court's "virtually unflagging obligation" to exercise that jurisdiction and not to await the Sixth Circuit.[9]

## CONCLUSION

For the foregoing reasons, as well as those in the States' opening memorandum and supporting documents, the States' motion for a preliminary injunction should be granted.

Respectfully submitted on 7th day of August, 2015,

**s/ Britt C. Grant**

| | |
|---|---|
| Samuel S. Olens | Patrick Morrisey |
| *Attorney General* (No. 551540) | *Attorney General* |
| Britt C. Grant - Lead Counsel | Elbert Lin |
| *Solicitor General* (No. 113403) | *Solicitor General* |
| Timothy A. Butler | Misha Tseytlin |
| *Deputy Solicitor General* (No. 487967) | *General Counsel* |
| James D. Coots | Erica N. Peterson |

---

[9] The Agencies also urge this Court to "consider deferring its ruling pending an order from the MDL Panel."  Doc. 50 at 25.  The States have explained why this course would not be appropriate in their opposition to the Agencies' stay motion, also filed today.  Put simply, the pendency of a motion to transfer under the MDL statute "does not affect or suspend orders and pretrial proceedings in any pending federal district court action."  J.P.M.L. R. 2.1(d).

*Sr. Asst. Attorney General* (No. 351375)
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
bgrant@law.ga.gov
(404) 651-9453
   *Counsel for Plaintiff Georgia*

Luther Strange
   *Attorney General*
Andrew Brasher
   *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609
   *Counsel for Plaintiff Alabama*
(admitted *pro hac vice*)

Pamela Jo Bondi
   *Attorney General*
Jonathan A. Glogau
   *Attorney for the State of Florida*
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Phone: (850) 414-3681
Fax: (850) 410-2672
allen.winsor@myfloridalegal.com
   *Counsel for Plaintiff Florida*
(admitted *pro hac vice*)

Jack Conway
   *Attorney General*
Sean J. Riley
   *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 Capitol Avenue, Suite 118
Frankfort, KY 40601
Sean.riley@ag.ky.gov
   *Counsel for Plaintiff Kentucky*
(admitted *pro hac vice*)

Sam M. Hayes
   *General Counsel*

*Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
State Capitol
Building 1, Rm 26-E
Charleston, West Virginia 25305
Elbert.Lin@wvago.gov
(304) 558-2021
   *Counsel for Plaintiff West Virginia*
(admitted *pro hac vice*)

Gregory F. Zoeller
   *Attorney General*
Thomas M. Fisher
   *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
Indiana Government Center - South, Fifth Floor
Indianapolis, Indiana  46204
(317) 232-6255
Tom.Fisher@atg.in.gov
   *Counsel for Plaintiff Indiana*
(admitted *pro hac vice*)

Derek Schmidt
   *Attorney General*
Jeffrey A. Chanay
   *Chief Deputy Attorney General*
Burke W. Griggs
   *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
burke.griggs@ag.ks.gov
(785) 368-8435
   *Counsel for Plaintiff Kansas*
(admitted *pro hac vice*)

Sean D. Reyes
   *Attorney General*
Parker Douglas
   *Federal Solicitor*
OFFICE OF THE UTAH ATTORNEY GENERAL
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320

25

Craig A. Bromby
  *Deputy General Counsel*
Andrew J. Norton
  *Deputy General Counsel*
NORTH CAROLINA DEPARTMENT OF
  ENVIRONMENT AND NATURAL RESOURCES
215 W. Jones Street
Raleigh, North Carolina 27603
sam.hayes@ncdenr.gov
craig.bromby@ncdenr.gov
andrew.norton@ncdenr.gov
(919) 707-8600
  *Counsel for Plaintiff North Carolina*
  *Department*
  *Of Environment and Natural Resources*
  (*pro hac vice* to be filed)

Alan Wilson
  *Attorney General*
Robert D. Cook
  *Solicitor General*
James Emory Smith, Jr.
  *Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street, Room 519
Columbia, SC 29201
Phone: (803) 734-3680
Fax: (803) 734-3677
Bcook@scag.gov
  *Counsel for Plaintiff South Carolina*
(admitted *pro hac vice*)

*Counsel for Plaintiff Utah*
(admitted *pro hac vice*)

Brad D. Schimel
  *Attorney General*
Karla Z. Keckhaver
  *Assistant Attorney General*
WISCONSIN DEPARTMENT OF JUSTICE
17 West Main Street
Madison, Wisconsin 53707
keckhaverkz@doj.state.wi.us
(608) 267-8901
  *Counsel for Plaintiff Wisconsin*
(admitted *pro hac vice*)

## <u>CERTIFICATE OF SERVICE</u>

    I certify that on this 7th day of August, 2015, a copy of the foregoing Reply In Support

Of Motion For A Preliminary Injunction was served electronically through the Court's CM/ECF

system on all registered counsel.

                                      **s/ Britt C. Grant**