# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | | |
|---|---|---|
| STATE OF GEORGIA, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | No. 2:15-cv-79 |
| | * | |
| SCOTT PRUITT, et al., | * | |
| | * | |
| Defendants. | * | |

## ORDER

This Matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction. Dkt. No. 32. This matter has been fully briefed, including by amici curae, and orally presented at a hearing. It is now ripe for review. For the following reasons, this Motion is **GRANTED.**

## BACKGROUND

Plaintiffs State of Georgia, State of West Virginia, State of Alabama, State of Florida, State of Kansas, Commonwealth of Kentucky, State of South Carolina, State of Utah, and State of Wisconsin ("the States")[1] filed the present lawsuit on June 30, 2015, against the administrators of the United States

---

[1] Plaintiffs' filed an amended complaint on July 20, 2015, adding the State of Indiana and the North Carolina Department of Environment and Natural Resources. Dkt. No. 31.

Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("Army Corps") (collectively, "the Agencies"). Dkt. No. 1. The States alleged that the Agencies had issued a final rule ("WOTUS Rule") the previous day (June 29, 2015) defining "Waters of the United States." Dkt. No. 1 ¶ 5 (citing 80 Fed. Reg. 37,053-37,127). The States claimed that the WOTUS Rule violated the Clean Water Act ("CWA"), the Administrative Procedure Act ("APA"), as well as the Commerce Clause and Tenth Amendment of the U.S. Constitution, and that they were entitled to injunctive relief. 33 U.S.C. §§ 1344, 1362(7); 5 U.S.C. § 706(2)(A); U.S. Const. art. I, § 8; U.S. Const. amend. X.

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One of the Act's principal tools in achieving that objective is the prohibition of "the discharge of any pollutant" defined as "any addition of any pollutant to navigable waters from any point source," and "navigable waters," in turn, is defined as "waters of the United States, including the territorial seas." Id. § 1311(a), § 1362(12), (14), (7). "Because many of the Act's substantive provisions apply to 'navigable waters,' the statutory phrase 'waters of the United States' circumscribes the geographic scope of the Act in certain respects." Nat'l Ass'n of Mfrs. v. Dep't

of Def., 583 583 U.S. ___, 138 S. Ct. 617, 624 (2018).  The Act
also requires that anyone who discharges pollutants into
navigable water obtain a permit.  Id. (citing § 1311(a)).  The
process of obtaining these permits can take years and cost
hundreds of thousands of dollars, and discharging into
"navigable waters" without a permit can subject the discharging
party of a fine of up to $37,500 per violation, per day, as well
as criminal penalties.  22 U.S.C. §§ 1311, 1319, 1365; 74 Fed.
Reg. 626, 627-28 (Jan. 7, 2009); Rapanos v. United States, 547
U.S. 715, 721 (2006).

Responding to calls for precision in the definition of
"waters of the United States," the Agencies jointly promulgated
the WOTUS Rule to "provid[e] simpler, clearer, and more
consistent approaches for identifying the geographic scope of
the [Act]."  80 Fed. Reg. 37054 at 37057.  And so, the WOTUS
Rule separates waters into three jurisdictional groups.  First,
it defines "tributaries" of primary waters as per se waters of
the United States, with tributary defined as "a water that
contributes flow, either directly or through another water," to
a primary water and "is characterized by the presence of the
physical indicators of a bed and bank and an ordinary high water
mark," declaring for the first time that "remote sensing
sources" or "mapping information" would be used to detect these
"physical indicators."  33 C.F.R. § 328.3(c)(3); 80 Fed. Reg. at

37,076-78.  The WOTUS Rule also envisions the use of "desktop tools" for "hydrologic estimation of a discharge sufficient to create an ordinary high water mark" to identify the presence of a bed, bank, and OHWM, or even the historical presence of such where physical characteristics are "absent in the field."  Id. at 37,077.

Second, the WOTUS Rule declares that all "adjacent" waters are per se jurisdictional, defining "adjacent waters" as waters and wetlands "bordering, contiguous or neighboring" primary waters, even if they are separated from the primary water by man-made or natural barriers.  33 C.F.R. § 328.3(c)(1).

Third, the WOTUS Rule also grants authority to the Agencies over certain waters with a relationship to a primary water, to include: (1) all waters, any part of which are within the 100-year floodplain of a primary water; and (2) all waters, any part of which are within 4,000 feet of the high tide line or ordinary high water mark of a primary water, impoundment, or tributary. Id. § 328.3(a)(8).

With the WOTUS Rule's new definition of "waters of the United States," the Agencies estimated that determinations of federal jurisdiction would increase by 2.84% to 4.65% annually. 80 Fed. Reg. at 37,101.[2]

---

[2] The States characterize this figure as a "drastic underestimation of the Rule's expansion."  Dkt. No. 32, p. 2.

The WOTUS Rule's effective date was August 28, 2015, and so the States filed a motion for preliminary injunction on July 21, 2015 to enjoin enforcement of the WOTUS Rule before it became effective. Dkt. No. 32. This Court held a hearing on the Motion on August 12, 2015. Dkt. No. 70. On August 27, 2015, the Court issued an order denying the preliminary injunction for lack of jurisdiction, holding that original jurisdiction lay with the Courts of Appeals. Dkt. No. 77.

Meanwhile, similar lawsuits[3] were brought around the country. The same day that this Court decided it lacked jurisdiction (August 27, 2015), the District of North Dakota granted the preliminary injunction to thirteen other states[4] challenging the WOTUS Rule. North Dakota v. U.S. Envtl. Prot. Agency, 127 F. Supp. 3d 1047 (D.N.D. 2015).

On January 22, 2018, the Supreme Court held that original jurisdiction of this dispute lies with the district courts, not with the Courts of Appeals. Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. __, 138 S. Ct. 617 (2018). As a result, the Motion is properly before this Court.

---

[3] The Court understands that a lawsuit challenging the WOTUS Rule in the Northern District of Oklahoma has been administratively closed pending completion of the Agencies' rulemaking process. Dkt. No. 149, p. 3; Okla. v. Envtl. Prot. Agency, No. 4:15-cv-03081-CVE-FHM (N.D. Okla. March 9, 2018). There are also suits pending in the Southern District of Texas and the District of Ohio. Dkt. No. 149, pp. 3-4; Am. Farm Bureau Fed'n v. Envtl. Prot. Agency, No. 3:15-cv-165 (S.D. Tex. Mar. 20, 2018); Ohio v. Envtl. Prot. Agency, No. 16-3564 (6th Cir. Mar. 27, 2018).
[4] Those states are North Dakota, Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, New Mexico, Nevada, South Dakota, and Wyoming.

In the interim, things have changed. The President of the United States issued an executive order in March 2017 for reconsideration of the WOTUS Rule. Exec. Order No. 13,778,82 Fed. Reg. 12,497 (Mar. 3, 2017). In response, the Agencies proposed a rule on July 27, 2017, that, once implemented, would rescind the WOTUS Rule and recodify the pre-2015 regulatory definition of "waters of the United States." See Definition of "Waters of the United States" – Recodification of Pre-Existing Rules, 82 Fed. Reg. 34899, 34901–34902. Then, in November 2017, following oral argument in National Association of Manufacturers v. Department of Defense, the Agencies proposed another new rule. That one became final on February 6, 2018 ("Applicability Rule"). The Applicability Rule is identical to the WOTUS Rule but provides an effective date of February 6, 2020. Until then, the Agencies assert that the WOTUS Rule "is being actively reconsidered by the Agencies." Dkt. No. 154-1, p. 1.

The Applicability Rule, in turn, has now been challenged in several lawsuits. Two lawsuits are pending in the Southern District of New York—the first involves a coalition of eleven states led by New York against the Agencies. Dkt. No. 149, pp. 1-2. Those eleven states seek a declaration that the Applicability Rule is unlawful. Id. The second New York action involves two environmental groups against the Agencies, arguing that the Applicability Rule is unlawful and seeking declaratory

and injunctive relief. Id.; see Compl., N.Y. v. Pruitt, No. 1:18-cv-1030-JPO (S.D.N.Y. Feb. 7, 2018); Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency, No. 1:18-cv-1048-JPO (S.D.N.Y. Feb. 6, 2018). Several other environmental groups sued the Agencies in the District of South Carolina, challenging the legality of the Applicability Rule and requesting declaratory and injunctive relief. Dkt. No. 149; see Compl., S.C. Coastal Conservation League v. Pruitt, No. 2:18-cv-330-DCN (D.S.C. Feb. 6, 2018). The parties in this case also made reference during the preliminary injunction hearing to a case challenging the Applicability Rule in the Western District of Washington. Dkt. No. 167, pp. 7, 29. The parties also represented that the challengers of the Applicability Rule have so far moved for summary judgment in three of those lawsuits. Id. pp. 6-7. The Agencies will be responding to those motions for summary judgment from now until August (as those cases have similar but staggered deadlines). Id. p. 29. No parties in those cases have sought preliminary relief. Id. The Southern District of New York denied motions to transfer both cases to the Southern District of Texas, and as far as this Court has been presently made aware, a motion to transfer the District of South Carolina case to the Southern District of Texas is still pending. Dkt. No. 149, p. 2; Dkt. No. 167, p. 5.[5]

---

[5] The Court is not aware of a motion to transfer the District of Washington

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008) (citing <u>Munaf v. Geren</u>, 553 U.S. 647, 689-90 (2008)). The purpose of a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." <u>United States v. Lambert</u>, 695 F.2d 536, 539 (11th Cir. 1983).

To receive a preliminary injunction, the plaintiff must establish the following requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." <u>Palmer v. Braun</u>, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing <u>Suntrust Bank v. Houghton Mifflin Co.</u>, 268 F.3d 1257, 1265 (11th Cir. 2001)).

The plaintiff must clearly meet the burden of persuasion on each of these four factors. <u>Four Seasons Hotel & Resorts, B.V. v. Consorcio Barr, S.A.</u>, 320 F.3d 1205, 1210 (11th Cir. 2003). When a court issues an injunction, the court's order must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the

case to the Southern District of Texas.

complaint or other document—the act or acts restrained or required." Fed. R. Civ. Proc. 65 (d)(1).

**DISCUSSION**

## I. Likelihood of success on the merits

The requirement that the movant demonstrate a substantial likelihood of success on the merits "is generally considered the most important of the four." White v. Alcon Film Fund, LLC, 955 F. Supp. 2d 1381, 1383 (N.D. Ga. 2013) (citing Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986) ("Ordinarily the first factor is the most important.").

The States allege that the Agencies violated the rulemaking authority granted to them under the CWA and the APA; they allege that the WOTUS Rule is arbitrary and capricious under the APA; they allege that the WOTUS Rule violates the Commerce Clause; they allege that the WOTUS Rule violates the Tenth Amendment; and they allege that the WOTUS Rule violates the APA's notice and comment requirements.[6]   The States need only show a

---

[6] Two days ago, the Intervenors submitted briefing urging that no Article III "case or controversy" presently exists because the Applicability Rule now supersedes the WOTUS Rule and the Agencies are reconsidering the WOTUS Rule in the meantime. Dkt. No. 173. But the Supreme Court explicitly stated that this case is presently justiciable:

> The parties have not suggested that any of these subsequent developments render this case moot. That is for good reason. Because the WOTUS Rule remains on the books for now, the parties retain "'a concrete interest'" in the outcome of this litigation, and it is not "'impossible for a court to grant any effectual relief ... to the prevailing party.'" Chafin v. Chafin, 568 U.S. 165, 172, 133 S. Ct. 1017, 185 L.Ed.2d 1 (2013) (quoting Knox v. Service Employees, 567 U.S. 298, 307, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012)). That remains true even if the agencies finalize and implement the November 2017 proposed

likelihood of success on one cause of action in order to prevail on this requirement at this time. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1289, 1298-99 (11th Cir. 2005). They have demonstrated a likelihood of success on their claims that the WOTUS Rule was promulgated in violation of the CWA and the APA, and the Court need not consider the remaining claims. Notably too, the Agencies have not opposed the States' position that they are likely to succeed on the merits, and in fact, have asserted that they themselves are presently reconsidering the WOTUS Rule. See Dkt. No. 167 ("[N]or are we affirming [our previous position that the States are not likely to succeed on the merits] as our position at this time.")

**A. Claim that WOTUS Rule violates the Clean Water Act**

The States have demonstrated that they are likely to succeed on the merits of their claim that the Agencies violated their statutory authority in promulgating the WOTUS Rule.

Justice Kennedy's analysis of this statutory authority in Rapanos v. United States[7] begins with the Clean Water Act's purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and requires the

---

rule's new effective date. That proposed rule does not purport to rescind the WOTUS Rule; it simply delays the WOTUS Rule's effective date.

Nat'l Ass'n of Mfrs., 583 U.S. __, 138 S. Ct. at 627 n.5.

[7] The Eleventh Circuit held in United States v. Robison that Justice Kennedy's concurrence controls. 505 F.3d 1208, 1222 (11th Cir. 2007) ("[W]e adopt Justice Kennedy's 'significant nexus' test as the governing definition of 'navigable waters' under Rapanos.").

Agencies' rules to comply with such an end. 547 U.S. 715, 779 (2006) (Kennedy, J., concurring). The Court recognized that, "in enacting the Clean Water Act Congress intended to regulate at least some waters that are not navigable in the traditional sense." Id. at 767. For a water to come within the agency's jurisdiction, Justice Kennedy held, there must be a "significant nexus" with a navigable water. Id. The rule at issue in Rapanos deemed a water a tributary if it "feeds into a traditional navigable water . . . and possesses an ordinary high-water mark." Id. at 781. This standard provided a "rough measure of the volume and regularity of flow." Id. But its "adoption as the determinative measure of whether adjacent weltands are likely to play an important role in the integrity of an aquatic system" covers wetlands "little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act's scope in SWANCC." Id. at 781-82. Relatedly, the Supreme Court in Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers ("SWANCC") held the Army Corps' rule invalid that asserted jurisdiction over waters "[w]hich are or would be used as habitat" by migratory birds. 531 U.S. 159, 164 (2001). Such a rule exceeded the Agencies' authority, the Court held, because it covered "nonnavigable, isolated intrastate waters" such as seasonal ponds and would "alter[] the federal-state framework by

permitting federal encroachment upon a traditional state power"—namely, the States' "traditional and primary power over land and water use." Id. at 171.

The WOTUS Rule here likely fails to meet this standard. In Rapanos, the agency defined a tributary as a water that "feeds into a traditional navigable water (or a tributary thereof) and possesses an ordinary high-water mark, defined as a line on the shore established by the fluctuations of water and indicated by [certain] physical characteristics." Id. at 781. But that definition "seem[ed] to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact waters." Id.

The same fatal defect appears to plague the WOTUS Rule here. The WOTUS Rule allows the Agencies to regulate waters that do not bear any effect on the "chemical, physical, and biological integrity" of any navigable-in-fact water. The definition of "tributary" covers a trace amount of water so long as "the physical indicators of a bed and banks and an ordinary high water mark" can be found by "mapping information" or "remote sensing tools" where actual physical indicators are "absent in the field." This definition is similar to the one invalidated in Rapanos, and it carries with it the same concern that Justice Kennedy had there—it seems "to leave wide room for

regulation of drains, ditches, and streams remote from any navigable-in-fact water."

The Army Corps had attempted to justify the rule at issue in SWANCC on the ground that 121 bird species had been observed at the site, including several known to depend on aquatic environments for a significant portion of their life. Similarly, the WOTUS Rule asserts that, standing alone, a significant "biological effect" – including an effect on "life cycle dependent aquatic habitat[s]" – would place a water within the CWA's jurisdiction. 33 C.F.R. § 328.3(c)(5). Thus, this WOTUS Rule will likely fail for the same reason that the rule in SWANCC failed.

### B. Claim that Agencies violated APA requirements

The States have demonstrated a likelihood of success on both of their claims under the APA – the claim that the WOTUS Rule is arbitrary and capricious and the claim that the final rule is not a logical outgrowth of the proposed rule.

### 1. Arbitrary and Capricious

The court must set aside a final agency rule if it finds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This "narrow" standard of review requires "'an agency [to] examine the relevant data and articulate a satisfactory explanation for its action.'" F.C.C. v. Fox

Television Stations, Inc., 556 U.S. 502, 513 (2009) (Motor
Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.,
463 U.S. 29, 43 (1983)).  The Court "should 'uphold a decision
of less than ideal clarity if the agency's path may reasonably
be discerned.'"  F.C.C., 556 U.S. at 513-14 (quoting Bowman
Transp., Inc. v. Ar.-Best Freight Sys., Inc., 419 U.S. 281, 286
(1974)).

The States are likely to succeed on the merits of this
claim as well.  The Agencies assert that any water that fits in
the definition of a "tributary" will, as of necessity,
"significantly affect the chemical, physical, and biological
integrity of traditional navigable waters."  80 Fed. Reg. 37075.
The WOTUS Rule asserts jurisdiction over remote and intermittent
waters without evidence that they have a nexus with any
navigable-in-fact waters.

## 2. "Logical Outgrowth" of the Proposed Rule

When agencies make rules, they must first publish proposed
rulemakings in the Federal Register including "either the terms
or substance of the proposed rule or a description of the
subjects and issues involved."  5 U.S.C. § 553(b).  This allows
"interested persons an opportunity to participate in the rule
making through submission of written data, views, or arguments."
Id. § 553(c).  The final rule must be a "logical outgrowth" of
the proposed rule.  Long Island Care at Home, Ltd. v. Coke, 551

U.S. 158, 174 (2007). In determining whether a final rule is a "logical outgrowth" of the proposed rule, the court should determine whether the interested parties "should have anticipated that such a requirement might be imposed." <u>Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.</u>, 705 F.2d 506, 549 (D.C. Cir. 1983). As the circuit to have considered most APA challenges, the D.C. Circuit has required the proposed rule to inform of "the range of alternatives being considered with reasonable specificity." <u>Id.</u> Applying these rules, the D.C. Circuit vacated a rule that permitted parties in railroad cases to recommend comparing data from the past four years where the proposal had only recommended comparing data from the most recent year. <u>CSX Transp., Inc. v. Surface Transp. Bd.</u>, 584 F.3d 1076, 1078 (D.C. Cir. 2009).

Here, the WOTUS Rule fails to meet the "logical outgrowth" test in significant ways. First, the proposed rule defined "adjacent waters" as, <u>inter alia</u>, those within a riparian area or floodplain of an interstate water or an impoundment or tributary of an interstate water, but the final rule defines waters to be per se adjacent when they are within: (1) 100 feet of a primary water, impoundment, or tributary; (2) the 100-year floodplain and 1,500 feet of a primary water, impoundment, or tributary; and (3) 1,500 feet of the high tide line of a primary water. <u>Cf.</u> 79 Fed. Reg. at 22,269 <u>with</u> 33 C.F.R. § 328.3(c)(2).

Second, unlike the final rule, the proposed rule made no mention of exempting waters on farmland only from the "adjacent waters" category. The proposal gave no indication that it would treat farmland differently from any other land or that it would treat farmland differently as between the adjacency and the tributary categories. Third, the proposed rule did not include in the definition of tributaries waters and land that possess no observable (from the ground) bed, bank, or ordinary high water mark, but the final rule defines tributaries as possessing a bed, bank, or ordinary high water mark that can be detected by remote sensing imagery. <u>Cf.</u> 79 Fed. Reg. at 22,269 <u>with</u> 80 Fed. Reg. at 37,076-78. Indeed, during the proposal, the Agencies' published policy instructed Army Corps personnel to combine the remote sensing imagery with "on the ground" field studies rather than relying exclusively on remote sensing.[8]

## II. Substantial threat of irreparable injury

It is hornbook law that "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.). The

---

[8] Corps, Research and Development Center, A Guide to Ordinary High Water Mark (OHWM)Delineation for Non-Perennial Streams in the Western Mountains, Valleys, and Coast Region of the United States 39 (Aug. 2014), http://acwc.sdp.sirsi.net/client/search/asset/1036027.

Supreme Court clarified in Winter that, whatever other sliding scale is imposed to analyze the factors, the irreparable injury must be likely. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In defining the likelihood of irreparable harm, the Eleventh Circuit requires that it "must be neither remote nor speculative, but actual and imminent." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting City of Jacksonville, 896 F.2d at 1285). That is, it cannot be "a merely conjectural or hypothetical [] threat of future injury." Winter, 555 U.S. at 22. "[T]he harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." Lambert, 695 F.2d at 540.

Here, according to the Agencies' own estimation, the effect of the WOTUS Rule will be an increase in CWA jurisdiction by 2.84 to 4.65% annually.[9] "[T]raditional and primary power over land and water use" belong to the States. SWANCC, 531 U.S. at 174 (citing Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments.")). Once the Rule takes effect, the States will lose their sovereignty over certain intrastate waters that will become subject to the scope of the Clean Water Act. Loss of sovereignty is an irreparable

---

[9] Again, the States characterize this figure as a "drastic undercounting of the Rule's expansion." Dkt. No. 32, p. 2.

harm. See Kansas v. United States, 249 F.3d 1213, 1227 (10th Cir. 2001) (deeming loss of "sovereign interests" irreparable); Akiachak Native Cmty. v. Jewell, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of state sovereignty as an irreparable harm).

In addition to the loss of sovereignty, the States will suffer an irreparable harm in the form of unrecoverable monetary harm. If the States incur monetary losses as a result of an unlawful exercise of regulatory authority, no avenue exists to recoup those losses because the United States has not waived sovereign immunity from suits seeking these sorts of damages. Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1289 (11th Cir. 2013) ("In the context of preliminary injunctions, numerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."); Bowen v. Massachusetts, 487 U.S. 879, 893 (1988) (APA does not waive agencies' sovereign immunity for damages actions.).

The States have asserted that compliance with the WOTUS Rule will cause them monetary harm. First, the WOTUS Rule requires States to expend resources updating the water quality goals under the CWA's Water Quality Standard program. The State of Kansas has produced evidence that this will require "significantly greater resources" than $300,000. Dkt. No. 32-3

¶¶ 8, 10.  Second, the WOTUS Rule requires States to expend resources in issuing additional state certifications under the Section 404 program.  33 U.S.C. § 1344.  The EPA has estimated that the WOTUS Rule will impose additional obligations on the States of between $798,000 and $1.3 million per year under this program alone.  EPA, Economic Analysis of the EPA-Army Clean Water Rule, at 19 (May 2015).  Third, the WOTUS Rule requires the States to create, process, and issue additional National Pollution Discharge Elimination System permits.  Dkt. No. 32-3 ¶ 13.  The EPA has predicted that this will impose upon the States additional obligations of between $527,000 and $770,000 per year under this program alone.  EPA, Economic Analysis of the EPA-Army Clean Water Rule, at 25-29 (May 2015).  These losses are unrecoverable economic losses, in addition to the unrecoverable loss of state sovereignty, because there is neither an alternative source to replace the lost revenues nor a way to avoid the increased expenses.

The States have easily shown that the harm they will suffer once the WOTUS Rule becomes effective has no adequate remedy at law.  But the Agencies argue that these harms are not "actual and imminent" because the WOTUS Rule may never become effective.

Here, there are two ways that the WOTUS Rule could become effective, thereby triggering immediate irreparable harm to the States.  First, the WOTUS Rule will become effective once the

Applicability date arrives (February 6, 2020). This trigger provides actual harm, and the Court will discuss whether it is imminent. Second, the WOTUS Rule will become effective if one of the several courts considering the issue invalidates the Applicability Rule. This trigger will occur, if at all, rather imminently. Together, these are two independent ways that the States can establish that irreparable harm is both actual and imminent.

Regarding the first trigger for the WOTUS Rule's effectiveness, the effective date is certain to arrive—that is, the States will suffer "actual" harm on February 6, 2020. As the law presently stands, the WOTUS Rule <u>will</u> become effective on that date. The Applicability Rule providing that date is not provisional, conditional, or equivocal, but definite in its effectiveness on that date.

The Agencies argue that there is not a substantial threat of irreparable harm before a decision on the merits can be reached, because the Agencies intend to issue a new and superseding rule before February 2020. The Intervenors[10] argue that the States' concerns are simply matters of regularity uncertainty, and that irreparable harm must be based on

---

[10] Presently before the Court is the Motion to Intervene by National Wildlife Federation and One Hundred Miles. Dkt. No. 136. That motion has been referred to the Magistrate Judge. The Court considers their brief in ruling on the present preliminary injunction motion. For simplicity's sake, the Court will refer to these entities as "the Intervenors" throughout this Order.

something more than regularity uncertainty (citing New England
Power Generators Ass'n, Inc. v. FERC, 707 F.3d 264, 369 (D.C.
Cir. 2013)).  New England does hold that uncertainty about the
possibility that an agency may reverse its position does not
create irreparable harm.  Id.  However, the present situation
is, in an important way, just the opposite.  The possibility
that the agency may reverse its position cannot create harm, nor
can the possibility that the agency will reverse its position
alleviate the harm already set in motion.  The States argue that
actions must be based on an agency's present position, without
speculating that they may change at some point in the future.
The Court can and must analyze the situation based on the
present state of the law.  And the law presently states that the
WOTUS Rule will actually become effective in February 2020.

The question then becomes whether February 6, 2020 –
nineteen months from now – is imminent.  The law does not
provide a time-specific answer.  At the outer limit, imminence
is capped by the amount of time it takes to render a decision on
the merits.  See Charles Alan Wright & Arthur R. Miller, 11A
Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (requiring a
demonstration that "the applicant is likely to suffer
irreparable harm before a decision on the merits can be
rendered") (emphasis added); Lambert, 695 F.2d at 539 ("[T]he
harm considered by the district court [in a preliminary

injunction] is necessarily limited to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits."). Given that the States filed this suit thirty-six months ago, and still no decision on the merits has been possible, it is quite possible that February 6, 2020 will occur before a decision on the merits can be rendered. No discovery has been permitted nor possible; dispositive motions have not been submitted, briefed, or even scheduled. Therefore, the Court finds that the occurrence of actual irreparable harm in nineteen months is sufficiently imminent to weigh this factor in favor of the States.

Moreover, there exists the possibility of an even earlier trigger of the WOTUS Rule – the WOTUS Rule could become effective, and the irreparable harm suffered by the States, even more imminently than February 6, 2020. This could occur if a court in one of the numerous other lawsuits pending in various states across the country finds that the Applicability Rule is invalid. Such decisions are ripe for decision beginning this very month.

The Agencies argue that the Court should not speculate regarding whether those courts will invalidate the Applicability Rule but should instead wait and see what their decisions turn out to be. Thus, the Agencies have asked the Court to hold the States' Motion in abeyance pending further developments in each

of the Applicability Rule cases. The States respond that this would be too late, for once the Applicability Rule is invalidated, the WOTUS Rule is immediately effective, and the harm to the States is immediately suffered. Their larger concern is that by the time any Court invalidates the Applicability Rule, it might be too late for the States to seek preliminary injunctive relief because preliminary injunctive relief is not available to remedy harm that has already occurred. Ala. v. U.S. Army Corps of Engineers, 424 F.3d 1117, 1133 (11th Cir. 2005); Dombrowski v. Pfister, 380 U.S. 479, 485 (1965) ("[W]e note that an injunction is limited to prospective relief."); Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) ("[P]reventing irreparable harm in the future is 'the sine qua non of injunctive relief.'") (quoting Frejlach v. Butler, 573 F.2d 1026, 1027 (8th Cir. 1978)).

While no one is certain that the Applicability Rule will be invalidated, the Court is satisfied that the States have gone as far as the law requires in showing that irreparable harm is likely and sufficiently imminent, either when the WOTUS Rule becomes effective in February 2020 and/or if the Applicability Rule is invalidated in one of the four lawsuits that becomes ripe for decision this month.

### III.   Balance of equities

The third preliminary injunction prerequisite requires the Court to compare the harm to the movant in the absence of the preliminary injunction with the harm to the nonmovant in granting the preliminary injunction.

Here, this factor weighs heavily in favor of the States. The harm faced by the States has already been articulated: loss of sovereignty and unrecoverable monetary losses. On the other hand, the only harm that the Agencies have articulated is complying with the Court's order. As counsel stated at the hearing, "the Agencies would have to monitor compliance with now two injunctions" – two injunctions that do the same thing. Dkt. No. 167, p. 25. Counsel went on: the harm is "hard to articulate, admittedly" but is the institutional harm of having their rule enjoined by a court. That would always be the case. If the harm of complying with an injunction – of having one's activity enjoined – were enough to tip the balance against an injunction, every request for injunction would fail. In any event, the effect of an injunction would be the same as what the Agencies themselves are seeking: non-application of the WOTUS Rule.

The harm to the Agencies of preserving the status quo as this case progresses pales in comparison to the harm that the

States urge – loss of sovereignty and unrecoverable monetary losses – were the WOTUS Rule to become effective.

## IV. Public interest

An injunction of the WOTUS Rule favors the public interest. First, "[t]he public has no interest in the enforcement of what is very likely" an unenforceable rule. <u>Odebrecht</u>, 715 F.3d at 1273. Second, if the WOTUS Rule becomes effective before a final decision on the merits is rendered, farmers, homeowners, and small businesses will need to devote time and expense to obtaining federal permits—all to comply with a rule that is likely to be invalidated. Lastly, enjoining the WOTUS Rule will put the eleven States in this case in the same position as the thirteen states granted preliminary injunctive relief by the District of North Dakota, thereby adding consistency of judicial determination as well as of the Rule's applicability.

## CONCLUSION

Plaintiffs have clearly met the burden of persuasion on each of the four factors entitling them to a preliminary injunction. Three of the four factors (substantial likelihood of success on the merits, balance of harms, and public interest) weigh overwhelmingly in Plaintiffs' favor. One, substantial threat of irreparable injury, is a closer call, yet has been satisfied. Plaintiffs' Motion for Preliminary Injunction (Dkt. Nos. 32) is hereby **GRANTED**. The Rule jointly promulgated by the

EPA and the Army Corps, found at Fed. Reg. 37,054-127, is hereby enjoined in the States of Georgia, Alabama, Florida, Indiana, Kansas, North Carolina, South Carolina, Utah, West Virginia, Wisconsin, and the Commonwealth of Kentucky.

**SO ORDERED**, this 8th day of June, 2018.

_____
HON. LISA GODBEY WOOD
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA