**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| STATE OF GEORGIA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANDREW WHEELER, *et al.*,<br><br>*Defendants*. | Case No. 2:15-cv-79 |

**INTERVENOR PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO INTERVENOR DEFENDANTS'
CROSS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Introduction ............................................................................................................................ 2

Argument ............................................................................................................................... 4

   A.   The agencies' ripeness argument is meritless ................................................................ 4

   B.   The Rule is inconsistent with the text of the Clean Water Act and Supreme
       Court precedent and exceeds constitutional limits on federal authority ......................... 7

      1.   The challenge to "interstate waters" is not time barred ............................................ 7

      2.   No one denies that the Rule reads the word "navigable" out of the statute ................ 9

      3.   The definition of "tributary" is inconsistent with Supreme Court precedent ........... 11

      4.   The definition of "adjacent" is inconsistent with Supreme Court precedent ........... 13

      5.   The Rule is unconstitutionally vague ..................................................................... 15

      6.   The Rule violates the Commerce Clause .................................................................. 17

   C.   The WOTUS Rule was promulgated without observance of lawful procedure ............... 17

      1.   The final rule is not a logical outgrowth of the proposed rule ................................. 17

      2.   The regulated parties lacked a meaningful opportunity to comment on the
          final Connectivity Report ..................................................................................... 20

      3.   The agencies failed to consider and respond to significant comments ..................... 22

      4.   The Agency showed a closed mind by engaging in an unlawful advocacy
          campaign ............................................................................................................ 23

      5.   The agencies violated the Regulatory Flexibility Act ............................................. 24

Conclusion ........................................................................................................................... 26

## INTRODUCTION

The agencies acknowledge that the 2015 WOTUS Rule is *currently* in full force and effect in 22 States across the country (DOJ Opp. 4), where it "is creating significant confusion and uncertainty for states, tribes, local governments, agency staff, regulated entities, and the public, particularly in view of court decisions that have cast doubt on [its] legal viability." *Id.* at 9. The agencies also admit that the Rule is most likely unlawful for "some of . . . the same [reasons] raised by the challengers on summary judgment." *Id.* at 14; *accord* 83 Fed. Reg. 32,227 (July 12, 2018) (agencies stating their concerns that the 2015 Rule is inconsistent with statutory text and Supreme Court precedent, exceeds federal Commerce Clause power, improperly usurps authority reserved to the States, and is procedurally deficient).

Yet the agencies say that a decision on the merits here would be "premature" because the agencies' reconsideration of the Rule means that "[the] case is not ripe for adjudication." DOJ Opp. 12. That is so, they say, because—in light of the pending repeal proposal—the harms flowing from the 2015 Rule "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*; *accord id.* at 13 (case unripe because it is "contingent on future possibilities").

These are inconsistent positions. We are not challenging the proposed repeal rule, which is all that might be said to "rest upon contingent future events." We are challenging the 2015 Rule itself—a final regulation, presently enforceable, contingent on nothing. The intervenor plaintiffs and their members live, work, and own property all across the country, including in the 22 States where the Rule is being enforced. They are suffering injury *right now*. The prospect that the agencies might repeal the 2015 Rule at some unknown future date does not undermine the immediacy of their injuries or the fitness of these challenges for prompt judicial resolution. Indeed, even in the 28 States covered by a preliminary injunction, the relief granted by this and other courts is interlocutory and tentative, not fixed or final. In this respect, the preliminary injunctions are merely designed to maintain order while the cases proceed. There accordingly are no impediments to this Court's adjudication of the plaintiffs' and intervenor plaintiffs' complaints on summary judgment.

2

Turning to the merits, the agencies appropriately decline to take a position on our substantive claims, reflecting that they have proposed to conclude that the 2015 Rule creates confusion and uncertainty and exceeds legal and constitutional limits on the their CWA jurisdiction as intended by Congress and required by Supreme Court decisions. 83 Fed. Reg. at 32,228. The agencies do, however, insist that we are time-barred from challenging the inclusion of "interstate waters," including features that are neither navigable nor have any significant nexus to a traditional navigable water, as among the "waters of the United States" covered under the CWA. DOJ Opp. 16-18. *See also* NGO Opp. 20-21. That is mistaken; the agencies reopened the "interstate waters" issue both by attempting anew to justify its inclusion and by extending jurisdiction to other features based on their interactions with interstate waters—points the agencies fail to address.

The intervenor defendants attempt to fill in where the agencies leave gaps, defending the Rule's substance by saying that it comports with the scientific record. But science has to operate within the confines of the statutory text. Here, as we demonstrated in the opening memorandum, the Rule is plainly out of step with statute's text and the Supreme Court's precedents. *See Rapanos v. United States*, 547 U.S. 715, 777-78 (2006) ("Scientific evidence" and "environmental concerns provide no reason to disregard limits in the statutory text") (Kennedy, J., concurring); 83 Fed. Reg. at 32,241 ("The agencies now believe that they previously placed too much emphasis on the information and conclusions of the Connectivity Report when setting jurisdictional lines in the 2015 Rule, relying on its environmental conclusions in place of interpreting the statutory text and other indicia of Congressional intent").  No issue of deference to the agencies' view of the science arises here.

The agencies and intervenor defendants both also assert that our procedural claims are lacking. But they again fail to engage in the substance of our arguments, offering instead misdirection and mischaracterization. None of it is enough to overcome what every other court to consider the issue has determined: that the final Rule was not a logical outgrowth of the proposed Rule, and that the Rule is in many other respects procedurally defective.

## ARGUMENT

### A.      The agencies' ripeness argument is meritless

The agencies urge this Court to decline jurisdiction over this case, asserting that a final judgment on the merits would be "premature" in light of the agencies' proposed repeal of the 2015 Rule. DOJ Opp. 12. Their position, in effect, is that because the case *might* become "moot" because of agency action at some unknown point in the future, it is presently "not ripe" for resolution. *Id*. at 14-16. That position has no merit. In fact, declining to exercise jurisdiction over a final regulation currently being enforced and causing immediate harms would be flatly inconsistent with the Court's "'virtually unflagging'" obligation to hear cases within its jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014) (citation omitted).

Under the ripeness doctrine, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). The "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.*

That rationale has no application here—and it takes no complex analysis to see why.

**1.**   To begin with, the 2015 Rule is plainly fit for judicial decision. It is a final agency action that is being enforced and that is requiring the intervenor plaintiffs and their members to adjust their conduct immediately. This is no mere "abstract disagreement[] over administrative policies" (*Abbott Labs*, 387 U.S. at 148), but a concrete dispute over the lawfulness of a final agency action that is now being enforced. A "substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately" is "'ripe' for review at once." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see also Media Gen. Operations Inc. v. Herman*, 152 F. Supp. 2d 1368, 1373 (S.D. Ga. 2001) ("Where the plaintiff challenges agency action, ripeness essentially turns on whether there has been 'final agency action' within the meaning of APA § 704."). That is this case.

4

It makes no difference that the agencies are reconsidering the Rule. There is no guarantee that the proposed repeal of the Rule will be finalized. In other words, the court has "no way of knowing" the direction that the proposed rulemaking may take. *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 354 n.8 (D.C. Cir. 1993); *see also Comite De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 184 (3d Cir. 2014) (rejecting the government's ripeness argument where the agency, despite a notice of proposed repeal, was "using the challenged rules on an ongoing basis"). That is especially so here, given that the agencies have stated, quite properly, that they "are keeping an open mind" and continuing to deliberate on "whether the 2015 Rule should be repealed, modified, *or retained*." DOJ Opp. 2 (emphasis added). The agencies accurately frame the repeal as conditional only. *See id.* at 8 ("*If* finalized, this proposal would . . .") (emphasis added); *id.* at 15 ("*If the Agencies finalize either the repeal rule or a new definition . . .*") (emphasis added).

Courts routinely review and vacate unlawful rules—even interim rules—while the agency considers a final replacement rule. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (rejecting "EPA's claim that the challenged errors are harmless simply because of the pendency of a properly-noticed final rule"); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1038, 1039-40 (D.C. Cir.) (rejecting the government's argument that an agency action is not final when the agency "intends to continue considering" the rule and holding agency act ripe for review), *modified on reh'g on other grounds*, 293 F.3d 537 (D.C. Cir. 2002). *Cf. Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 627 n.5 (2018) (deciding issue of jurisdiction to challenge 2015 Rule despite proposed repeal).

**2.**   Delayed resolution would also impose substantial hardship on parties before the Court. On this score, "[i]t must be alleged that the plaintiff has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged statute or official conduct." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (internal quotation marks omitted). That is this case. It is flat wrong to suggest that the Rule "w[ill] not take effect absent further action by the agency." DOJ Opp. 16.

The agencies argue the parties face no hardship from a delay because a regional preliminary injunction is in place. That is mistaken, for two reasons.

*First*, everyone agrees (as they must) that the Rule is in effect in 22 States and the District of Columbia. The intervenor defendants' members with operations in those jurisdictions are now subject to regulation under the Rule and have had to alter their conduct to conform with it. That by itself is sufficient to ripen the controversy here. According to the Supreme Court, delay imposes hardship when a regulation is presently "ha[ving] an immediate and substantial impact upon the respondents." *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967); *see also Abbott Labs.*, 387 U.S. at 152 (a regulation is sufficiently "immediate as to render the issue appropriate for judicial review" where it has a "direct effect on the day-to-day business" of the parties).

As we explained in the motion for an expanded preliminary injunction (Dkt. 208), these harms are very real: Regulated entities are incurring significant compliance costs as they obtain permits they would not otherwise need or refrain from development projects that have been made economically infeasible by the 2015 WOTUS Rule. *See* Dkt. 208, at 11-16; Dkt. 218, at 5-9. Indeed, it's enough just to show that the persistent doubts about the validity of the Rule have "plagued" the regulated community. *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 581 (1985) (such uncertainties "impose a palpable and considerable hardship") (internal quotation marks omitted). Even the agencies acknowledge these harmful uncertainties. DOJ Opp. 8-9; 83 Fed. Reg. at 32,237.[1]

*Second*, even as to the 28 States where the Rule is enjoined, it is settled that a preliminary injunction it inherently tentative and does not deprive a court of continuing Article III jurisdiction. Were it otherwise, preliminary injunctions would function as final judgments. That is not the law. To the contrary, a preliminary injunction is "by its very nature, interlocutory, tentative, provisional, ad

---

[1]   *Wyoming v. Zinke*, 871 F.3d 1133, 1142-43 (10th Cir. 2017) does not suggest otherwise. There, the district court had already invalidated a challenged regulation. *Id.* at 1137. In the interim, the agency had instituted procedures to rescind the invalidated regulation. Because the challenged regulation had already been set aside, withholding judicial review would not have imposed *any* recognizable hardship. *Id.* at 1142-43. Here the opposite is true.

interim, impermanent, mutable, not fixed or final or conclusive." *Eastman Kodak Co. v. Fotomat Corp.*, 317 F. Supp. 304, 325 (N.D. Ga. 1969). The preliminary injunctions against enforcement of the 2015 Rule are "designed to maintain order" based on "tentative findings" while the cases proceed; they are provisional only and do not provide final relief. 18B Charles Alan Wright et al., *Federal Practice & Procedure: Jurisdiction* 2d § 4478.1 (2d ed. 2002). Thus, even in those States where the Rule is not being enforced, the regulated public remains "immediately in danger" (*O'Shea*, 414 U.S. at 494) of being subject to the Rule.

At bottom, there is no credible basis for saying that a final regulation that is being enforced and imposing substantial hardship on the challengers is not ripe for judicial review. The Court should address the challenge to the 2015 Rule before it.

**B.    The Rule is inconsistent with the text of the Clean Water Act and Supreme Court precedent and exceeds constitutional limits on federal authority**

*1.    The challenge to "interstate waters" is not time barred*

We demonstrated in our opening memorandum (at 12-15) that the Rule effectively reads the word "navigable" out of the CWA. Nowhere is that conclusion more clear than with respect to the Rule's coverage of "interstate waters," which are categorically jurisdictional regardless of whether they are navigable or have any appreciable connection to a navigable water. *See* 80 Fed. Reg. 37,054, 37,074 (June 29, 2015) ("Interstate waters" are those that cross state borders, "even if they are not navigable" and "do not connect to [navigable] waters").

The agencies (DOJ Opp. 16-18) and intervenor defendants (NGO Opp. 20-21) assert that our challenge to "interstate waters" is untimely. They contend that (1) the APA requires challenges to final agency actions to be brought within six years, (2) the provision for "interstate waters" predated the 2015 Rule by more than six years, and (3) the Rule did not change the provision for "interstate waters." Therefore, they say, the challenge is time barred. That is incorrect.

It is well settled that the period for seeking judicial review of an agency's rule or other interpretation "may be made to run anew when the agency in question by some new promulgation

creates the opportunity for renewed comment and objection." *Ohio v. EPA,* 838 F.2d 1325, 1328 (D.C. Cir. 1988). The "general principle" of this so-called reopener doctrine is that "if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable." *Ass'n of Am. RRs v. I.C.C.,* 846 F.2d 1465, 1473 (D.C. Cir. 1988). The doctrine thus provides that "the time for seeking review r[uns] anew from the time of re-promulgation" when "the agency h[olds] out [the unchanged section] as a proposed regulation, offer[s] an explanation for its language, solicit[s] comments on its substance, and respond[s] to the comments in promulgating the regulation in its final form." *Ohio*, 838 F.2d at 1328 (internal quotation marks omitted).

That is just what happened here: The agencies expressly held out coverage of "interstate waters" as part of the proposed 2015 Rule, offered an extensive justification for that coverage, and took and responded to comments on the issue. For example, the notice of the proposed 2015 Rule included a highly detailed discussion of why, in the agencies' view, "the plain language of the Clean Water Act and the statute as a whole clearly indicate Congress' intent to include interstate waters within the scope of 'navigable waters' for purposes of the Clean Water Act." 79 Fed. Reg. 22,188, 22,254 (Apr. 21, 2014) (initial capitals and emphasis omitted); *see also generally id.* at 22,254-59 (discussion of the basis for agency jurisdiction over interstate waters). And as the agencies expressly acknowledged in the preamble to the final 2015 Rule, "[t]he agencies received a number of comments on interstate waters." 80 Fed. Reg. at 37,075. "Some commenters," for example, "asserted that interstate waters required a significant nexus to a traditional navigable water in order to be jurisdictional after *Rapanos*." *Id*. The agencies then responded substantively to these comments, explaining that "[t]he agencies disagree" that interstate waters should not categorically be included within the their regulatory jurisdiction "for the reasons described above, in Appendix B to the proposed rule, and in the Technical Support Document." *Id*. That is a textbook example of reopening the issue for renewed comment, objection, and legal challenge. *Ohio*, 838 F.2d at 1328.

Application of the reopener doctrine under these circumstances is particularly appropriate because the state of the law has developed significantly since the agencies first asserted jurisdiction

over "interstate waters" shortly after the CWA was enacted. Arguments based on the reasoning in *Rapanos*, *SWANCC*, and *Riverside Bayview* are not "arguments that [were] available to [the parties or the agencies] at the time the [original] rule was adopted." *Nat'l Mining Ass'n v. Office of Hearings & Appeals*, 777 F. Supp. 2d 164, 174 (D.D.C. 2011). The parties thus "had an entirely new ground for attacking the regulations." *Id.* That is added reason to apply the reopener doctrine.

Beyond all that, the agencies must be understood as having reopened the "interstate waters" issue because the Rule drastically alters the kind and quantity of features that may be deemed jurisdictional on the basis of their *connection to* non-navigable interstate waters. Under the 2015 Rule, "tributaries" to interstate waters are jurisdictional (33 C.F.R. 328.3(c)(3)), as are features "adjacent" to interstate waters (33 C.F.R. 328.3(c)(1)), and features with a "significant nexus" to interstate waters (33 C.F.R. 328.3(c)(5)). By elevating interstate waters among the core features to which other features may be linked for jurisdictional purposes, the Rule dramatically expands the role and importance of "interstate waters" under the CWA. This, too, provides a new ground for objecting to the agencies' inclusion of "interstate waters" as among the features categorically deemed to be "waters of the United States." The Court accordingly should address the Rule's improper coverage of all "interstate waters." which reads the word "navigable" out of the CWA. *See* Opening Mem. 14.[2]

2.   *No one denies that the Rule reads the word "navigable" out of the statute*

As we showed in our opening memorandum (at 12-15), the Rule's extension of regulatory jurisdiction over dry ditches, intermittent rivulets, isolated wetlands, as well as water features of any sort that happen the cross a state line effectively reads the word "navigable" out of the statute.

The intervenor defendants' only response is to say that "the structure and language of the [CWA] plainly protects waters beyond navigable-in-fact waters." NGO Opp. 21. We do not disagree.

---

[2]   Even the intervenor defendants agree that the Act cannot be interpreted to cover "isolated ponds, like those in *SWANCC*, or drains and ditches simply because they carry minor intermittent water volumes 'toward' a navigable water." NGO Opp. 13. Yet such features *are* jurisdictional under the Rule if they happen to cross a state line. That is an arbitrary and capricious distinction.

But that does not mean that the agencies' have limitless jurisdiction over innumerable dry land features. To the contrary, "the word 'navigable'" cannot be ignored and must "be given some importance." *Rapanos*, 547 U.S. at 778-79 (Kennedy, J., concurring). Agencies, no less than courts, "must give effect to every clause and word of" the statutes they purport to interpret. *Setser v. United States*, 566 U.S. 231, 239 (2012) (internal ellipses and quotation marks omitted).

Yet the 2015 Rule gives the word *no* effect, and neither do the intervenor defendants. In their view, it is enough to observe that the agencies "meticulously reviewed all available science about how waters are connected to determine which categories of waters significantly affect the physical chemical, or biological integrity" of traditionally navigable waters. NGO Opp. 8-9. Even assuming arguendo that were correct (it is not), pointing to the Connectivity Report is not responsive to our argument, which concerns the statutory language and Supreme Court precedent within which the agencies must operate. As the agencies recognize, they cannot rely on "environmental conclusions in place of interpreting the statutory text and other indicia of Congressional intent" to ensure they remain within their "statutory authority to regulate." 83 Fed. Reg. at 32,241.

The point on this score is, in other words, not that scientific evidence is lacking, but that the Clean Water Act, by its plain terms, applies to *navigable* waters and waters closely connected to them—not to every intermittent trickle or dry drainage ditch that a scientific study may show has some attenuated connection with a navigable water. If the Act's language is read to "extend to the furthest stretch of its indeterminacy" as the intervenor defendants suggest, there would be no end to federal jurisdiction because, "[r]eally, universally, relations stop nowhere." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 (1997) (internal quotation marks omitted); *accord id*. at 813 n.7 ("as many a curbstone philosopher has observed, everything is related to everything else") (quoting *Cal. Div. of Labor Standards Enforcement v.  Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)). Deposits on an open field could, in theory, be carried away by sheet-flow runoff during a rain event, ultimately reaching some distant erosional feature that flows into to an even more distant brook that scientific studies show "affects" some far-off river;

but that would not justify including "open fields" within the definition of "navigable waters."

All of this is made clear in Justice Kennedy's *Rapanos* concurrence, where he stated that the agencies may not regulate as waters of the United States "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." 547 U.S. at 781. Yet that is exactly with the Rule does. *See* Opening Mem. 12-15. The intervenor defendants simply talk past this argument, citing *scientific evidence* as a basis for concluding that Justice Kennedy's interpretation of *statutory text* was wrong.

As this Court observed in granting a preliminary injunction, one clear example of how the agencies appealed to science to avoid clear law is its reinstatement of the migratory bird rule that was struck down in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"). The Rule "asserts that, standing alone, a significant 'biological effect'—including an effect on 'life cycle dependent aquatic habitat[s]—would place a water within the CWA's jurisdiction." *Ga. v. Pruitt*, 326 F. Supp. 3d 1356, 1365 (S.D. Ga. 2018) (internal quotation marks omitted). This Court was surely correct, therefore, that the Rule should "fail for the same reason that the rule in *SWANCC* failed." *Id.*

3.   *The definition of "tributary" is inconsistent with Supreme Court precedent*

We explained in the opening memorandum (at 15-17) how the Rule's definition of "tributary" covers "remote" features with only "minor" connections to navigable waters—features that "in many cases" are "little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act's scope in *SWANCC*." *Rapanos*, 547 U.S. at 781-82 (Kennedy, J., concurring). That is largely due to the Rule's dependence on the presence of "ordinary high water marks" with a "bed and banks" between them. As we explained, those malleable requirements are easily satisfied even when there is no regular or significant flow associated with them, especially in dry environments like vast tracts throughout the arid West.

The intervenor defendants' response to this point is simply to regurgitate the agencies' *ipse dixit* from the preamble to the final Rule: a bed, banks, and OHWM are "only created by sufficient

and regular intervals of flow." NGO Opp. 12 (quoting 80 Fed. Reg. at 37,076). "The physical indicators of bed and banks and ordinary high water mark," they insist, "[therefore] demonstrate that there is sufficient volume, frequency, and flow in such tributaries to a traditional navigable water, interstate water, or the territorial seas to establish a significant nexus." *Id*. (quoting 80 Fed. Reg. at 37,058); *accord* Dkt. 199-13, at 28 (confirming that the Rule's definition of "tributary" relies on the premise that that an "OHWM forms due to some regularity of flow and does not occur due to extraordinary events").

That is simply incorrect. In the western United States, in particular, erosional features with beds, banks, and OHWMs frequently reflect one-time water events; they assuredly are not reliable indicators of regular flow. *See* Opening Mem. 16.

The intervenor defendants say that we offer "no science to support [this] position." NGO Opp. 12. But that is wrong again. In fact, we cited several public comments that are chock full of citations to scientific analyses, including numerous peer reviewed articles (*e.g.*, Dkt. 199-18 (citing peer reviewed studies from the *Journal of Hydraulic Engineering*, *Ecohydrology*, *Water Resources Research*, and multiple topical anthologies)), and no fewer than six of the Army Corps of Engineers' own studies. *E.g. id.*; Dkt. 199-15, at 7-11. These studies, which went unaddressed by the agencies in the rulemaking, leave no doubt that the Rule's definition of "tributary" sweeps in features "carrying only minor water volumes toward" a "remote" navigable water that in no way "bear a sufficient nexus with other regulated waters." *Rapanos*, 547 U.S. at 781, 788.

In an apparent attempt to excuse the Rule's inconsistency with Justice Kennedy's *Rapanos* concurrence, the intervenor defendants note that Justice Kennedy did not have "the benefit of more than 1,200 peer-reviewed scientific publications and hundreds of pages of technical support to elucidate" the true meaning of the statute. NGO Opp. 12. But the question is not what the scientific evidence *shows*; it was what the statutory text *means*. The intervenor defendants' passion for the scientific evidence may be a basis for proposing amendments to the CWA, but it is not a basis for interpreting the Act's *current* text to mean something that it does not. As this Court observed in

12

granting a preliminary injunction, the 2015 Rule's definition of "tributary" is "similar to the one in-validated in *Rapanos*, and it carries with it the same concern that Justice Kennedy had there." *Pruitt*, 326 F. Supp. 3d at 1365.

        4.     *The definition of "adjacent" is inconsistent with Supreme Court precedent*

      The same goes for the intervenor defendants' defense of the Rule's definition of "adjacent" waters. We showed in the opening memorandum (at 17-19) that the agencies' approach to "adjacent" features is inconsistent with (1) *United States v. Riverside Bayview Homes, Inc.* because it sweeps in countless features that are not "inseparably bound up" with the water that they supposedly neighbor (474 U.S. 121, 134 (1985)); (2) Justice Kennedy's *Rapanos* concurrence, which expressly rejected the notion that jurisdiction could be based on "mere adjacency to a tributary" (547 U.S. at 786); (3) the *Rapanos* plurality, which requires a "continuous surface connection" for an adjacency determination (*id.* at 742); and (4) the Corps' own guidance, which previously held that "it is not appropriate to determine significant nexus based solely on any specific threshold of distance" (Dkt. 199-22, at 2) (internal quotation marks omitted).

      In response, the intervenor defendants offer another variation on their favored theme, insisting that the agencies' conclusion that "adjacent" waters, as defined in the Rule, have a "sig-nificant nexus" to traditional navigable waters, interstate waters, and the territorial seas "is strongly supported by the scientific evidence." NGO Opp. 16. But they fail to back that up. Pointing to no evidence at all, they simply assert the Rule identifies "categories of tributaries . . . significant enough" that "wetlands adjacent to them" are likely perform "important functions for an aquatic system incorporating navigable waters." *Id*. at 17 (quoting *Rapanos*, 547 U.S. at 781).

      To be sure, Justice Kennedy suggested that the Corps might be able to identify a subset of tributaries that perform such significant functions. But that is not what the Rule does. Instead, it asserts adjacency jurisdiction based on an *even broader* (and categorical) definition of tributaries than the one that faced the Court when *Rapanos* was decided. As the agencies frankly acknowledge, the Rule's expansive definitions mean that "the vast majority of water features in the United States"

are covered. 83 Fed. Reg. at 32,229; *accord* Dkt. 199-45, at 24.

The intervenor defendants claim that the Rule lawfully covers waters "within the 100-year floodplain of a jurisdictional water" as "adjacent" waters, because waters within a flood plain have an ecological connection to wetlands that "goes far beyond the probability of flooding." NGO Opp. 15, 18. But in making this claim, the intervenor defendants fail to justify the agencies' decision to use the 100-year floodplain rather than the 50-year, 500-year, or any other time-delineated floodplain. The selection of the 100-year floodplain cutoff was entirely arbitrary. So, too, was the decision to impose a 1,500-foot distance limit from the primary water's OHWM. If, as the intervenor defendants assert, "[f]loodplain waters provide vital functions within a river system such as through flood storage and acting as a buffer to mitigate pollution" (*id.* at 18), that presumably would be true of floodplain features that are further than 1,500 feet from the primary water.

The intervenor defendants tepidly defend the distance limits as "reasonable," asserting that "the geographic boundaries were drawn *based on scientific evidence that waters within those boundaries significantly affect primary waters*." NGO Opp. 19. Setting aside for now that the public had no opportunity to comment on the distance limits or scientific evidence that supposedly supports them, the intervenor defendants again miss the point. The question is not whether features *within* the boundaries have been shown to "significantly affect" the primary water; it is whether the evidence justifies the drawing of those boundaries in the first place because they mark some magical differentiation in "significant effect" on the primary water—as though any feature 1,499 feet from the feature has a significant effect, but any that is 1,501 feet from it does not. On that critical question, there is *zero* evidence.

The bald conclusion that a number is "reasonable because it is reasonable" is not entitled to deference. *WJG Tel. Co. v. FCC*, 675 F.2d 386, 388-89 (D.C. Cir. 1982). An agency "may not pluck a number out of thin air." *Id.* And merely intoning "technical expertise" is "not sufficient" in the absence of "specific scientific support substantiating the reasonableness of the bright-line standards they ultimately chose." *In re EPA*, 803 F.3d 804, 807-08 (6th Cir. 2015), *vacated on jurisdictional*

14

*grounds sub nom. In re U.S. Dep't of Defense*, 713 F. App'x 489 (6th Cir. 2018).

       5.    *The Rule is unconstitutionally vague*

As though the textual deficiencies of the Rule were not enough, it also violates the Constitution. The intervenor defendants attempt to salvage the standardless discretion apparent in the Rule by relying on an outmoded principle: "A rule that does not reach constitutionally protected conduct is not void for vagueness unless it is impermissibly vague in all of its applications." *Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d 1261, 1277 (11th Cir. 1999); NGO Opp. 22-23. The Supreme Court has since clarified that "our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015). Not only is *American Iron* outmoded, but it also does not apply to the present circumstances. *American Iron* involved a challenge to "a clause whose sole effect is to give a regulated person an additional, optional means of compliance with a statute or regulation." 182 F.3d at 1277. Here, regulated parties face steep fines and criminal penalties for non-compliance.

The intervenor defendants next suggest that costly jurisdictional determinations (JDs) ameliorate the vagueness of the Rule. NGO Opp. 23. But a JD does nothing to address the Rule's encouragement of arbitrary and discriminatory enforcement—it is merely another instance in which that arbitrariness can manifest itself. Again, "the difficulty and ambiguity associated with identifying" an OHWM means that "if [you] asked three different district staff to make a jurisdictional determination, [you] would probably get three different assessments." GAO, *Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction*, GAO-04-297, at 20-22 (Feb. 2004). That is particularly apparent given that "[o]ther evidence, besides direct field observation," can "establish" an OHWM. 80 Fed. Reg. at 37,076. The preamble warns that regulators may use, for example, desktop computer models "independently to infer" jurisdiction where "physical characteristics" of bed and banks and OHWM "are *absent* in the field." *Id.* at 37,077 (emphasis added). That means an OHWM will exist when they *say* it exists, even if it is

not visible to the naked eye. In fact, "[t]here are no 'required' physical characteristics that must be present to make an OHWM determination." Dkt. 199-23, at 3.

JDs cannot solve the constitutional problem when they are themselves guided by a vague rule; are available only in the Section 404 context, not the Section 402 context (*see* 33 C.F.R. 331.2); and are not binding on NGOs, who are free to bring citizen enforcement actions under the Rule's nebulous standards. And the Rule's "uncertain reach" is especially troubling given the "draconian penalties" for CWA violations, which include criminal as well as civil penalties. *Sackett v. EPA*, 566 U.S. 120, 132-33 (2012) (Alito, J., concurring). The Rule invites the exercise of "arbitrary power" that "leav[es] people in the dark about what the law demands" and allows the agencies "to make it up." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223-24 (2018) (Gorsuch, J., concurring in part and concurring in the judgment). Due process does not permit that approach.

In arguing otherwise, the intervenor defendants point to *Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000), which says in a footnote that "the availability of advisory opinions to gauge the application of [the Rule] to specific situations bolsters its validity." *Id*. at 959 n.4. *Mason* involved a challenge to a rule regulating the Florida Bar that restricted attorney advertising. The Court found the Rule's language "plain," before referencing the availability of advisory opinions to provide additional guidance. *Id.* at 959.

The situation here could not be more different. For one thing, the Rule's language is not plain and does not put members on notice of the features covered by the Rule. *See* Opening Mem. 19-22. For another, a single JD will not provide guidance helpful beyond the specific feature under consideration. And finally, the availability of an advisory determination in *Mason* did not necessitate the "hiring of expert consultants to determine" the applicability of the regulation at great cost to the regulated public. *Hawkes Co. v. U.S. Army Corps of Eng'rs.*, 782 F.3d 994, 1003 (8th Cir. 2015). We are unaware of any other circumstance in which a citizen must obtain a case-specific government report, at great personal expense, to be informed of the limits of the law. *See id*. ("This is a unique aspect of the CWA; most laws do not require the hiring of expert consultants to determine if they

16

even apply to you or your property."). Simply put, the possibility that regulated parties might pursue the costly JD process—which does not solve the Rule's arbitrary standards and produces inconsistent results—does not cure the vagueness of the Rule.

### 6. The Rule violates the Commerce Clause

To defend the Rule's constitutionality under the Commerce Clause, the intervenor defendants state that the "Commerce Clause allows the federal government to regulate interstate waters and activities affecting interstate waters." NGO Opp. 24. The crux of their argument appears to be that the Rule is valid because it applies the significant nexus test, and the significant nexus test only captures such waters. *Id*. This argument crumbles easily: the Rule does comply with the significant nexus test as laid out in *Rapanos*; instead, it captures waters far removed from waters that are navigable-in-fact, or can be used as channels of interstate commerce.  Because the Rule captures features that do not "'substantially affect[]' interstate commerce" (*United States v. Lopez*, 514 U.S. 549, 559 (1995))—admittedly including trivial, non-navigable interstate waters—it violates the Commerce Clause.

### C.   The WOTUS Rule was promulgated without observance of lawful procedure

#### 1. The final rule is not a logical outgrowth of the proposed rule

The agencies and intervenor defendants defend the drastic changes made between the proposed rule and final Rule, without opportunity for further comment, as a "logical outgrowth" of the proposal. DOJ Opp. 21-25; NGO Opp. 26. That is incorrect. The alterations between the proposed and final rule resulted in substantial changes that were not foreseeable and so required an additional notice and comment period to satisfy the APA. The logical outgrowth test cannot save a rule where "'interested parties would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the proposed rule.'" *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation omitted).

**a.**  Reasonable parties could not anticipate distance limitations in the final definition of "adjacent waters." The agencies contend that those distance limits are a "logical outgrowth" because

EPA "sought comment on a number of ways to address and clarify jurisdiction over 'adjacent waters,' including establishing a floodplain interval (e.g., a 50-year or 100-year floodplain) and providing clarity on reasonable proximity as an important aspect of adjacency." DOJ Opp. 21. A simple read of the federal record shows otherwise. The agencies requested:

> comment on other whether there are other reasonable options for providing clarity for jurisdiction over waters with these types of connections….Options could include asserting jurisdiction over all waters connected through a shallow subsurface hydrologic connection or confined surface hydrologic connection regardless of distance; asserting jurisdiction over adjacent waters only if they are located in the floodplain or riparian zone of a jurisdictional water; considering only confined surface connections but not shallow subsurface connections for purposes of determining adjacency; or **establishing specific geographic limits** for using shallow subsurface or confined surface hydrological connections as a basis for determining adjacency, including, for example, distance limitations based on ratios compared to the bank-to-bank width of the water to which the water is adjacent.

79 Fed. Reg. at 22,208 (emphasis added). While the agencies evinced an "intent to … define the lateral reach" of the term  (DOJ Opp. 22 (alteration and emphasis omitted, quoting 79 Fed. Reg. at 22,207)), this mention of "geographic limits" as one possibility out of a list of several fails to identify the possible range for the geographic limit under consideration, why a geographic limit could be appropriate, or how the geographic limit might be selected, and suggests limits tied to geographic features rather than measured by arbitrary, purely numerical metrics of distance. Indeed, the agencies acknowledge that none of the final Rule's various "quantitative measures" "appear[ed]" in the proposed rule, and thus the agencies did not receive public comment on these specific measures." 83 Fed. Reg. at 32,229.[3]

 The fact that "geographic limit" is slapped among a list of alternative methods with no

---

[3] Of course, the agency was not required to "identify the precise numerical limit." *Ala. Power Co. v. OSHA*, 89 F.3d 740 (11th Cir. 1996). The issue here is that the agency did not say anything that would permit an understanding that a numerical limit was on the table, much less give an opportunity to comment. Regardless, *Alabama Power* does not apply here. That case was governed by 29 U.S.C. § 655(b)(2), which requires an opportunity to comment on standards that are modified. The court determined that a final rule simply clarified rather than modified a proposal that had permitted natural fabrics in the workplace, where the final rule elaborated that while "natural fabrics are in no way prohibited altogether … certain conditions to which a worker may be exposed call for either a heavyweight natural fabric, or a lightweight flame retardant natural fabric." *Id.* at 745.

elaboration does not render the final Rule a "natural subset" of the proposal. *Cf. La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1081 (D.C. Cir. 2003) (final rule was a natural subset where the proposal merely suggested a different means for the same ultimate result). Nor does it provide an opportunity for meaningful participation in notice and comment. Indeed, the idea that a generic request for "comment on other whether there are other reasonable options" including (among many others) "establishing specific geographic limits" (79 Fed. Reg. at 22,208) would give the public notice that they should anticipate and comment on 1,500-foot and 4,000-foot thresholds inconsistently sprinkled throughout the Rule borders on ridiculous. Although a proposal may rely on a "description of the subjects and issues covered by a proposed rule, [the] description must provide sufficient detail and rationale for the rule to permit interested parties to participate meaningfully." *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994) (internal quotation marks omitted). Much smaller jumps fail the logical outgrowth test. *See, e.g.*, *CSX Transp., Inc.*, 584 F.3d at 1082 (Rule not a logical outgrowth where release of one-year data proposed but final rule expanded to four years).

The agencies and intervenor defendants suggest that comments regarding distance limitations establish adequate notice. *See* DOJ Opp. 23, citing *Am. Trucking Ass'ns, Inc. v. FMCSA*, 724 F.3d 243, 253 (D.C. Cir. 2013) (parties' express recognition in comments of possibility of standard ultimately adopted confirmed prior analysis showing rule to be a logical outgrowth); NGO Opp. 28. But comments alone are not enough. While "insightful comments may be reflective of notice and may be adduced as evidence of its adequacy," other courts have rejected "bootstrap arguments predicating notice on public comments alone." *Horsehead Res.*, 16 F.3d at 1268. The distance limitations in the definition of "adjacent" do not quality as a logical outgrowth of an initial proposal that no reasonably careful reader would take to suggest distance limitations, still less those adopted in the final rule.

**b.**  Reasonable parties also could not anticipate distance limitations in the definition of waters with a significant nexus. Relying on a case that "stretches the concept of 'logical outgrowth'

19

to its limits," *NRDC v. Thomas*, 838 F.2d 1224, 1243 (D.C. Cir. 1988), the agencies argue that the distance limitations smuggled into the final definition of case-specific waters were a logical out-growth of the proposal because the "germ" of a distance limitation was contained in the proposal. The agencies (at 26) see this "germ" in the proposal that case-specific waters should be "sufficiently close" to a jurisdictional water. The intervenor defendants see it in the statement that case-specific significant nexus determinations would be based on the "location" of the water. NGO Opp. at 29 (quoting 79 Fed. Reg. 22,214). But neither the bare-bones phrase "sufficiently close" nor the one-off word "location" give the remotest notice that a particular numerical measure of distance would be the standard. That is especially so in a context where different types of "connections" were under discussion. These unexplained, isolated statements do not provide the notice necessary to comport with the purpose of APA notice and comment rulemaking: to provide parties a meaningful opportunity to participate. *See Horsehead Res.*, 16 F.3d at 1267.[4]

  2. *The regulated parties lacked a meaningful opportunity to comment on the final Connectivity Report*

  The agencies contend that parties had an adequate opportunity to comment on the Connectivity Report, despite the fact that its final version was published after the notice and comment window closed, because the final Report "simply clarified and expanded upon concepts and topics in the *Draft* Science Report." DOJ Opp. 30 (emphasis added). The intervenor defendants chime in that the Draft Science Report reviewed thousands of scientific studies. NGO Opp. 30. But the relevant inquire is what was missing from the draft Report and its relevance to the final rule.

  It is true that "an agency may add supporting documentation for a final Rule in response to comments, as well as supplementary data that expands on or confirms the information contained in the proposed rule." DOJ Opp. 29 (citing *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th

---

[4] The "germ" referenced in *Thomas* that drove the agency to alter a standard for determining emissions limitations "was obvious at an early stage" and "constantly asserted" as a theme during the rulemaking. 838 F.2d at 1242. And the EPA in *Thomas* afforded the parties a two-week comment period to address the specific change. Neither circumstance is present here.

Cir. 2006). But that is not what happened here.

The SAB "recommended numerous substantive changes to the Connectivity Report." Dkt. 199-2, at 73 ; *see* Dkt. 199-3. The agencies thus made several notable changes to the Connectivity Report in response to the SAB's review. As a starting point, the final Report cited 349 scientific and academic sources that were not included in the draft Report, including 36 sources published between when the draft and final Reports were issued. There is no question that the public would have commented on these additions if given the opportunity. The WAC Comments, for example, criticized the draft Report for failing to provide metrics to measure the significance of a nexus to traditional navigable waters (Dkt. 199-2 at 25-26); analyzing "significant nexus" as a binary rather than a gradient (at 27); and failing to assess the significance of the effects of ephemeral features on downstream waters (at 35). *See also, e.g.*, Dkt. 199-32, at 41, 53; Dkt. 199-33, at 9, 60-61. These and other commenters would have expanded and refined these criticisms in light of the new sources and analysis, had they been given the opportunity to do so.

Beyond that, the final Report introduced a new, continuum-based approach that analyzed the connectivity of particular waters to downstream waters along various "[d]imensions." Dkt. 199-27, at 41.. And it added a new case study on the connectivity to downstream waters of "Southwestern Intermittent and Ephemeral Streams." Dkt. 199-29, at 2. Both of those changes were responses to SAB criticisms of the proposed Rule, and both would have garnered additional comments from the intervenor plaintiffs had they been disclosed to the public during the comment period.

An additional round of notice and comment is required where a new study is relied on to support the final rule and "critical" to the agency's decision and analysis. *Idaho Farm Bureau*, 58 F.3d at 1403. It is a basic requirement of rulemaking that "the scientific material which is believed to support the rule should be exposed to the view of interested parties for their comment," because "[o]ne cannot ask for comment on a scientific paper without allowing the participants to read the paper." *United States v. Nova Scotia Food Prods. Corp*., 568 F.2d 240, 252 (2d Cir. 1977).

The agencies suggest that the intervenor plaintiffs do not meet their burden to establish "how

they may have responded [to the new material] if given the opportunity" (DOJ Opp. 30). Not so. As we explained in our Motion for Summary Judgments, based on the "349 scientific and academic sources that were not included in the draft Report," members of the intervenor plaintiffs would have "expanded and refined" their criticisms to the draft Report for "failing to provide metrics to measure the significance of a nexus to traditional navigable waters" (Dkt. 199-2, at 25-26); analyzing "significant nexus" as a binary choice rather than a gradient (*id.* at 27); and failing to assess the significance of the effects of ephemeral features on downstream waters (*id.* at 35). *See also, e.g.*, Dkt. 199-32, at 41, 53; Dkt. 199-33, at 9, 60-61; Opening Mem. 28 n.6. The intervenor plaintiffs also explained that several of their members submitted comments stating that the agencies' failure to extend the comment period in light of the delayed release of the Science Report deprived them of the opportunity to comment on the Report's conclusions and methodology. Opening Mem. 28.

### 3.    The agencies failed to consider and respond to significant comments

The intervenor defendants dispute that the agencies failed to consider and respond to significant comments, but cite to replies that do not demonstrate agency engagement with our key concerns. NGO Opp. 32-33. For example, they assert that the agencies addressed comments regarding the Rule's over-expansion of federal jurisdiction by citing to comment responses stating the Rule is narrower than existing regulations. *Id.* This is a clear example of the agency brushing off rather than addressing comments; the position that the Rule *narrows* federal jurisdiction is patently inaccurate. *See, e.g.*, 83 Fed. Reg. at 32,244 (disclosing the mathematical trick that the agencies used to mischaracterize the 34.5% increase in "other waters" jurisdiction into reported 2.09% increase); *id.* at 32,246 (documenting an apparent increase in jurisdictional tributaries from approximately 3.5 million miles to 8 million miles). In fact, the agencies acknowledged that "the vast majority of the nation's water features" fall within the Rule. Dkt. 199-45, at 24; *see also* 83 Fed. Reg. at 32,242-47 (questioning the basis for the agencies' prior conclusion).

The agencies also did not adequately respond to the concern that the proposed rule would eviscerate permitting exceptions for agricultural activities. The intervenor defendants point to a

response stating that the proposal "maintains current statutory exemptions" and "expands regulatory exclusions … to make it clear that this rule does not add any additional permitting requirements on agriculture." NGO Opp. 33 (quoting RTC-1, at 13-14). But this terse, unexplained statement failed to address the relevant concerns: that the CWA's recapture provision would operate to catch agricultural activities that would otherwise be exempt, and that the expansion of jurisdictional "tributaries" would catch agricultural stormwater and irrigation ditches. *See* Opening Mem. 30.

The agencies also failed meaningfully to address the Rule's vastly overbroad coverage of mostly-dry land features in the arid West. On this score, the intervenor defendants say that the agencies' observation that the Corps had previously applied the OHWM metric in the arid West is an adequate response to comments demonstrating that reliance on ordinary high water marks is out of place in dry environments. NGO Opp. 32-33. That is wrong.

Once again, public commenters explained at length—with numerous citations to the Corps' own studies—that an OHWM is *not* an indication of regular flow in arid environments and that basing a definition of "tributaries" on the presence of an OHWM will sweep in features carrying only minor water volumes on irregular and often one-time-only intervals. *E.g.*, Dkt. 199-11; 199-15; 199-18. The observation that the Corps had previously issued guidance on the topic is not responsive to commenters' point that the guidance is useless and does not consistently identify features that are appropriately considered jurisdictional—all the more so given that "the difficulty and ambiguity associated with identifying" an OHWM means that "if [you] asked three different district staff to make a jurisdictional determination, [you] would probably get three different assessments." GAO, *Waters and Wetlands*, *supra*, at 20-22.

4. *The Agency showed a closed mind by engaging in an unlawful advocacy campaign*

The agencies and intervenor defendants miss the point of our arguments relating to EPA's unlawful advocacy campaign. We assert no cause of action based on that illegal conduct. In consequence, our standing to bring such a claim, and whether a private cause of action exists to chal-

lenge the agencies' illegal conduct, are not relevant inquiries. Our point instead is that the GAO report documenting that EPA engaged in a covert propaganda campaign in violation the Appropriations Act and anti-lobbying provisions evidences that the agencies approached the promulgation of the 2015 Rule with a closed mind—a fact that is highly relevant to our APA claims.

Under the APA, the intervenor plaintiffs were entitled to "fairness and transparency" in the rulemaking process. *Iowa League of Cities v. EPA*, 711 F.3d 844, 871 (8th Cir. 2013). The agencies' covert propaganda campaign shows that opponents of the Rule did not receive the "due consideration" to which they were entitled. *Id.* Instead, the EPA used social media to seed third-party comments in favor of the Rule, without disclosing that it was the source of the message; and it linked to the websites of action groups to encourage readers to lobby Congress to defeat legislation aimed at blocking the Rule. The GAO had no trouble finding those biased activities to be unlawful propaganda and lobbying.

The agencies' unlawful conduct thus distorted the rulemaking process by introducing elements "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). And it leaves the clear impression that the agencies were more interested in pushing through their regulation than listening without bias to the views of stakeholders—an impression confirmed by their failure properly to address comments, discussed above. See *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977) (APA requires agency respond to significant comments that "cast doubt on the reasonableness of a position taken by the agency"). The agencies responded to comments not with neutral, well-reasoned analysis, but with covert (sometimes overt) propaganda that started with calling the Rule the "Clean Water Rule" and became progressively more strident as the regulated community exposed the flaws in the proposal. *See* Opening Mem. 31-32.

### 5.   The agencies violated the Regulatory Flexibility Act

The intervenor defendants assert that the agencies' inaccurate and conclusory certification that the Rule would not "have a significant economic impact on a substantial number of small entities" (79 Fed. Reg. at 22,220) suffices to meet its requirements under the RFA. NGO Opp. 33.

But a "conclusory statement with no evidentiary support in the record"—which is all the agencies supplied here—"does not prove compliance with the Regulatory Flexibility Act." *Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 919 F.2d 1148, 1157 (6th Cir. 1990).

The agencies rested their conclusion about the non-impact of the Rule on small businesses on the startling idea that the Rule *narrows* the scope of the CWA and ignored comments explaining that the Rule expands jurisdiction. The failure to address these concerns merits vacatur. "[E]ven when an agency decides (rightly or wrongly, and with or without compliance with the requisite procedures) that it need not prepare regulatory flexibility analyses, the impact of the rule upon small entities can be placed at issue in the public comments, and the agency's failure to make adequate response to serious alleged deficiencies in this regard can of course be grounds for reversal." *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984). And, separately from the agencies' failure to address that concern, vacatur is merited because the agency's defective analysis premised on the Rule narrowing jurisdiction reveals the overall unreasonableness of the final Rule. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 539 (D.C. Cir. 1983) ("[A] reviewing court should consider the regulatory flexibility analysis as part of its overall judgment whether a rule is reasonable and may, in an appropriate case, strike down a rule because of a defect in the flexibility analysis.").

*    *    *

Because they are in the midst of reconsidering the 2015 Rule, the agencies take no position in their summary judgment submission on our arguments regarding the Rule's substantive defects that require vacatur. The agencies do, however, express concerns that "certain findings and assumptions supporting adoption of the 2015 Rule were not correct, and that these conclusions, if erroneous, may separately justify repeal of the 2015 Rule." DOJ Opp. 8. The agencies elaborate on those legal defects in their Supplemental Notice of Proposed Rulemaking (83 Fed. Reg. 32,227), which—unlike the 2015 rulemaking—takes seriously the substantial defects we have identified and seeks comment on them. Faced with agencies that now appear to recognize that the 2015 Rule suffers from serious legal defects, the intervenor defendants attempt to save the Rule by suggesting it is the result of the

2015 agencies' exercise of their expertise in analyzing the science, instead of engaging the legal authority that the Rule violates. NGO Opp. 1, 6. But resolution of this challenge does not turn on questions of *Chevron* deference. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). As we have shown, the Rule is unlawful because it violates the plain text of the CWA, Supreme Court precedent, as well as the Constitution. It accordingly must be vacated.

## CONCLUSION

The motion for summary judgment should be granted, and the Rule should be vacated. The intervenor defendants' Cross Motion for Summary Judgment should be denied.

Dated: November 7, 2018                  Respectfully submitted,

*/s/ Timothy S. Bishop*
Timothy S. Bishop*
Michael B. Kimberly*
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
tbishop@mayerbrown.com
mkimberly@mayerbrown.com

Mark D. Johnson
Georgia Bar No. 395041
Gilbert, Harrell, Sumerford & Martin, P.C.
777 Gloucester Street, Suite 200
Brunswick, Georgia 31520
(912) 265-6700
mjohnson@gilbertharrelllaw.com

*Attorneys for intervenor plaintiffs*
admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 7, 2018, I filed and thereby caused the foregoing document to be served via the CM/ECF system in the United States District Court for the Southern District of Georgia on all parties registered for CM/ECF in the above-captioned matter.

*/s/ Timothy S. Bishop*