## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

State of Georgia, *et al.*,
          *Plaintiffs,*

     v.

Andrew Wheeler, *et al.*,
          *Defendants.*

Case No. 2:15-cv-79-LGW-RSB

## REPLY BRIEF IN SUPPORT OF PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO INTERVENOR-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

In their opening brief, the Plaintiff States showed that the 2015 WOTUS Rule is an unprecedented and unauthorized expansion of federal jurisdiction over state lands and waters—a federal overreach that this Court and others have already concluded is likely illegal. In their responses, neither the Agencies nor Intervenor-Defendants offer a persuasive defense of the Rule. Indeed, the Agencies do not even try to defend the substance of the Rule; after first asking this Court to not decide the case (recycling already-rejected "prudential ripeness" arguments), the Agencies take "no position" on the Plaintiff States' substantive challenges to the Rule. In fact, the Agencies point out that they have "expressed concern" that the WOTUS Rule "may not comport with and accurately implement the legal limits on" their jurisdiction under the Clean Water Act (CWA); may "test the limits of the scope of the Commerce Clause"; and may have impermissibly "altered the balance of authorities between the federal and State governments." Such statements of doubt from the very agencies that promulgated the Rule do not instill confidence in its legality.

Intervenor-Defendants take up the substantive defense of the Rule in the Agencies' stead, but they ultimately offer no argument that saves the Rule from its fatal defects. Among other problems, they cannot explain away the Rule's clear inclusion of various categories of features— ditches, trickles, and more—that Justice Kennedy's controlling *Rapanos* opinion deems beyond the Clean Water Act's jurisdictional grant. And Intervenor-Defendants' reliance on *Chevron*

deference is particularly misguided, since the Agencies themselves—the only parties that could be entitled to such deference—do not seek it.

The Agencies and Intervenor-Defendants fare no better in defending against the Plaintiff States' procedural challenges. Most importantly, neither shows where the proposed rule notified interested parties that the WOTUS Rule might define adjacent and case-by-case waters according to five specific distance-based limitations. The Agencies point to vague and generalized phrases in the proposed rule like "lateral reach" and "sufficiently close," none of which indicated that they were considering or might include in the final rule fixed numeric distances as determinative limitations on jurisdictional waters, much less what range of distances was under consideration. In addition, the Defendants fail to point to any reasoned, science-based justification for those particular limits, which makes them arbitrary and capricious, in violation of the Administrative Procedure Act (APA).

In short, the Defendants' responses offer no reason for this Court to retreat from its preliminary conclusion that the WOTUS Rule is likely illegal. It was and remains a rule that exceeds the Agencies' statutory authority, violates the Constitution, and violates the APA's procedural requirements. This Court should therefore grant summary judgment in the Plaintiff States' favor and vacate the Rule in its entirety.[1]

# ARGUMENT

## I. This Court, the Supreme Court, and courts around the country have properly rejected the Agencies' prudential ripeness arguments.

The Agencies once again ask this Court to decline to adjudicate this case as a matter of prudential ripeness because they have proposed to repeal the WOTUS Rule. ECF No. 215 (Agencies' Br.) at 15–19; *see* ECF No. 134 (Agencies' motion to stay) at 9–11. This Court already rejected that invitation once, *see* ECF Nos. 134, 140 (States' response), 143 (Agencies'

---

[1] Plaintiff North Carolina Department of Environmental Quality joins Part III.A of this brief only.

reply), 144 (order denying motion to stay), and the argument has not improved with age. As an initial matter, this argument remains on shaky doctrinal footing. The Supreme Court has recently questioned the "continuing vitality of the prudential ripeness doctrine," which permits a federal court to decline to adjudicate a claim on "prudential" grounds even if the plaintiffs have established Article III standing. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014). The Court cautioned that that result would be "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* (citations omitted). Just so here. As the Supreme Court explained in its decision holding that district courts have original jurisdiction to review challenges to the WOTUS Rule*,* the Plaintiff States have Article III standing: "Because the WOTUS Rule remains on the books for now, the parties retain a concrete interest in the outcome of this litigation, and it is not impossible for a court to grant any effectual relief … to the prevailing party." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 627 n.5 (2018) (alteration in original) (citations omitted). In short, the Agencies have not divested this Court of jurisdiction by merely *proposing* repeal of the challenged rule, and *Susan B. Anthony List* makes clear that this Court should exercise that jurisdiction to decide this case.

Whatever the validity of the doctrine, however, the Agencies' prudential ripeness argument fails on the merits. This Court already rejected the same argument in denying the Agencies' motion to stay this litigation at the preliminary-injunction stage, ECF No. 144 (order denying motion to stay), as have other courts that have considered it in the context of WOTUS litigation. *See* Motion to Hold the Briefing Schedule in Abeyance at 3–4, *Nat'l Ass'n of Mfrs.*, 138 S. Ct. 617 (No. 16-299); *Nat'l Ass'n of Mfrs.*, No. 16-299 (Apr. 3, 2017) (Order Denying Motion to Hold the Briefing Schedule in Abeyance); *see also North Dakota v. U.S. EPA*, No. 3:15-cv-59 (D.N.D. March 23, 2018), ECF No. 185 (Order Granting Motion to Lift Stay; Denying Motion for Stay) at 11, 15–16. That is for good reason: this case remains fit for judicial review. It is still a final, "definitive" agency regulation, *Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984), coming "at the end of a rulemaking

proceeding," *Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990). The Plaintiff States' claims still involve "purely legal" challenges under the CWA, the APA, and the Constitution, *id.,* and no "further factual development" is necessary, *Susan B. Anthony List*, 134 S. Ct. at 2347 (citation omitted).

The Agencies contend that the case is unfit for judicial resolution because they have proposed to repeal and replace the WOTUS Rule, which would moot the litigation. Agencies' Br. at 17–18. But that proposed rule was already in place the last time the Court considered and rejected this argument. *See* ECF Nos. 134, 144; *see also* ECF No. 174 (order granting preliminary injunction) at 21 (holding that the Court "can and must analyze the situation based on the present state of the law," and explaining that the "possibility that the agency will reverse its position [does not] alleviate the harm already set in motion"). Moreover, the Agencies' proposed repeal does not implicate the rationale for the prudential ripeness doctrine in administrative law cases: preventing courts from "inappropriately interfer[ing] with further administrative action" by "entangling themselves in abstract disagreements over administrative policies." *Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)). The Agencies do not explain how a decision from this Court would interfere with their still-pending proposed rulemaking. In fact, they point out that some of the potential legal defects of the WOTUS Rule that they cited in their proposed repeal as reasons for repealing the Rule "are the same ones raised by the challengers on summary judgment." Agencies' Br. at 17. Thus, far from interfering with the rulemaking, a decision from this Court on those issues presumably would help the administrative decisionmaking process by providing further clarity as to whether those reasons in fact require repealing the Rule.

The Agencies also claim that the Court's preliminary injunction prevents any delay in the resolution of this suit from causing Plaintiff States hardship. *Id.* at 19 (reasoning that the challengers do not "face any impending harm because there is no suggestion that the Court will lift the injunction any time soon"). For starters, this Court "need not consider" hardship;

"where ... there are no significant agency or judicial interests militating in favor of delay, lack of 'hardship' cannot tip the balance against judicial review." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1259 (11th Cir. 2010) (alterations in original) (cleaned up). In any event, the Agencies cite no law for the proposition that a preliminary injunction issued by a court entertaining a lawsuit eliminates hardship in a way that makes a case prudentially unripe. Nor could they: If that were the case, suits would become prudentially unripe anytime a court issued a preliminary injunction. That is not—and cannot—be the law. Instead, the preliminary injunction in this case is just that—preliminary—and remains subject to future modification or suspension. Apart from the Court's injunction, then, "the possibility that the agency will reverse its position [does not] alleviate the harm already set in motion," ECF No. 174 at 21, and does not support Defendants' prudential ripeness arguments.

## II.   The WOTUS Rule violates the Clean Water Act.

The Plaintiff States have shown that the WOTUS Rule's criteria for deeming waters jurisdictional are significantly broader than—and thus fail to satisfy—Justice Kennedy's standard for the CWA's jurisdictional scope, which the Eleventh Circuit has held is the controlling legal test. ECF No. 203 (States' Br.) at 9–15; *United States v. Robison*, 505 F.3d. 1208, 1222 (11th Cir. 2007). The Agencies not only decline to defend the Rule against these arguments, Agencies' Br. at 36–37, but have conceded in their supplemental rulemaking notice that "court rulings against the 2015 Rule suggest that the interpretation of the 'significant nexus' standard as applied in the 2015 Rule may not comport with and accurately implement the legal limits on CWA jurisdiction intended by Congress and reflected in decisions of the Supreme Court," Definition of "Waters of the United States"—Recodification of Preexisting Rule, 83 Fed. Reg. 32,227, 32,228 (July 12, 2018).

Intervenor-Defendants, for their part, make numerous generalized appeals to science without explaining or showing, with reference to the administrative record or otherwise, *how* the Rule's criteria for covered waters—rather than other less expansive criteria—are tailored to

ensure that all covered waters "significantly affect the chemical, physical, and biological integrity of" navigable waters and thus fall within the Agencies' statutory authority. *Rapanos v. United States*, 547 U.S. 715, 780 (2006) (Kennedy, J., concurring in the judgment). As discussed below, those contentions are meritless.

### A.   Tributaries

Intervenor-Defendants seek to justify the Rule's definition of "tributary" by arguing, in broad brushstrokes, that (a) science shows that tributaries can affect the physical, chemical, and biological integrity of primary waters, and (b) the Agencies "carefully limited the definition of tributary to those waters scientifically shown to have sufficient flow to significantly affect the physical, chemical, and biological integrity of primary waters, as Justice Kennedy directed." ECF No. 213 (Int.-Defs.' Br.) at 10–11.[2] But these sorts of conclusory arguments fail to explain exactly *how* the Rule manages to assure that covered waters satisfy the "significant nexus" test— because it does not. Instead, the Rule—by its plain terms—covers ground or water features created by flow that is "intermittent" or "ephemeral" and "only in response to precipitation events," Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,053, 37,076 (June 29, 2015), without regard to the degree of flow from those features to primary waters.  Those criteria sweep in certain types of ground or water features Justice Kennedy concluded were outside of the CWA's reach, *see Rapanos*, 547 U.S. at 781.

Whether science shows that tributaries *generally* have important effects on primary waters is not the relevant question. The question is whether tributaries *as defined by the Rule* have the kinds of "significant" effects on primary waters that Justice Kennedy's significant-nexus test requires. *Id*. But despite their repeated insistence that science dictates the Rule's tributary definition, Intervenor-Defendants fail to point to anything in the record explaining how

---

[2] Intervenor-Defendants suggest that Justice Kennedy's concurrence authorizes the Agencies to "identify categories of tributaries" through "regulation" that satisfy the significant-nexus test. Int.-Defs.' Br. at 9. Even if so, the problem here, as discussed below, is not the Agencies' use of categories *per se*, but rather the way the Rule formulates those categories.

the Rule's tributary criteria ensure that only waters with significant effects on primary waters are included. That is a necessary showing, because Justice Kennedy's *Rapanos* concurrence contemplates that some water features that fall within the definition of "tributaries" exceed the CWA's scope.

For example, as to the new criterion providing that waters qualify as jurisdictional tributaries if they have the "physical indicators of bed and banks" in addition to an "ordinary high water mark," the Agencies previously asserted that those criteria ensure that any covered tributary will have "sufficient volume, frequency, and flow" to primary waters "to establish a significant nexus." 80 Fed. Reg. at 37,058; *see* Int.-Defs.' Br. at 12. That rule formulation, per Intervenor-Defendants, supposedly rectifies the defects of the tributary definition Justice Kennedy critiqued in *Rapanos*, which required that a qualifying tributary have an ordinary high water mark (OHWM) *only*. *See Rapanos*, 547 U.S. at 781 ("[T]he breadth of this [OHWM-only] standard—which seems to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it—precludes its adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood."). But despite invoking the authority of "1,200 peer-reviewed scientific publications and hundreds of pages of technical support" as support for the Rule, Int.-Defs.' Br. at 12–13, Intervenor-Defendants do not cite a single scientific authority that explains *how* the presence of those physical indicators *necessarily* establishes that a water's volume and flow will result in the "significant effects" on primary waters that Justice Kennedy's test requires. The text of the Rule, in fact, includes no requirement for a certain amount of volume at all; it provides only that a jurisdictional tributary must "contribute[] flow" to a primary water, not any particular quantum of flow. 33 C.F.R. § 328.3(c)(3). And indeed, the Agencies have since conceded that under the Rule, "tributaries need not be demonstrated to possess any specific volume, frequency, or duration of flow, or to contribute flow to a traditional navigable water in any given year or specific time period." 83 Fed. Reg. at 32,228. The Rule provides that the "physical indicators" of

bed, banks, and OHWM merely "demonstrate there is volume, frequency, and duration of flow sufficient *to create*" *those physical indicators*, 33 C.F.R. § 328.3(c)(3) (emphasis added), but nothing about those criteria require that the feature will have the volume, frequency, and duration of flow sufficient *to create the significant effects on primary waters required by Justice Kennedy's test*. Without any such limit, the Rule's "bed, banks, and OHWM" requirement suffers from the same fatal defect Justice Kennedy highlighted in the original, OHWM-only rule.

Nor are Intervenor-Defendants able to show that the Rule's tributary definition avoids running afoul of the specific kinds of extra-jurisdictional features noted in Justice Kennedy's *Rapanos* concurrence. In addition to pointing out the Rule's problematic reliance on an OHWM as a criterion for defining covered tributaries, the States have shown that, by not requiring any particular quantum of volume or flow, nothing in the Rule precludes its covering "[t]he merest trickle, [even] if continuous" or "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." *Rapanos*, 547 U.S. at 769, 781. Intervenor-Defendants do not explain how the Rule would exclude "mere trickles" because, of course, it does not. While the Rule precludes certain streams like gullies, rills, or other ephemeral waters not having an OHWM or bed and banks, *see* 33 C.F.R. § 328.3(b)(4)(vi); ECF No. 213-10 (Technical Support Document) at 270, a "mere trickle" steadily flowing may well eventually form those physical indicators and thus be covered by the new Rule, which would be unlawful under Justice Kennedy's controlling opinion.

Intervenor-Defendants also fail to provide a satisfying answer for the problematic drains and ditches that Justice Kennedy flagged as features that exceed the jurisdiction authorized by the CWA. *Rapanos*, 547 U.S. at 781 (rejecting standard that might extend to "drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it"); *see also* ECF No. 199 (Int.-Pls.' Br.) at 11 (discussing Rule's inclusion of "dry desert washes and arroyos in the arid West, 'tributaries' from which water has long since disappeared and that are invisible to the naked eye, ponds on never-mapped 100-year floodplains, and virtually all land in Alaska and the water-rich Southeast"); *id*. at 12–14 (providing illustrations of problematic

8

features likely to be covered by the Rule). Intervenor-Defendants argue that the WOTUS Rule excludes certain "intermittent and ephemeral ditches," *see* Int.-Defs.' Br at 14–15, but the very Federal Register page they cite makes clear—and they acknowledge—that the Rule continues to regulate many ditches *regardless* of the degree of flow, *see* 80 Fed. Reg. 37,078 ("[j]urisdictional ditches" include "[d]itches with perennial flow," "[d]itches with intermittent flow that are a relocated tributary, or are excavated in a tributary, or drain wetlands," and "[d]itches, regardless of flow, that are excavated in or relocate a tributary"). A rule that treats ditches as jurisdictional regardless of the amount of water flowing through them flouts Justice Kennedy's controlling opinion.

### B.   Adjacency

Intervenor-Defendants defend the Rule's adjacency definition with the same broad and conclusory invocations of science, but again without any explanation for how the Rule's specific criteria ensure that the waters it covers will necessarily satisfy the significant-nexus test. *See* Int.-Defs.' Br. at 15–16. Those responses too are unavailing. As an initial matter, the States pointed out that, to the extent that the tributary definition is overbroad, the adjacency definition is overbroad. States' Br. at 12–13. Intervenor-Defendants do not respond at all to this argument. Nor do Intervenor-Defendants account for the fact that the adjacency category covers waters simply because they are somewhat near a remote "tributary," even though Justice Kennedy specifically explained that such waters fell outside of the CWA's reach. *Rapanos*, 547 U.S. at 780.

Even where Intervenor-Defendants offer specific responses to the States' arguments, those responses are insufficient. The States argued, for example, that using a 100-year floodplain and the Rule's other distance limits is overbroad under *Rapanos*. States' Br. at 13. That a ground or water feature has a 1% chance of linking to a jurisdictional water in a given year, *see* Int.-Defs.' Br. at 18 (explaining 100-year floodplains), exceeds any reasonable notion of a significant nexus. *See Rapanos,* 547 U.S. at 780 (Kennedy, J., concurring in the judgment) (rejecting theory

that "adjacency to tributaries, however remote and insubstantial," sufficed to bring a water within CWA jurisdiction because that result would reach "beyond the holding of [*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985)]"). Intervenor-Defendants respond, in essence, that floodplains or watersheds matter *generally. See, e.g.,* Int.-Defs.' Br. at 18 ("Floodplain waters provide vital functions within a river system such as through flood storage and acting as a buffer to mitigate pollution."). But Justice Kennedy's test requires more. As discussed above, it mandates that the feature in question have a "significant" connection with navigable-in-fact waters, not just *any* connection. *Rapanos*, 547 U.S. at 779. Intervenor-Defendants claim that the specific distances and criteria the Agencies selected ensure that waters fall under the Rule only if there is that significant connection. But they offer no record support explaining how or why waters affect primary waters to a legally significant extent only at the point those jurisdictional criteria are met rather than something less expansive than those criteria. More fundamentally, science cannot answer the ultimate legal question of what waters the CWA reaches as a matter of definition. Science can model what kinds of effects occur given various standards under consideration, but the question whether a particular definition limits the Agencies' jurisdiction to waters with a "significant nexus" to navigable waters (as Justice Kennedy's test requires) is ultimately a legal judgment. *See id.* Intervenor-Defendants' invocations of science in the abstract are thus insufficient to render the "adjacency" definition lawful under the controlling test.

### C.   Case-by-Case Waters

The case-by-case waters category includes—among many other things—the very same kinds of waters that the Supreme Court held were not jurisdictional in *Solid Waste Agency of North Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) (*SWANCC*), the decision Justice Kennedy relied upon in formulating the significant-nexus test that controls here. *Rapanos*, 547 U.S. at 767 ("Because such a nexus was lacking with respect to isolated ponds, the Court held [in *SWANCC*] that the plain text of the statute did not permit the Corps' action."). For

example, under the Rule, if ducks used hydrologically isolated wetlands for foraging and feeding, that would extend federal jurisdiction to the isolated wetland. *See* 80 Fed. Reg. at 37,093. The same would be true if insects bred in an isolated wetland or marsh and were later eaten by birds or fish in a non-navigable stream that crosses a state border. *See id.* And isolated wetlands or depressions could be deemed jurisdictional precisely because of their isolation—if the Agencies were to determine that such features store water, trap sediment, or cycle nutrients, they could be deemed jurisdictional individually or in conjunction with other similarly situated waters. *See id.* These results are not compatible with Justice Kennedy's controlling test for CWA jurisdiction.

Intervenor-Defendants offer no answer for this. Instead, they assert, generally, that the science shows "which categories of waters significantly affect the physical, chemical, *or* biological integrity of other covered waters, and thus meet Justice Kennedy's significant nexus test." Int.-Defs.' Br. at 9 (emphasis added). But this effectively amounts to an admission that the WOTUS Rule purports to overrule *SWANCC,* which rejected the expansion of CWA jurisdiction to isolated intrastate sand and gravel pits based solely on a biological factor—the presence of migratory birds—an approach that would "read[] the term 'navigable waters' out of the statute." 531 U.S. at 162, 171–72. Intervenor-Defendants' formulation is also inconsistent with Justice Kennedy's actual "significant nexus" test, which requires a significant effect on the "chemical, physical, *and* biological integrity" of navigable waters. 547 U.S. at 780 (emphasis added) (rejecting inclusion of waters with effects on navigable waters that "are speculative or insubstantial" because such waters "fall outside the zone fairly encompassed by the statutory term 'navigable waters'"). Intervenor-Defendants respond that Justice Kennedy could not have meant for waters that contribute to the chemical and physical integrity of a primary water, but not to the biological integrity of that water, to be subjected to "unregulated pollution." Int.-Defs.' Br. at 19–20. But this focus on potentially polluting actions, rather than the relationship between upstream waters and navigable waters, is misguided. Rather, the "significant nexus" test acts as a gatekeeper for determining when federal jurisdiction may be appropriate over waters *other than*

11

navigable-in-fact waters or waters readily susceptible of being rendered so. Requiring a heightened standard for waters at the outer edge of Congress's and the Agencies' CWA authority is reasonable and exactly what Justice Kennedy intended in using language from 33 U.S.C. § 1251(a).

### D. Interstate Waters

The Plaintiff States explained that the WOTUS Rule also exceeds the Agencies' jurisdiction under the CWA by asserting jurisdiction over "interstate waters" without regard to whether those waters are navigable or connected to navigable waters—and then asserting jurisdiction over *additional* waters (tributaries and adjacent and case-by-case waters) based on their connection to those potentially non-navigable waters. States' Br. at 15 (citing *Rapanos*, 547 U.S. at 778 (Kennedy, J., concurring in the judgment) (CWA "invokes Congress' traditional authority over waters navigable in fact or susceptible of being made so")).

Both the Agencies and Intervenor-Defendants assert that the States' objection to the scope of "interstate waters" is untimely. Agencies' Br. at 19–21; Int.-Defs.' Br. at 20–21. They reason that the WOTUS Rule did not change the preexisting regulatory language that includes interstate waters as a separate category of waters of the United States, and that the time to challenge that portion of the regulation is long past. Agencies' Br. at 19–21; Int.-Defs.' Br. at 20–21.

This argument misses two key points. As an initial matter, the period for seeking judicial review of a rule or other interpretation reopens when, as here, the agency "open[s] the issue up anew" in a proposed rule and seeks and responds to comments on the issue. *Ass'n of Am. R.Rs. v. Interstate Commerce Comm'n*, 846 F.2d 1465, 1473 (D.C. Cir. 1988); *see, e.g.*, Definition of "Waters of the United States" Under the Clean Water Act, 79 Fed. Reg. 22,187, 22,254–59 (Apr. 21, 2014) (Proposed Rule) (extended discussion justifying including "interstate waters" as jurisdictional waters); 80 Fed. Reg. at 37,075 (indicating that the Agencies received and responded to comments on "interstate waters"). Moreover, Plaintiff States challenge not only the scope of "interstate waters" as defined, but also the Agencies' decision to assert jurisdiction over

12

waters in their tributaries, adjacent, and case-by-case categories based on those waters'
connection with the overbroad category of interstate waters. In other words, the Plaintiff States
contend that the WOTUS Rule improperly asserts federal jurisdiction over interstate waters
without *any* navigability inquiry, and then extends jurisdiction to waters with a nexus to *those*
non-navigable waters. States' Br. at 15. This issue could not have possibly been raised before the
WOTUS Rule; the point is that the Rule creates an integrated regime that the States contend is
unlawful. And Defendants make no arguments on the merits that justify this aspect of the
WOTUS Rule.

### E.  The WOTUS Rule is not entitled to judicial deference.

Intervenor-Defendants suggest that this Court should defer to the Agencies' prior
determination that the Rule does not exceed their authority under the CWA. *See, e.g.*, Int.-Defs.'
Br. at 8 n.2, 25–26. But this argument misconstrues the nature of agency deference and is wrong
for multiple reasons:

*First*, when an "agency no longer seeks deference" for parts of an agency action, "it
would make no sense for th[e] court to determine whether the disputed agency positions …
warrant *Chevron* deference." *Glob. Tel*Link v. FCC*, 866 F.3d 397, 407–08 (D.C. Cir. 2017).
Here, the Agencies have not only declined to defend the WOTUS Rule, but have conceded that
the Rule in fact poses many of the problems "raised by the challengers on summary judgment."
Agencies' Br. at 17 (quoting various concerns listed in supplemental notice of proposed
rulemaking). Deference is thus especially unwarranted here, where "the agency has abandoned
[its prior] positions." *Glob. Tel*Link,* 866 F.3d at 408.

*Second*, because the Agencies attempted to justify the WOTUS Rule as consistent with
Justice Kennedy's concurrence in *Rapanos*, the question at hand is whether the Agencies have
violated the terms of that opinion. The Agencies' interpretation of a judicial opinion is not
entitled to deference. *See Akins v. FEC*, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc) (vacated on
other grounds) (holding that courts are "not obliged to defer to an agency's interpretation of

Supreme Court precedent under *Chevron* or any other principle."). *Third,* deference cannot save an unlawful rule, as Justice Kennedy's opinion in *Rapanos* shows. *See* 547 U.S. at 778–9 ("The deference owed to the Corps' interpretation of the statute does not extend so far" as to "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters.").

*Fourth, Chevron* deference applies to agency interpretations of ambiguous statutory language, but under *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427 (2014), when an agency seeks to "bring about an enormous and transformative expansion" in its authority to make "decisions of vast 'economic and political significance,'" under a "long-extant statute," it must point to a clear statement from Congress authorizing such a step. *Id.* at 2444 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). This means there is no circumstance under which *Chevron* deference could save the WOTUS Rule. If the CWA is ambiguous enough with respect to the scope of "navigable waters" to permit deference under *Chevron*, it does not provide the clear statement necessary to permit the transformative expansion the WOTUS Rule would bring about.

*Fifth,* when an agency action raises serious constitutional questions, deference to an agency interpretation is inappropriate and "the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *SWANCC*, 531 U.S. at 172 (citing *Edward J. DeBartolo v. Florida Gulf Coast Bldg. and Const. Trades Council,* 485 U.S. 568, 575 (1988)). Because the WOTUS Rule raises just these sorts of constitutional questions, *see* States' Br. at 24–28, it warrants no deference.

## III.   The Rule violates the APA.

### A.   The Rule is not a logical outgrowth of the proposed rule, which did not put interested parties on notice of the final rule's distance-based criteria or its unduly narrow farm exclusion.

The States explained that the WOTUS Rule must be vacated because the Agencies failed to comply with the APA's notice-and-comment requirement. Specifically, certain features of the

final rule—i.e., the specific distance requirements of "adjacent" and "case-by-case" waters, and the adjacent-waters-only farming exclusion—were not "logical outgrowths" of the proposed rule. States' Br. at 20–22. Defendants respond that because the proposed rule implied or mentioned distance limitations generally, the public received sufficient notice. But Defendants' specific justifications for the substantial changes between the proposed and final rule are both legally and logically unsound.

**1.** With respect to the three distance-based criteria of the "adjacent waters" definition—(1) waters within 100 feet of a primary water, impoundment, or "tributary;" (2) waters within a 100-year floodplain and 1,500 feet of a primary water, impoundment, or "tributary;" and (3) waters within 1,500 feet of the high-tide line of a primary water, 33 C.F.R. § 328.3(c)(2) (defining "neighboring" waters, a subset of "adjacent waters")—Defendants argue that the Agencies complied with the APA because the proposed definition "encompassed waters located within the distance limitations established by the riparian area or floodplain of a primary water, impoundment, or tributary, and waters with a shallow subsurface hydrologic connection or confined surface hydrologic connection to a primary water, impoundment, or tributary." Agencies' Br. at 25. They further argue that the Agencies requested comment on a number of options with respect to "establishing specific geographic limits for using shallow subsurface or confined surface hydrological connections as a basis for determining adjacency." *Id.* (quoting 79 Fed. Reg. at 22,208).

But the language Defendants point to in the proposed rule did not notify the public that the Rule would rely on specific distance-based limits—like those used in the final rule's definition of "neighboring"—as determinative bases for defining jurisdictional waters. For example, the Agencies point out that the adjacency definition was "designed to provide greater clarity by identifying specific areas and characteristics for jurisdictional adjacent waters" and that they "request[ed] comment for additional clarification." *Id.* at 24 (quoting 79 Fed. Reg. at 22,209). Proposing that "specific areas and characteristics" could inform the overall adjacency calculus is a far cry from defining jurisdiction based *solely* on specific *distances* from certain

15

*reference points*; the former gives no indication of the latter. The same holds true for the
Agencies' contention that their notion of adjacency "has always included an element of
reasonable proximity" and that their use of certain terms was intended to "define the lateral reach
of the term 'neighboring.'" *Id.* at 25 (citing 79 Fed. Reg. at 22,207). Vague terms like "lateral
reach" and "reasonable proximity" provide only the most general suggestion that distance from a
primary water could be *a* consideration in determining which "adjacent" waters might be deemed
jurisdictional; they do not come close to suggesting that the Rule would use fixed numeric
distances (e.g., 100 feet, 1,500 feet) or a 100-year floodplain as determinative limitations on
jurisdictional waters, much less what range of distance-based criteria was under consideration. In
addition, the request for comments indicated that consideration of "specific geographic limits"—
specifically, limits "for using shallow subsurface or confined surface hydrological
connections"—was only one of several "options" the Agencies were considering "as a basis for
determining adjacency." 79 Fed. Reg. at 22,208. Others included asserting jurisdiction over "all
waters connected through a shallow subsurface hydrologic connection or confined surface
hydrologic connection *regardless of distance*," or "adjacent waters *only if* they are located in the
floodplain or riparian zone of a jurisdictional water," neither of which suggested that specific
distance limitations might be relevant at all. *Id.* Put simply, the Agencies appear to contend that
because unspecified geographic limitations were one of several potential factors for determining
the bounds of "adjacent waters," they were justified in adopting *any* determinative distance-
based criteria whatsoever—whether 10 inches, 10 feet, or 10 miles. Such an approach could be
used to "justify any final rule" defining adjacency and must be rejected. *Envtl. Integrity Project
v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005).

If the Agencies wanted to build the definition of adjacency around distances from certain
reference points, they needed to inform the public of "the range of alternatives being considered
with reasonable specificity," *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506,
549 (D.C. Cir. 1983), as to both the particular reference points themselves and the particular
distances. But the proposed rule did not provide that the Agencies were considering any

16

particular floodplain zone or any particular range of fixed distances as jurisdictional bounds. *See* 79 Fed. Reg. at 22,207 (noting that waters may qualify if they were "located within the riparian area or floodplain" of another relevant water). The proposed rule's only mention of specific figures came in the form of an offhand example: "When determining whether a water is located in a floodplain, the agencies will use best professional judgment to determine which flood interval to use (for example, 10 to 20 year flood interval zone)." *Id.* To the extent this can be taken as a "range of alternatives" at all, it was not "reasonably specific," *see Small Refiner,* 705 F.2d at 549, but rather affirmatively *misleading*, since the final rule used a *100-year* floodplain. Had the Agencies provided adequate notice of the ranges being considered for these various reference points and distance limits, it would have allowed the stakeholders to provide informed feedback on the proposed distance limitations. Instead, stakeholders with interests in millions of acres of affected land were essentially blindsided by arbitrary distance figures that appeared for the first time in the final rule.

Both the Agencies and Intervenor-Defendants cite decisions to show that final administrative rules need not exactly mirror proposed rules. That is beside the point. What Defendants cannot point to are decisions approving the inclusion of previously unspecified numerical limits in a final rule establishing sweeping federal jurisdiction. If anything, the decisions Defendants cite undermine their argument. For example, in *Waukesha v. EPA,* 320 F.3d 228 (D.C. Cir. 2003), *see* Agencies' Br. at 24, which involved regulation of the maximum contaminant levels (MCL) in drinking water, the proposed rule suggested an MCL for naturally occurring uranium of either 20, 40, or 80 µ g/L. The final rule, however, set the MCL at 30 µg/L. *Id.* at 232. The court upheld the rule against a logical-outgrowth challenge because the final MCL was within the range of possible alternatives and was very close in proximity to the proposed higher and lower MCLs. *Id.* at 246–47. Here, by contrast, the Agencies offered no range of alternatives at all—they simply maintain that the mention of the *concept* of geographic or distance limitations, in the context of other potential non-numerical criteria, should have somehow put the public on notice of the specific (and arbitrary) numerical limits that set the

17

jurisdictional reach of "adjacent" waters in the final rule. *Waukesha* offers no support for that argument.[3]

*Alabama Power Co. v. OSHA*, 89 F.3d 740 (11th Cir. 1996), *see* Int.-Defs.' Br. at 27–28, is similarly inapposite. Intervenor-Defendants mischaracterize that case as one where a proposed rule permitted protective clothing made of all natural fabrics, regardless of weight, but the final rule specified that certain weights of natural fabrics would be allowed, including cotton fabrics greater than 11 ounces under certain conditions. Int.-Defs.' Br. at 28. The dispute in *Alabama Power* was not over the final rule itself, which specified in a preamble that flame-resistant natural or synthetic materials were acceptable, and did not mention a weight. Instead, the dispute focused on a subsequently issued "correction to the preamble," which emphasized that natural materials were acceptable, provided they were "of such weight and construction as not to ignite" under dangerous conditions. 89 F.3d at 743. The correction further specified, as an example, that "cotton fabrics of 11 ounces or [more] generally will not ignite" when exposed to electric arcs. *Id.* The petitioners challenged the provision at issue on the ground that OSHA failed to provide a comment period for the correction, which they asserted amounted to a "revision" of the rule because it mandated certain weights. *Id.* at 744. The court disagreed, noting that the corrected rule simply suggested that heavier fabrics might be called for under certain circumstances, and that employers retained the discretion to determine whether or not cotton or wool clothing would be acceptable under various circumstances. *Id.* The court thus concluded that the "final standard, correction included … would have constituted a logical outgrowth of the proposed standard if

---

[3] The same holds true for *Louisiana Federal Land Bank Association v. Farm Credit Administration*, 336 F.3d 1075 (D.C. Cir. 2003), in which a proposed FCA rule would have removed geographic restrictions on direct loans and allowed lenders to participate in loans outside their own territories. *Id.* at 1079. The final rule only removed the geographic restrictions on loan participations, but left the restrictions on direct loans in place. *Id.* The court upheld the final rule because it eliminated only part of the restrictions it originally contemplated doing away with, and was thus was a "natural subset" of the proposed rule. *Id.* at 1081. Again, the distance-based limitations in the final WOTUS Rule cannot have been a natural subset of the proposed rule because it mentioned geographic limitations only in the abstract.

originally promulgated as corrected," and that OSHA was accordingly exempt from the notice requirements for standard modifications. *Id.* at 745. *Alabama Power*, in short, is not analogous to this case.

The same holds true for the rest of the logical-outgrowth cases cited by Defendants. For example, in *American Iron & Steel Institute v. OSHA*, 182 F.3d 1261 (11th Cir. 1999); *see* Int.-Defs.' Br. at 20–21, physicians challenged an OSHA rule on the ground that the proposed rule had merely suggested the possibility that non-physician health care professionals could handle some but not all medical evaluation tasks, but the final rule eliminated the mandatory role for physicians altogether. *Id.* at 1275–76. The court reasoned that the proposed rule provided sufficient notice because, unlike the proposed WOTUS Rule, the proposed OSHA rule *had* at least indicated that a range of specific options were on the table—physicians would be required to perform all, some, or no examinations—and the agency chose one of those options in the final rule. *See id.* at 1276 (agency solicited comments on the "extent of the role that should be given to non-physician health professionals."). And in *Small Refiner*, the court criticized the EPA for not specifying in a proposed rule which "loopholes" regarding refiner productions limits it intended to close. 705 F.2d at 548. The court nonetheless held that the challenger was aware *in fact* of the requirement at issue because its attorney attended a hearing discussing the requirement and because the challenger was closely involved in the rulemaking. *Id.* at 548–49. Defendants do not—and indeed could not—contend that the States had notice in fact of the relevant distance requirements in this case.

Finally, in *American Trucking Associations v. Federal Motor Carrier Safety Administration*, 723 F.3d 243 (D.C. Cir. 2013), the proposed rule at issue include a mandated 30-minute off-duty break for long-haul truckers, whereas the final rule imposed the break requirement on both long- and short-haul truckers, who had historically been excepted from hours-of-service rules. *Id.* at 252. The court rejected a procedural challenge to the rule, noting that because another part of the proposed rule suggested eliminating the hours-of-service exception for short-haul truckers, thus requiring them to comply with the same rules as long-haul

19

truckers, the court "fail[ed] to see how any reasonable commentator would have read the [proposed rule] to suggest the agency would not do what it was otherwise free to: apply the 30-minute break requirement to short- and long-haul truckers alike." *Id.* at 253. Here, by contrast, no other provisions of the proposed WOTUS rule would have even arguably put the public on notice of the arbitrary and specific distance-based criteria that emerged in the final rule.

The Agencies reason, finally, that a "slew" of public comments that made some mention of distances "show[s] that the public had adequate notice of the issue." Agencies' Br. at 26. But courts "have rejected bootstrap arguments predicating notice on public comments alone." *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994). Further, a few comments guessing at one of the standards, out of more than a million comments total, do not show that the interested parties had sufficient notice. Comments that are "sparse and ambiguous at best" support the argument that the notice was not adequate. *Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991). The fact that Defendants cannot point to a single comment that actually discussed the five distance limits that make up the heart of the Rule highlights the inadequacy of the notice and comment process for the Rule. Had the Agencies actually given proper notice of the actual distances at issue, the record likely would have looked dramatically different with respect to this aspect of the Rule: stakeholders would have submitted detailed maps, economic studies, and other documents in support of comments debating the proposed distance limitations. The absence of such materials in the record speaks volumes: the parties could not comment on numerical criteria they did not know were at issue.

**2.** Defendants' arguments with respect to case-by-case waters fare no better. The final rule unexpectedly provided that the Agencies' case-by-case jurisdictional analysis would now relate, as relevant here, to: (1) waters within the 100-year floodplain of a primary water; and (2) waters within 4,000 feet of a primary water, impoundment, or tributary. 33 C.F.R. § 328.3(a)(8). Although the Agencies concede that the proposed rule "did not specify the distances in the final rule," they nonetheless reason that the mention of the word "location" in the proposed rule provided "at least the 'germ' of a distance limitation" and thus gave the public notice of the

20

ultimate distance criteria. Agencies' Br. at 29. This argument stretches the "logical outgrowth" test too far. Again, the mention of a general concept, like "distance" or "location," is a far cry from the discussion of specific distances—or even proposed *ranges* of distances, *see Waukesha,* 320 F.3d at 232—that would enable affected parties the opportunity to study and provide meaningful comments on or objections to those proposals. Moreover, the proposed rule refers to "location" as supplemental information to be included only if available, *not* as a dispositive factor in the jurisdictional determination. *See* 79 Fed. Reg. at 22,214 ("When making a jurisdictional determination for an 'other water,' the administrative record will include available information supporting the determination. In addition to location and other descriptive information regarding the water at issue, the record will include a clear explanation of the rationale for the jurisdictional conclusion and a description of the information used to determine whether the 'other water' has a significant nexus."). The subsections of the proposal that follow this single sentence consist of three-and-a-half pages discussing potential requirements for case-by-case waters, and *none* of the possibilities contemplate adopting criteria based upon specific distances from specific reference points. *See* 79 Fed. Reg. at 22,214–17.

Furthermore, that the case-by-case category was to be limited to "waters 'sufficiently close' to a jurisdictional water," Agencies' Br. at 29, did not indicate that any specific fixed distances or floodplain interval zones would be determinative, especially given that the proposal used that phrase in discussing *characteristics* and *functions* of landforms. *See* 79 Fed. Reg. at 22,213. In any event, to the extent the proposed rule implied distances at all, it offered no information whatsoever about the specific distances or ranges of distances under consideration.

The Agencies also contend that a smattering of comments mentioning "distance" show that the public had adequate notice that the final case-by-case jurisdiction definition would include specific distance components. Agencies' Br. at 26–27. But the comments the Agencies cite undercut their argument. For instance, a few commenters suggested that distance should not be used at all in a case-by-case analysis, while others suggested that it should not be the sole factor. *Id.* at 26. And three other commenters, concerned that distance factors might play a role in

the final definition, asked the Agencies to specify what distance would be considered "sufficiently close." *Id.* Comments that include arguments against using any distance at all, or pleas for more specificity as to how distance could be used in an eventual rule do not show that the public had specific notice of two precise and previously unmentioned distance-based criteria for determining the jurisdictional reach of the Rule.[4]

**3.** The States have explained that the Rule's partial farming exclusion was enacted in violation of the APA because the proposed rule made no mention of exempting waters on farmland only from the "adjacent waters" category. States' Br. at 22. The Agencies effectively concede error on this point, and argue instead that any procedural deficiencies on this point were harmless error. Agencies' Br. at 30–31. This response misreads the States' argument. The lack of notice as to a contemplated farmland exemption deprived the States of the opportunity to propose the exclusion of farmland from the "tributaries" category as well. Considering the sheer amount of farm acreage that could be swept in to federal jurisdiction under the new definitions, the inability to comment on potential farm exceptions is not harmless error.

### B.   The Rule is arbitrary and capricious because key components lack necessary record support.

The States also contend that the Rule is arbitrary and capricious because numerous aspects of the Rule, including the distance-based components and the unduly narrow farm exclusion, lack adequate record support. States' Br. at 22–23. Defendants, in response, invoke science in the abstract, Int.-Defs.' Br. at 25–26, but fail to identify scientific support in the record for the specific distance limits of the rule—e.g., being within a 100-year floodplain or 1,500 feet of a primary water as opposed to, say, a 10-year floodplain or 500-foot distance. In other words, the record does not show how these particular distance-based limitations ensure that the Rule

---

[4] The same holds true for Georgia's comments. Contrary to Intervenor-Defendants' suggestion, *see* Int.-Defs.' Br. at 28, Georgia's request for the inclusion of "specific geographic limits," "including, for example, distance limitations," *id.*, does not mean that Georgia—or the public in general—had notice that the Agencies were contemplating sweeping expansions of jurisdiction based on arbitrary distance-based limitations.

includes only waters the CWA authorizes the Agencies to regulate. Indeed, the Agencies have effectively conceded that the line they drew was arbitrary. The Agencies' Technical Support Document provides as follows:

> Based on a review of the scientific literature, the agencies' technical expertise and experience, and the implementation value of drawing clear lines, the rule establishes a distance limit for floodplain waters to meet the definition of "neighboring" and thus to be "waters of the United States" by rule. This distance limitation was established in order to protect vitally important waters within a watershed while at the same time providing a practical and implementable rule. The agencies are not determining that waters in the floodplain farther than 1,500 feet from the ordinary high water mark never have a significant nexus. Rather, the agencies are using their technical expertise to promulgate a practical rule that draws reasonable boundaries in order to protect the waters that clearly have a significant nexus while minimizing uncertainty about the scope of "waters of the United States." Because waters beyond these limits may have a significant nexus, the rule also establishes areas in which a case specific significant nexus determination must be made.

ECF No. 213 (Agencies' Technical Support Doc.) at 301–02. Thus, the Agencies apparently picked their selected distances because they (1) offer bright lines that (2) protect waters that "clearly" have a significant nexus to navigable waters. But *any* fixed distance would provide clear guidance, and the Agencies offer no scientific justification for why their chosen distances ensure protection of only waters with a significant nexus, or why other distance-based limitations would not. And in fact, the record indicates that "functional relationships," not distances alone, are the appropriate way to define adjacency. States. Br. at 23 (citing Science Advisory Board's conclusions). The Defendants have no record-based defense of the Agencies' arbitrary distance-based criteria for defining jurisdictional waters.

## IV.   The WOTUS Rule exceeds Congress's Commerce Clause authority and violates the States' Tenth Amendment rights.

The Agencies do not contest the States' argument that the Rule goes beyond Congress's Commerce Clause authority and invades the States' sovereign authority to manage local lands in violation of their Tenth Amendment rights. *See* Agencies' Br. at 36–37; States' Br. at 24–28. To the contrary, the Agencies have conceded in the supplemental notice of proposed rulemaking that "many features that are categorically jurisdictional under the 2015 Rule, such as wetlands that

fall within the distance thresholds of the definition of 'neighboring,' test the limits of the scope of the Commerce Clause because they may not have the requisite effect on the channels of interstate commerce." 83 Fed. Reg. at 32,249. The Agencies also "expressed concern" in the same supplemental notice that the 2015 Rule "may have altered the balance of authorities between the federal and State governments, contrary to the agencies' statements in promulgating the 2015 Rule and in contravention of CWA section 101(b), 33 U.S.C. 1251(b)." *Id*. at 32,228.

Intervenor-Defendants defend the Rule's constitutionality. As to the Commerce Clause, they contend that the Rule is a valid exercise of the federal government's power to "regulate interstate waters and activities affecting interstate waters." Int.-Defs.' Br. at 24. They are incorrect. As an initial matter, Intervenor-Defendants do not address the States' point that the Rule cannot be justified as a regulation of "activities that substantially affect interstate commerce," *see United States v. Lopez,* 514 U.S. 549, 558–59 (1995), because Congress did not invoke that aspect of the commerce power in adopting the CWA. *See* States' Br. at 25–27 (citing *SWANCC*, 531 U.S. at 168 n.3 (there is no indication that "Congress intended to exert anything more than its commerce power over navigation" in adopting the CWA)). Further, as the States explained, even if Congress had invoked the substantial-effects aspect of the Commerce Clause, the Supreme Court has rejected efforts by Congress to regulate non-economic activities under a substantial-effects theory. *See* States' Br. at 26–27 (citing *Lopez,* 514 U.S. at 561, 567; *United States v. Morrison*, 529 U.S. 598, 613 (2000)).

As for the Tenth Amendment, Intervenor-Defendants argue that the WOTUS Rule passes constitutional muster because it "does not compel any action by the States." Int.-Defs.' Br. at 25. But this elides the States' argument. The States have not claimed that the Rule violates the Tenth Amendment by compelling the States to act; rather, they have contended that the Rule is unconstitutional because it regulates States as States, and in doing so cuts too deeply into the States' traditional power to manage local lands—"perhaps the quintessential state activity." *FERC v. Mississippi*, 456 U.S. 742, 767 n.30 (1982); States' Br. at 27-28. Intervenor-Defendants offer no response to this contention.

24

## CONCLUSION

This Court should grant summary judgment in favor of the Plaintiff States and hold unlawful and vacate the WOTUS Rule.

Respectfully submitted.

/s/ *Andrew A. Pinson*
Christopher M. Carr
   *Attorney General*
Andrew A. Pinson
   *Solicitor General*
    *Lead Counsel*
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334
apinson@law.ga.gov
(404) 651-9453

*Counsel for Plaintiff State of Georgia*

Patrick Morrisey
   *Attorney General*
Lindsay S. See
   *Solicitor General*
Office of the Attorney General
State Capitol , Building 1, Rm 26-E
Charleston, West Virginia 25305
lindsay.s.see@wvago.gov
(304) 558-2021

*Counsel for Plaintiff State of West Virginia*
(admitted *pro hac vice*)

Steve Marshall
   *Attorney General*
Andrew Brasher
   *Solicitor General*
Office of the Attorney General
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609

*Counsel for Plaintiff State of Alabama*
(admitted *pro hac vice*)

Pamela Jo Bondi
   *Attorney General*
Jonathan Glogau
   *Attorney for the State of Florida*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
jon.glogau@myfloridalegal.com
(850) 414-3300

*Counsel for Plaintiff State of Florida*
(admitted *pro hac vice*)

Curtis T. Hill, Jr.
  *Attorney General*
Thomas M. Fisher
  *Solicitor General*
Office of the Attorney General
302 West Washington Street
Indiana Government Center - South, 5th Fl.
Indianapolis, Indiana 46204
tom.fisher@atg.in.gov
 (317) 232-6255

*Counsel for Plaintiff State of Indiana*
(admitted *pro hac vice*)


Joshua H. Stein
  *Attorney General*
Asher P. Spiller
  *Assistant Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
aspiller@ncdoj.gov
(919) 716-6977


*Counsel for Plaintiff N.C. Department of Environmental Quality*
(admitted *pro hac vice*)



Andy Beshear
  *Attorney General*
Sam Flynn
  *Assistant Attorney General*
Office of the Attorney General
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
samuel.flynn@ag.ky.gov
(502) 696-5650

*Counsel for Plaintiff State of Kentucky*
(admitted *pro hac vice*)

Derek Schmidt
  *Attorney General*
Jeffrey A. Chanay
  *Chief Deputy Attorney General*
Office of the Attorney General
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
 (785) 368-8435

*Counsel for Plaintiff State of Kansas*
(admitted *pro hac vice*)


Alan Wilson
  *Attorney General*
Robert D. Cook
  *Solicitor General*
James Emory Smith, Jr.
  *Deputy Solicitor General*
Office of the Attorney General
1000 Assembly Street, Room 519
Columbia, South Carolina 29201
esmith@scag.gov
(803) 734-3680

*Counsel for Plaintiff State of South Carolina*
(admitted *pro hac vice*)


Brad D. Schimel
  *Attorney General*
Misha Tseytlin
  *Solicitor General*
Wisconsin Department of Justice
17 West Main Street
Madison, Wisconsin 53703
tseytlinm@doj.state.wi.us
(608) 267-9323

*Counsel for Plaintiff State of Wisconsin*
(admitted *pro hac vice*)

Sean D. Reyes
   *Attorney General*
Tyler Green
   *Solicitor General*
Office of the Attorney General
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
tylergreen@agutah.gov
(801) 538-9600

*Counsel for Plaintiff State of Utah*

*(*admitted *pro hac vice*)

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2018, I served this motion by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Andrew A. Pinson*
Andrew A. Pinson