**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| STATE OF GEORGIA, *et. al.,*<br>    Plaintiffs, | |
| v. | Case No.: 2:15-cv-00079-LGW-BWC |
| ANDREW WHEELER, *et. al.*<br>    Defendants | |

**INTERVENOR DEFENDANTS' REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Clean Water Rule is based on thorough, peer-reviewed science, over one million public comments, and over 400 meetings with individuals and groups across the country; it is also wholly consistent with approximately forty years of Clean Water Act law. Plaintiffs' arguments for vacating the Rule are meritless, and the Court should uphold the Rule.

## ARGUMENT

**I.      The Rule does not violate the Clean Water Act.**

**A.      Plaintiffs' challenge to "interstate waters" is time-barred.**

Plaintiffs' time-barred claim regarding jurisdiction over interstate waters was not revived through the reopener doctrine, which applies when an agency announces a new position on a new issue in response to comments. The Agencies here made clear that the Clean Water Rule "does not change" the Agencies' jurisdiction over interstate waters. 79 Fed. Reg. at 22,200. Industry Intervenors cite *Ohio v. EPA*, 838 F.2d 1325 (D.C. Cir. 1988), but this case is more similar to *American Iron & Steel Institute v. EPA*, 886 F.2d 390 (D.C. Cir. 1989), which was decided by the same court the following year and distinguished *Ohio*. In the later case, EPA referenced its

existing treatment of post-closure permits for hazardous waste facilities in the preamble of a proposed rule, but "nowhere [did the Agency] reopen the question of *whether*" it should change its existing approach. *Id.* at 398 (emphasis in original). In the final rule, "EPA noted briefly that it had received comments [on its existing treatment of post-closure permits]; [and] it responded by saying it 'reaffirmed' its previous position and at most briefly reiterated its prior reasoning." *Id.* Distinguishing the case from *Ohio v. EPA*, the D.C. Circuit Court of Appeals held, "the 'reopening' rule of *Ohio v. EPA* is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *Id.* That is what Plaintiffs attempt to do here, and the Court should not allow it. "To so read *Ohio v. EPA* would undermine congressional efforts to secure prompt and final review of agency decisions." *Id.*

Although the Agencies received comments addressing interstate waters, the Agencies responded by clarifying that the Clean Water Rule "makes no change to the interstate water section of the existing regulations." *See* RTC-10 at 269. The fact that the Agencies briefly repeated old reasons for this policy does not matter. *Am. Iron*, 886 F.2d at 398; *see also Nat'l Ass'n of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F.3d 135, 145 (D.C. Cir. 1998) ("The mere act of repeating old reasons for an old policy . . . is not the equivalent of reconsidering, and therefore reopening, the old issue.").

### B.   The Rule does not read the word "navigable" out of the Clean Water Act.

Even if it were not time-barred, Plaintiffs' challenge to the inclusion of interstate waters would fail on the merits. Interstate waters were subject to federal regulation before the Clean Water Act, *see, e.g.*, 33 U.S.C. §§ 466a(d)(1), 466i(e) (1952), and legislative history is clear that the purpose of the Act was to expand, not shrink, the scope of previous regulation. As the

Supreme Court put it, "Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *United States v. Riverside Bayview Homes, Inc*., 474 U.S. 121, 133 (1985). Indeed, the legislative history of the Clean Water Act, which Plaintiffs largely ignore, makes clear that the term "navigable waters" was to be given "the broadest possible constitutional interpretation." S. Conf. Rep. No. 1236 (1972); H.R. Rep. No. 911 (1972); S. Rep. No. 414 (1971); Tech. Support Doc., ECF No. 211-10, at 6-9.

In addition to the legislative history, courts have repeatedly interpreted Congress' chosen definition to mean that it intended the Clean Water Act to extend beyond traditional tests of navigability to the outer limits of the Commerce Clause. And the Supreme Court has never indicated that the Clean Water Act does not extend to interstate waters. *Cf. Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 166, 169, 171, 172 (2001) (*SWANCC*) (describing waters as neither navigable nor *interstate* in determining jurisdiction); *City of Milwaukee v. Ill.*, 451 U.S. 304, 317 (1981) (finding that federal common law did not govern interstate waters because Congress had occupied the field with the Clean Water Act).

### C.    The definition of "tributary" is consistent with the Clean Water Act and Supreme Court precedent.

Plaintiff States next argue that the Rule covers tributaries that are inconsistent with Justice Kennedy's significant nexus test in *Rapanos.* They argue that the Rule covers water features created by intermittent or ephemeral flow "without regard to the degree of flow from those features to primary waters." State Reply Br. (State Br.), ECF No. 222, at 6.

As a threshold matter, Plaintiff States misapprehend the holding of *Rapanos* regarding the definition of tributaries that have a significant nexus to jurisdictional waters. They appear to

contend that the Agencies must have some set "particular quantum of volume or flow," *see id.* at 8, that would indicate that a water feature had a significant nexus with jurisdictional waters (and then argue pages later that the significant nexus test is a legal test *not* a scientific standard, *id.* at 10). But nothing in *Rapanos* or the Clean Water Act—or administrative law generally— requires the Agencies to establish a precise numerical limit of volume or flow to be used to determine whether a tributary has a significant nexus with jurisdictional waters. *See U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 737 (D.C. Cir. 2016) ("We are mindful, moreover, that 'by requiring regulations to be too specific courts would be opening up large loopholes allowing conduct which should be regulated to escape regulation.' . . . The flexible approach adopted by the [agency rule] aims to address that concern in a field in which 'specific regulations cannot begin to cover all of the infinite variety of conditions.'") (internal citations omitted). The Rule does use volume of flow as an important consideration in general, but it reasonably does not attempt to set specific numerical thresholds for volume and flow that would apply to every single stream in every region of America. Under Plaintiff States' approach, EPA would be required to establish set numerical limits of volume and flow for different types of streams in vastly different watersheds around the country *regardless* of whether such flow had a significant nexus on downstream waters in the respective watersheds.

Rather than engage in this impossible and over-prescriptive task, the Clean Water Rule properly followed Justice Kennedy's direction to:

> [t]hrough regulations or adjudication, . . . identify categories of tributaries that, due to their volume of flow (either annually or on average), their proximity to navigable waters, ***or other relevant considerations***, are significant enough that wetlands adjacent to them are likely, ***in the majority of cases***, to perform important functions for an aquatic system incorporating navigable waters.

*Rapanos,* 547 U.S. at 780-81 (emphasis added). Indeed, this passage from *Rapanos* highlights just why the Clean Water Rule passes legal muster—Justice Kennedy specifically explained that the Agencies could identify categories of tributaries that have a significant nexus using reasonable conditions and without requiring a precise "quantum of volume or flow" as the States desire. Rather, the Agencies were allowed to define jurisdictional tributaries through other means, including "proximity to navigable waters" and, even more broadly, "other relevant considerations." *Id.*

The Agencies followed the direction in *Rapanos* here—in fact, they defined covered tributaries more restrictively than required by *Rapanos*. First, they defined covered tributaries more narrowly than prior regulations. The Clean Water Rule defines tributaries as only those waters that are characterized by the presence of physical indicators of a sufficient amount of flow—bed and banks, and ordinary high water marks—and which flow into a larger stream or river. 33 C.F.R. § 328.3(a)(5), (c)(3) (defining tributary). The preexisting 1986 regulations, by contrast, required only the presence of an ordinary high water mark and thus defined tributaries more expansively. *See* 33 CFR 328.3 (1986).[1]

Second, the Clean Water Rule's more limited definition of tributary is based on a sound scientific footing which showed that the physical indicators chosen are *only* created if there are "sufficient and regular intervals of flow" in a waterbody that could have a significant nexus downstream. 80 Fed. Reg. at 37,076; Tech. Support Doc. at 235-36 (citing Lichvar and McColley 2008 and Mersel and Lichvar 2014 for proposition that physical indicators of flow can be created by perennial, intermittent, and ephemeral flows); Science Report, ECF No. 211-6, at

---

[1] The 2008 Guidance identified a number of different ways to determine flow, including physical indicators like an ordinary high water mark, a channel defined by bed and banks, or "shelving, wracking, water staining, sediment sorting, and scour."

ES-15, 2-2 (using physical indicators of flow, such as bed and banks, to identify components of

the river system). The Agencies rationally concluded that these physical indicators can be created

by perennial, intermittent, and ephemeral flows of water. Tech. Support Doc. at 235 (citing

scientific studies). The Agencies used bed and banks and an ordinary high water mark as

defining physical features of a jurisdictional tributary because these features can only be created

if there is sufficient flow.

In fact, the Rule's definition of tributary is even *more conservative and narrower* than the

Science Report recommends.  In the Science Report, a tributary is a stream with a bed and banks

that flows into a larger stream or river. *See* Science Report 2-2, 2-4, A-13. The Rule, by contrast,

requires that a tributary *also* have an ordinary high water mark. 33 C.F.R. § 328.3(c)(3).

"Tributaries" under the Rule are thus a subset of tributaries in the Science Report, which

concluded unequivocally that all tributaries, as it defined them, are physically, chemically, and

biologically connected to downstream rivers. *See* Tech. Support Doc. at 246 ("The scientific

literature unequivocally demonstrates that tributaries exert a strong influence on the physical

integrity of downstream waters."); *id.* at 249, 254; Science Report ES-2, 6-1. The Rule's

definition of tributaries is thus conservative.

The Rule's requirements of a bed, banks, ordinary high water, and contribution of flow to

downstream primary waters addresses Justice Kennedy's concern in *Rapanos* about covering

waters adjacent to "drains, ditches, and streams remote from any navigable-in-fact water and

carrying only minor water-volumes toward it . . . ." 547 U.S. at 781. Waters that have an

ordinary high water mark and bed and banks do not carry "only minor water volumes," but rather

are shown by the science to have significant impacts on downstream primary waters, and thus

waters adjacent to them do too. *See* Tech. Support Doc. at 245 (explaining that "those physical

6

characteristics indicate sufficient flow such that the covered tributaries are performing similar functions and tributaries located in the single point of entry watershed are working together in the region to provide those functions to the nearest traditional navigable waterway, interstate water, or the territorial seas"). In *Rapanos*, Justice Kennedy himself noted that the ordinary high water mark gives a "rough measure of the volume and integrity of flow." 547 U.S. at 781.

Industry Intervenors raise substantially the same argument as the States, claiming that ordinary high water mark and bed and banks are "malleable requirements" that may be satisfied "even when there is no regular or significant flow . . ., especially in dry environments like vast tracts throughout the West." [2] Indus. Intervenor Reply Br. (Int. Br.), ECF No. 221, at 11. They claim that in the western United States, "erosional features with beds, banks and OHWMs frequently reflect one-time water events . . . ." *Id.* at 12. The 2006 Corps report cited by Industry Intervenors however, found that physical indicators were reliable evidence of flow. *See* Lichvar et al., *Distribution of Ordinary High Water Mark (OHWM) Indicators and Their Reliability in Identifying the Limits of "Waters of the United States" in Arid Southwestern Channels* 14 (2006). Further, the 2013 Corps report cited by Conservation Groups states that ordinary high water marks, even though they may be "randomly" located across a channel, are nevertheless a reliable indicator of water flow, explaining that ordinary high water marks "may best be described as flow indicators" and "are useful for identifying portions of the channel that have been inundated from the most recent flow event." *See* Lefebvre et al., *Survey of OHWM*

---

[2] As acknowledged by the Agencies in their Response to Comments, the Corps' Arid West OHWM Manual explains that ordinary high water marks in the arid west can be identified "using other features associated with the limits of the active floodplain (channel), which are easily identified in the field, less variable over time, and statistically linked to the hydrologic and hydraulic parameters of ephemeral and intermittent arid channel forms, to support the traditional OHWM indicators. This method . . . represents the most consistent and repeating pattern associated with 'ordinary' events representing OHW in the arid west." RTC-8 at 313-314.

*Indicator Distribution Patterns across Arid West Landscapes* 17 (2013). Beyond Industry Intervenors' unavailing citation to Corps studies, they more generally imply that, applied in the arid West, the presence of a bed and banks and ordinary high water mark covers waters with no significant nexus. *See* Int. Br. at 11-12. The science supports the opposite conclusion:  tributaries in the arid West have a significant nexus to downstream waters. Water flows from ephemeral tributaries, for instance, are major drivers of water flow in rivers downstream and impact their integrity and sustainability. *See* Science Report at B-37, B-59; Tech. Support Doc. at 265-66.  By supplying surface water during flood events, ephemeral channels influence downstream waters by impacting sub-surface flows.  *See* Science Report 1-10 (ephemeral flows in arid landscapes are key sources of baseflow for downstream waters); Science Report at B-41 to B-42 (in the arid and semiarid Southwest ephemeral tributaries are the dominant source of recharge in valley floors). During one storm in New Mexico, flows from an ephemeral tributary accounted for 76% of the Rio Grande's flood flow. *Id*. at 3-7 to 3-8.

At base, Industry Intervenors seem to think that that tributaries flowing in infrequent but heavy bursts are functionally insignificant compared to tributaries flowing continuously in smaller volumes.  The record shows that to be incorrect. Science Report at 1-8 (low-frequency, short-duration flooding can result in a large-magnitude downstream transfer of floodwaters, sediment, large woody debris, and organisms, with important downstream effects). Justice Kennedy's *Rapanos* opinion recognized this very point. He explained that the plurality's insistence on regular flow "makes little practical sense," because "[t]he merest trickle, if continuous, would count as a 'water' . . . while torrents thundering at irregular intervals through otherwise dry channels would not." *Rapanos*, 547 U.S. at 769.

More broadly, these arguments miss the mark because *Rapanos* does not require that every single water defined as a tributary have a significant nexus to jurisdictional waters on its own. Rather, Justice Kennedy held in *Rapanos* that the agencies' definition of a category of waters is valid so long as the majority of waters in that category—not necessarily every single one—has a significant impact on navigable waters. Justice Kennedy explained that the Corps could "identify categories of tributaries" that, based on volume of flow, proximity to navigable waters, or other considerations, are significant enough "in the majority of cases" to establish the required impact on navigable waters. *Id*. at 780-81; *see also Riverside Bayview*, 474 U.S. at 135, n. 9 ("If it is reasonable for the Corps to conclude that *in the majority of cases*, adjacent wetlands have significant effects on water quality and the aquatic ecosystem, its definition can stand. *That the definition may include some wetlands that are not significantly intertwined with the ecosystem of adjacent waterways is of little moment*, for where it appears that a wetland covered by the Corps definition is in fact lacking in importance to the aquatic environment—or where its importance is outweighed by other values—the Corps may always allow development of the wetland for other uses simply by issuing a permit.") (emphases added). Industry Intervenors' argument that one western water feature may, in occasional circumstances, have an ordinary high water mark and a bed and banks but not a significant nexus to downstream waters misses these important holdings of *Rapanos* and *Riverside Bayview* that waters covered by the Act may be defined categorically.  The Clean Water Rule's definition of tributaries is more than adequately justified by the scientific record.

### D.   The definition of "adjacent" is consistent with the Clean Water Act and Supreme Court precedent.

Plaintiffs next argue that the Rule's definition of adjacent waters is inconsistent with *Riverside Bayview* and *Rapanos* and is generally overbroad. The Clean Water Rule defines

adjacent waters as those that are either very close to a traditionally navigable water or a tributary, or those that are within its 100-year floodplain and also within 1,500 feet. 33 C.F.R. § 328.3(c)(2)(i), (ii). That definition is supported by the scientific record, which shows that waters within these boundaries have significant impacts on downstream waters.

Plaintiffs' arguments regarding adjacent waters is largely a rehashing of their complaints regarding the Rule's treatment of tributaries. Their logic is that if there is one water feature somewhere in the country that is within the 100-year floodplain and 1,500 feet from a covered water's ordinary high water mark *but* does not have a significant nexus to navigable waters, then the Rule is arbitrary. But as with their arguments regarding the Rule's treatment of tributaries, the logic is fatally flawed. *See supra* at Section I.C. Neither *Rapanos* nor *Riverside Bayview* require that every single water in a covered category meet the significant nexus test if the *majority of waters* in the category do. The language of these decisions on this issue could not be more clear. *See Riverside Bayview,* 474 U.S. at 135, n. 9 ("Of course, it may well be that not every adjacent wetland is of great importance to the environment of adjoining bodies of water. But the existence of such cases does not seriously undermine the Corps' decision to define all adjacent wetlands as 'waters.' If it is reasonable for the Corps to conclude that *in the majority of cases,* adjacent wetlands have significant effects on water quality and the aquatic ecosystem, its definition can stand."); *see also Rapanos* , 547 U.S. at 780-81 (Kennedy, J., concurring). The arguments made by Industry Intervenors and the States can be rejected on this basis alone.

In addition to the legal flaws in Industry Intervenors' and the States' arguments regarding adjacency, their arguments are factually baseless. Both parties appear to suggest that the record is too general to support the adjacency definitions created by the agency. But in fact, the Rule's

definition of adjacent waters is supported by a plethora of science in the administrative record.

For example, with regard to waters within 100 feet of tributaries, the record notes that:

> Many studies indicate that the primary water quality and habitat benefits will generally occur within a several hundred foot zone of a water. *See, e.g.*, Peterjohn and Correll 1984; Hawes and Smith 2005. In addition, the scientific literature indicates that to be effective, contaminant removal needs to occur at a reasonable distance prior to entry into the downstream traditional navigable waters, interstate waters, or the territorial seas. Some studies also indicate that fish, amphibians (e.g., frogs, toads), reptiles (e.g., turtles), and small mammals (e.g., otters, beavers, etc.) will use at least a 100-foot zone for foraging, breeding, nesting, and other life cycle needs. Dole 1965; Smith and Green 2005; Semlitsch 2008; Steen et al. 2012.

Tech. Support Doc. at 298. The States complain that the record does not support a "significant connection," but the scientific literature shows that "riparian areas are highly connected to streams, so much so that considering the riparian influence on streams is essential to understanding their structure and function." Science Report at 4-40.  Moreover, adjacency "has always included an element of reasonable proximity." 79 Fed. Reg. at 22,207-08 (citing *Riverside Bayview*, 474 U.S. at 133-34); *see also* 80 Fed. Reg. at 37,089 ("The agencies have always recognized that adjacency is bounded by proximity."); 42 Fed. Reg. at 37,122, 37,128 (July 19, 1977) (Clean Water Act jurisdiction extends to "any adjacent wetlands that form the border of or are in reasonable proximity to other waters of the United States, as these wetlands are part of this aquatic system"). It was within the Agencies' rulemaking authority to identify a point on the continuum at which:  (a) waters are appropriately regarded as jurisdictional based on adjacency; and (b) waters may be regarded as jurisdictional only after a case-specific analysis.

On inclusion of waters within the 100-year floodplain, science in the record finds that:

> Floodplain waters improve water quality through the assimilation, transformation, or sequestration of pollutants, including excess nutrients and chemical contaminants such as pesticides and metals, that can degrade downstream water integrity. [Science Report] at ES-3. In addition to providing effective buffers to protect downstream waters from point source and nonpoint source pollution, these

11

systems form integral components of river food webs, providing nursery habitat for breeding fish and amphibians, colonization opportunities for stream invertebrates, and maturation habitat for stream insects. *Id*. Lateral expansion and contraction of the river in its floodplain result in an exchange of organic matter and organisms, including fish populations that are adapted to use floodplain habitats for feeding and spawning during high water, that are critical to river ecosystem function. *Id*. Floodplain wetlands and open waters also affect the integrity of downstream waters by subsequently releasing (desynchronizing) floodwaters and retaining large volumes of stormwater, sediment, and contaminants in runoff that could otherwise negatively affect the condition or function of downstream waters. *Id*.

Tech. Support Doc. at 300. In sum, the scientific record shows that wetlands located in floodplains are "highly connected" to rivers and tributaries through surface water, shallow groundwater, and biological connectivity. Science Report at 4-39, ES-2 to ES-3 (*see* Science Report at 4-40, Table 4-3 for summary of physical, biological, or chemical impacts of floodplain wetlands); *see generally* Science Report § 4.4 at 4-3 to 4-20 (reviewing and synthesizing impacts of floodplain wetlands on physical, chemical, and biological integrity of rivers and streams, citing dozens of peer-reviewed scientific papers supporting conclusion). Tellingly, neither the States nor Industry Intervenors argue that the Agencies misinterpreted a specific publication or any other technical information in the voluminous record before them.

Both parties also complain about the Rule's selection of the 100-year floodplain rather than "any other time-delineated flood plain" as well as the 1,500-foot distance limit from the primary water's ordinary high water mark. *See* Int. Br. at 14. The Agencies chose to use a 100-year interval floodplain, as opposed to a different interval, in part for reasons of clarity. 80 Fed. Reg. at 37,089. Contrary to the Industry Intervenors' claims, that does not make the decision arbitrary. The question is whether the Agencies' choices are "within a zone of reasonableness," not whether its numbers are "precisely right." *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001) (quotation marks omitted). Within the bounds of what is supported by the scientific

evidence, administrability and enforceability can be a consideration in setting a regulatory standard. *See id.* at 459; *see also Beazer E., Inc. v. U.S. EPA Region III*, 963 F.2d 603, 609 (3d Cir. 1992) (courts defer to an agency's line-drawing if the interpretation is "reasonable and consonant with Congress' intent"). Here, the floodplain interval chosen by the Agencies was reasonable and supported by the science:  it protects waters with a significant influence on the integrity of downstream waters, and does so in a clear and implementable way.[3] To the extent Industry Plaintiffs assert that a shorter flood interval would have been clearer, the Agencies did not agree, and explained why. *See* 80 Fed. Reg. at 37,083; Tech. Support Doc. at 300-01.[4] The court should not second-guess that judgment. *See Ark. v. Okla.*, 503 U.S. 91, 112-13 (1992) (court should not supplant agency findings, even if the record could support other findings).

> E.     **The consideration of waters on a case-by-case basis is consistent with the Clean Water Act and Supreme Court precedent.**

State Plaintiffs' claim that the case-by-case waters category of the Clean Water Rule asserts jurisdiction over the ponds in *SWANCC* is not supported by the evidence. The Court in *SWANCC* held that the use of "isolated," non-navigable, intrastate ponds by migratory birds was not itself a sufficient basis for the exercise of federal authority, rejecting the so-called "Migratory Bird Rule." *See* 531 U.S. at 174. *SWANCC* did not hold, as Plaintiffs imply, that the ponds at issue could not be protected *even if* they had a significant nexus to navigable waters.

---

[3] The 100-year floodplain delineates boundaries for federally subsidized flood insurance under the National Flood Insurance Program. Given the well-documented flood absorption and attenuation properties of wetlands protected by the Clean Water Rule, Tech. Support Doc. at 300-01, 80 Fed. Reg. at 37,083, defining jurisdiction along the same lines comports with the strong federal interest in minimizing flood insurance taxpayer subsidies. Indeed, many commenters requested that the Agencies use a 100-year flood plain. *See* 80 Fed. Reg. at 37,803.

[4] Notably, the Agencies originally proposed a broader definition of adjacency than the one finally selected in the Rule. The proposed rule would have included all floodplain waters as adjacent. *See* 79 Fed. Reg. at 22,263 (proposed definition of "neighboring" in 33 CFR 328.3(c)(2)). Thus, the Rule's provision that cuts off the automatic inclusion of floodplain waters beyond 1,500 feet works in the States' and Industry Intervenors' favor.

The Clean Water Rule does not revive the Migratory Bird Rule, and in fact explicitly deletes provision (a)(3), which was at issue in *SWANCC*, from the existing regulation. Tech. Support Doc. at 31. The Clean Water Rule extends to those waters which significantly influence the chemical, physical, or biological integrity of traditionally navigable or interstate waters. In contrast, the Migratory Bird Rule did not turn on a significant nexus to the water's biological integrity, but on the basis of whether migratory birds, or hunters pursuing them, crossed state lines. *SWANCC*, 531 U.S. at 163-64. Importantly, the circumstances giving rise to *SWANCC* would not create jurisdiction under the Clean Water Rule. The Agencies specifically note that under the Clean Water Rule, the mere presence of migratory birds relied on for jurisdiction in *SWANCC* would not provide evidence that a water had a significant effect on the biological integrity of navigable waters:  "Non-aquatic species or species such as non-resident migratory birds *do not* demonstrate a life cycle dependency on the identified aquatic resources and are not evidence of biological connectivity for purposes of this rule." 80 Fed. Reg. at 37,094 (emphasis added).

State Plaintiffs also argue that under Justice Kennedy's significant nexus standard, jurisdiction may only be established when a water significantly affects the chemical, physical, *and* biological integrity of a primary water at the same time. *See* State Br. at 11. That is incorrect. The purpose of the Clean Water Act is to "restore and maintain" all three forms of integrity. *See* 33 U.S.C. § 1251(a). State Plaintiffs' interpretation of the significant nexus test would thwart the purpose of the Clean Water Act by allowing *only* for the regulation of pollution that degrades water *in all three respects at once. Cf. Sosa v. Chase Manhattan Mortg. Corp.*, 348 F.3d 979, 982-83 (11th Cir. 2003) (construing the word "and" disjunctively to avoid "irrational results").

Justice Kennedy implicitly recognized that jurisdiction does not require a significant effect on all three types of integrity in *Rapanos* by identifying a number of different functions that may create a significant nexus to a primary water, such as pollution trapping, flood control, and runoff storage. *Rapanos*, 547 U.S. at 779. Those functions would not require a water to impact the chemical, physical, *and* biological integrity of a primary water. State Plaintiffs also mischaracterize the Court's holding in *SWANCC. See* State Br. at 11. The Court in *SWANCC* held that the use of "isolated," non-navigable, intrastate ponds by migratory birds was not itself a sufficient basis for jurisdiction. *See* 531 U.S. at 174. *SWANCC* does not hold, and the Act does not support, the notion that a significant nexus can never arise from a significant effect on the biological integrity of navigable waters. Accordingly, the Rule's definition of "significant nexus" is consistent with the purpose of the Clean Water Act and the Court's decisions in *SWANCC* and *Rapanos*.

State Plaintiffs pose a series of hypotheticals involving wildlife which they claim would establish jurisdiction under the Clean Water Rule based on a biological nexus, but allegedly would not be compatible with Justice Kennedy's significant nexus test in *Rapanos*. State Br. at 11. These hypotheticals are speculative, mischaracterize the Rule, and demonstrate a fundamental misunderstanding of the significant nexus test. Under the Rule, smaller waters that serve as nurseries for species that predominantly reside in larger primary waters, or smaller waters that serve as foraging, feeding, nesting, and breeding grounds for these species, may be determined to be jurisdictional waters *if they significantly affect the biological integrity of primary waters*. *See* 80 Fed. Reg. at 37,093-94. The Agencies did not consider biological functions of waters unless those functions affected the biological integrity of primary waters. *See* Tech. Support Doc. at 14. As discussed above, this is consistent with Justice Kennedy's

significant nexus test and the purpose of the Clean Water Act.[5] *See* 33 U.S.C. § 1251(a) (stating that the purpose of the Clean Water Act is to restore "chemical, physical, and biological integrity of the Nation's waters"). The Clean Water Act has always been understood to protect aquatic wildlife as a key component of maintaining and restoring the water quality of primary waters. As early as 1975, the Corps recognized that "[w]etlands considered to perform functions important to the public interest include . . . [w]etlands which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species." 40 Fed. Reg. 31,328 (1975). The Clean Water Act itself contains many provisions relating to wildlife. *See, e.g.,* 33 U.S.C. § 1252(a) ("[D]ue regard shall be given to the improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife . . . ."); 33 U.S.C. § 1312(a) (requiring effluent limitations for, among other things, "the protection and propagation of a balanced population of shellfish, fish and wildlife").

**III.    The Agencies complied with the Administrative Procedure Act and other procedural requirements.**

**A.    The final Rule is a logical outgrowth of the proposed rule.**

Industry Intervenors appear to concede that the Agencies are not required to identify a numerical limit in the proposed rule. *See* Int. Br. at 18 n.3 ("Of course, the agency was not required to 'identify the precise numerical limit.'"). But they downplay the reality that the Agencies specifically requested and received comment on different ways to define "adjacent waters"—including "establishing *specific geographic limits*," "including, for example, *distance limitations*." 79 Fed. Reg. at 22,208 (emphasis added). Thus, "interested parties" like Plaintiffs

---

[5] This approach is also consistent with the 2008 guidance document, which would apply in the absence of the Clean Water Rule.

"should have anticipated" that establishing specific geographic limits or distance limitations to define "adjacent waters" was "*possible*" when the Agencies specifically requested comment on these issues. *See Miami-Dade Cty. v. U.S. E.P.A.*, 529 F.3d 1049, 1059 (11th Cir. 2008) ("A rule is deemed a logical outgrowth if interested parties 'should have anticipated' that the change was possible."). Not only should they have anticipated it, they asked for it.  Some Plaintiffs in this case expressly supported the inclusion of "specific geographic limits," "including for example distance limitations," and clear floodplain rules. *See* RTC-3, excerpts at ECF No. 211-11, at 153-54 (comments by Georgia Department of Transportation); *see also id.* at 129 (responding to Utah's request that the Rule "include an explicit requirement" for reasonable proximity).

Industry Intervenors admit that courts view comments as evidence of adequate notice, yet argue that "other courts have rejected" this approach. Int. Br. at 19. But here the Agencies *sought comment* on "including specific distance limitations" to define adjacency. Further, regardless of what "other courts" do, the question is whether the Eleventh Circuit views comments as evidence of notice, and it does. *See Miami-Dade Cty.*, 529 F.3d at 1059 ("[A]lthough they may not provide the only basis upon which an agency claims to have satisfied the notice requirement, comments may be adduced as evidence of the adequacy of notice.").

Plaintiffs also ignore the import of *Alabama Power Co. v. OSHA*, 89 F.3d 740 (11th Cir. 1996). In *Alabama Power*, the Occupational Safety and Health Administration (OSHA) published a proposed rule regarding protective apparel for certain employees exposed to hazardous flames, sought comment, and then published a final rule. After issuing the final rule, OSHA published what it called a "correction" to the rule, adding a numerical weight limit for fabrics for the first time. Alabama Power complained that it should have received an opportunity to comment on the numerical limit. The Eleventh Circuit held that the modification standard, 29

U.S.C. § 655(b)(2), which provides the public an opportunity to comment on modifications, did *not* apply, and that an additional comment period was not required because "the final standard, correction included" was a "logical outgrowth" of the proposed standard. *Ala. Power*, 89 F.3d at 745. Plaintiffs' suggestion that somehow this Eleventh Circuit case, which directly addresses the issue at hand, does not apply because it involved a corrected final rule is wrong—the question before the Circuit was whether the final corrected standard was a *logical outgrowth* of the draft standard. *Id.* Indeed, the Eleventh Circuit itself has cited *Alabama Power* for this proposition in a case having nothing to do with modifications or corrections. *See Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d 1261, 1276 (11th Cir. 1999). Plaintiffs' unsupported effort to say otherwise is nothing but a failed attempt to distinguish a binding case that directly contradicts their position.[6]

**B.      The parties had meaningful opportunity to comment on the Science Report.**

Industry Intervenors are wrong that interested parties were deprived of an opportunity to comment on the Final Science Report. As previously explained, the final Science Report's "continuum-based approach" was not "new," *contra* Int. Br. at 21, despite Plaintiffs' best efforts to paint it as such. *See* 79 Fed. Reg. at 22,193; Draft Science Report, ECF No. 211-13, at 3-4, 4-21 to 4-23, 6-3 (discussing the "River Continuum Concept"); *id.* at 3-33 (discussing the factors that "determine where components of a [river] system fall on the connectivity-isolation gradient"); *id.* at 5-57 (discussing the "continuum of connectivity" in wetlands). Instead, the final report merely supplemented and refined information already disclosed in the draft report.

---

[6] In addition to these reasons, Industry Intervenors' argument regarding the inclusion of distance-based limitations for case-by-case waters also fails because Plaintiffs can show no redressible injury from the complained-of change. That change categorically *excluded* from coverage some waters that would have been subject to potential inclusion.

Industry Intervenors rely on two cases to support their position. Both undercut it. First, in *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 252 (2d Cir. 1977), the FDA issued a regulation regarding the processing of smoked fish. The appellant argued that the FDA regulation was invalid because the FDA did not disclose the scientific data and methodology on which it relied to ban the sale of certain products. The court agreed, holding that "when the pertinent research material is readily available and the agency has no special expertise," there is "[no] reason to conceal the scientific data relied upon from the interested parties." *Id.* at 251.

Unlike here, however, in *Nova Scotia* the FDA did not release *any* science at all. *Id.* ("[A]ll the scientific research was collected by the agency, and none of it was disclosed . . . .") Contrary to Industry Intervenors' characterization, the court did not hold that supplementing the scientific basis for a rule after the close of the comment period violates the APA. Quite the opposite, the court recognized that "a proceeding might never end if such [scientific] submission required a reply ad infinitum." *Id.* at 251 n.15. Therefore, in finding that the FDA should have disclosed the scientific basis for the rule, the court noted that disclosing this information "simply would have required *a single round* of comment." *Id.* (emphasis added).

Second, in *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392 (9th Cir. 1995), the Ninth Circuit considered whether a final Fish and Wildlife Service rule listing the Springs Snail as an endangered species violated the APA because the Fish and Wildlife Service did not disclose a non-public USGS report that it heavily relied on to list the snail. *Id.* at 1403. The Ninth Circuit held that agency's failure to disclose the report, which "was critical to FWS' decision to list the Springs Snail," violated the APA because the report "did not confirm or replace existing data" but instead provided "the only scientific information on the cause of the decline in spring flows" that were threatening the snail. *Id.* In reaching its conclusion, however, the court emphasized

19

that, as long as new information is not "the *only* scientific information" on a critical issue, "[a]n agency can add material to the administrative record after the close of a public comment period when that material is in response to the comments" and that "an agency may use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown." *Id.* at 1402, 1403 (emphasis added) (internal citations and quotation marks omitted). That is precisely what happened here.

Instead, this case is more akin to *Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991). In that case, EPA issued a proposed rule and contemporaneously released a scientific report containing the data on which the rule was based. Later, EPA replaced the scientific report with a different, supplementary one that included additional data. Petitioners complained that this "last minute" replacement violated the APA by depriving petitioners of their opportunity to comment on the later report, which was issued after the close of the comment period. The D.C. Circuit Court of Appeals held that the agency's reliance on the supplemental report did not violate the APA's notice and comment provisions "because EPA's methodology remained constant, and because the added data was used to check or confirm prior assessments." *Id.* at 485; *see also Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 58 (D.C. Cir. 1984) ("It is impossible to perceive why correction of an asserted deficiency in earlier studies . . . should give rise to an additional opportunity to comment."); *Air Transport Ass'n of Am. v. C.A.B.,* 732 F.2d 219, 224 (D.C. Cir. 1984) (holding that agency reliance on "internal staff studies" did not violate APA).

## C.    The Agencies responded to significant comments.

The Agencies' written response to comments runs *17 volumes* and totals *over 7,500 pages*. Even Plaintiffs appear to acknowledge that the Agencies responded to their comments in

some fashion. *See* Int. Br. at 22-23 (complaining about *adequacy* of responses). Instead, their argument amounts to a complaint that they did not like the Agencies' responses. "There is no requirement, however, that an agency respond to significant comments in a manner that satisfies the commenter." *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017). "Instead, to respond adequately, the agency must only address significant comments 'in a reasoned manner,' that allows a court 'to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Id*. (internal citations omitted). In other words, the agency's responses need only show that its decision was "based on a consideration of the relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984). Here, the Agencies' response shows that the Rule was based on a full consideration of the relevant factors.

        In any event, Industry Intervenors' complaints mischaracterize the record. For example, they complain that the Agencies' did not adequately respond to their complaint that an ordinary high water mark can be difficult to identify in the arid West. Specifically, Industry Intervenors contend that the Agencies' only response was "that the Corps had previously applied the OHWM metric in the arid West." Int. Br. at 23. That is not accurate. First, the Agencies pointed to a publicly available 84-page Army Corps of Engineers field guide on the identification of the ordinary high water mark in the arid West that underwent internal and external peer review and technical review by multiple scientists. *See* RTC-8 at 316-17 (directing commenters to "The Field Guide for the Identification of OHWM in the Arid West" for "additional, more specific guidance for identifying the OHWM within the arid West Region"); *see also* Robert W. Lichvar et al., U.S. Army Corps of Eng'rs, *A Field Guide to the Identification of the Ordinary High Water Mark (OHWM) in the Arid West Region of the Western United States: A Delineation Manual* (2008). Responding by providing a publicly available peer-reviewed document

published by the Corps itself hardly counts as brushing off the Industry Intervenors' concerns. If

that weren't enough, the Agencies also thoroughly responded to these comments within the

response document itself, explaining the approach set forth in the Corps' manual:

> The Arid West OHWM manual was developed to address these challenges in low-gradient, alluvial ephemeral/intermittent channel forms, by using other features associated with the limits of the active floodplain (channel), which are easily identified in the field, less variable over time, and statistically linked to the hydrologic and hydraulic parameters of ephemeral and intermittent arid channel forms, to support the traditional OHWM indicators. This method uses stream geomorphology and vegetation response to the dominant stream discharge and represents the most consistent and repeating pattern associated with "ordinary" events representing OHW in the arid west.

RTC-8 at 313-14; *see also id.* at 316-17; 345-46. On top of this, the final Science Report has an

entire section dedicated to arid southwestern ephemeral and intermittent streams. *See* Science

Report at Section B.5; RTC- 9 at 25-28. Again, the fact that Industry Intervenors dislike or

disagree with these responses does not make them inadequate under the APA.

Similarly, Industry Intervenors complain that the Agencies' response to comments

regarding "the Rule's over-expansion of federal jurisdiction" was "a clear example of the agency

brushing off rather than addressing comments." Int. Br. at 22. Again, this mischaracterizes the

record. In addition to addressing this topic multiple times in their response to comments, the

Agencies thoroughly addressed these concerns at pages 30-34 and 83-85 of the Technical

Support Document. Among other things, the Agencies substantively responded to concerns about

(1) whether "the proposed rule asserts expansive jurisdiction that is beyond the commerce

authority Congress exercised in enacting the CWA;" (2) whether the proposed rule expands

jurisdiction when compared to the 1986 regulatory scheme; (3) whether the proposed rule

expands jurisdiction when compared to the 2008 guidance document; (4) how the proposed rule

is different than the Migratory Bird Rule; (5) how the proposed rule places limitations on the

Agencies' authority; and (6) confusion among commenters about whether the Agencies' scope of jurisdiction is broader or narrower under the proposed rule. Tech. Support Doc. at 30-34, 83-85. Far from "brushing off" comments on the scope of jurisdiction under the Clean Water Rule, the Agencies painstakingly responded to each and every concern.

### D. The Agencies did not engage in an unlawful advocacy campaign.

Industry Intervenors appear to agree that neither the Appropriations Act of 2014 nor the "anti-lobbying laws" give rise to a separate cause of action. Instead, they argue that the Agencies' so-called "propaganda campaign" shows that the Agencies approached the rulemaking with a "closed mind" and did not offer "fairness and transparency" to interested parties. This argument fails for at least three reasons. First, as the Agencies pointed out, "The GAO opinion in no way found that EPA acted in bad faith, or that the Agencies had a 'closed mind to criticism.'" Agency Response Br., ECF No. 215, at 33 (internal citations omitted).[7] Second, as the Agencies address in their Response in Opposition to Plaintiffs' Motion for Summary Judgment, neither the Appropriations Act of 2014 nor the anti-lobbying laws give rise to a procedural claim under the Administrative Procedure Act. Third, the record plainly shows that the Agencies did not approach the rulemaking with a "closed mind." As detailed in the Conservation Groups' Cross-Motion for Summary Judgment, the Agencies carefully crafted the Clean Water Rule over several years, solicited and received over one million public comments, prepared a nearly 7,500-page response to those comments, and held over 400 public meetings with individuals and groups across the country—an unprecedented level of outreach by any standard. Industry Intervenors' suggestion that this level of outreach demonstrates a "closed mind" is wrong.

---

[7] The GAO separately concluded that the Agencies had complied with all procedural requirements. See Letter from Robert J. Cramer, Gov't Accountability Office, to Jim Inhofe, Comm. on Env't and Pub. Works (July 15, 2016) at 2.

**E.      The Agencies complied with the Regulatory Flexibility Act.**

The Agencies fully satisfied their obligations under the Regulatory Flexibility Act. In any event, however, Industry Intervenors entirely ignore case law holding that, even if the Agencies' certification were improper (which it was not), the Clean Water Rule would still be valid because the Agencies completed the required outreach and analysis, rendering any noncompliance with the Regulatory Flexibility Act harmless error. *See Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 879 (9th Cir. 2003) ("Any hypothetical noncompliance [with the RFA] would thus have been harmless, since the available remedy would simply require performance of the economic assessments that EPA actually made); *cf. Miami-Dade*, 529 F.3d at 1061. It is undisputed that the Agencies conducted outreach meetings with small business participants from various sectors as early as 2011 and held over 400 public meetings in all, seeking feedback from all types of stakeholders including small entities and businesses. This level of outreach to small businesses more than satisfies the procedural requirements of the Regulatory Flexibility Act.

**III.    The Rule is constitutional.**

**A.      The Rule is not unconstitutionally vague.**

Industry Intervenors complain that the Clean Water Rule's reliance on an ordinary high water mark to define tributary renders the Rule unconstitutionally vague. Industry Intervenors' allegation that "[r]egulators can reach any outcome they please," Int. Br. at 19, is misleading, without support, and wrong. The Rule defines ordinary high water mark by specific physical characteristics or "other appropriate means that consider the characteristics of the surrounding areas." *See* 33 C.F.R. § 328.3(c)(6). Agency guidance further instructs regulators what "other appropriate means" are and how to identity an ordinary high water mark. *See* U.S. Army Corps of Eng'rs, Reg. Guidance Letter 05-05 (Dec. 7, 2005). The Agencies have also published field

24

guides for identifying ordinary high water marks. The comprehensive direction contained in the Rule, agency guidance, and the field guides distinguishes this case from those cited by Intervenors, where regulators were left to guess at the meaning of undefined terms like "indecent language." *Compare F.C.C. v. Fox Tel. Stations*, 567 U.S. 239, 243 (2012).

Certainly, the definition of ordinary high water mark offers limited flexibility, but flexibility is necessary to address different circumstances in different parts of the county. The law on this point is clear:  the fact that the definition offers some flexibility does not render the Rule unconstitutionally vague. *See U.S. Telecom*, 825 F.3d at 737 ("[A] regulation is not impermissibly vague because it is 'marked by flexibility and reasonable breadth, rather than meticulous specificity.'"). Contrary to Plaintiffs' intimations, "[t]here is no requirement . . . that statutes [or regulations] define every factual situation that may arise." *United States v. Biro*, 143 F.3d 1421, 1430 (11th Cir. 1998). "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is not sufficient reason to hold the language too ambiguous . . . ."*Id.* Nor does it matter that the Agencies may use remote sensing tools to identify an ordinary high water mark. The Agencies have used such evidence for years, long before the Clean Water Rule was promulgated, 80 Fed. Reg. at 37,076-77, and courts have repeatedly accepted this evidence. Plaintiffs' unfounded objection that the use of remote sensing tools will lead to arbitrary enforcement is entirely contrary to historical evidence.

### B. The Rule does not violate the Commerce Clause or the Tenth Amendment.

Plaintiffs' arguments that the Clean Water Rule violates the Commerce Clause and the Tenth Amendment are premised on the incorrect assumption that the Rule encompasses waters without a significant nexus to primary waters. As discussed above, the record shows that waters covered by the Rule have a significant nexus to primary waters. Thus, these waters are properly

regulated under the Commerce Clause, and the Rule does not violate the Tenth Amendment.

Plaintiffs' arguments to the contrary fail with their significant nexus arguments.

## CONCLUSION

For all of these reasons, the Court should grant summary judgment in favor of

Defendants, dissolve its preliminary injunction, and uphold the Clean Water Rule.

Respectfully submitted this 28th day of November, 2018.

*s/ Catherine M. Wannamaker*
Southern Environmental Law Center
Georgia Bar No. 811077
463 King Street, Suite B
Charleston, SC 29403-5270
(843) 720-5270
*cwannamaker@selcsc.org*

*s/ J. Blanding Holman IV*
*Admitted pro hac vice*
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403-5270
(843) 720-5270
*bholman@selcsc.org*

*s/ Megan Hinkle Huynh*
*Admitted pro hac vice*
Georgia Bar No. 877345
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
(404) 521-9900
*mhuynh@selcga.org*

*Counsel for Intervenor Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2018, I electronically filed the foregoing
*Intervenor Defendants' Reply in Support of Cross-Motion for Summary Judgment* with the Clerk
of Court using the CM/ECF system which will send notification of such filing to the attorneys of
record.

*s/ Megan Hinkle Huynh*

26