IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

State of Georgia, *et al.*,
   *Plaintiffs,*

v.

Andrew Wheeler, *et al.*,
   *Defendants.*

Case No. 2:15-cv-79-LGW-RSB

**PLAINTIFF STATES' RESPONSE TO INTERVENOR-DEFENDANTS'
STATEMENT OF UNDISPUTED MATERIALS FACTS**

  The Plaintiff States submit this response to the Intervenor-Defendants' Statement of Material Undisputed Facts (Statement), ECF No. 211-1, as required by this Court's order, *see* ECF No. 225.

  Rule 56.1 statements are unnecessary in cases brought under the Administrative Procedure Act (APA) to review final agency action. Review of the challenged agency action in such cases is based on the administrative record rather than facts raised by the parties in pleadings. *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *see also Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977) (questions "pertaining to merit of the administrative decision" are "determined exclusively on the administrative record"). Indeed, in these cases, the district court does not resolve facts at all; "[i]n cases involving judicial review of agency action … the district court acts as an appellate tribunal and 'the entire case on review is a question of law.'" *Stillwell v. U.S. Dep't of Commerce*, 2017 WL 6947420, at *4 (M.D. Fla. Nov. 27, 2017) (quoting *Brinklys v. Johnson*, 175 F. Supp. 3d 1388, 1349 (M.D. Fla. 2016)); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court."). Thus, although "summary judgment is an appropriate procedure for resolving" APA challenges, "the standard set forth in Rule 56(a) does not apply."

*Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016). "At the summary judgment stage [of APA challenges] the court does not look at whether there is a genuine issue of material fact, but instead turns directly to the question of the validity of the challenge." *Malladi v. Brown*, 987 F. Supp. 893, 922 (M.D. Ala. 1997), *aff'd sub nom. United States v. Ponder*, 150 F.3d 1197 (11th Cir. 1998).

For these reasons, neither statements of undisputed fact nor responses to such statements are necessary or helpful to resolving this case. *See, e.g.*, *Glara Fashion, Inc. v. Holder*, No. 11 Civ. 889 (PAE), 2012 WL 352309, at *1 n. 1 (S.D.N.Y. Feb. 3, 2012) (no Rule 56.1 statement required in administrative record review case); *Student X v. New York City Dep't of Educ.*, No. 07-cv-2316, 2008 WL 4890440, at *11 (E.D.N.Y. Oct. 30, 2008) (declining to require counter-statement of undisputed material facts in APA case because "the 56.1 Statement will not aid the court in its independent review of the [administrative] record"); *Karpova v. Snow*, 402 F. Supp. 2d 459, 465 (S.D.N.Y. 2005) (summary judgment appropriate without submission of statements of undisputed facts in APA cases).[1]

Nonetheless, subject to the above discussion and in an abundance of caution, the Plaintiff States' responses to the Intervenor-Defendants' Statement follow in correspondingly numbered paragraphs.

1. The purpose of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of our Nation's waters." 33 U.S.C. § 1251.

States' Response: The Plaintiff States' claims are brought under the APA, and the court need not evaluate whether a material dispute of fact exists in a motion for summary judgment, but instead should evaluate the question of law based on the administrative record. Thus, no response to this paragraph is necessary. To the extent this Court nonetheless requires a response, the Plaintiff States do not object to facts in this paragraph to the extent they are consistent with

---

[1] Plaintiff States note that out of an abundance of caution, they filed a statement of undisputed material facts with their motion for summary judgment to comply with Local Rule 56.1. As with this response, however, they maintain that no such statements are necessary in APA cases.

the administrative record. To the extent the Intervenor-Defendants have identified "facts" that are argumentative, reflect legal conclusions, or are inconsistent with a referenced document, statute, or regulation's plain language, meaning, or context, the Plaintiff States dispute such facts. To the extent this paragraph relies on facts outside the administrative record, the Court should decline to consider or rely on such facts to resolve any claims because that information is not before the court. To the extent the Court considers such facts, the Plaintiffs dispute them.

2. The Act allows the Environmental Protection Agency ("EPA") and the Army Corps of Engineers (the "Corps") (collectively, the "Agencies") to regulate "navigable waters," which in turn are defined as "waters of the United States." 33 U.S.C. § 1251 et seq.; 33 U.S.C. 1362(7).

States' Response: *See* Response No. 1.

3. Congress did not, however, define the term "waters of the United States." *See* 33 U.S.C. 1362.

States' Response: *See* Response No. 1.

4. Despite this lack of definition, the legislative history of the Clean Water Act makes clear that Congress intended the term to be interpreted broadly. *See* S. Conf. Rep. No. 1236 (1972); H.R. Rep. No. 911 (1972); S. Rep. No. 414 (1971).

States' Response: *See* Response No. 1.

5. The Conference Report for the Clean Water Act observed, "The Conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation…." S. Conf. Rep. No. 1236 (1972).

States' Response: *See* Response No. 1.

6. The House Report explained, "One term that the Committee was reluctant to define was the term 'navigable waters.' The reluctance was based on the fear that any interpretation would be read narrowly. However, this is not the Committee's intent. The Committee fully intends that the term 'navigable waters' be given the broadest possible constitutional interpretation…." H.R. Rep. No. 911 (1972).

States' Response: *See* Response No. 1.

7. The Senate Report expressed similar concerns, cautioning that "[t]hrough a narrow interpretation of the definition of interstate waters the implementation [of the prior water pollution act] was severely limited." S. Rep. No. 414 (1971).

States' Response: *See* Response No. 1.

8. Still, over the past four decades, parties have disagreed about the scope of the Agencies' jurisdiction under the Clean Water Act, with industry groups and property owners seeking to avoid permitting requirements arguing for a narrow construction of the term, and those seeking to protect the environment arguing for a broad construction. See, e.g., *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985); *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (SWANCC); *Rapanos v. United States*, 547 U.S. 715 (2006).

States' Response: *See* Response No. 1.

9. The Supreme Court has addressed the scope of the Agencies' jurisdiction at least three times since 1985. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985); *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (SWANCC); *Rapanos v. United States*, 547 U.S. 715 (2006).

States' Response: *See* Response No. 1.

10. In response to these Supreme Court decisions, the Agencies issued guidance documents in 2003 and 2008. 80 Fed. Reg. at 37,056.

States' Response: *See* Response No. 1.

11. However, according to the Agencies, "these two guidance documents did not provide the public or agency staff with the kind of information needed to ensure timely, consistent, and predictable jurisdictional determinations." 80 Fed. Reg. at 37,056.

States' Response: *See* Response No. 1.

12. As a result, "[m]embers of Congress, developers, farmers, state and local governments, energy companies, and many others requested new regulations to make the process

of identifying waters protected under the CWA clearer, simpler, and faster." 80 Fed. Reg. at 37,056.

    <u>States' Response</u>: *See* Response No. 1.

    13. Because the guidance documents did not allow for consistent or predictable enforcement of the Clean Water Act, certain smaller streams (such as intermittent, ephemeral, or headwater streams) and wetlands were left vulnerable to contamination and degradation, despite having a "significant nexus" to traditional navigable waters, interstate waters, or the "territorial seas." 80 Fed. Reg. at 37,056.

    <u>States' Response</u>: *See* Response No. 1.

    14. In the continental United States, intermittent, ephemeral, or headwater streams make up 58%, or 207,476 miles, of the stream miles that provide water for public drinking water systems. Geographic Information Systems Analysis of the Surface Drinking Water Provided by Intermittent, Ephemeral, and Headwater Streams in the U.S. (attached as Ex. 1).

    <u>States' Response</u>: *See* Response No. 1.

    15. That means that approximately 117 million people—over one third of the entire U.S. population —get some or all of their drinking water from public drinking water systems that rely at least in part on these vulnerable streams. Geographic Information Systems Analysis of the Surface Drinking Water Provided by Intermittent, Ephemeral, and Headwater Streams in the U.S. (attached as Ex. 1).

    <u>States' Response</u>: *See* Response No. 1.

    16. Millions of people living in the states that are plaintiffs in this case depend on public drinking water systems that draw at least in part from ephemeral, intermittent, or headwater streams. Geographic Information Systems Analysis of the Surface Drinking Water Provided by Intermittent, Ephemeral, and Headwater Streams in the U.S. (attached as Ex. 1).

    <u>States' Response</u>: *See* Response No. 1.

    17. In Georgia, for example, over 4.9 million people—nearly half the state's population—receive drinking water from systems that rely at least in part on intermittent,

ephemeral, or headwater streams. *See* Percentage of Surface Drinking Water from Intermittent, Ephemeral, and Headwater Streams in Georgia (attached as Ex. 2).

    States' Response: *See* Response No. 1.

    18. The Clean Water Rule also restores the protections of the Clean Water Act to important wetlands left vulnerable to contamination and degradation under the guidance documents.

    States' Response: *See* Response No. 1.

    19. "[W]etlands can perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage." *Rapanos*, 547 U.S. at 779 (Kennedy, J., concurring in the judgment).

    States' Response: *See* Response No. 1.

    20. The role of wetlands in reducing flood peaks is particularly valuable: according to EPA, "[o]ne review of wetland studies reported that riparian wetlands reduced or delayed floods in 23 of 28 studies." EPA, Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence ("Science Report"), ID-20858, at ES-9 (2015) (attached as Ex. 3).

    States' Response: *See* Response No. 1.

    21. Wetlands also "store large amounts of sediment and organic matter from upstream and from upland areas. For example, riparian areas have been shown to remove 80−90% of sediments leaving agricultural fields in North Carolina." Science Report at ES-9.

    States' Response: *See* Response No. 1.

    22. The Agencies estimate that the Final Rule's restoration of protection to wetlands may result in public benefits of $306 to $501 million annually. EPA & Corps, Economic Analysis of the EPA-Army Clean Water Rule, ID-20866, at 50-52 (2015) (attached as Ex. 4).

    States' Response: *See* Response No. 1.

    23. Because the guidance documents did not allow for consistent or predictable enforcement of the Clean Water Act, and thus left many small streams and wetlands vulnerable to

contamination and degradation, the Agencies began a process to formally amend the 1986 regulatory definition of "Waters of the United States." *See* 79 Fed. Reg. 22,188.

        States' Response: *See* Response No. 1.

        24. As part of this process, the Agencies proposed a rule clarifying the definition of "waters of the United States" on April 21, 2014. 79 Fed. Reg. 22,188.

        States' Response: *See* Response No. 1.

        25. The Agencies solicited comments on the proposed rule for over 200 days. 80 Fed. Reg. at 37,057.

        States' Response: *See* Response No. 1.

        26. Among other things, the Agencies sought comment about "establishing specific geographic limits" or "distance limitations" for the category of adjacent waters. 79 Fed. Reg. at 22,208-09.

        States' Response: *See* Response No. 1.

        27. Many commenters—including states and industry groups—complained that the proposed definition of "adjacent" was "too vague" and "too expansive." Response to Comments ("RTC"), available at https://www.epa.gov/cwa-404/response-comments-clean-water-rule-definition-waters-united-states (last accessed Sept. 27, 2018) (excerpts attached as Ex. 8) Topic 3 at 18. "The dominant request was to identify specific limits." Id.

        States' Response: *See* Response No. 1.

        28. Indeed, several commenters suggested, opposed, or commented on the use of numerical distance limitations to define the term "adjacent" during the comment period. See, e.g., RTC Topic 3 at 153-54.

        States' Response: *See* Response No. 1.

        29. For example, the State of Georgia supported the inclusion of "specific geographic limits," "including, for example, distance limitations" and clear floodplain rules to be included in the definition of adjacency. RTC Topic 3 at 153-54.

        States' Response: *See* Response No. 1.

7

30. The proposed rule also noted that "distance of hydrological connection" would be a factor considered for case-by-case determinations. 79 Fed. Reg. at 22,214.

States' Response: *See* Response No. 1.

31. All told, the Agencies received "over one million public comments on the proposal, the substantial majority of which supported the proposed rule." 80 Fed. Reg. at 37,057.

States' Response: *See* Response No. 1.

32. The Agencies responded to public comments in a nearly 7,500 page response to comments, the Rule's Preamble, and the Technical Support Document. *See generally* RTC; Technical Support Document for the Clean Water Rule ("Tech. Support Document"), ID-20869, at 190 (attached as Ex. 7), 80 Fed. Reg. 37,054.

States' Response: *See* Response No. 1.

33. Among other topics, the Agencies addressed and responded to comments relating to the application of the OHWM standard in the arid West. *See, e.g.*, RTC Topic 8 at 313-14, 316, and 345-46, and Topic 9 at 25-28.

States' Response: *See* Response No. 1.

34. The Agencies also addressed and responded to concerns that the Clean Water Rule would expand the area subject to federal regulatory jurisdiction. *See, e.g.*, RTC Topic 1 at 171-72; RTC Topic 4 at 453-55; RTC Topic 5 at 18-19; Tech. Support Doc. at 30-34.

States' Response: *See* Response No. 1.

35. Likewise, the Agencies responded to concerns that the Clean Water Rule would eliminate permitting exemptions for agricultural activities. *See, e.g.*, RTC Topic 1 at 13-14; RTC Topic 6 at 30-31; RTC Topic 7 at 311, Topic 12 at 747, 750-51, 755-56.

States' Response: *See* Response No. 1.

36. In addition to soliciting public comments, the Agencies also received "input provided through…over 400 meetings nationwide with states, small businesses, farmers, academics, miners, energy companies, counties, municipalities, environmental organizations, other federal Agencies, and many others." 80 Fed. Reg. at 37,057.

States' Response: *See* Response No. 1.

37. In so doing, the Agencies conducted unprecedented outreach to a wide range of stakeholders and sought feedback from all types of stakeholders including small entities. *See* 80 Fed. Reg. 37,057; *see also, e.g.*, 2014 EPA Regional Proposed Rule Meetings/Events, ID-13182 (attached as Ex. 5); 2014 EPA Headquarters Proposed Rule Meetings/Events, ID-13183 (attached as Ex. 6).

States' Response: *See* Response No. 1.

38. For example, in 2011, in collaboration with the Office of Management and Budget and the Small Business Association, the Agencies conducted an outreach meeting of small business participants from the oil and gas sector, the farming and agriculture sector, the construction and development sectors, the manufacturing sector, municipal storm sewer systems or publicly owned treatment plants, and non-governmental organizations to gather input on jurisdictional policies. Final Report of the Discretionary Small Entity Outreach for the Clean Water Rule, ID-20865 (attached as Ex. 12) at 7-8.

States' Response: *See* Response No. 1.

39. In 2014, the Agencies again met with small entities in these sectors and others, including the mining sector, fertilizer and pesticide use entities, and the power industry. Final Report of the Discretionary Small Entity Outreach for the Clean Water Rule, ID-20865 (attached as Ex. 12) at at 11.

States' Response: *See* Response No. 1.

40. Before issuing the Clean Water Rule, the Agencies reviewed "more than 1,200 peer-reviewed scientific papers and other data and information including jurisdictional determinations, relevant agency guidance and implementation manuals, and federal and state reports that address connectivity of aquatic resources and effects of downstream waters." Tech. Support Document at 93.

States' Response: *See* Response No. 1.

41. "[T]he purpose of the review and synthesis [was] to summarize current scientific understanding about the connectivity and mechanisms by which streams and wetlands, singly or in aggregate, affect the physical, chemical, and biological integrity of downstream waters." Tech. Support Document at 94-95.

<u>States' Response</u>: *See* Response No. 1.

42. The Agencies considered, among other things, impacts caused by the "transport of physical materials and chemicals such as water, wood, and sediment, nutrients, pesticides, and mercury; movement of organisms or their seeds or eggs; and hydrologic and biogeochemical interactions occurring in surface and groundwater flows, including hyporheic zones and alluvial aquifers." Tech. Support Document at 95.

<u>States' Response</u>: *See* Response No. 1.

43. The Agencies used this scientific foundation to craft regulatory language that was "easier to understand, consistent, and environmentally more protective" than the Agencies' prior regulations and guidance. 80 Fed. Reg. at 37,057.

<u>States' Response</u>: *See* Response No. 1.

44. As part of this process, EPA's Office of Research and Development prepared a comprehensive report entitled "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence." 80 Fed. Reg. at 37,057.

<u>States' Response</u>: *See* Response No. 1.

45. The Science Report provides "much of the technical basis for th[e] rule." 80 Fed. Reg. at 37,057.

<u>States' Response</u>: *See* Response No. 1.

46. The process for creating the Science Report complied with and exceeded all administrative requirements. *See generally* Def. Int. Response Br.

<u>States' Response</u>: *See* Response No. 1.

47. At the same time the Agencies published the proposed rule, they released a Draft Science Report for review and comment. *See* Connectivity of Streams and Wetlands to

10

Downstream Waters: A Review and Synthesis of the Scientific Evidence (September, 2013 External Review Draft) ("Draft Science Report"), ID-0004, at 3-4; 3-33; 4-21 to 4-23; 5-57; 6-3 (attached as Ex. 10).

    <u>States' Response</u>: *See* Response No. 1.

48. The Draft Science Report contained a review of nearly 1,000 peer-reviewed scientific studies on the "connectivity or isolations of streams and wetlands relative to large water bodies such as rivers, lakes, estuaries, and oceans." Draft Science Report at 1-1, 1-3.

    <u>States' Response</u>: *See* Response No. 1.

49. Prior to publication, the Draft Science Report underwent several rounds of internal and external peer review.

    <u>States' Response</u>: *See* Response No. 1.

50. In addition, the Draft Science Report was reviewed by a Scientific Advisory Board ("SAB") panel. 80 Fed. Reg. at 37,062.

    <u>States' Response</u>: *See* Response No. 1.

51. The SAB was established "to provide independent scientific and technical advice to the EPA Administrator on the technical basis for Agency positions and regulations." 80 Fed. Reg. at 37,062.

    <u>States' Response</u>: *See* Response No. 1.

52. The panel consisted of "27 technical experts in an array of relevant fields, including hydrology, wetland and stream ecology, biology, geomorphology, biogeochemistry, and freshwater science." 80 Fed. Reg. at 37,062. The panel members represented "academia, a federal government agency, non-profit organizations, and consulting firms." 80 Fed. Reg. at 37,062.

    <u>States' Response</u>: *See* Response No. 1.

53. The SAB panel held several public meetings and hearings. 80 Fed. Reg. at 37,062.

    <u>States' Response</u>: *See* Response No. 1.

54. In October 2014, the SAB panel completed its peer review of the Draft Science Report. SAB Science Report Review, ID-8046, at 1 (attached as Ex. 11).

States' Response: *See* Response No. 1.

55. Although the SAB panel provided guidance to improve the Science Report, it concluded that the Draft Science Report was "a thorough and technically accurate review of the literature on the connectivity of streams and wetlands to downstream waters." SAB Science Report Review at 1.

States' Response: *See* Response No. 1.

56. In addition to its peer review of the Draft Science Report, the SAB also reviewed "the adequacy of the scientific and technical basis of the proposed rule" itself. 80 Fed. Reg. at 37,064.

States' Response: *See* Response No. 1.

57. The SAB found, "[T]he available science supports the conclusion that the types of water bodies identified as 'waters of the United States' in the proposed rule exert strong influence on the chemical, physical, and biological integrity of downstream waters." 80 Fed. Reg. at 37,064.

States' Response: *See* Response No. 1.

58. Regarding tributaries, the SAB found, "[t]here is strong scientific evidence to support the EPA's proposal to include all tributaries within the jurisdiction of the Clean Water Act. Tributaries, as a group, exert strong influence on the physical, chemical, and biological integrity of downstream waters, even though the degree of connectivity is a function of variation in the frequency, duration, magnitude, predictability, and consequences of physical, chemical, and biological processes." 80 Fed. Reg. at 37,064.

States' Response: *See* Response No. 1.

59. Regarding "adjacent waters" and wetlands, the SAB found, "[t]he available science supports the EPA's proposal to include 'adjacent waters' and wetlands as a waters of the United States…because [they] have a strong influence on the physical, chemical, and biological integrity of navigable waters." 80 Fed. Reg. at 37,064.

States' Response: *See* Response No. 1.

60. Regarding case-by-case waters, the SAB found that "scientific literature has established that 'other waters' can influence downstream waters, particularly when considered in aggregate," and "thus found it 'appropriate to define 'other waters' as waters of the United States on a case-by-case basis, either alone or in combination with similarly situated waters in the same region.'" 80 Fed. Reg. at 37,064.

States' Response: *See* Response No. 1.

61. The Agencies themselves provided substantial expertise as well. As they noted, "The agencies, most often the Corps, have made more than 400,000 CWA jurisdictional determinations since 2008. Of those, more than 120,000 have been case-specific significant nexus determinations. The agencies have made determinations in every state in the country, from the arid West to the tropics of Hawaii, from the Appalachian Mountains in the East to the lush forests of the Northwest." Tech. Support Doc. at 178.

States' Response: *See* Response No. 1.

62. On June 29, 2015, the Agencies issued the final rule, entitled "Clean Water Rule: Definition of 'Waters of the United States." 80 Fed. Reg. 37,054.

States' Response: *See* Response No. 1.

63. The purpose of the Clean Water Rule is to remove uncertainty and clarify the scope of the Agencies' jurisdiction by defining "waters of the United States." 80 Fed. Reg. 37,054.

States' Response: *See* Response No. 1.

64. The Clean Water Rule does not violate the Clean Water Act or Supreme Court precedent interpreting that Clean Water Act. *See generally* Def. Int. Response Br.

States' Response: *See* Response No. 1.

65. The Clean Water Rule complies with the Administrative Procedure Act. *See generally* Def. Int. Response Br.

States' Response: *See* Response No. 1.

66. The "arbitrary and capricious standard is exceedingly deferential." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). A rule is arbitrary and capricious only if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

States' Response: *See* Response No. 1.

67. The Court is "not authorized to substitute [its] judgment for the agency's as long as [the agency's] conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009).

States' Response: *See* Response No. 1.

68. The Clean Water Rule is not a substantial or transformative encroachment on state law. *See generally* Def. Int. Response Br.

States' Response: *See* Response No. 1.

69. The Clean Water Rule is constitutional, and does not violate the Commerce Clause, the Tenth Amendment, or the Due Process Clause of the Fifth Amendment. *See generally* Def. Int. Response Br.

States' Response: *See* Response No. 1.

70. The Agencies complied with the Regulatory Flexibility Act. *See generally* Def. Int. Response Br.

States' Response: *See* Response No. 1.

71. The Agencies did not engage in unlawful advocacy campaigns. *See generally* Def. Int. Response Br.

States' Response: *See* Response No. 1.

Respectfully submitted.

/s/ Andrew A. Pinson
Christopher M. Carr
 *Attorney General*
Andrew A. Pinson
 *Solicitor General*
  *Lead Counsel*
Office of the Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334
apinson@law.ga.gov
(404) 651-9453

*Counsel for Plaintiff State of Georgia*

Patrick Morrisey
 *Attorney General*
Lindsay S. See
 *Solicitor General*
Office of the Attorney General
State Capitol, Building 1, Rm 26-E
Charleston, West Virginia 25305
lindsay.s.see@wvago.gov
(304) 558-2021

*Counsel for Plaintiff State of West Virginia*
(admitted *pro hac vice*)

Steve Marshall
 *Attorney General*
Andrew Brasher
 *Solicitor General*
Office of the Attorney General
501 Washington Ave.
Montgomery, Alabama 36130
abrasher@ago.state.al.us
(334) 353-2609

*Counsel for Plaintiff State of Alabama*
(admitted *pro hac vice*)

Pamela Jo Bondi
 *Attorney General*
Jonathan Glogau
 *Attorney for the State of Florida*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
jon.glogau@myfloridalegal.com
(850) 414-3300

*Counsel for Plaintiff State of Florida*
(admitted *pro hac vice*)

Curtis T. Hill, Jr.
 *Attorney General*
Thomas M. Fisher
 *Solicitor General*
Office of the Attorney General
302 West Washington Street
Indiana Government Center - South, 5th Fl.
Indianapolis, Indiana 46204
tom.fisher@atg.in.gov
(317) 232-6255

*Counsel for Plaintiff State of Indiana*
(admitted *pro hac vice*)

Derek Schmidt
 *Attorney General*
Jeffrey A. Chanay
 *Chief Deputy Attorney General*
Office of the Attorney General
120 SW 10th Ave., 3d Floor
Topeka, Kansas 66612
jeff.chanay@ag.ks.gov
(785) 368-8435

*Counsel for Plaintiff State of Kansas*
(admitted *pro hac vice*)

Joshua H. Stein
   *Attorney General*
Asher P. Spiller
   *Assistant Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
aspiller@ncdoj.gov
(919) 716-6977

*Counsel for Plaintiff N.C. Department of Environmental Quality*
(admitted *pro hac vice*)


Andy Beshear
   *Attorney General*
Sam Flynn
   *Assistant Attorney General*
Office of the Attorney General
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
samuel.flynn@ag.ky.gov
(502) 696-5650

*Counsel for Plaintiff State of Kentucky*
(admitted *pro hac vice*)

Sean D. Reyes
   *Attorney General*
Tyler Green
   *Solicitor General*
Office of the Attorney General
Utah State Capitol Complex
350 North State Street, Suite 230
Salt Lake City, Utah 84114-2320
tylergreen@agutah.gov
(801) 538-9600

*Counsel for Plaintiff State of Utah*
(admitted *pro hac vice*)

Alan Wilson
   *Attorney General*
Robert D. Cook
   *Solicitor General*
James Emory Smith, Jr.
   *Deputy Solicitor General*
Office of the Attorney General
1000 Assembly Street, Room 519
Columbia, South Carolina 29201
esmith@scag.gov
(803) 734-3680

*Counsel for Plaintiff State of South Carolina*
(admitted *pro hac vice*)


Brad D. Schimel
   *Attorney General*
Misha Tseytlin
   *Solicitor General*
Wisconsin Department of Justice
17 West Main Street
Madison, Wisconsin 53703
tseytlinm@doj.state.wi.us
(608) 267-9323

*Counsel for Plaintiff State of Wisconsin*
(admitted *pro hac vice*)

## CERTIFICATE OF SERVICE

    I hereby certify that on December 10, 2018, I served this motion by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

                                            /s/ *Andrew A. Pinson*
                                            Andrew A. Pinson