```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF GEORGIA
                       BRUNSWICK DIVISION


STATE OF GEORGIA, et al.,            )
                                     )
              Plaintiffs,            )
                                     )        CIVIL ACTION NO.
        vs.                          )      2:15-CV-00079-LGW-RSB
                                     )
ANDREW WHEELER, et al.,              )
                                     )
 _____Defendants._____ )
```

<br>

```
                        MOTIONS HEARING
            BEFORE THE HONORABLE LISA GODBEY WOOD
                 December 14, 2018; 2:01 p.m.
                      Brunswick, Georgia
APPEARANCES:

For the State Plaintiffs    ANDREW A. PINSON, Esq.
                            Office of the Attorney General
                            40 Capitol Square SW
                            Atlanta, Georgia  30334
                            (404) 463-0770
                            apinson@law.ga.gov


For the Plaintiff           JAMES EMORY SMITH, Esq.
State of South Carolina     Office of the SC Attorney General
                            P. O. Box 11549
                            Columbia, South Carolina  29211
                            (803) 734-3677
                            esmith@scag.gov


For the Intervenor          MICHAEL B. KIMBERLY, Esq.
Plaintiffs                  Mayer Brown, LLP
                            1999 K Street NW
                            Washington, DC 20006
                            (202) 263-3127
                            mkimberly@mayerbrown.com
```

| | |
|---|---|
| For the Defendants<br>Wheeler, James and<br>US EPA | JONATHAN D. BRIGHTBILL, Esq.<br>U. S. Department of Justice<br>Environment & Natural Resources<br>    Division<br>Office of the Assistant Attorney<br>    General<br>P. O. Box 7415<br>Washington, DC 20044-7415<br>(202) 514-2766<br>jonathan.brightbill@usdoj.gov<br><br>MARTHA MANN, Esq.<br>U. S. Department of Justice<br>Natural Resources Division<br>P. O. Box 7611<br>Washington, DC 20044-7611<br>(202) 514-0223<br>martha.mann@usdoj.gov<br><br>OTTO WOELKE LEITHART, Esq.<br>U. S. Department of Justice<br>United States Attorney's Office<br>P. O. Box 8970<br>Savannah, Georgia  31401<br>(912) 201-4422<br>woelke.leithart@usdoj.gov |
| For the Defendant<br>U. S. Army Corps of<br>Engineers | JOHN BALLARD, Esq.<br>MADELINE CROCKER, Esq.<br>100 West Oglethorpe Avenue<br>Savannah, Georgia 31401 |
| For the Intervenor<br>Defendants | JAMES BLANDING HOLMAN, IV, Esq.<br>Southern Environmental Law Center<br>463 King Street<br>Suite B<br>Charleston, South Carolina 29403<br>(843) 720-5270<br>bholman@selcsc.org |
| Reported by: | Debbie Gilbert, CCR<br>Official Court Reporter<br>801 Gloucester Street<br>Post Office Box 1894<br>Brunswick, GA 31521-1894<br>(912) 262-2608 or (912) 266-6006<br>debra_gilbert@gas.uscourts.gov<br>- - - |

2

```
 1                    P R O C E E D I N G S

 2              (Call to order at 2:01 p.m.)

 3         THE COURT:  Good afternoon.

 4         SPEAKERS:  Good afternoon, Your Honor.

 5         THE COURT:  Ms. Sharp, call the next case.

 6         THE CLERK:  CV2:15-79, Plaintiff State of Georgia,

 7    State of West Virginia, State of Alabama, State of Florida,

 8    State of Kansas, Commonwealth of Kentucky, State of South

 9    Carolina, State of Utah, State of Wisconsin, the North Carolina

10    Department of Environment and Natural Resources, State of

11    Indiana, Intervenor Plaintiffs American Farm Bureau Federation,

12    American Forest & Paper Association, American Petroleum

13    Institute, American Road and Transportation Builders

14    Association, Georgia Association of Manufacturers, Leading

15    Builders of America, National Alliance of Forest Owners,

16    National Association of Home Builders, National Association of

17    Manufacturers, National Cattlemen's Beef Association, National

18    Corn Growers Association, National Mining Association, National

19    Pork Producers Council, National Stone, Sand and Gravel

20    Association, Public Lands Council, US Poultry & Egg Association,

21    versus defendants Andrew Wheeler, R. D. James, United States

22    Environmental Protection Agency, United States Army Corps of

23    Engineers, and Intervenor Defendants Natural Resource Defense

24    Council, One Hundred Miles, National Wildlife Federation, South

25    Carolina Coastal Conservation League.
```

```
1              On behalf of the plaintiff states, we have Andrew

2       Pinson.  On behalf of intervenor plaintiffs, we have Michael

3       Kimberly.  On behalf of Defendants Andrew Wheeler, R. D. James

4       and United States Environmental Protection Agency, we have

5       Jonathan Brightbill, Martha Mann, Woelke Leithart.  On behalf of

6       the United States Army Corps of Engineers, we have John Ballard

7       and Madeline Crocker, and on behalf of the intervenor

8       defendants, we have Blanding Holman.

9              THE COURT:  Ready for the plaintiffs?

10             MR. PINSON:  Yes, ma'am.

11             THE COURT:  And ready for the defense?

12             MR. BRIGHTBILL:  Yes, ma'am.

13             THE COURT:  Counsel, let me start by welcoming you to

14      Brunswick, Georgia.  The briefs are voluminous.  There are four

15      pending motions and I want to assure you that I have studied the

16      motions and the briefs so you don't need to use your time at the

17      podium educating me about the background facts that are included

18      in your briefs because I did study those so that will free you

19      up to talk about the issues that are in play.

20             I also had the chance to study and very much

21      appreciate the two filings that were made today.  I believe I

22      got one from each side, the agency status report as well as the

23      plaintiffs' notice that details some of the very recent

24      developments, including this Tuesday's December 11th issue of a

25      rule for comment, and I've looked at the list of all the other
```

1    cases that are pending across the country and the status of

2    those.

3            There's a couple of ways we can proceed to hear these

4    four motions.  We could go issue by issue or party by party, and

5    I think what makes the most sense is just go in docket order,

6    and I believe the very first two motions were filed, the first

7    motion was filed by the intervenor plaintiffs.  That was a

8    motion for summary judgment and then the State of -- the states

9    filed a motion for summary judgment followed by the intervenor

10   plaintiffs' motion to amend the preliminary injunction that I

11   issued earlier this year, and finally there's a cross motion for

12   summary judgment that has been filed by intervenor defendants.

13           Let me begin, then, with the first motion that was

14   filed by the intervenor plaintiffs.  Who will speak on their

15   behalf?

16           MR. KIMBERLY:  Your Honor, Michael Kimberly.

17           THE COURT:  Counsel, if you will approach the podium,

18   and while you're there I want to hear about both your pending

19   motions, the summary judgment as well as your request that I

20   expand what is a preliminary injunction that applies in just the

21   states that served as plaintiffs.

22           It's my understanding that you would like me to

23   enlarge that preliminary injunction so that it applies all over

24   the country; is that correct?

25           MR. KIMBERLY:  That's right, Your Honor.  I think

1    whether and how The Court deals with the preliminary injunction

2    motion will depend in part on how it deals with the pending

3    summary judgment motions.

4              So I guess I would like to approach the two motions

5    in four steps.  I would like to talk first about addressing the

6    merits.  I would like to talk about the statutory text and then

7    I would like to talk about some of the procedural arguments that

8    we make.

9              Besides that, I will talk about at the third step

10   some constitutional issues that we think are inherent in the

11   WOTUS rule, and then finally I will follow up with sort of

12   procedural issues about what kind of relief we're asking The

13   Court for, bearing in mind, as Your Honor said, that you've read

14   the briefs.

15             So just to take a step back, we're here challenging a

16   rule that was promulgated in 2015.  It was enforced for about

17   six weeks, and from that point forward, through a series of

18   judicial interventions and an administrative intervention, was

19   put on hold for about three years.

20             As Your Honor now knows, it's in force in 22 states

21   as a consequence of a patchwork of preliminary injunctions that

22   have issued since its promulgation.

23             THE COURT:  Well, in the District of South Carolina,

24   one judge there invalidated the applicability, 2020.

25             MR. KIMBERLY:  That's correct.

1          THE COURT:  And so now it crept up in the states that

2     don't have, like ours and the plaintiffs in this case, a

3     preliminary injunction.

4          MR. KIMBERLY:  That is correct, Your Honor, and in

5     the meantime -- so and what the District of South Carolina did

6     was it not only entered a permanent injunction against

7     enforcement of the applicability date rule, it also vacated the

8     rule.

9          THE COURT:  And Washington did as well.

10          MR. KIMBERLY:  And Washington in the meantime has

11     done the same.  Two days ago the Southern District of New York

12     heard argument and additional challenges to the applicability

13     date rule and that court has since taken the issue under

14     advisement, so the applicability date rule is now twice over

15     vacated and it's under consideration by a third court as well.

16          So as a consequence, then, this rule that every court

17     that has addressed it has concluded is at least suspect on its

18     merits is in force in 22 states and the District of Columbia.

19          So if I may, I will focus first on some of the issues

20     that we have with the rule and then I will talk a bit more about

21     the practical consequences of the current state of play.

22          Before I explain what our concerns are with the

23     inconsistency of the rule of the statutory text, I will say as a

24     threshold matter, we concede, as do the state plaintiffs in

25     their briefs, that for present purposes, according to Eleventh

 1   Circuit precedent, that Justice Kennedy's concurring opinion in

 2   *Rapanos* is deemed controlling.

 3            THE COURT:  That controls.

 4            MR. KIMBERLY:  I would like to make clear for

 5   purposes of preserving the issue that that is not something that

 6   we concede is correct as a matter of broader law although we do

 7   appreciate that this Court is --

 8            THE COURT:  That's what we're dealing with, right.

 9            MR. KIMBERLY:  In the Eleventh Circuit, Your Honor,

10   you are bound by what the Eleventh Circuit has said.

11            So there are, I think, three aspects of the 2015

12   WOTUS rule that are inconsistent with Justice Kennedy's

13   concurring opinion in *Rapanos*.

14            The first of those is a topic that has not received

15   as much attention in the states' briefing but we think is an

16   important point, and that's coverage of interstate waters.

17            The rule, the preamble to the final rule is clear

18   that coverage of interstate waters, which are defined as any

19   water feature that crosses a state border, that jurisdiction

20   over those waters is categorical, and it does not depend on

21   whether such waters have any nexus at all, much less a

22   significant one, to what would be considered a traditional

23   navigable water.

24            Justice Kennedy, in his concurrence, was quite clear

25   that to the extent the Clean Water Act covers water features

1    that are not traditionally navigable, it covers waters that have

2    a significant impact or significant nexus with such waters.

3           Avowedly, the coverage of interstate waters is

4    inconsistent with that requirement, and indeed what we have seen

5    in the federal defendants' proposal for replacement rule issued

6    just two days ago -- or it might have been just yesterday; the

7    days kind of blur together -- is that the agencies now agree,

8    and in their notice of proposed rulemaking, they have explained

9    how it is that coverage of interstate waters crept into coverage

10   under the Clean Water Act as a vestige of prior enactments and

11   that, properly understood, the Clean Water Act does not, in

12   fact, cover interstate waters.

13          So that's Point Number 1, and I gather on the notice

14   of proposed rulemaking it's not one you will see contested by

15   the federal defendants here.

16          The second feature of the Clean Water -- excuse me,

17   of the --

18          THE COURT:  Hasn't the Supreme Court itself stated

19   that the Clean Water Act was designed to regulate waters that

20   wouldn't necessarily be deemed navigable under the classical

21   understanding of navigation?  I'm thinking of the *Riverside*

22   *Bayview* case in particular.

23          MR. KIMBERLY:  Certainly, it has, and I think that's

24   clear in Justice Kennedy in *Rapanos* as well.  We do not take the

25   position that the Clean Water Act can be interpreted to cover

1    only truly traditional navigable waters.

2           We acknowledge, according to Supreme Court precedent,

3    that indeed it covers more.  The question is how to read the

4    Supreme Court's precedence to extend beyond what is

5    traditionally navigable, and what Justice Kennedy has suggested

6    is there needs to be a truly significant nexus such that there

7    would be a real and appreciable effect on downstream waters.

8           And, again, the coverage for interstate waters in the

9    preamble to the 2015 rule expressly disavows that there has to

10   be any such connection.

11          And so any water feature -- it could be a small,

12   intermittent brook that has no connection to a truly navigable

13   water but by dint of the fact that it crosses a state line --

14   would be deemed jurisdictional, and we don't see any way to

15   square that position either with the text of the statute

16   standing on its own or viewed through the lens of *Rapanos*, *Swank*

17   and *Bayside Riverview*, *Riverside Bayview*.

18          So now if I may, I will talk briefly about

19   tributaries as well.  This is the second of the three elements

20   of the rule that we think are inconsistent with Justice

21   Kennedy's concurrence and the text of the statute.

22          Justice Kennedy -- and this is at Page 18 of our

23   opening brief -- I'm sorry, that's as to adjacency.  This is at

24   Pages 12 to 15 of our opening brief where we provide pictorial

25   evidence of the sorts of features that would be considered

1    tributaries under the 2015 WOTUS rule.

2         Under the rule, they needn't carry water regularly.

3    All they did to do is exhibit an ordinary high water mark and

4    contribute flow, even indirectly, meaning it can go underground

5    and be groundwater for a while and appear later on.

6         This is inconsistent, we think, both with the

7    scientific evidence as a basis for asserting jurisdiction,

8    particularly as it relates to the arid west, because the Corps

9    itself in a number of its own studies and memoranda has made

10   clear that ordinary high marks are randomly --

11        THE COURT:  Is it your argument that it is my role to

12   decide who is right scientifically about the ordinary high water

13   mark?

14        MR. KIMBERLY:  No.  I think it would be enough to

15   observe that the rule covers features, particularly in the arid

16   west, that reflect extreme one-time weather events that do not,

17   in fact, indicate -- as Justice Kennedy said in his own

18   concurrence, that, in fact, do not indicate regular flow.

19        THE COURT:  And I am not going to put you on the spot

20   at the podium and make you refer me to the exact place in the

21   record that does this, but for the purposes of any followup

22   briefing that you may want to do, what I'm looking for is

23   specific evidence in the record demonstrating that the

24   definition of "tributaries" does, in fact, cover isolated dry

25   regions away from water or isolated ponds.

1          I want to make sure I'm pinpointing the point in the

2     record that --

3          MR. KIMBERLY:  Certainly, and I can, Your Honor, here

4     at the podium point you to a couple of our exhibits.  That would

5     include the Arizona Mining Association's comments.  This is

6     Exhibit J to our motion for summary judgment.  This is Barrick

7     Gold's comments at Page 15 and 16, Exhibit K to our motion for

8     summary judgment, and the Freeport McMoRan technical comments.

9     This is at Page 7 Exhibit L to our motion for summary judgment.

10         What's more, as I mentioned, Your Honor, the Corps'

11    own experience bears out that ordinary high water marks are not

12    a reliable indicator of regular free flow.

13         This is Exhibit J -- excuse me, Exhibit M to our

14    motion for summary judgment and Exhibit N to our motion for

15    summary judgment.

16         And what the Corps of Engineers held in particular --

17    and I'm quoting now -- is "OHWM" -- that's ordinary high water

18    mark -- "indicators are distributed randomly throughout the arid

19    landscape and are not related to specific channel

20    characteristics," and this is reflected in those other exhibits

21    that I cited to you just a moment ago, that because the arid

22    west does not experience regular exposure to water the way that,

23    for instance, Georgia does, these sorts of one-time extreme

24    water events don't heal in the same way that they would in more

25    water-rich environments, and so you could find evidence and,

1    indeed as I said, we cited evidence, including on Page 14 of our

2    opening brief, Figure 4 shows some examples of what would be

3    deemed an ordinary high water mark with a bed and banks between

4    them, and you look at the picture and it's quite clear, this a

5    dry desert, and yet these features are being deemed waters of

6    the United States subject to regulation under the Clean Water

7    Act.

8         I will say something now about adjacency, which is

9    another issue that arises in Justice Kennedy's concurrence in

10   *Rapanos*.  Justice Kennedy said in particular at Page 786 of his

11   opinion -- that's 547 US 786 -- that mere adjacency to a

12   tributary is insufficient to categorically assert jurisdiction

13   over that adjacent feature.

14        THE COURT:  Is it your position that adjacency can

15   only include wetlands and no other type?

16        MR. KIMBERLY:  Well, I don't think it's -- my clients

17   haven't taken a position on that particular question in this

18   litigation, and I don't think The Court would necessarily have

19   to get that specific or go that far.

20        I think it would be enough to say that it is

21   inconsistent with Justice Kennedy's concurrence to say

22   categorically that any feature that is deemed adjacent to a

23   tributary will necessarily have a significant -- a substantial

24   effect on a traditional navigable water.

25        THE COURT:  Part of the response that I think I'm

1    going to hear from your opponents across the aisle is that when

2    Justice Kennedy was making those statements about adjacent

3    wetlands, he was basing that on existing standards for

4    tributaries at that time.  How do you respond?

5          MR. KIMBERLY:  That's true, and his discussion of

6    tributaries, in the context of making that comment, imbedded in

7    that discussion is exactly the criticism of ordinary high water

8    mark that I was just telling you about.

9          He assumed, then, for purposes of further discussion

10   that taking as given ordinary high water mark is a

11   scientifically adequate basis for inferring regular flow, that

12   even then still adjacency to such a feature would not suffice.

13         THE COURT:  Is the nature of your criticism, does it

14   go at its heart to the specific limits that are contained in

15   that deposition, or is it your contention that usage of

16   geographic limits in any form is a problem?

17         MR. KIMBERLY:  Well, that I think bears on the second

18   point that I was going to get into and I'm happy to do that now.

19         THE COURT:  Okay.

20         MR. KIMBERLY:  It's to say that -- and actually it

21   really bears on two points, both a substantive point and a

22   procedural point, as to these distance limitations.

23         The problem with the distance limitations, which are

24   imbedded in the definition of "adjacency" and "significant

25   nexus" is that there is no scientific explanation or evidence to

1    support a conclusion that a feature that is 1499 feet away does

2    have a significant nexus when one that is 1501 feet away does

3    not.

4            And at the risk of alighting two different points,

5    what I'll say also is that was not something, this incorporation

6    of hard-and-fast distance limits, our position is was not

7    something that the public was put on adequate notice to comment

8    meaningfully on.

9            Certainly we would have commented on the inherent

10   problems of using such limits if we had been aware.  The

11   Government's position is that four words appearing on Page

12   22,208 of --

13           THE COURT:  Gave you notice that this was going to

14   come up.

15           MR. KIMBERLY:  Indeed.  In Volume 79 of the Federal

16   Register these four words "establishing specific geographical

17   limits," in the course of an 88-page document --

18           THE COURT:  You've seen their citation to the

19   Eleventh Circuit case that -- I guess the case dealt with what

20   workers are going to wear and --

21           MR. KIMBERLY:  Right.

22           THE COURT:  -- they at the end included a thread

23   count or something like that.

24           MR. KIMBERLY:  Right.

25           THE COURT:  And the Eleventh Circuit said that you

1    can't come back with those kind of numerical details.

2              MR. KIMBERLY:  So I guess -- and I think this is the

3    *Alabama Power* --

4              THE COURT:  We're jumping ahead a little bit to your

5    problem with the process but nevertheless...

6              MR. KIMBERLY:  It's an important point, though, Your

7    Honor.  I think there are two things to say about that.  One,

8    that case took -- it concerned a different statutory scheme.

9              THE COURT:  How does that matter?

10             MR. KIMBERLY:  It's specific to OSHA, so I think the

11   standards are a little bit different under that scheme, but even

12   if it were a traditional EPA case subject to the same rule, what

13   happened there was a simple correction.  There had been a final

14   rule.  The agency then issued a correction to the final rule.

15   It didn't in that case incorporate --

16             THE COURT:  If they had called this a correction and

17   hadn't had 1500 feet or whatever and then just corrected it to

18   include it, then that would be okay?

19             MR. KIMBERLY:  I don't think so, no, Your Honor,

20   because these are two -- there that was a continuity and

21   consistency in the basic substance of what the agency was doing.

22             Here we had a proposed rule that depended on

23   hydrological relationships and functional relationships, and as

24   I say, there is no evidence that these sort of hard-and-fast

25   distance limitations are at all expositive of those sorts of

1    functional relationships.

2         It's a completely substantively different way of

3    defining what kind of a connection is relevant and necessary,

4    and so -- and I'll note also the agencies' response is to say

5    members of the public did comment on the possibility of distance

6    limitations being used.

7         They point to -- the intervenor defendants proudly

8    note that over a million comments were submitted, and it's quite

9    true.  The Government can point to just 13 out of over one

10   million comments that address the question of distance, and, in

11   fact, if you look at some of those comments, they don't really.

12   I mean, they try to suggest that one of my clients here, the

13   National Association of Manufacturers, submitted a comment

14   relevant to distance limitations, when that is facially

15   inaccurate.

16        They suggest that the National Association of

17   Manufacturers in one of its comments cited a study that itself

18   cited the possibility of a distance limitation.  That is not

19   meaningful comment on either the appropriateness of using

20   distance limitations or, taking as given that distance

21   limitations will be used, what the appropriate distances are.

22        THE COURT:  Before we leave adjacency, address for me

23   the issue about the hundred-year floodplain and what about that

24   violates the Clean Water Act and how it goes beyond what you

25   contend is the limit.

1          MR. KIMBERLY:  Well, I think there are some similar

2     concerns applied.  There are many different ways of drawing

3     basic time intervals for floodplains.  There's a five-year

4     floodplain, the likelihood of a flood over a five-year period.

5          THE COURT:  You're saying basically they pulled the

6     hundred-year out of -- I think they say it coincides with

7     insurance usage.

8          MR. KIMBERLY:  That's right.  Unclear how that

9     relates to functional relationships between water features, and

10    I think beyond that, one of the concerns that they raised or

11    rationals that they raised for using the 100-year floodplain is

12    that there is a well-recognized preexisting map of 100-year

13    floodplains, but, of course, the problem is -- and I'm

14    forgetting the name of the agency -- I apologize -- that

15    produces that map but it's known to be --

16         THE COURT:  FEMA.

17         MR. KIMBERLY:  Exactly, the FEMA 100-year floodplain

18    maps are well known to be inaccurate and unreliable.  They do

19    provide a clear line to draw, but if we are just to take the

20    FEMA map as the gospel, it's again not clear how that maps onto

21    what the scientific evidence shows and how the regulated public

22    was to understand that functional relationships would be

23    translated into this what we take to be scientifically arbitrary

24    decision that the 100-year floodplain is the one to use.

25         THE COURT:  All right.

1              MR. KIMBERLY:  Okay.  So maybe now I will talk just

2    briefly about some of the other procedural issues that we think

3    are presently live.  We've talked a bit about the failure to put

4    the public on notice of the use of distance limitations.  This,

5    I think, relates also to significant nexus.

6              So let me say something briefly about the

7    connectivity report.  So the draft report that was made public

8    and was the basis for public comments differed significantly

9    from the final report that ended up being the underpinning for

10   the final rule.  The draft report purported to include

11   references and the difference is this.

12             The draft did not base its central analyses on the

13   existence of a continuum, a gradient of relationships.  In the

14   final report, Finding Number 4, Conclusion Number 4 in the

15   executive summary, is all about the importance of the continuum

16   of hydrological relationships.

17             THE COURT:  As I understand it, there were almost 350

18   scientific sources added to the report.

19             MR. KIMBERLY:  That's exactly right.

20             THE COURT:  Is it your contention that the issues

21   that you complain of, all of those, none of those were covered

22   by the original scientific information?  All of that was

23   included in the 349 added scientific --

24             MR. KIMBERLY:  Yeah.  I can't provide Your Honor with

25   a breakdown of how many of the 349 were used in service of this

1    continuum argument.  I can say a number of them were.

2         I think that the case that has occupied the parties'

3    attention before this case in the briefing is *Solite*.  I think

4    the difference there is --

5         THE COURT:  You know, we tried to line up, it looks

6    like the defendants have cited to three instances in the draft

7    report showing that there is reference to a continuum-based

8    approach.

9         MR. KIMBERLY:  No, it's true, and actually they give

10   seven pinpointed references, seven pinpointed references in a

11   331-page document.  But, in fact, many of those are citations to

12   documents --

13        THE COURT:  Well, do you have to do eight or what?

14        MR. KIMBERLY:  Well, I think you have to have a

15   meaningful discussion, so, for example, I think -- frankly what

16   it looks like to me is that what the Government did is it just

17   did a word search for the word "continuum" and it put those

18   seven pages up in its brief.

19        When you look, for instance, at the first pinpointed

20   citation that the Government gives, all it does is cite a

21   document that has "continuum" in the title.

22        It doesn't actually explain that thinking about these

23   relationships over a continuum is the appropriate way to do it.

24        And that is so of a number of the other citations as

25   well.

1              So I think if you look at the differences between the

2    draft report and the final report focusing on Conclusion Number

3    4, you will see significant substantive differences predicated

4    on a significant portion of those 349 new citations.

5              It's true, as the intervenor defendants point out,

6    that there were over 100 citation in the draft report, but when

7    you consider that 349 were added, it suggests that there is

8    significant additional work being done here.

9              And they rely on *Solite* to suggest otherwise, but in

10   *Solite* what was going on is the evidence that had been cited was

11   superseded by studies that had taken place in the interim, and

12   those same studies, the words of the court were "confirmed the

13   findings of the original draft summary of the relevant

14   evidence."

15             Here the same can't be said.  It's not just that it

16   confirmed -- the additional 349 citations confirmed what the

17   draft study said.  The final study and those new 349 citations

18   responded to the concerns of the science advisory board, which

19   were significant substantive concerns, and were used to support

20   this entirely new concept of a continuum, and the public was not

21   given an opportunity to comment on those very significant

22   changes in the report.

23             THE COURT:  Let me get you to skip to the part of

24   your argument about the advocacy activities --

25             MR. KIMBERLY:  Sure.

1           THE COURT:  -- that you've detailed in your motion.

2           I understand that the GAO and others have found that

3     to be amiss, but how does that factor in to whether the APA was

4     violated?

5           MR. KIMBERLY:  Well, I think principally what it

6     shows is that the agencies had a closed mind to comments.  The

7     fact that they were engaged in proactive lobbying and advocacy

8     and propaganda in service of promulgating their rule shows that

9     they were not, in fact, open to the criticisms that they were

10    hearing from members of the regulated public.  I think that is

11    where I think it principally plays in.

12          And the law on that point, which is undisputed, I

13    think is clear.  This incidentally is one of the issues on the

14    flip side that is coming up in the applicability date rule

15    litigation, and if it's sauce for the goose, it's sauce for the

16    gander.

17          THE COURT:  Right, and then let me get you on the

18    motion for summary judgment to briefly go through anything you

19    want to add about your constitutional arguments.

20          MR. KIMBERLY:  Yes, Your Honor.

21          THE COURT:  Like the vagueness, Commerce Clause.

22          MR. KIMBERLY:  And those are the two points for us

23    are Commerce Clause and vagueness.

24          The Commerce Clause points I think substantially

25    overlap with a lot of what I was saying before about the text.

1            The rule I think by its terms -- well, actually, let

2     me back up and say first the Supreme Court has recognized that

3     the Clean Water Act, that Congress' authority for enacting the

4     Clean Water Act, derives from the Commerce Clause and

5     particularly its regulation over channels of commerce and then

6     in turn over conduct that substantially affects interstate

7     commerce.

8            It's clear that if a -- if a water feature is not

9     itself actually navigable, can't be made so, then the Congress'

10    authority for regulating that water feature can't derive from

11    its authority over channels of commerce.  It's got to derive

12    under the substantial effects test, and again looking at the

13    interstate waters is one example.

14           The agencies expressly disavow that there has to be

15    any substantial effect on channels of commerce and traditional

16    navigable waters, and indeed the agencies in their description

17    of what constitutional authority authorizes the 2015 rule say

18    that these features could significant -- substantially affect

19    interstate commerce, but, of course, that isn't the legal

20    standard.

21           The legal standard is that they actually

22    significantly do, and I think all The Court needs to do is look

23    at that one line to see that the agencies have effectively

24    abandoned any at least traditional as we understand it Commerce

25    Clause justification for the 2015 clean water rule, and I know

1   also Mr. Pinson will be addressing some of those Commerce Clause

2   issues, so if I may, I will focus also on and principally on the

3   vagueness problems, and I think there are three features that

4   are worth highlighting here.

5        First, ordinary high water mark, ordinary high water

6   mark plays a very important role in the 2015 WOTUS rule, but

7   there are no specific required characteristics, and so, for

8   instance, there is a GAO report -- and this is on Page 23 of our

9   reply brief -- it notes "the difficulty" -- and I'm quoting

10   now -- "the difficulty and ambiguity associated with identifying

11   an ordinary high water mark" --

12        THE COURT:  And is your argument that it's difficult

13   for the public to predict or impossible for them to figure out?

14        MR. KIMBERLY:  I think it's -- so there are two

15   features of the vagueness doctrine that are relevant here.  The

16   first is whether the public is put on notice, fair notice.

17        The second is whether the standards that are

18   announced in the regulations give regulators unchecked

19   discretion to apply the rule arbitrarily.  I think probably the

20   cleanest and easiest way to understand what is going on is in

21   that second bucket, that it just give too broad discretion.

22        THE COURT:  What about the ability to use mapping

23   technology?

24        MR. KIMBERLY:  That's an important part of the

25   ordinary high water mark problem, because, of course, what the

1      2015 rule provides is that these unidentified characteristics,

2      these unexplained characteristics, can be discerned not by

3      government agents in the field visiting property and looking at

4      it, but by using laser-assisted satellite imagery and indeed

5      discerning bed and banks and ordinary high water mark where none

6      is visible in the field, and so a landowner can have a water of

7      the United States on his or her property without even knowing it

8      until the Government comes knocking on the door saying it's

9      there and they can't see it.

10             THE COURT:  Is this technology or any models

11     available to the public for --

12             MR. KIMBERLY:  I don't believe the LIDAR -- the

13     technology is called LIDAR.  I don't believe the LIDAR-assisted

14     technology is available to the public, although Mr. Brightbill

15     might correct me on that if I'm wrong, but my understanding is

16     that it is not, and so the bottom line is at least as far as

17     ordinary high water mark is concerned, the agencies will find it

18     when they want to find it.

19             I think beyond that, significant nexus, a number of

20     elements of the significant nexus test also suffer from

21     vagueness problems.  For example, a landowner, to determine

22     whether or not a water has a significant nexus, has to conduct a

23     4000-foot radius survey looking for other waters that are,

24     quote, similarly situated to that water, but it's not at all

25     clear what that means or how that standard puts the public on

1    notice.

2          Those waters that are similarly situated and function

3    alike with the landowner's water feature have to, quote,

4    significantly affect the integrity of a downstream traditional

5    navigable water, but it's not clear what "integrity" means nor

6    is it clear what "significant effect" means.  The agencies

7    defined "significant effect" as anything more than speculative

8    or insubstantial.

9          Well, that doesn't help a landowner any, and in the

10   end, anything that is more than speculative or insubstantial

11   would be whatever the agencies say that it means.

12         THE COURT:  Let me get you to switch gears to your

13   other issue and that is regarding the expansion of the

14   preliminary injunction that's already in play in this case, and

15   let me pretermit some of the arguments by saying I'm not

16   concerned about the timing of your motion.

17         That's not going to hold me back, and I'm not

18   concerned with the particular rule of civil procedure.  I am

19   concerned with the substance of a preliminary injunction

20   requirement as it applies to the non-states.

21         As I know you're aware, having read my original

22   preliminary injunction, the heart of the factor regarding the

23   harm focused uniquely on the harm that the state sovereigns will

24   experience, the stated insult to their sovereignty, the

25   necessity to gear up certain regulatory state procedures.

1    None of that would apply on the irreparable harm to

2    your clients in the same way that it would apply to states.

3    So absent those kind of harms that are sort of

4    uniquely available to state entities, what is it that you've

5    brought before me that shows the concrete kind of harm that I

6    need to look for in examining whether to expand this preliminary

7    injunction?

8    MR. KIMBERLY:  So there are two things to say about

9    this, Your Honor, and I will start backward and say, as an

10   initial matter, I think the very easiest way for The Court to

11   avoid this question is simply to enter a final judgment in favor

12   of the plaintiffs, and if it did so expeditiously, it would moot

13   the need for a preliminary injunction because, of course, that

14   would be vacating the rule, striking it from the Code of Federal

15   Regulations, which, of course, would apply throughout the

16   country.

17   Setting that aside -- and that is my first answer.

18   Setting that aside, I think the second answer is to point to

19   unrecoverable, nonrecoverable compliance costs and this was

20   something --

21   THE COURT:  And have some of those been expended?

22   MR. KIMBERLY:  They have, yes, and that is in the

23   record, for instance, in the declaration of Janet Price for

24   Rayonier, Incorporated, which is --

25   THE COURT:  Your opponents say, well, you've got a

1    sprinkling of those things but not something in every state.

2         MR. KIMBERLY:  Well, and I think the answer to that,

3    Your Honor, is the Eleventh Circuit's own case law on this point

4    concerning what it takes to establish associational standing.

5    The theory behind associational standing I think conceptually is

6    not something so different from something akin to a class

7    action, but the point is that the association stands in the

8    shoes of its members before The Court and presses those members'

9    interests.

10         In order to have standing to bring such a claim,

11   according to Eleventh Circuit case law, all we need to prove is

12   that one of our national associations has one client that has

13   suffered injury, and that would be enough to press a claim on

14   behalf of the entire membership, and we've done that many, many

15   times over as we demonstrate from Pages 6 to 8 of our reply

16   brief in support of the preliminary injunction motion.

17         THE COURT:  I appreciate your argument, and let me

18   turn to our next filer then.

19         Thank you, Mr. Kimberly.

20         MR. KIMBERLY:  Thank you, Your Honor.

21         THE COURT:  I believe the next motion was filed by

22   the states, a motion for summary judgment.  Mr. Pinson, will

23   that be you?

24         MR. PINSON:  Yes, Your Honor.  May I approach?

25         Thank you, Your Honor.

1              So as you know, there's a lot of overlap between

2    these two sets of briefs, and you've covered some of it already

3    so I won't --

4              THE COURT:  And you don't need to replow that ground.

5              MR. PINSON:  I appreciate that.

6              So I would like to start I guess with one point that

7    I think has not been raised so much here yet, which is the

8    agencies no longer defend this rule at least on its substance.

9    I think that matters, and it matters for thinking about this at

10   the outset because --

11             THE COURT:  What does that do to Chevron deference?

12             MR. PINSON:  That's exactly what I was getting to,

13   Your Honor, and we cite in our brief the *Global Tel Link*, which

14   is a recent DC Circuit case, which says if the agencies are no

15   longer asking for deference and they have abandoned the

16   position, then you no longer get it.

17             That matters in particular for our claims that the

18   agencies exceeded their statutory authority because, if you look

19   at the *Rapanos* opinion, of course, Justice Kennedy does point to

20   and decides that in view of deference, and he says, "Even with

21   deference, this goes too far."

22             THE COURT:  So you're saying that we remove the cloak

23   of deference because of --

24             MR. PINSON:  That's -- Your Honor, I think it means

25   the question reduces to you deciding what is the best reading of

1    the statutory text, of course, in light of *Rapanos*, but without

2    the cloak of deference, so I think that's an important point to

3    get at at the start.

4         So I would like to, I guess, talk about we have three

5    basic sets of claims in our briefing.  Of course, we have the

6    claims about exceeding statutory authority under the Clean Water

7    Act.  Our procedural claims largely are the notice and comment

8    claims, and then we have some constitutional claims.

9         I'll start with the statutory authority claims under

10   the Clean Water Act, and again, we've covered some of this

11   already in this hearing.

12        So I would like to kind of pinpoint what I think is

13   maybe the clearest violation of the Clean Water Act and one that

14   maybe you don't have to get into the weeds so much in terms of

15   the science.

16        You asked whether it's your role to decide who is

17   right scientifically in terms of is there a significant nexus

18   with respect to certain waters.

19        And we agree with the intervenor plaintiffs as far as

20   the evidence that's in the record with respect to ephemeral

21   waters and things like that, but at least with respect to one

22   piece, you don't really have to engage with what the scientific

23   basis is or whether that's enough because Justice Kennedy's

24   already told us in *Rapanos*, and that's again that passage where

25   he discusses adjacency to tributaries.

1          I think it's critical to note that in that case, he

2     has already as a matter of law said that ordinary high water

3     mark as a basis for defining adjacency and including it

4     categorically is not sufficient; right?

5          And so what that means is that, as a matter of law,

6     there is not a significant nexus created by tributaries as

7     defined, so we don't have to look at -- they cite 1200 new

8     studies that weren't there when Justice Kennedy issued that

9     opinion.

10         That doesn't matter because Justice Kennedy has

11    already said as a matter of law these aren't sufficient, and so,

12    again, I think that's sort of a key thing that I don't want to

13    lose here, is that Justice Kennedy pointed out tributaries as a

14    definition that's impermissible, and then if you look at the

15    rule here, it hasn't materially changed.

16         The "tributary" definition still starts with an

17    ordinary high water mark.  They have added to that definition of

18    "bed and banks."

19         Of course, bed and banks, as the rule itself says,

20    was already an indicator of ordinary high water mark in the

21    prior rule, so the new rule doesn't change or alter what it was

22    looking at with respect to what makes a tributary, and Justice

23    Kennedy said that's not sufficient.

24         Looking through the defendants' briefing, nothing

25    that I saw in the record going through made clear that bed and

1    banks added anything significant as far as setting some type of

2    limit as to volume or regularity of flow that would have

3    satisfied Justice Kennedy, and again I think certainly, you

4    know, that's even more significant of a flaw if you take into

5    account that there is no deference here.

6            So in our briefing, we also address sort of

7    separately adjacent waters, tributaries.  I'm happy to answer

8    any further questions that you have about those, but I think --

9            THE COURT:  You also raise in your brief the

10   case-by-case category and the problems that you have with that.

11   Doesn't there have to be some sort of fallback or catch-all

12   category, just for practical purposes?

13           MR. PINSON:  Your Honor, I think under Justice

14   Kennedy's opinion, he allows for the possibility that you would

15   have case-by-case analysis of whether waters have a significant

16   nexus.

17           Given that controlling opinion, we can't say that the

18   agencies cannot have some case-by-case category.  The problem is

19   with the breadth of this case-by-case category and what we view

20   as the agency's overly expansive view of what significant nexus

21   is permissible, and the agencies themselves point out in -- I

22   believe it's their -- one of their recent notices of proposed

23   rulemaking, the rescission one, that under this 4000-foot rule

24   as far as case-by-case waters, that virtually the vast majority

25   of the nation's water features could be included in that, and

1    then when you tack on that those waters can be included based on

2    one of nine separate -- any one of nine separate sort of factors

3    with respect to biological, chemical or physical connections, it

4    could be that all of those are sort of permissibly

5    jurisdictional under that rule.

6              THE COURT:  Just from a big-picture procedural

7    standpoint, acknowledging there are so many moving parts to this

8    and so many places in the country, you, as the state defendants,

9    are protected, shall we say, from the 2015 application

10   presently.

11             Why should The Court not let, as the defendants

12   argue, the present rulemaking play out and the rule that was

13   announced this week, why not let that play out?  Why weigh in on

14   a motion for summary judgment or otherwise on a rule that is no

15   longer being carried forward by the administration?

16             MR. PINSON:  So a couple of points.  First of all, I

17   think that the doctrine that they relying on, prudential

18   ripeness, the Supreme Court has at least looked upon it

19   disfavorably in the past couple of years, right.  In *Susan B.*

20   *Anthony List* and in *Lexmark*, it said a court's --

21             THE COURT:  You've got to decide cases that come

22   before you.

23             MR. PINSON:  It's a virtually unflagging obligation.

24   The doctrine, of course, in the Eleventh Circuit is still there,

25   but those decisions should give, I think, any court pause with

1    respect to sort of how aggressive they are in applying them.

2              THE COURT:  What is your -- and I'm going to ask this

3    across of the folks across the aisle as well -- what is your

4    understanding as far as the time trajectory of where we're going

5    from this point forward with regard to the December 11th rule?

6              MR. PINSON:  Your Honor, I don't know as far as the

7    December 11th rule or even the repeal whether the -- when or

8    where those will be finalized, and, of course, I think it's

9    important to note that the agencies have said, as they must,

10   that they are keeping an open mind, right?  So this Court cannot

11   know whether and when specifically these rules will be

12   finalized.

13             THE COURT:  Presumably the comments they get and so

14   forth might change their mind and they not go forward in

15   principle with what's been proposed.

16             MR. PINSON:  That's how the APA process is supposed

17   to work.

18             THE COURT:  Designed to work.

19             MR. PINSON:  And until that point, again, the rule is

20   in effect in 22 states.  It's -- we are protected.

21             THE COURT:  Not for you.

22             MR. PINSON:  We are protected by virtue of this

23   Court's preliminary injunction.  I am not aware and I did not

24   see the agencies or the other defendants cite any case that says

25   a preliminary injunction alone can take away a Court's sort of

```
 1    jurisdiction or even as a matter of prudential ripeness mean

 2    that they should not decide the case.

 3              THE COURT:  All right, Mr. Pinson.  Thank you.

 4              I believe our next motion then was filed by -- it

 5    looks like it was -- make sure we go in order and the next

 6    motion was filed by intervenor defendants -- is that correct --

 7    cross motion for summary judgment?

 8              MR. HOLMAN:  It's up to you.

 9              THE COURT:  Who would like to speak on behalf of the

10    intervenor defendants?

11              MR. HOLMAN:  That would be me.

12              THE COURT:  Would that be you?

13              MR. HOLMAN:  Yes, Your Honor.  Pardon me.  I thought

14    I was going to be going after the US but I will --

15              THE COURT:  It matters not.  If the US is poised to

16    go, we will do it that way.

17              MR. BRIGHTBILL:  Thank you, Your Honor.  May I

18    approach?

19              THE COURT:  On behalf of the United States agencies,

20    are you going to be speaking for all of them?

21              MR. BRIGHTBILL:  Yes, Your Honor, and thank you.  My

22    name is Jonathan Brightbill from the Department of Natural

23    Resources Division in Washington at the Department of Justice.

24    With me is my colleague Martha Mann.  Also with me are John

25    Ballard and Madeline Crocker from the Army Corps of Engineers in
```

1    the Savannah District and Woelke Leithart from the US Attorney's

2    Office, so I appreciate the opportunity to appear before you

3    today and address the views of the United States on these

4    issues.

5              As Your Honor knows, this is an instance where there

6    are a lot of courts that are simultaneously dealing with similar

7    issues.

8              This is one of a dozen cases that are currently --

9    have a -- at least on their docket -- a pending challenge to the

10   2015 Waters of the United States Rule that was promulgated by

11   the agencies.

12             THE COURT:  Now, some of those are stayed.

13             MR. BRIGHTBILL:  That's right, Your Honor.

14             THE COURT:  Is that correct?

15             MR. BRIGHTBILL:  Yes.

16             THE COURT:  We've got the Western District of

17   Washington, they stood down.  Northern District of Florida, they

18   stood down.  Northern District of Georgia, they stood down.

19   Southern District of Texas, they stood down.

20             So they are sort of waiting to see what everybody

21   else does, so to speak, but there are still about eight or nine

22   courts that are grappling currently with some of these issues

23   according to the notice that you filed this morning.

24             MR. BRIGHTBILL:  Yes, Your Honor, that's right.

25             A tremendous amount of party and judicial resources

1    are continuing to be spent dealing with these issues, and even

2    once these issues are decided potentially at various district

3    court levels, there may be appeals, and whether you call it

4    prudential ripeness or whether you call it merely courts

5    exercising their inherent discretion to manage their dockets and

6    decide that they are going to stay the case that's before them

7    and allow an administrative proceeding to play out before they

8    weigh in, one way or another, Your Honor, the United States

9    continues to ask this Court to exercise that discretion.

10             THE COURT:  Let me just also ask you a very practical

11   question.

12             The new rule that was announced December 11th,

13   however how long it takes, the 60-day comment period and then

14   whatever happens after that, at the end of the day, once you and

15   your clients decide what to do about that rule, wouldn't you

16   think it might be possible that some of the parties perhaps that

17   are here today might challenge that rule in multiple courts and

18   just as what befell the 2015 rule might some day befall this

19   2018 rule, and we would have multiple parties in multiple

20   courts.

21             At some point, somebody has to decide something and

22   let it move on up the chain perhaps some day to the US Supreme

23   Court to fill in some of what Justice Kennedy has told us.

24             MR. BRIGHTBILL:  We absolutely agree with that, Your

25   Honor.

```
1              THE COURT:  Tell me what, understanding that I
2    wouldn't hold you to any of these days, but just give me an idea
3    about what kind of time period this latest round of rulemaking
4    might undergo.
5              MR. BRIGHTBILL:  Yeah, I'm happy to do that, Your
6    Honor.  That are two rules pending as Your Honor is aware, or
7    proposed rules, I should say.
8              THE COURT:  Repeal and replacement.
9              MR. BRIGHTBILL:  Right, there's a repeal and
10   replacement, very popular in politics these days to talk about
11   repeal and replacement.
12             So with respect to the repeal rule, the repeal rule
13   was finalized the end of August or, excuse me, the comment
14   period was finalized.
15             THE COURT:  We've seen that, but I'm talking about
16   the replace one going forward.  What is our timeframe --
17             MR. BRIGHTBILL:  Sure.  I can address that as well,
18   Your Honor.
19             So on the replacement rule that was publicized on
20   Tuesday, it has not yet been published in the Federal Register.
21   It will publish in the Federal Register sometime in the next
22   couple of weeks, and that will commence a 60-day comment period.
23             At that point, then the agencies will gather the
24   comments, review the comments, determine whether the comments
25   are things that can be, within the confines of the proposed
```

1      rulemaking, adjustments made or not, within the limits of the

2      logical outgrowth doctrine and other things, or if at that point

3      they would potentially have to do a supplemental notice, but if

4      that is not required in response to the comments that are

5      received and the agencies are of the view that they can proceed,

6      you could theoretically -- and, again, this is just an estimate

7      of counsel.  This is not a representation on behalf of the

8      agencies.  You could theoretically see something sometime this

9      summer on that.

10            Your Honor, I would like to come back to a note that

11     the comment period on the repeal rule, which is a second

12     rulemaking which also has the opportunity to in no small --

13            THE COURT:  Reconsider, absolutely.

14            MR. BRIGHTBILL:  Yes, so that comment period

15     concluded the end of August, Your Honor, and so for the last

16     several months, the agencies have obviously been spending a

17     tremendous amount of time and resources focused on getting the

18     proposed rule out on the replacement part of this whole thing.

19            There's now a comment period that is with the ball in

20     the court of the people, so to speak, Your Honor, and so it

21     would be possible if they decide to move forward with the

22     replacement or the repeal rule, excuse me, in the interim for

23     you to see that in the next couple of months.

24            So in light of all of that, and in light of the very

25     dynamic that you were referring to, Your Honor, which is that

```
 1    there could be litigation with respect to the additional rules
 2    that come out and where does this all end, Your Honor, that's
 3    precisely the reason why the United States has been asking this
 4    Court and all the other courts to stay their hand because the
 5    point at which it's the view of the United States that this
 6    should end at least from an administrative process and then we
 7    let the courts go about doing and determining who is right at
 8    the end of the day on all this is after the reconsideration
 9    processes are complete.
10              Until that time, there's still the opportunity here
11    for issues to become mooted, for questions to become narrowed.
12              THE COURT:  While that may be your desire, it's not
13    the reality right now in many states.  In many states, the 2015
14    law is in effect.
15              MR. BRIGHTBILL:  In many states, the 2015 law is in
16    effect, Your Honor, and I would note that in the states where --
17    in many of the states where the 2015 law is in effect, those
18    states which are non-parties to this proceeding have sought to
19    have that 2015 law go into effect, Your Honor.
20              THE COURT:  Right.  That's their choice.  I
21    understand.
22              MR. BRIGHTBILL:  Exactly.  They affirmatively
23    litigated to bring that result about, Your Honor.  So at the end
24    of the day, until there is a conclusion of the administrative
25    proceedings, it continues to be the view of the United States
```

1    anyway that this court and frankly all of these courts should

2    stand down, allow those proceedings to conclude so we can narrow

3    the issues and frankly save some amount of judicial resources

4    before everyone gets out to the races here deciding who's right.

5              THE COURT:  How does that square with *Susan B.*

6    *Anthony List*?

7              MR. BRIGHTBILL:  *Susan B. Anthony List* is --

8              THE COURT:  It's a case that says you shouldn't do

9    that.

10             MR. BRIGHTBILL:  Okay, so it doesn't say that you

11   shouldn't do that per se, Your Honor.  I mean, it certainly

12   talks about elements of prudential ripeness and an unfailing

13   duty ultimately to decide the case, but that doesn't purport to

14   override the inherent discretion of this District Court and

15   every district court to manage its docket and make judgments.

16             There's also not a holding there, Your Honor.

17   There's a suggestion and a question about whether that doctrine

18   is appropriate, and perhaps that doctrine may be inappropriately

19   applied in the facts of that case, but in this particular set of

20   circumstances, you have agencies that are affirmatively going

21   forward and have made the judgment to take a look at this again.

22   We're not done yet.  We've heard what you're saying.  We're

23   going to go back to the drawing board and see if there is some

24   merit to what you're putting forward.

25             THE COURT:  Let me ask you to move on then to your

1    substantive arguments.

2         MR. BRIGHTBILL:  Certainly.  So with respect to the

3    substantive arguments -- and I just want to clarify and explain

4    a little bit the position of the United States on this.

5         As you know from the briefs, because of this

6    reconsideration process that's underway, the United States will

7    not take a position on the substantive questions relating to the

8    2015 rule.

9         THE COURT:  That's understandable.

10        MR. BRIGHTBILL:  As has been pointed out here, the

11   agencies have already been accused of not keeping an open mind

12   in these administrative proceedings, and, therefore, in light of

13   the fact that they are reconsidering that prior rule but they

14   haven't admittedly made a final decision to repeal or replace

15   that rule, they are maintaining an open mind, and, in fact,

16   should the agencies finalize a decision that would be to

17   maintain that rule, they would want to have continued to

18   maintain an open mind throughout that proceeding so as to remove

19   any such challenges to a subsequent decision by the agency.

20        THE COURT:  And I can understand why you need to

21   stand down on those issues, but nevertheless the procedural

22   arguments that have been raised with regard to whether your

23   clients followed the APA with regard to the 2015 rule, I think

24   those are things that you've addressed.

25        MR. BRIGHTBILL:  Yes, and my colleague, Ms. Mann, is

1    going to address those arguments on behalf of the United States.

2               THE COURT:  All right.

3               MR. BRIGHTBILL:  So I want to, if I could, just move

4    ahead and address this issues of the business intervenors

5    requesting a nationwide vacatur or a nationwide injunction.

6               So universal nationwide injunctions covering all

7    persons, states, non-parties are an extraordinary remedy.

8               THE COURT:  And in South Carolina, what was

9    different?  Why should they have done that but we shouldn't

10   here?

11              MR. BRIGHTBILL:  Frankly, that judge should not have

12   done that, Your Honor, and the United States made that point and

13   articulated these same concerns to that court, and the United

14   States is continuing to evaluate its options in that particular

15   case, Your Honor.

16              THE COURT:  Do you share The Court's observation

17   that, insofar as the irreparable harm prong goes in evaluating

18   the need for an injunction, a preliminary injunction, that the

19   kind of harms identified by this Court that would befall the

20   states don't apply with equal force to private parties?

21              MR. BRIGHTBILL:  I want to be real careful about

22   this, Your Honor, because I think the United States would have

23   to concede that there are certain impacts to these business

24   intervenors that are not compensable in a monetary way, and it

25   would not be the position of the United States that such

1    entities could never demonstrate irreparable harm in any facts

2    or any rulemakings.  It is the position --

3              THE COURT:  My question was different than that.

4              MR. BRIGHTBILL:  Yeah.

5              THE COURT:  It was:  Does the United States join in

6    the position that the kind of harm that might befall states if

7    this rule were to go in place, even for a interim period, is

8    different than the kind of harm that might befall private

9    parties?

10             MR. BRIGHTBILL:  I would agree, Your Honor, that the

11   states did describe a different character of harms than the

12   types that have been articulated by the business intervenors,

13   but at the end of the day, the United States is of the view

14   that, given the nature of review that this Court has engaged in,

15   which is a review of a rule pursuant to the APA and the limits

16   on such reviews that have been put by the Supreme Court in terms

17   of the level of specificity that must be shown in terms of the

18   individuals identifying harms, the nature of that harm, that

19   these business intervenors have not to this stage of the

20   proceedings -- and this is the summary judgment stage --

21   demonstrated those harms sufficient to establish the application

22   of an injunction or a vacatur, for that matter, Your Honor, on a

23   nationwide basis or even an individual basis with the key

24   decisions for this Court's review being the decisions written

25   both by Justice Scalia, one being the *Lujan versus National*

1    *Wildlife Federation* in 1990 and then the more recent *Summers v.*

2    *Earth Institute*.

3            What those decisions specify and call for is that, in

4    instances where you don't have a provision, a statutory

5    provision, which permits for the facial review of a regulation,

6    such as the case here, it's necessary in order to obtain such

7    relief for a party to come in and identify specific people who

8    have, at specific parcels of land or at aspecific instance,

9    specific defined geographic area, from a specific application of

10   the rule or regulation that they are seeking to challenge, which

11   is frankly fairly traceable and a result of an injury that comes

12   from that new regulation or that regulation, that changed

13   regulation, whatever it is, as compared to the regime that came

14   before it, all of those things need to be demonstrated and

15   established, Your Honor, and it is the view of the United States

16   that those showings have not been made in this proceeding.

17           THE COURT:  Let me get you to switch, then, to the

18   motions for summary judgment that have been filed.

19           Is Ms. Mann going to cover all of that?

20           MR. BRIGHTBILL:  Yes.  If I could.

21           THE COURT:  Anything else you would like to say with

22   regard to the preliminary injunction?

23           MR. BRIGHTBILL:  Just a couple of quick points here,

24   Your Honor, in response to some things that were noted.  It was

25   suggested that a decision by this Court would vacate the rule on

1      a nationwide basis, kind of strike from the Federal Register.  I

2      just want to make clear that that is not the view of the United

3      States and that is not actually something that this Court is

4      empowered to do under the APA.

5              Furthermore, there was an issue raised with respect

6      to organizational standing and that organizational standing

7      gives those broad organizations the ability to bring claims on

8      behalf of their members and they have to identify specific

9      members.

10             That's fine insofar as it goes as bringing a claim,

11     Your Honor, but as the Supreme Court recently made clear in the

12     decision of the *Town of Chester v. City of Laredo*, it's

13     necessary when you get to the remedy stage of actually

14     determining how broad you're going to go about entering an

15     injunction, Your Honor, you need to actually then establish

16     standing with respect to those particular persons, places and

17     applications of the regulations, and so the broad level, the

18     organizational standing, that was fine for getting them in the

19     door, Your Honor, and allowing them to argue, but in terms of

20     the scope in your injunction, you are limited by the Supreme

21     Court and how it has interpreted the limits of Article III and

22     the traditional equitable powers of this and other district

23     courts in the scope of the relief you can grant.

24             Finally, Mr. Pinson made a reference to the *Global

25     Tel* decision, which I think is not -- that decision is not quite

1    on all fours, Your Honor, with the situation that we have here

2    with the important distinction being that while the agencies

3    have proposed to take away that prior interpretation and

4    proposed to remove the WOTUS rulemaking or replace it with

5    another additional or different WOTUS rulemaking, that agency

6    action is not final, and so as a technical matter, that still

7    remains the past agency decision and the interpretation of the

8    agencies until it is repealed or replaced.

9              Thank you, Your Honor.

10             THE COURT:   Thank you.

11             Let me hear then from Ms. Mann.

12             And Ms. Mann, let me start you off with a Chevron

13   question.   You heard from across the aisle that they contend

14   Chevron deference doesn't even apply in this case anymore

15   because the agency to whom deference would ordinarily be due is

16   not pressing forward anymore.

17             What is the United States' position with regard to

18   that argument?

19             MS. MANN:   Two things, Your Honor.   One is that, with

20   respect to the issues that are not significantly intertwined

21   with the issues that are under reconsideration, I'm going to

22   present some argument mostly on procedural issues today.

23             I think that Mr. Brightbill was attempting to answer

24   your question with his last response, which is to say that,

25   until the agencies repeal or replace, I don't believe that they

```
 1    have abandoned the idea.  They recognize that rule.  They have
 2    not withdrawn the briefs in the cases, but at this point it is
 3    under reconsideration.
 4            That's why the agencies have opted to keep an open
 5    mind, to not come in and brief those issues as they are
 6    reconsidering them.
 7            THE COURT:  At what point, what action does the
 8    agency have to take before Chevron deference disappears?  At
 9    what point in that process does that happen?
10            MS. MANN:  Quite candidly, Your Honor, I haven't
11    thought about that myself and I haven't discussed it with either
12    cocounsel or my clients, but if it is something that The Court
13    would appreciate further briefing on --
14            THE COURT:  I will commend that to you.
15            MS. MANN:  -- it would be a good idea.
16            THE COURT:  Yes.
17            MS. MANN:  I'm sorry not to have an answer for you as
18    I stand here now.
19            THE COURT:  I would rather someone admit that than
20    make it up.
21            MS. MANN:  Thank you.
22            I'm going to touch on a few of the points that were
23    raised I believe mostly by the intervenor defendants with regard
24    to some of the procedural-type arguments.
25            First, Your Honor, I will touch on four things.
```

1    First, the challenge to the rule's inclusion of interstate

2    waters, the United States still continues to say it is untimely.

3    Second, the final rule is the logical or a logical outgrowth of

4    the proposal.  Third, the agency has provided adequate notice of

5    the scientific basis for the rule.  And fourth and finally, the

6    plaintiff intervenors antilobbying and propaganda claims should

7    be rejected.  The agency has complied with all of the applicable

8    procedural requirements, and their arguments, they don't come

9    even close to showing that the agencies acted with an

10   unalterably closed mind.

11           And first with respect to interstate waters, it is an

12   untimely claim.  "Interstate waters" have been defined as

13   jurisdictional since 1978.

14           THE COURT:  Does the agency reopen the issue by

15   submitting it for comment and responding to comments about it?

16           MS. MANN:  Your Honor, I'm not intending to come in

17   and rehash our brief.  I know you've read them and you've read

18   them well.  I can tell by the questions that you have here

19   today.

20           We had discussed in our brief that where an agency

21   doesn't signal reconsideration of its previous rule interpreting

22   a statute that the agency is not reopening the issue or

23   restarting the clock for review.

24           In their reply brief, the plaintiffs and plaintiff

25   intervenors contend, they cite some cases for the proposition

1    that a prior regulation is reopened and the statutory

2    limitations are started where an agency does a few things:

3    Holds out the previous regulatory text as a proposal; offers an

4    explanation for the language -- this is the important one --

5    solicits comments on that substance and then responds to the

6    comments received.

7          Here the agencies did not put this out as a proposal.

8    They stated quite clearly at 79 Fed Register 22,200 that the

9    proposal does not change that provision of the regulations and

10   that they were not taking up the issue again, and significantly

11   for your purposes, Your Honor, the agencies never sought comment

12   on that part of the regulatory text.

13         And to the extent, one other point to make in

14   response to the reply briefs is that to the extent that

15   plaintiffs and plaintiff intervenors are challenging waters that

16   have a relationship to interstate waters, those challenges are

17   not really relevant to whether the interstate waters claims are

18   timely or not.  That goes to the question of whether adjacent

19   waters or case-specific waters are appropriate or not.

20         THE COURT:  Let me get you to jump to the logical

21   outgrowth.

22         MS. MANN:  We're together.  I was just turning the

23   page.  As Your Honor knows, the APA has provisions requiring

24   that either the substance of a proposed rule or a description of

25   the subjects and issues involved need to be part of the

1    proposal.

2           As the Eleventh Circuit has stated in *Miami/Dade*

3    *County versus EPA*, the purpose of notice and comment is to allow

4    an agency to reconsider and sometimes change its proposal based

5    on the comments of affected persons.

6           All that's required for a final rule to be a logical

7    outgrowth of a proposal is that the agency expressly seeks

8    comment on a particular issue or makes clear that it's

9    contemplating a particular change.

10          Here there were three areas that the parties have

11   raised with respect to logical outgrowth.  One is the distance

12   limitations and the definition of "neighboring," which is part

13   of adjacent waters, and the goal of this rulemaking, the

14   agencies believe, was clearly stated as wanting to provide

15   greater clarity by identifying specific areas and

16   characteristics for jurisdictional adjacent waters.

17          "Adjacent waters," as Your Honor may know, have been

18   interpreted as broadly or applied broadly --

19          THE COURT:  Let me kind of cut to the quick.

20          MS. MANN:  Sure.

21          THE COURT:  I think the question is really here there

22   doesn't seem to be any range of distance that was proposed.

23   Would you argue that you could have come in and instituted a

24   thousand-year floodplain or 1500 miles instead of 1500 feet?

25          What is the limit if you can just say something about

1    geographical limitations and then for the final rule come up

2    with anything?

3              MS. MANN:  Well, Your Honor, it was very specifically

4    stated that the agencies would assess the distance and that they

5    specifically requested comment on establishing --

6              THE COURT:  When you say "it was specifically," what

7    was the distance that was specific about it?

8              MS. MANN:  Well, I think your question is:  Does an

9    agency have to come in and say, okay, we're thinking of --

10             THE COURT:  No, it's not.

11             MS. MANN:  -- five feet to 5000 feet?

12             THE COURT:  That's a part of it.

13             MS. MANN:  But with respect to the range of

14   alternatives, that language comes from the *Small Refiner Lead*

15   *Phased Down Task Force* case out of the DC Circuit from 1983.

16             THE COURT:  It does, but would you argue you could

17   have used a 5000-year floodplain?  Could you have used 1500

18   miles instead of 1500 feet?

19             MS. MANN:  Well, I certainly think that there could

20   have been an arbitrary and capricious vulnerability if you were

21   to have done something like that, but I do think that where

22   you're notifying the public, "Look, this has been interpreted

23   fairly broadly and what we're trying to do here is to make clear

24   that the limits we set" --

25             THE COURT:  If we say 5000 is arbitrary and

1   capricious and you say 100 isn't, what's the standard?  How do I

2   decide 100 isn't but 5000 is?  What...

3          MS. MANN:  Well, the question is whether the -- with

4   respect to the procedural claim --

5          THE COURT:  That's your question but mine is that

6   one, so can you answer it?

7          MS. MANN:  Well, I think what you're asking is more

8   can the agency support it, but if you are asking the question

9   could the agency have come out with any number, I don't know

10  that I can answer that question as I stand here because --

11         THE COURT:  I think you said no but my next question

12  was --

13         MS. MANN:  No --

14         THE COURT:  -- If they can't come up with any number,

15  how do we judge what kind of number?  What's too much?

16         MS. MANN:  Well, I think that that's the arbitrary

17  and capricious part of the analysis.  The --

18         THE COURT:  How do I judge in this context "This is

19  arbitrary and capricious but this isn't"?

20         MS. MANN:  The question is not whether that number

21  stands up to scrutiny as reasonable.  The question for the

22  procedural claim is should somebody have understood when they

23  read the proposal that the agency might put a number in there

24  and the answer to that question is yes.

25         THE COURT:  And so once you answer yes, they are

1    entitled to put any number in there?

2         MS. MANN:  That's a -- that's a -- that's a different

3    part of the argument.

4         THE COURT:  Right, and that's what I'm asking you to

5    answer.

6         MS. MANN:  And that is not something -- that is one

7    of the issues that is under reconsideration.  The agencies have

8    put forth a different definition --

9         THE COURT:  But for this suit, all right -- I

10   understand you might fix that later -- but for this suit, what

11   is your answer?

12        MS. MANN:  Well, as we've tried to make clear, Your

13   Honor, we're not engaging on that question at this time.  The

14   question that I'm hoping to engage with you on right now is

15   whether somebody should have understood that there could be a

16   number in the final rule.

17        THE COURT:  And I understand your argument on that

18   different issue.

19        MS. MANN:  And I'm glad you brought up the *Alabama*

20   *Power* case, Your Honor, the Eleventh Circuit, because I think

21   that that's very on all fours and so is the *Small Refiner* case

22   out of the DC Circuit.

23        In that case and in *Alabama Power*, the purpose of the

24   agency's rulemaking was quite clear.  In *Alabama Power* they were

25   concerned about folks that worked around electric utilities

1    getting sparks and catching on fire, so the weight of the

2    fabrics that came out in the ultimate correction was something

3    that the Eleventh Circuit said people should have understood

4    that because that's the purpose of the rule.

5         The same thing in the *Small Refiner* case where the

6    agencies had made clear they were trying to get rid of loopholes

7    and so there were two things that were into issue in the notice

8    arguments, and one of them was whether past producers would be

9    subjected to the limits that were imposed there by the EPA, and

10   the DC Circuit said, "Yeah, people understood what the purpose

11   of this rule was, to get rid of these loopholes, and even though

12   that past producer component of the final regulation wasn't in

13   the proposal, people were on notice," and so...

14        THE COURT:  Let me get you to go to the connectivity

15   report.

16        MS. MANN:  Sure.

17        THE COURT:  There's two parts of that that I'm

18   struggling to understand.  The 36 scientific reports that were

19   published after the draft science report and added to the final

20   science report, what was the substance of that?

21        MS. MANN:  Well, Your Honor, there were over a

22   thousand -- as the other side recognizes, there were quite a

23   number of scientific sources that were cited to in the draft

24   report.

25        And between the time that the draft report and the

1    final report were completed, the agencies added additional

2    sources.

3            Some of those were suggested by members of the

4    science advisory board that had reviewed the draft report, but I

5    think it's quite telling, if you read the briefing, that the

6    parties challenging that cannot point to anything about the

7    report or the sources that they can say would have changed or

8    what they would have said about that that impacts this case.

9            If they say they would have refined --

10           THE COURT:  So it's your position that there was no

11   new additional information in anything added to the final

12   science report that would have needed public comment in any way?

13           MS. MANN:  No, Your Honor, we don't believe so.  The

14   concept of a continuum, you mentioned earlier that there were

15   many citations that the agencies provided -- and I can repeat

16   them but I think you already know them -- where the agencies had

17   referred both in the proposal to a gradient in the relation of

18   waters to each other and in the draft report to discussing

19   connectivity as something that has a continuum, and even if the

20   agencies hadn't used the word "continuum," which they did -- I

21   think the plaintiff intervenors acknowledge that -- the concepts

22   were very much real in the report, and they don't point to any

23   part of the report or any source and say, "Aha, if we had known

24   this specific thing, here are the things that we would have

25   said."

1           All they say is that they would have refined or

2    enlarged the comments that they already made.  The additional

3    sources that were added only confirmed the same information that

4    was already in the report.

5           THE COURT:  They teased out three subjects, topics,

6    that they say the public was not able to comment on, the failing

7    to provide metrics to measure the significance of the nexus to

8    traditional navigable waters, analyzing significant nexus as a

9    binary choice rather than as a gradient and finally failing to

10   assess the significance of effects of ephemeral features on

11   downstream waters.

12          How do you respond to those three issues that they

13   say the public didn't have an opportunity to comment on at all?

14   Were those included in the draft report?

15          MS. MANN:  Those concepts and those -- the scientific

16   information was there.  There were additional supporting sources

17   that were added.

18          THE COURT:  Wait, when you say "was there," you mean

19   in the draft report?

20          MS. MANN:  The concepts and the science were there,

21   Your Honor.  The idea --

22          THE COURT:  By "there," do you mean the draft report?

23          MS. MANN:  In the draft report.  I apologize for

24   confusing you, but the agencies had addressed -- you know, when

25   you asked the question about metrics, I'm not sure if we're

1    getting to distance limitations or what other metrics you're

2    referring to, so I want to be careful there.

3          I don't want to overstate the position, but I think

4    that if you look at -- and they have had multiple chances with

5    their motions here, both on the preliminary injunction motions

6    and their motions for summary judgment, to point to you and say,

7    "Your Honor, look at this source; there is nothing like this in

8    the draft report and this is what we would have said."

9          Without showing with some specificity what they would

10   have said and what specific information they would have been

11   looking at when they made those statements, those claims are

12   just on incredibly weak ground.

13         If you don't have any more questions on that, I'm

14   going to turn to the antilobbying and propaganda claims.

15         THE COURT:  And I think I understand your arguments

16   in that regard.  It's my understanding that you take the

17   position that nothing improper was done, and at bottom, there is

18   no private cause of action for any of that anyway.

19         Is that --

20         MS. MANN:  Well, one comment I would make, after

21   reading their reply brief, and this is our chance to kind of

22   come back and beyond to respond to that.  It started out in

23   their summary judgment motion that they were making this

24   procedural claim, that the agency had violated these

25   antilobbying provisions, but as you look at their reply, they

1    have shifted at that point.  They acknowledge that they don't

2    have a private right of action.  They acknowledge that the GAO

3    found that the agencies had met all the applicable procedural

4    requirements and they --

5              THE COURT:  The GAO report was not glowing for the

6    agency.

7              MS. MANN:  Well, there are two separate GAO reports,

8    Your Honor.  The one that they've cited to was a report where

9    the GAO was looking at whether there had been violations of the

10   antilobbying provision, but after every single rulemaking that

11   the agencies -- any agency does, the GAO looks at the rule,

12   looks at the supporting information that the agency in question

13   provides and they let the agency know, yes, you've met your

14   procedural requirements, or no, you haven't.

15             And that was a different report than the one that

16   they are citing to, but the GAO did, in fact, find that the

17   agencies had made all of their applicable procedural

18   requirements.

19             The point that I wanted to make to you, Your Honor,

20   is that their argument shifts from their opening brief to their

21   reply to one of saying, "There's a closed mind here," and that's

22   a different argument, and what I would point Your Honor to is

23   that there is a presumption that an agency official is presumed

24   to be objective and capable of judging a particular controversy

25   fairly and on the basis of those circumstances, and courts have

```
1    found that to rebut this presumption, a plaintiff has to make a,

2    quote, clear and convincing showing that the agency member has

3    an unalterably closed mind on matters critical to the

4    disposition of the proceeding, and that's from *Association of*

5    *National Advertisers versus FTC*, out of the DC Circuit.  That is

6    a very high bar.

7              THE COURT:  I understand your argument.

8              MS. MANN:  No circuit court has ever found an

9    unalterably closed mind.

10             THE COURT:  Let me turn, then, to man who has been

11   waiting patiently and that is Mr. Holman.

12             Thank you, Ms. Mann.

13             MS. MANN:  Thank you, Your Honor.

14             MR. BRIGHTBILL:  Your Honor, may I address your

15   question about *Global Tel Link?*

16             THE COURT:  In a followup brief.  I will look forward

17   to reading that.

18             Mr. Holman.

19             MR. HOLMAN:  Thank you, Your Honor.

20             THE COURT:  On behalf of the intervening defendants.

21             MR. HOLMAN:  That's right, Your Honor.

22             May it please The Court, I'm Bland Holman and I would

23   like to start today with something that hasn't been discussed,

24   which is the statute, the Clean Water Act and its objectives,

25   which are to restore and maintain the chemical, physical and
```

1   biological integrity of the nation's waters.

2           THE COURT:  I think part of the reason it hasn't been

3   discussed is because this is a chance to talk about things that

4   I may not have been briefed on, and we're getting down to the

5   nitty-gritty of the issues that have been raised, and I

6   appreciate that's at the heart of why you're here and the

7   importance of that statute.

8           MR. HOLMAN:  Your Honor, I --

9           THE COURT:  That will not be lost in my examination,

10  and I appreciate you going into it, but I don't think it will

11  advance the ball to spend a long time reading sections of that.

12          MR. HOLMAN:  I was already going to move to "waters

13  of the United States" -- you understand that is the definition

14  that's at issue -- can't be interpreted without any look at the

15  statute's purpose or intentions, which is what I feel is going

16  on on this side of the room, and if we could just go ahead and

17  jump to the actual definition of "tributaries," which seems to

18  be one of the substantive issues there, just so The Court is

19  clear, because this also has not been mentioned, the definition

20  of "tributary," the rule has three elements.

21          There needs to be flow.  There needs to be ordinary

22  high water mark and there needs to be bed and banks, and the

23  agency was well within the parameters of having its -- reaching

24  a conclusion that these are indicators of flow and significant

25  nexus, and Your Honor has asked very specifically about things

1    in the record showing that, and if Your Honor -- I would be
2    pleased to go through showing that there is abundant evidence in
3    this record showing that these tributaries, that definition
4    which will capture tributaries with flow affect the physical,
5    chemical and biological integrity of the nation's water.  Just
6    as an example --
7              THE COURT:  Let me ask you:  Do you maintain that the
8    indicators that you are talking about are never caused by one-
9    time large events?
10             MR. HOLMAN:  One-time large events, you mean like a
11   thousand-year flood?
12             THE COURT:  Something of that nature.
13             MR. HOLMAN:  I don't know that that -- to me -- our
14   answer to that is the -- the correct question is whether or not
15   the definitions capture waters of the United States.
16             THE COURT:  And that is what I'm -- do these
17   indicators always demonstrate a significant nexus?
18             MR. HOLMAN:  Your Honor, I don't think they have to
19   always, even if there's a false positive, within Justice
20   Kennedy's opinion, the discussion is in most of the cases.
21             THE COURT:  Given the nature of the definition in the
22   statute itself is your argument, I would think.
23             MR. HOLMAN:  Our position is that the notion that the
24   definition is not supported by record evidence is absolutely
25   counter to the record.

1              The fact that there may in some -- one could imagine

2      some scenario where there is some water out there of the

3      hundreds of thousands of waters of the United States that may

4      not have a significant nexus perhaps doesn't disprove the rule.

5              It's a rule and it is allowed, they are allowed to

6      base it on the science, and what the science shows is that these

7      are definitions that include flow and they include streams with

8      connections.

9              For example, just for an example, biological

10     connection between tributaries and downstream waters, EPA cites

11     studies, these tributaries export plankton, vegetation, fish

12     eggs, insects, invertebrates like worms or crayfish, smaller

13     fish that are -- they cite many, many studies that show this, so

14     I don't really understand the position that The Court has been

15     asked to put itself in, which is to second-guess the science,

16     because there is no credible claim that the science is lacking,

17     and I think under the applicable standard of review, that means

18     that this Court has to affirm the rule, because the test is

19     whether or not it runs counter to the evidence before the

20     agencies were so implausible that it could not be ascribed to a

21     difference in the view or the product of agency expertise under

22     the *Miccosukee Tribe* case, which is binding on this case,

23     irrespective of the deference issue.

24             The question is whether or not this is an arbitrary

25     and capricious rule on the record that's before the agency, and

1    the record is overwhelming and it shows these are indicators of

2    flow.  It shows that this complies completely with Justice

3    Kennedy's test.

4           A lot of the focus in the briefing was on the merest

5    trickle and saying these tests could capture the merest trickle

6    and that therefore violates Justice Kennedy's test, and I would

7    submit, Your Honor, that the records shows that at 80 Federal

8    Register at Page 37,076 the agency makes a finding that bed,

9    banks and ordinary high water mark are only created by

10   sufficient and regular intervals of flow, so the key is there's

11   enough flow in these streams to actually move things.  They are

12   moving the earth.  They are creating a channel, and they are

13   putting things on the beds and the banks.  That is not a

14   trickle.

15          That is not a trickle, and it does not run afoul of

16   Justice Kennedy's opinion.

17          If I might turn to the proximity issue which Your

18   Honor was asking about.  I would start with Justice Kennedy's

19   opinion itself where he actually includes the notion of

20   proximity.  He says, "Wetlands can perform critical functions

21   related to the integrity of other waters, functions such as

22   pollutant trapping, flood control and run-off storage," so he is

23   talking about flood control.  So using the floodplain as a

24   denominator here is within the bounds of that opinion and the

25   evidence shows --

1          THE COURT:  When you say the floodplain, you mean the

2     hundred-year floodplain?

3          MR. HOLMAN:  Well, flood control is a function that

4     could be served, you could select different flood intervals in

5     drawing your line and it --

6          THE COURT:  I was just asking about your language

7     when you said "the floodplain."  You mean the floodplain of any

8     given area?

9          MR. HOLMAN:  Well, I will read several pieces of

10    evidence and we can talk about the issues that The Court has

11    with the hundred-year floodplain, but as a general matter,

12    floodplain is a general description of an area that is

13    adjacent --

14         THE COURT:  That's what I mean.  You're using just

15    generically, the floodplain of whatever area.

16         MR. HOLMAN:  I am, Your Honor, but I think it's

17    not -- that doesn't mean that's an endless term.  It doesn't

18    mean that it covers the million-year floodplain.  I think that

19    in the science --

20         THE COURT:  No.  Go on to something else.  That's not

21    at all what --

22         MR. HOLMAN:  Well, the record is clear that

23    floodplains, wetlands and open waters within the hundred --

24    here's a specific technical cite for the hundred-year

25    floodplain.

1          Wetlands and open waters within the hundred-year

2     floodplain impact primary waters by connecting, quote, aquatic

3     environments through both surface and shallow water, subsurface

4     hydrological flow paths, so the evidence is there, and Justice

5     Kennedy recognized in his opinion that proximity matters.

6          So here we have evidence in the record showing that

7     wetlands and water bodies that are in the floodplain have these

8     connections to these navigable waters and that the agency was

9     within its rights to define the floodplain as setting the

10    significant nexus standard.

11         Now one point that was made about the ordinary high

12    water mark, which was another focus of the discussion earlier,

13    it was claims that the ordinary high water mark is as a matter

14    of law unacceptable to this Court.  So in other words, The Court

15    doesn't have to mind all this science stuff.  It doesn't have to

16    look behind the agency and see whether or not the 1200 studies

17    that it looked at over the course of several years in drawing

18    these lines, it doesn't have to second-guess all that.

19         It can just go to straight to Justice Kennedy and

20    just figure out the ordinary high water mark is simply unlawful,

21    and, Your Honor, I would submit to you that is not a proper

22    reading and I would like to read to you from the opinion where

23    Justice Kennedy says, "An ordinary high water mark," he says,

24    "this standard presumably provides a rough measurement of the

25    volume and regularity of flow," and he says, "It may well; it

1    may well provide a reasonable measure of whether specific minor

2    tributaries bear sufficient nexus with other regulated waters to

3    constitute navigable waters under the act; yet the breadth of

4    the standards" -- he goes on to flag some concerns.

5        He says that "The breadth of that standard raised

6    concerns and precludes its adoption as the determinative measure

7    whether the wetlands adjacent to them are likely to be" -- and,

8    Your Honor, I just want to be clear.

9        I don't think that is a statement by Justice Kennedy

10   saying ordinary high water mark can never be a factor, it can

11   never be a driving factor in determination, especially where the

12   agency has multiple grounds to back up its determination that

13   these proximate lines include water that's significant nexus,

14   and the fact that some waters may fall within the definition and

15   The Court might think that those specific waters do not have

16   significant nexus does not mean the rule is invalid.

17       THE COURT:  Is it your position that the 2015 WOTUS

18   rule is actually narrower than what predated it?

19       MR. HOLMAN:  It is narrower in certain respects.  And

20   specifically I believe the 2015 rule does not include waters

21   that affect interstate commerce or could affect interstate

22   commerce, and I believe that was excluded in the 2015 rule, so

23   it is narrower.

24       It's also clearer because, of course, the regime that

25   preceded it was a basically a case-by-case test for the entire

1    country.  Even if you are outside of the floodplain, even if you

2    were more than 4000 feet away from the ordinary high water mark,

3    you had to get a case-by-case test, and one of the -- frankly

4    one of the misgivings conservationists had about this rule is

5    that it said if you are outside these limits, you don't get a

6    case-by-case test.

7            So the rule is clearer.  It is narrower, and it also

8    exclude waters from doing case by case, and it gives clear

9    guidelines.  They are based on distance.  They are based on

10   measurable things, and so the notion that this doesn't provide

11   any kind of constitutional, you know, void-for-vagueness

12   concerns, I don't really understand that, especially compared to

13   the predecessor which is what the injunctive relief you've been

14   asked to give would put back in place.

15           THE COURT:  And yet the agencies estimate that the

16   land covered would increase from 2.84 percent to 4.6 whatever

17   percent; is that a calculation that you dispute?

18           MR. HOLMAN:  Your Honor, I'm not in a position to

19   dispute that calculation.

20           THE COURT:  I understand.

21           MR. HOLMAN:  My understanding is that's a

22   conservative figure.  You know, the Corps of Engineers has

23   done -- I believe the figure is 400,000 jurisdictional

24   determinations.  That's in the record, and I would say to you

25   that one of the things that stood out to me in the record is

1   that the positive jurisdictional determinations they made where

2   they're finding significant nexuses that they were mostly all

3   within the 4000-foot limit.

4           So, in other words, while it's doing this

5   case-by-case analysis, it's finding based on that record that

6   those fit within the rule that it's prescribed, so that fits

7   with what it did with the rule.

8           THE COURT:  Thank you, Mr. Holman.

9           MR. HOLMAN:  Thank you.

10          THE COURT:  Counsel, I know each of you have probably

11  more to say.  But what I will do is allow you to supplement the

12  record.

13          You're not required to -- you're invited to -- within

14  ten days from today's date.  If you think of something on your

15  way home that you wish you had said or had the opportunity to

16  respond to, or if some of my questions raised something that you

17  would like to follow up on -- I think we identified a couple of

18  areas as we went along.

19          But I appreciate very cogent arguments and I will

20  look for -- again you're not required but you're invited to

21  follow up with additional briefing.

22          Counsel, thank you and we will be in recess.

23          (Proceedings concluded at 3:42 p.m.)

24

25

1                              CERTIFICATION

2

3          I certify that the foregoing is a true and correct

4     transcript of the stenographic record of the above-mentioned

5     matter.

6

7

9     _____        12/15/2018

10    Debra Gilbert, Court Reporter            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25