**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| STATE OF GEORGIA, *et. al.,*<br>             Plaintiffs, | |
| v. | Case No.: 2:15-cv-00079-LGW-BWC |
| ANDREW WHEELER, *et. al.*<br>             Defendants | |

**INTERVENOR DEFENDANTS' POST-HEARING BRIEF**

The Conservation Groups submit the following supplemental brief to address issues raised at the December 14 hearing. As shown below, Plaintiffs' arguments for vacating the Rule are meritless, and the Court should uphold the Rule.

**A.     The significant nexus test is a functional test applied with reference to the integrity of the Nation's waters.**

At the hearing, Plaintiffs elided any discussion of the significant nexus test as it relates to the Clean Water Act's explicit "objective": to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under Supreme Court precedent, however, Clean Water Act jurisdiction must be determined with reference to the statute's water quality purposes. The Court in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), upheld the Agencies' finding that wetlands were "waters of the United States" because they played "a key role in protecting and enhancing water quality," *id.* at 133-34, and it was this lack of "significant nexus" between wetlands and navigable waters that informed the Court's decision in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 167 (2001) (*SWANCC*).

Justice Kennedy made the functional relationship clear in *Rapanos v. United States*, where he explicitly held that a water is "water of the United States" if "either alone or in combination with similarly situated lands in the regions," it "*significantly affect[s] the chemical, physical, and biological integrity* of other covered waters…." 547 U.S. 715, 780 (2006) (emphasis added). By repeating the statute's explicit objective—maintaining the "chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—his opinion makes clear that the statute's objectives define its jurisdictional scope. Justice Kennedy's opinion also underlines the need for that relationship to be determined functionally. The Agencies, he held, could "identify categories of tributaries that, due to their volume of flow…, their proximity to navigable waters, *or* other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the *majority* of cases, to *perform important **functions** for an aquatic system* incorporating navigable waters." *Id.* at 780-81 (emphasis added).

The Agencies here followed Justice Kennedy's direction by developing a significant nexus rule based, ultimately, in functional science. As discussed below, Plaintiffs' challenges to that science are cursory, unsound, and must be rejected. So too their contention that the Rule must be struck down because, notwithstanding the science, certain stand-alone *legal* limits preclude jurisdiction over the waters identified as having a significant nexus. These proposed legal limitations are meritless, and this Court is bound to apply the significant nexus test as actually established in Justice Kennedy's opinion.

Plaintiffs first mistakenly contend that Justice Kennedy's *Rapanos* decision makes it unlawful to use an ordinary high water mark ("OHWM") in determining whether a tributary is jurisdictional. That is incorrect. Justice Kennedy characterized the OHWM standard as "presumably provid[ing] a rough measure of the volume and regularity of flow" and, "subject to

reasonably consistent application," concluded that it "*may well provide a reasonable measure* of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters' under the Act." *Rapanos*, 547 U.S. at 781 (emphasis added). Rather than stand for the notion that OWHM cannot be used to determine whether a stream is jurisdictional, this language shows that it could.[1]

When it came to wetlands, Justice Kennedy did raise concerns with use of an OHWM as *the* "determinative measure" of whether adjacent wetlands play an important role in the integrity of an aquatic system comprising navigable waters, since it could sweep in streams "remote from any navigable-in-fact water and carrying only minor water volumes toward it." *Id.* "*Absent more specific regulations*," Justice Kennedy held, the Corps must demonstrate a significant nexus "on a case-by-case basis," but those determinations could form the basis for a regulation that "presume covered status for other comparable wetlands in the region." *Id.* at 782 (emphasis added).

What this means is that while OHWM may not, absent more specific regulation, be the "determinative" factor for determining whether wetlands adjacent to non-navigable tributaries are jurisdictional, the Agencies may well use OHWM in promulgating regulations to determine jurisdiction in combination with other factors. The Agencies did just that. They included OHWM as *one of three* factors that, taken together, supported the agency's functional significant nexus determination for covered tributaries. *See* 80 Fed. Reg. at 37,076 (discussing requirement for

---

[1] Unlike in this case, neither Justice Kennedy nor the litigants in *Rapanos* had the benefit of more than 1,200 peer-reviewed scientific publications, hundreds of pages of technical support, and the independent review of dozens of experts to show that waters with an ordinary high water mark have a significant nexus to downstream waters. The Agencies have far more scientific support for their determinations now than the Court had twelve years ago when it questioned the possible breadth of ordinary high water mark determinations in *Rapanos.*

tributary to contribute flow to a primary water *and* have a bed and banks *and* have an ordinary high water mark indicative of sufficient and regular intervals of flow).

Plaintiffs' second meritless limitation on the functional significant nexus test is sourced in States' rights. *See*, *e.g.,* State Reply Br., ECF No. 222, at 23-24. But Justice Kennedy considered, and rejected, Plaintiffs' argument in *Rapanos*.  Because the significant nexus test by itself "prevents problematic applications of the statute," the possibility of "federalism concerns in some circumstances" do not limit the test, much less require an interpretation "that departs in all cases from the Act's text and structure." 547 U.S. at 783.  Said another way, where a functional significant nexus exists, the water falls within the federal Commerce power animating the Clean Water Act's reach, and nothing in the Act or the Constitution supports removing jurisdiction.

Lest there be any doubt, in enacting the Act Congress made plain its intent to exercise its full power over interstate commerce.  As stated in the Conference Report: "The Conferees fully intend that the term 'navigable waters' be given the *broadest possible constitutional interpretation*…." S. Conf. Rep. No. 1236 (1972) (emphasis added).  Likweise, the House Committee reported that it had been reluctant to define navigable waters "based on the fear that any interpretation would be read narrowly," which would contravene the Committee's intent "that the term *'navigable waters' be given the broadest possible constitutional interpretation.*" H.R. Rep. No. 911 (1972) (emphasis added).

Plaintiffs' citation to 33 USC § 1251(b) ("Section 101(b)") does not change the calculus. Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The statute as a whole and in its particulars

erects pervasive federal authority over U.S. water pollution. Among other things, it establishes federal authority and oversight over state actions;[2] federal authority to veto individual state permits, 33 U.S.C. § 1342(d)(2); federal authority to assume the enforcement of violations of state permits, 33 U.S.C. §§ 1319(a)(1), (2); federal authority to review state water quality standards, 33 U.S.C. § 1313(c); and federal authority to prohibit States from adopting standards less stringent than those established under the Clean Water Act, 33 U.S.C. § 1370.[3]

Seen alongside these provisions and the Act's explicit objective to clean the "Nation's waters," Section 101(b) assumes its proper stature. Its announcement of a "policy" to "recognize, preserve, and protect the *primary* responsibilities and rights" of States to "prevent, reduce, and eliminate pollution" 33 U.S.C. § 1251(b) (emphasis added), reflects at most the Act's cooperative federalist structure, which gives States primary duties (e.g., to write permits and set water quality standards) *within* a nationwide program to restore and maintain the integrity of the Nation's waters. And while Section 101(b) recognizes the primary role of States in planning the "development and use" of land and water "resources," *id.*, that language does not independently limit federal power to control water *pollution*.  State planning of land and water *use* for civic and economic development is distinct from, and does not limit, federal power to regulate water pollution. As the Supreme Court has explained, land use planning is "undoubtedly different" from environmental regulation. *See California Coastal Comm'n v. Granite Rock Cor.*, 480 U.S. 572, 587 (1987). "Land use planning in essence chooses particular uses for the land;

---

[2] A state may assume responsibility for the NPDES permitting program only if the program meets Clean Water Act standards, and EPA may withdraw approval if the state fails to administer the program in accordance with Clean Water Act requirements. 33 U.S.C. § 1342(b), (c).

[3] And when the federal government encouraged the states to assume the Section 404 program, it includes clear conditions and requirements to limit the states' involvement in the program.

5

environmental regulation, at its core does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits." *Id.*

**B.    The Clean Water Rule did not materially expand Clean Water Act jurisdiction.**

At the hearing, the Court inquired into Plaintiffs' claims that the Clean Water Rule greatly expanded jurisdiction over waters of the United States. In fact, the Rule *removed* categories of waters from jurisdiction compared to the prior regulatory regime. *Compare*, *e.g.*, 33 C.F.R. § 328.3(a)(5) (1999) (protecting all tributaries), *with* 33 C.F.R. § 328.3(a)(5) (2018) (protecting tributaries only if they contribute flow to a primary water *and* have a bed and banks *and* have an ordinary high water mark); *compare* 33 C.F.R. § 328.3(a)(3) (1999) (protecting all waters that could affect interstate commerce), *with* 33 C.F.R. § 328.3 (2018) (omitting that category entirely). Further, while the Agencies found that implementation of the Rule would result in an approximately 2-5% increase in positive jurisdictional findings, 80 Fed. Reg. at 37,101, that estimate likely overstates things. The Agencies recently stated in their Supplemental Notice for the Repeal Rule that "the regulatory changes in the 2015 Rule did not materially impact" the bulk of jurisdictional categories at all; instead, it impacted at most a third of 6 percent of "other waters" jurisdictional determinations, or 2% of covered waters overall. *See* 83 Fed. Reg. at 32,244.[4]

---

[4] The Agencies estimated that 34 percent of previously non-jurisdictional "other waters" would become jurisdictional, and further found that even a doubling the number of "other waters" would increase jurisdiction for all waters by only 4.65 percent. Economic Analysis, ECF No. 211-7, at 13.  Plaintiffs' claims of greatly expanded coverage for streams ignores the Agencies' use of conservative assumptions, *id.* at viii, and hinges on expressing increases as percentages of positive determinations without disclosing very low baseline figures. In fact, 35 states would see an increase, if any, of less than 2%, while fourteen would see no change at all. *See* EPA & Corps, Supporting Documentation: Analysis of Jurisdictional Determinations for Economic Analysis and Rule, ID-20877, at 46.

**C.      Plaintiffs rely on *Global Tel\*Link*, but that case was amended and superseded.**

At the hearing, State Plaintiffs directed the Court to *Global Tel\*Link v. Federal Communications Commission*, 859 F.3d 39 (D.C. Cir. 2017), for the proposition that *Chevron* deference does not apply when an agency informally withdraws its support for an opinion or regulation.[5] But that case was amended and superseded less than two months later at 866 F.3d 397, 417 (D.C. Cir. 2017). After issuing an initial opinion, the majority amended the language relied on by State Plaintiffs, clarifying, "*We need not and do not decide whether we were required to follow Chevron Step Two even though the agency declined to defend its position before the court.*" *Id.* at 417 (emphasis added). Plaintiffs' representation that the D.C. Circuit decided the deference issue in *Global Tel\*Link* is therefore wrong.

The D.C. Circuit's decision to amend and supersede its initial opinion makes sense. Until the Agencies formally repeal the Clean Water Rule, the existing Rule represents their authoritative interpretation on these issues and should be afforded deference. Nothing in the APA suggests that a regulation can be repealed outside the rulemaking process. To the contrary, agencies must use the same procedures when they repeal a rule as they use to issue the rule. 5 U.S.C. §§ 551(5), 553(b) and (c) (providing that APA requirements apply to agency processes for "formulating, amending, or repealing a rule"). This principle ensures that any amendment or revocation of an existing regulation is enacted with notice and public comment, reasoned decision-making, and an opportunity for judicial review—not by an agency informally retreating from its position in a court case.

---

[5] Judge Pillard dissented from the initial opinion (which was later amended), reasoning "By suggesting that agencies can relinquish judicial deference through such limited and belated maneuvers as refusing to defend portions of their briefs during oral argument, the majority risks enabling agencies to end-run the principle that they must 'use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.'" 859 F.3d at 67.

In any event, the Clean Water Rule is based on extensive external peer review by over two dozen of the nation's top scientists and over 1,200 scientific studies, none of which Plaintiffs have specifically attacked (or even discussed). Whether or not the Court applies *Chevron* deference to the Rule, it cannot disregard the *science* on which the Rule was based. And that *science* has not changed. Plaintiffs still have the burden to show that the Rule is arbitrary and capricious under the APA, a test they plainly do not meet given the Rule's strong scientific foundation.

**D.    The Rule does not regulate "trickles" of water.**

Plaintiffs repeatedly claim that the Rule regulates "trickles" of water. That is wrong. The Rule's definition of tributary requires an ordinary high water mark, a bed and banks, and the contribution of flow downstream. 80 Fed. Reg. at 37,076, 37,105-06. According to the Technical Support Document, the Science Report, and the scientific literature, a water feature must have a sufficient volume, duration, and frequency of flow to form these physical features. *See, e.g.,* Tech. Support Doc., ECF No. 211-10, at 69 ("Informed by science, the agencies identified a category of tributaries that were 'waters of the United States' based on those waters having sufficient volume, duration, and frequency of flow to form two physical indicators of flow – a bed and banks and another indicator of ordinary high water mark. The science demonstrates how valuable these tributaries are for the chemical, physical or biological integrity of downstream traditional navigable waters, interstate waters, or the territorial seas."); *see also id.* at 171, 234, 235, 241, 245, 272, 325; *see also* Science Report, ECF No. 211-6, at 3-45 ("[T]he very existence of a continuous bed and bank structure provides strong geomorphologic evidence for connectivity"); 5-10 ("Formation of a channel indicates that connectivity, in terms of its combined descriptors (frequency, duration, magnitude, timing) is sufficiently strong (or

'effective') and outweighs terrestrialization processes (e.g., revegetation, wind-mediated processes, soil formation processes)."); *cf. id.* at 2-2 (noting that "channels" are defined by the presence of continuous bed and bank structures).

In other words, a "trickle" does not have enough volume or power to create an ordinary high water mark, a bed and banks, or other physical marks on the landscape, and thus would not be considered a tributary under the Rule. Plaintiffs offer no evidence to the contrary—only unsupported allegations that are contradicted by the record. *See*, *e.g.,* State Reply Br., ECF No. 222, at 1 (claiming without support that the Rule covers "trickles"); *id.* at 8 (claiming without support that the Rule regulates "the merest trickle").

State Plaintiffs also complain that, even if these indicators require more than a trickle, Defendants still have not shown that a water possessing these features will have significant effects on downstream waters. State Reply Br., ECF No. 222, at 8. Setting aside the fact that Plaintiffs, not Defendants, have the burden in this case, the record is replete with scientific evidence showing that tributaries, as defined by the Rule, significantly impact the physical, chemical, and biological integrity of downstream waters. *See* Science Report at 6-1 (concluding that tributaries "exert a strong influence on the integrity of downstream waters"); 80 Fed. Reg. at 37,064 (noting that Scientific Advisory Board concluded "there is strong scientific evidence to support the EPA's proposal to include all tributaries within the jurisdiction of the Clean Water Act"); Scientific Advisory Board Review, ECF No. 215-6, at 3 (noting that "strong scientific support has been provided" for the conclusion that all tributary streams are physically, chemically, and biologically connected to downstream waters).

Regarding impacts to physical integrity, the record shows that tributaries, even when seasonal, are a dominant source of water in most rivers. Tech. Support Doc. at 246. They directly

impact flow volume, temperature, dissolved oxygen, and other physical conditions in downstream waters, and also transport sediment to those waters, impacting their physical shape. Tech. Support Document at 246-249; *see also* Science Report at 3-5 to 3-21. The record also shows that tributaries significantly affect the chemical integrity of downstream navigable waters by impacting the amount and form of nutrients and carbon received by those waters. Tech. Support Document at 249-254; *see also* Science Report at 3-21 to 3-27. Finally, the record shows that tributaries strongly impact the biological integrity of downstream navigable waters. Tech. Support Doc. at 254-256; *see also* Science Report at 3-37 to 3-45. Among other things, they may be directly linked by the movement of living organisms, or they may increase the amount and quality of habitat or provide sources of food for downstream organisms. *Id.*

To recap, the Technical Support Document, Science Report, and scientific literature "*unequivocally* demonstrate[] that tributaries exert a *strong* influence" on the physical, chemical, *and* biological integrity of downstream waters. Tech. Support Doc. at 246, 249, 254 (emphasis added). The Technical Support Document alone cites hundreds of scientific studies supporting its conclusions on this point. *See, e.g.,* Tech. Support Doc. at 246-256 (citing Science Report; Winter 2007; Bukaveckas 2009; Alexander *et. al.* 2007 ; Vivoni *et. al.* 2006; Saco and Kumar 2002; Hamilton *et al*. 2005; Costelloe *et.al.* 2007; Church 2006; Wood and Armitage 1997; Gomi and Sidle 2003; Gooderham *et al.* 2007); Benda and Cundy 1990; Benda *et al.* 2005; Bigelow *et al*. 2007; Allan 1995; Ice 2008; Knispel and Castella 2003; Power *et al*. 1999 ; Curry *et al*. 1997; Baxter and Hauer 2000; Labbe and Fausch 2000; Bradford *et al*. 2001; Cairns *et al*. 2005; Caissie 2006; Gardner and Sullivan 2004; Johnson *et al*. 2010; Fisher and Likens 1973; Meyer 1994; Wallace *et al.* 1997; Hall and Meyer 1998; Hall *et al*. 2000; Augspurger *et al*. 2008; Paul *et al.* 2006; Corti *et al.* 2011; Dieter *et al.* 2011; Fellman *et al.* 2013; Committee on

Environment and Natural Resources 2000; Díaz and Rosenberg 2011; Murphy *et al.* 2011 ;
Freeman *et al.* 2007; O'Connor and Whitall 2007; He and Xu 2015. ; Alexander *et al.* 2000 ;
Mulholland *et al*. 2008; Goolsby et al. 1999 ; Rabalais *et al*. 2002 ; U.S. Environmental
Protection Agency 2003 ; Webster and Patten 1979; Newbold *et al*. 1981; Elwood *et al.* 1983;
Ensign and Doyle 2006; Mulholland *et al*. 1988; Seitzinger *et al*. 2002; Merriam *et al.* 2002;
Whiles and Dodds 2002; Hall, *et al*. 2009; Mulholland and Hill 1997; Mulholland 2004;
Mulholland *et al*. 1995; Newbold *et al*. 1983; Chapra 1996; Bernhardt, *et al*. 2002 ; Meyer and
Likens 1979; Simmons 2010; Peterson *et al.* 2001; Wang *et al*. 2007 ; Graf 1994.; Axtmann and
Luoma 1991; Kimball *et al*. 1995; Reneau *et al.* 2004; Meyer and Wallace 2001; Meyer *et al*.
2004; Huryn *et al*. 2005; Gorman 1988; Hitt and Angermeier 2008; Progar and Modenke 2002;
Nakano and Murakami 2001; Wipfli and Gregovich 2002; Lande and Shannon 1996; Hughes *et
al.* 2009; Anderson 2010; Bohonak and Jenkins 2003; Meyer *et al*. 2007; Ebersole *et. al.* 2003;
Scrivener *et al.* 1994; Fraser *et al.* 1995; Pires *et al.* 1999; Wigington *et al.* 2006; Woodford and
McIntosh 2010; Gomi *et al.* 2002; Kaplan *et al.* 1980; Vannote *et. al.* 1980; Brooks and Lemon
2007; Tetzlaff and Soulsby 2008; Levick *et al.* 2008). Plaintiffs, who have the burden of proof
and are subject to an arbitrary and capricious standard of review,[6] have offered hardly any
scientific evidence to support their position. Under that standard, it does not matter whether the
Plaintiffs would like a different regulation, or whether the Court would reach a different result if
it were conducting its own scientific inquiry. *See Ark. v. Okla.*, 503 U.S. 91, 112-13 (1992). The

---

[6] "The arbitrary and capricious standard is *exceedingly deferential*." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (emphasis added). A rule is arbitrary and capricious only if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

only question is whether the rule is supported by the record, and it plainly is. *See id.*

**E.      Plaintiffs' photographs demonstrate nothing.**

Rather than citing the record (which contradicts their position), Industry Intervenors continue to rely on photographs to complain that the Rule is "nonsensical." Intervenor Br., ECF No. 199, at 14. But the photographs demonstrate nothing useful. For example, Industry Intervenors claim that the Rule would "likely" cover the water feature in Figure 2 of their opening brief. *Id.* at 13. But they do not explain how they can tell that the water feature in that photograph has an ordinary high water mark, a bed and banks, or contributes flow to a downstream navigable water. Nor do they suggest that flow from this feature would not impact downstream navigable or interstate waters. In short, Industry Intervenors offer no evidence (only unsupported assumptions) that the feature in Figure 2 would be regulated under the Rule, or that if it were, such regulation would violate the significant nexus standard. This kind of conclusory allegation is not enough to overcome any standard of review, much less an arbitrary and capricious standard.

Industry Intervenors also lament that the photograph in Figure 6 was deemed "a jurisdictional wetland," not "a parking-lot puddle" as they think it should be. *Id.* at 22. But that determination was made in 2007, *eight years before* the Agencies promulgated the Clean Water Rule. *See In re EPA & Dep't of Def. Final Rule*, No. 15-3751 (6th Cir.), ECF No. 129-1, at 101. Likewise, in Figure 3, the Industry Groups show a photograph of an aquatic feature that they note was deemed jurisdictional in 2014—again, *before* the Agencies promulgated the Clean Water Rule. Intervenor Br., ECF No. 199, at 13. Industry Intervenors may be unhappy with these determinations, but they have nothing to do with this case.

## CONCLUSION

For all of these reasons, the Court should grant summary judgment in favor of

Defendants, dissolve its preliminary injunction, and uphold the Clean Water Rule.

Respectfully submitted this 24th day of December, 2018.

<u>s/ Catherine M. Wannamaker</u>
Southern Environmental Law Center
Georgia Bar No. 811077
463 King Street, Suite B
Charleston, SC 29403-5270
(843) 720-5270
*cwannamaker@selcsc.org*

<u>s/ J. Blanding Holman IV</u>
*Admitted pro hac vice*
Southern Environmental Law Center
463 King Street, Suite B
Charleston, SC 29403-5270
(843) 720-5270
*bholman@selcsc.org*

<u>s/ Megan Hinkle Huynh</u>
*Admitted pro hac vice*
Georgia Bar No. 877345
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
(404) 521-9900
*mhuynh@selcga.org*

*Counsel for Intervenor Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 24, 2018, I electronically filed the foregoing *Intervenor Defendants' Post-Hearing Brief* with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorneys of record.

<u>*s/ Megan Hinkle Huynh*</u>