# In the United States District Court for the Southern District of Georgia Brunswick Division

STATE OF GEORGIA, et al.,

    Plaintiffs,

    v.

ANDREW R. WHEELER, in his official capacity as Acting Administrator, U.S. Environmental Protection Agency, et al.,

    Defendants.

No. 2:15-cv-00079

## ORDER

Before the Court is a challenge to a 2015 administrative regulation defining "waters of the United States" (hereinafter, the "WOTUS Rule") under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1344, 1362(7) (2018). Congress enacted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Id. § 1251(a). To accomplish that goal, Congress implemented permitting requirements in the CWA for discharging pollutants into the nation's "navigable waters." Id. § 1311(a), § 1362(12), (14). Congress defined "navigable waters" to mean "the waters of the United States, including the territorial seas." Id. § 1362(7). To carry out the requirements of the CWA, Congress delegated authority under the Act to the administrators of the United States Environmental Protection Agency ("EPA") and the United States Army Corps of Engineers ("the Corps")

(collectively "the Agencies"). <u>See</u> <u>id.</u> § 1361(a). The issues in this case are whether the Agencies extended their jurisdiction beyond the limits of the CWA, failed to adhere to the procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and violated the Constitution by promulgating the WOTUS Rule.

After analyzing the administrative record, and for the reasons explained below, the Court holds that the WOTUS Rule extends the Agencies' delegated authority beyond the limits of the CWA, and thus is not a permissible construction of the phrase "waters of the United States" within the statute, and that the Agencies' promulgation of the WOTUS Rule violates the APA's procedural requirements. Therefore, Plaintiffs' Motions for Summary Judgment, dkt. nos. 199, 203, are **GRANTED**. Intervenor Defendants' Motion, dkt. no. 211, is **DENIED**. The WOTUS Rule is hereby **REMANDED** to the Agencies for further proceedings consistent with this Order. Intervenor Plaintiffs' Motion to Amend the Court's Preliminary Injunction, dkt. no. 208, is **DENIED** at this time. The Court's Preliminary Injunction, dkt. no. 174, will **REMAIN** in place pending the outcome of the ongoing administrative proceedings regarding the WOTUS Rule.

<u>**BACKGROUND**</u>

Plaintiffs State of Georgia, State of West Virginia, State of Alabama, State of Florida, State of Kansas, Commonwealth of Kentucky, State of South Carolina, and State of Utah ("the States" or "State

Plaintiffs")[1] filed the present lawsuit on June 30, 2015 against the administrators of the EPA and the Corps challenging the promulgation of a final agency rule defining the term "waters of the United States," Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) (to be codified at 33 C.F.R. pt. 328), as used in the CWA, 33 U.S.C. §§ 1344, 1362(7). Dkt. No. 1. Since then, the State Plaintiffs have been joined by the American Farm Bureau Federation, American Forest & Paper Association, American Petroleum Institute, American Road and Transportation Builders Association, Georgia Association of Manufacturers, Georgia Farm Bureau Federation, Leading Builders of America, National Alliance of Forest Owners, National Association of Home Builders, National Association of Manufacturers, National Cattlemen's Beef Association, National Corn Growers Association, National Mining Association, National Pork Producers Council, National Stone, Sand, and Gravel Association, Public Lands Council, and U.S. Poultry & Egg Association (collectively "the Intervenor Plaintiffs") as intervening plaintiffs. Dkt. Nos. 178, 187. Because the Agencies have declined to defend the substantive challenges to the WOTUS Rule in this case, National Wildlife Federation and One Hundred Miles (collectively "the Intervenor Defendants") intervened to defend the substantive challenges. Dkt. Nos. 136, 182.

---

[1] Plaintiffs filed an amended complaint on July 20, 2015 adding the State of Indiana and the North Carolina Department of Environment and Natural Resources. Dkt. No. 31. The North Carolina Department of Environment and Natural Resources joins the Plaintiff States' Motion for Summary Judgment on the grounds that the Agencies violated the notice requirement because the Final Rule was not the logical outgrowth of the Proposed Rule. Dkt. No. 203 at 9 n.4. See infra section III.A. Additionally, the State of Wisconsin recently withdrew from this case. See Dkt. Nos. 252, 253.

In this case, Plaintiffs claim that the WOTUS Rule should be vacated because it violates the CWA, 33 U.S.C. §§ 1344, 1362(7), the APA, 5 U.S.C. § 706(2)(A), as well as the Commerce Clause and Tenth Amendment of the U.S. Constitution, U.S. Const. art. I, § 8; U.S. Const. amend. X.

## I.    The CWA and the WOTUS Rule

As stated above, Congress enacted the CWA in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  One of the CWA's principal tools for achieving that objective is the prohibition of "the discharge of any pollutant" defined as "any addition of any pollutant to navigable waters from any point source," and "navigable waters," in turn, is defined as "waters of the United States, including the territorial seas."  Id. § 1311(a), § 1362(12), (14), (7).  "Because many of the Act's substantive provisions apply to 'navigable waters,' the statutory phrase 'waters of the United States' circumscribes the geographic scope of the Act in certain respects."  Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. __, 138 S. Ct. 617, 624 (2018).  The Act also requires that anyone who discharges pollutants into navigable waters obtain a permit.  Id. (citing § 1311(a)).  The process of obtaining a permit can take years and cost hundreds of thousands of dollars, and discharging into "navigable waters" without a permit can subject the discharging party to a fine of up to $37,500 per violation, per day, as well as criminal penalties.  22 U.S.C. §§ 1311, 1319, 1365; 74 Fed. Reg. 626, 627-28 (Jan. 7, 2009); Rapanos v. United States, 547 U.S. 715, 721 (2006).

Responding to calls for precision in the definition of "waters of the United States," the Agencies jointly promulgated the WOTUS Rule to "provid[e] simpler, clearer, and more consistent approaches for identifying the geographic scope of the [Act]." 80 Fed. Reg. 37,054 at 37,057. The Agencies published the Proposed Rule on April 21, 2014, 79 Fed. Reg. 22,188, and then promulgated the Final Rule on June 29, 2015, 80 Fed Reg. 37,054. Under the WOTUS Rule, "waters of the United States" include "(1) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) All interstate waters, including interstate wetlands; [and] (3) The territorial seas" (collectively "primary waters"). 33 C.F.R. § 328.3(a)(1-3). The Rule also covers "(4) All impoundments of waters otherwise identified as waters of the United States under this section." Id. § 328.3(a)(4). The WOTUS Rule then adds three new categories of waters to the definition of waters of the United States—two that are per se jurisdictional and one that is jurisdictional on a case-by-case basis.

The first added category of waters is "tributaries." The Rule covers "[a]ll tributaries" of primary waters. Id. § 328.3(a)(3). The Rule defines tributaries as any water "that contributes flow, either directly or through another water" to a primary water "that is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark" (hereinafter "OHWM"). Id. § 328.3(c)(3). The Rule declares for the first time that "remote sensing sources" or "mapping information" can be used to detect these "physical indicators." 80 Fed. Reg. at 37,076-78. The WOTUS Rule also envisions

the use of "desktop tools" for "hydrologic estimation of a discharge sufficient to create an [OHWM]" to identify the presence of a bed, bank, and OHWM, or even the historical presence of such where physical characteristics are "absent in the field." Id. at 37,077.

The second per se category is "adjacent waters." The Rule covers "[a]ll waters adjacent to" a primary water, an impoundment, or a tributary, "including wetlands, ponds, lakes, oxbows, impoundments, and similar waters." Id. § 328.3(a)(6). Under the Rule, "adjacent" means "bordering, contiguous or neighboring" primary waters, impoundments, or tributaries, even if they are separated from the primary water by man-made or natural barriers. Id. § 328.3(c)(1). The Rule further defines "neighboring" to mean: (1)"[a]ll waters located within 100 feet of the [OHWM]" of a primary water, impoundment, or tributary; (2) "[a]ll waters located within the 100-year floodplain" of a primary water, impoundment, or tributary and "not more than 1,500 feet from the [OHWM] of such water"; and (3) "[a]ll waters located within 1,500 feet of the high tide line" of a primary water, "and all waters within 1,500 feet of the [OHWM] of the Great Lakes." 33 C.F.R. § 328.3(c)(2). The Rule explains that if any portion of a water defined as neighboring is within one of these distance limitations, then the entire water is considered neighboring. Id. The Rule also excludes from the definition of "adjacent" waters those "[w]aters being used for established normal farming, ranching, and silviculture activities." Id. § 328.3(c)(1).

The third category does not define waters as per se jurisdictional, but rather determines on a case-by-case basis if waters have a

"significant nexus" to a primary water. <u>Id.</u> § 328.3(a)(8). Specifically, this category covers all waters, any part of which are within the "100-year floodplain" of a primary water, and all waters, any part of which are within 4,000 feet of the high tide line or OHWM of a primary water, impoundment, or tributary "where they are determined on a case-specific basis to have a significant nexus to" a primary water. <u>Id.</u> Under the Rule, a water has a "significant nexus" to a primary water "when any single function or combination of functions performed by the water, alone or together with similarly situated waters in the region, contributes significantly to the chemical, physical, or biological integrity of the nearest" primary water. <u>Id.</u> § 328.3(c)(5). The Rule lists the following functions as relevant to the significant nexus evaluation:

> (i) Sediment trapping, (ii) Nutrient recycling, (iii) Pollutant trapping, transformation, filtering, and transport, (iv) Retention and attenuation of flood waters, (v) Runoff storage, (vi) Contribution of flow, (vii) Export of organic matter, (viii) Export of food resources, and (ix) Provision of life cycle dependent aquatic habitat (such as foraging, feeding, nesting, breeding, spawning, or use as a nursery area) for species located in a [primary water].

<u>Id.</u>

Under the WOTUS Rule's new definition of "waters of the United States," the Agencies estimated that the Rule would increase federal "positive jurisdictional determinations" in the United States from 2.84% to 4.65% annually. 80 Fed. Reg. at 37,101. The State Plaintiffs characterize this increase as "unrealistically underinclusive." Dkt. No. 203 at 17.

## II.  Procedural History

The WOTUS Rule's effective date was August 28, 2015, but the States filed a motion for preliminary injunction on July 21, 2015 to enjoin enforcement of the WOTUS Rule before it became effective.  Dkt. No. 32. On August 27, 2015, this Court issued an order denying the preliminary injunction for lack of jurisdiction, holding that original jurisdiction lay with the Courts of Appeals.  Dkt. No. 77.

Meanwhile, similar lawsuits[2] were brought around the country.  The same day that this Court decided it lacked jurisdiction (August 27, 2015), the District of North Dakota granted a preliminary injunction to thirteen other states[3] challenging the WOTUS Rule.  North Dakota v. E.P.A., 127 F. Supp. 3d 1047 (D.N.D. 2015).

On January 22, 2018, the Supreme Court held that original jurisdiction of this dispute lies with the district courts, not with the Courts of Appeals.  Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. __, 138 S. Ct. 617 (2018).  As such, this Court reopened this action and considered the State Plaintiffs' Motion for a Preliminary Injunction,

---

[2] The Court understands that lawsuits challenging the WOTUS Rule are pending throughout the country in the following districts: the District of North Dakota (Case No. 3:15-cv-59: summary judgment motions pending);  the Southern District of Texas (Case No. 3:15-cv-162: summary judgment granted and WOTUS Rule remanded to Agencies to be considered in accordance with the court's order); the Southern District of Ohio (Case No. 2:15-cv-2467: motion for preliminary injunction pending; the Northern District of Oklahoma (Case No. 4:15-cv-381: motions for preliminary injunction pending for two consolidated cases);  the Northern District of Georgia (Case No. 1:15-cv-2488: case stayed); the Northern District of Florida (4:14-cv-579: case stayed); the District Court for the District of Columbia (Case No. 1:16-cv-1279: administratively closed); and the Northern District of California (Case No. 18-cv-3521: case stayed pending case management conference).  Dkt. No. 238 at 2-3.
[3] Those states are North Dakota, Alaska, Arizona, Arkansas, Colorado, Idaho, Missouri, Montana, Nebraska, New Mexico, Nevada, South Dakota, and Wyoming.

dkt. no. 149, granted the States' Motion, and on June 8, 2018, enjoined enforcement of the WOTUS Rule in the states that were parties to the case. Dkt. No. 174. After issuing the preliminary injunction, the Court allowed the Intervenor Defendants, dkt. no. 182, and the Intervenor Plaintiffs, dkt. no. 187, to join the case as intervening parties. Subsequently, the State Plaintiffs and Intervenor Plaintiffs filed motions for summary judgment on August 31, 2018. Dkt. Nos. 199, 203. Intervenor Plaintiffs also filed a Motion to Amend the preliminary injunction to apply nationwide. Dkt. No. 208. In response to the Plaintiffs' motions for summary judgment, Intervenor Defendants filed a response as well as their own cross-motion for summary judgment. Dkt. Nos. 211, 213. The Agencies responded to the Plaintiffs' motions for summary judgment, but they responded only to the Plaintiffs' procedural claims, deciding not to take a position on the merits of the substantive challenges to the WOTUS Rule. Dkt. No. 219 (correcting prior response at Dkt. No. 215).

While this case has been pending, things have changed around the country involving the WOTUS Rule. The President of the United States issued an executive order in February 2017 for reconsideration of the WOTUS Rule. Exec. Order No. 13,778, 82 Fed. Reg. 12,497 (Feb. 28, 2017). In response, the Agencies proposed a rule on July 27, 2017 that, once implemented, would rescind the WOTUS Rule and recodify the pre-2015 regulatory definition of "waters of the United States." See Definition of "Waters of the United States" – Recodification of Pre-Existing Rules, 82 Fed. Reg. 34899, 34901-02. Then, in November 2017, following oral argument in National Association of Manufacturers v. Department of

Defense, 138 S. Ct. at 617, the Agencies proposed another new rule. That rule, known as the "Applicability Rule," became final on February 6, 2018. Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018) (to be codified at 33 C.F.R. pt. 328). The Applicability Rule is identical to the WOTUS Rule but provides an effective date of February 6, 2020. Various parties then challenged the Applicability Rule in several lawsuits.[4] On August 16, 2018, a court in the District of South Carolina enjoined the Applicability Rule from taking effect for violating the APA. S.C. Coastal Conservation League v. Pruitt, 318 F. Supp. 3d 959, 969 (D.S.C. 2018). Then, on November 26, 2018, a court in the Western District of Washington vacated the Applicability Rule for violating the APA. Puget Soundkeeper All. v. Wheeler, No. C15-1342-JCC, 2018 WL 6169196, at *7 (W.D. Wash. Nov. 26, 2018). As a result of these two decisions, the WOTUS Rule went into effect in the twenty-two states (and the District of Columbia) that are not covered by either this Court's or another court's preliminary injunction. See Dkt. No. 208 at 7. Then, on December 11, 2018, the Agencies announced a new proposed rule revising the definition of "waters of the United States" to replace the 2015 WOTUS Rule at issue in this case. Dkt. No. 233 at 3. That proposed rule was published in the Federal Register for notice and comment on February 14, 2019. Revised Definition of "Waters of the United States," 84 Fed. Reg. 4154 (Feb. 14, 2019) (to be codified at 33

---

[4] See Compl., New York v. Pruitt, No. 1:18-cv-1030-JPO (S.D.N.Y. Feb. 7, 2018); Compl., Nat. Res. Def. Council, Inc. v. E.P.A., No. 1:18-cv-1048-JPO (S.D.N.Y. Feb. 6, 2018); Compl., S.C. Coastal Conservation League v. Pruitt, No. 2:18-cv-330-DCN (D.S.C. Feb. 6, 2018); Puget Soundkeeper All. v. Wheeler, 2:15-cv-01342-JCC (W.D.W. Aug. 20, 2015).

C.F.R. pt. 328). Finally, on May 28, 2019, the District Court for the Southern District of Texas found that the WOTUS Rule violated the APA and remanded the Rule to the Agencies. Texas v. United States Envtl. Prot. Agency, No. 3:15-CV-00162, 2019 WL 2272464, at *1 (S.D. Tex. May 28, 2019).

## STANDARD OF REVIEW

Because the CWA does not provide a separate standard of review of EPA decisions, judicial review of final EPA actions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 623 (2018). Under the APA, a court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observation of procedure required by law." 5 U.S.C. § 706(2).

"[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Challenges to agency action under the APA are properly adjudicated on cross-motions for summary judgment. See, e.g., Fla. Fruit & Vegetable Ass'n v. Brock, 771 F.2d 1455, 1459 (11th Cir. 1985) ("The summary judgment procedure is particularly appropriate in cases in which the court is asked to review . . . a decision of a federal administrative agency."). However, the standards set forth in Federal Rule of Civil

Procedure 56 do not apply. <u>Fulbright v. McHugh</u>, 67 F. Supp. 3d 81, 89 (D.D.C. 2014), <u>aff'd sub nom.</u> <u>Fulbright v. Murphy</u>, 650 F. App'x 3 (D.C. Cir. 2016) (explaining that although "summary judgment is an appropriate procedure for resolving" APA challenges, "the standard set forth in Rule 56(a) does not apply"). Therefore, "[a]t the summary judgment stage [of APA challenges] the court does not look at whether there is a genuine issue of material fact, but instead turns directly to the question of the validity of the challenge." <u>Malladi v. Brown</u>, 987 F. Supp. 893, 922 (M.D. Ala. 1997), <u>aff'd sub nom.</u> <u>United States v. Ponder</u>, 150 F.3d 1197 (11th Cir. 1998). The Court's judicial review in this case is limited to the administrative record. <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.")

## DISCUSSION

The Plaintiffs raise various substantive and procedural challenges against the WOTUS Rule. Before reaching those issues, the Court will determine in Section I whether the Plaintiffs' challenges in this case are ripe. Proceeding to the merits of the challenges, the Court will analyze the Plaintiffs' arguments under the CWA in Section II. In Section III, the Court will address Plaintiffs' procedural challenges to the WOTUS Rule under the APA. Finally, the Court will address the constitutional challenges to the Rule in Section IV.

## I.  Ripeness

Before reaching the merits of this case, the Court must first determine whether this case is ripe for review.  The Agencies argue that the case is not ripe and that the Court should decline to decide the case on the merits because the WOTUS Rule is currently stayed under this Court's preliminary injunction and the Agencies are actively working to repeal the WOTUS Rule and replace it with a new rule.  In other words, the Agencies contend that this case is not prudentially ripe.  Plaintiffs argue that this case is ripe because a final rule has been promulgated, the WOTUS Rule would otherwise be in effect if not for this Court's preliminary injunction, and therefore, a live case and controversy exists.  After considering these arguments, the Court determines that the case is ripe for review.

The Court first notes that the Supreme Court has relatively recently called the prudential ripeness doctrine into question (although it has declined to directly address the matter).  The Supreme Court has stated that the doctrine "is in tension with our recent affirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014) (citations omitted); see also Fla. Panthers v. Collier Cty., Fla., No. 213CV612FTM29DNF, 2016 WL 1394328, at *11 (M.D. Fla. Apr. 8, 2016) ("[T]he Court also rejects plaintiffs' reliance on 'prudential' principles relating to ripeness. A unanimous Supreme Court has retreated from 'prudential' standing principles not founded on Article III requirements, and the Supreme Court has declined to consider the continuing vitality of the prudential

ripeness doctrine where there was a sufficient Article III injury." (citations omitted)).  Additionally, the Supreme Court in addressing the jurisdictional issues involving judicial review of the WOTUS Rule stated that "[b]ecause the WOTUS Rule remains on the books for now, the parties retain 'a concrete interest' in the outcome of this litigation, and it is not 'impossible for a court to grant any effectual relief . . . to the prevailing party,'" and that this remained true even if the Agencies finalized and implemented the Applicability Rule.  Nat'l Ass'n of Mfrs., 138 S. Ct. at 627 (citation omitted).  Thus, it appears that this Court can and should decide this case, despite the Agencies' prudential ripeness arguments.

Nevertheless, even under the prudential ripeness doctrine, the Court determines that the challenge to the WOTUS Rule in this case is ripe for review.  The prudential ripeness doctrine is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807–08 (2003).  "Determining whether administrative action is ripe for judicial review requires [the Court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Id. at 808.  In applying these two prongs, courts also consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with

further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Pittman v. Cole, 267 F.3d 1269, 1278 (11th Cir. 2001) (citations omitted).

Turning to the fitness prong, this case is fit for review. The Eleventh Circuit has explained that the need for factual development and interference with administrative procedures, specifically before an agency has the opportunity to finalize its policies, raise fitness concerns. Pittman, 267 F.3d at 1278. However, no such fitness concerns exist in this case. First, the WOTUS Rule is a final agency action because it is a rule that has been promulgated through notice and comment rulemaking, and it would be in effect in the Plaintiff States if not for this Court's preliminary injunction. Second, there is no need for further factual development in this case. Cf. Nat'l Park Hosp. Ass'n, 538 U.S. at 812 (finding case not fit for review where despite the agency action being final, factual development would "significantly advance [the Court's] ability to deal with the legal issues presented" (citation omitted)). The Court has the benefit of a very detailed administrative record, Supreme Court precedent directly on point, and the Parties' briefs which highlight and organize the substantive and procedural issues before the Court in this case. Third, the Court's adjudication of this case would not interfere with administrative procedures, especially in light of its ultimate remedy; rather, it would assist in clarifying the substantive and procedural problems with the WOTUS Rule, many of which the Agencies highlight in their brief in pointing to the proposed repeal of the WOTUS Rule. See Dkt. No. 219 at 14. The Agencies argue that the Court would interfere because the Agencies are working to repeal and

replace the WOTUS Rule. However, the Court finds that ruling on the merits while also tailoring the remedy to avoid unnecessary interference with the administrative process will both serve the Court's role to adjudicate cases before it and assist in the Agencies' ongoing administrative proceedings involving the WOTUS Rule.

As for hardship, the Eleventh Circuit has explained that "[w]here . . . there are no significant agency or judicial interests militating in favor of delay, [lack of] 'hardship' cannot tip the balance against judicial review." Harrell v. Fla. Bar, 608 F.3d 1241, 1259 (11th Cir. 2010). Still, Plaintiffs can satisfy the hardship prong. The WOTUS Rule is a final agency rule that expands the scope of federal jurisdiction over waters of the United States, which, in combination with the permitting requirements of the CWA, would cause significant and unrecoverable economic harm to the State Plaintiffs if they were forced to comply with the Rule. As detailed in this Court's preliminary injunction, adhering to the WOTUS Rule would cost the State Plaintiffs millions of dollars in unrecoverable funds, not to mention the unrecoverable loss of state sovereignty. See Dkt. No. 174 at 19.

The Agencies argue that Plaintiffs are not currently harmed by the WOTUS Rule because it has been enjoined by this Court. While this is technically true, it does not mean that the Plaintiffs do not have a right to challenge the merits of an allegedly unlawful rule heard and considered. Moreover, preliminary injunctions are "by [their] very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive." Eastman Kodak Co. v. Fotomat

Corp., 317 F. Supp. 304, 325 (N.D. Ga. 1969). They are not meant to be final decisions. Thus, while this Court's remedy will keep the preliminary injunction in place, it does so only after the Court has fully addressed the merits of Plaintiffs' challenge and only to allow the administrative process to play out in light of this decision. Therefore, the Court will adhere to its virtually unflagging obligation to hear and decide this case while also balancing that obligation with the realities of the ongoing administrative process.

## II. CWA

Plaintiffs bring several challenges against the WOTUS Rule under the CWA. Specifically, Plaintiffs argue that the Rule is unlawful under the CWA because, based on the Supreme Court's interpretation of the CWA, the Rule extends the Agencies' jurisdiction over water and land in the United States beyond their delegated authority provided by the Act. Plaintiffs argue that the WOTUS Rule is unlawful under the CWA with respect to its definitions of interstate waters, tributaries, adjacent waters, and case-by-case waters. Additionally, Plaintiffs argue that the WOTUS Rule violates the CWA because it significantly interferes with land and waters traditionally under state authority without clear intent from Congress to allow that interference. After carefully reviewing the administrative record, the Court finds that the WOTUS Rule violates the CWA.

### A. Background on Supreme Court's Interpretation of the CWA

On a few occasions, the Supreme Court has interpreted the breadth of federal jurisdiction within the term "navigable waters" in the CWA.

The first was in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121 (1985). In Riverside Bayview, "the Court upheld the Corps' jurisdiction over wetlands adjacent to navigable-in-fact waterways." Rapanos, 547 U.S. at 766 (Kennedy, J., concurring) (citing Riverside Bayview, 474 U.S. at 139). The case involved a wetland that directly abutted a navigable-in-fact creek that fed into Lake St. Clair, and the Court held that "the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act." Riverside Bayview, 474 U.S. at 131, 134. "The Court reserved, however, the question of the Corps' authority to regulate wetlands other than those adjacent to open waters." Rapanos, 547 U.S. at 766 (Kennedy, J., concurring) (citing Riverside Bayview, 474 U.S. at 131-132, n.8).

About fifteen years later, in Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers ("SWANCC"), 531 U.S. 159, 162 (2001), the Court addressed whether "navigable waters" as defined in the CWA extended to "an abandoned sand and gravel pit in northern Illinois which provid[ed] habitat for migratory birds." The land at issue in SWANCC was a long-abandoned sand and gravel pit mining operation that had given way to a "successional stage forest, with its remnant excavation trenches evolving into a scattering of permanent and seasonal ponds." Id. at 163. The Corps asserted jurisdiction over these ponds when the plaintiff applied for a permit to dispose nonhazardous solid waste on the site. The Corps based its jurisdiction on the Migratory Bird Rule which classified the ponds as "waters of the United States"

because they were "used as habitat by other migratory birds which cross state lines." Id. at 163-64 (quoting 51 Fed. Reg. 41206, 41217 (Nov. 13, 1986) (to be codified at 33 C.F.R. pts. 320-30)). Distinguishing the facts of SWANCC from the prior holding of Riverside Bayview, the Court stated that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in Riverside Bayview." Id. at 167. The Court found that extending jurisdiction under the CWA to isolated, intrastate ponds based on their use as a habitat for migratory birds would read "the term 'navigable waters' out of the statute," thereby violating the plain language of the CWA. Id. at 172. The Court reasoned that although it had said in Riverside Bayview that the word "navigable" was of "limited import," it "is one thing to give a word a limited effect and quite another to give it no effect whatever." Id. (citing Riverside Bayview, 474 U.S. at 133).

Five years later, the Court issued its most recent decision on the scope of the CWA's coverage of "navigable waters" in Rapanos v. United States, 547 U.S. at 715. At issue in Rapanos was the Corps' assertion of jurisdiction—based on its then definition of "waters of the United State"—over wetlands adjacent to tributaries that eventually empty into traditional navigable waters. The Court failed to reach a majority opinion. A four-justice plurality found that the "Corps' expansive interpretation of . . . waters of the United States is . . . not based on a permissible construction of the [CWA]" and held that waters of the United States only included "relatively permanent, standing or continuously flowing bodies of water" and that only wetlands with a continuous surface connection to those relative permanent waters could

be considered "adjacent" under the CWA. Id. at 739, 742. A four-justice dissent deferred to the Corps' broad interpretation of the CWA finding that the assertion of jurisdiction over wetlands adjacent to other waters, including tributaries, was reasonable under the statute. Id. at 787-88 (Stevens, J., dissenting).

Justice Kennedy wrote a concurring opinion that was more limited than the dissent's expansive reading but also broader than the plurality's narrow reading. Taking language from SWANCC, he established a different rule: the significant-nexus test. Summarizing the Court's prior cases on the issue, Justice Kennedy explained that

> [t]aken together these cases establish that in some instances, as exemplified by Riverside Bayview, the connection between a nonnavigable water or wetland and a navigable water may be so close, or potentially so close, that the Corps may deem the water or wetland a "navigable water" under the Act. In other instances, as exemplified by SWANCC, there may be little or no connection. Absent a significant nexus, jurisdiction under the Act is lacking.

Id. at 767 (Kennedy, J., concurring). Justice Kennedy held that wetlands possess a significant nexus, "and thus come within the statutory phrase 'navigable waters,'" when they, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at 780 (Kennedy, J., concurring). In contrast, when "'wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Id.

Based on this rule, Justice Kennedy held—based on the reasonable inference of ecologic interconnection—that the Corps' assertion of

jurisdiction over wetlands adjacent to navigable-in-fact waters was lawful under Riverside Bayview. But, he also found that while the Corps could "identify categories of tributaries that, due to their volume of flow . . . , their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases," to have a significant nexus to navigable waters, the "Corps' existing standard for tributaries . . . provides no such assurance." Id. at 781 (Kennedy, J., concurring). He found that the Corps' existing definition of tributaries, which included waters that "feed[] into a traditional navigable water (or tributary thereof) and possess an [OHWM]," was so broad that it left "wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it." Id. As a result, he found that the breadth of that definition of tributaries "preclud[ed] its adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." Id. Under that standard, he found that "in many cases" wetlands adjacent to tributaries would be "little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act's scope in SWANCC." Id. at 781-82 (Kennedy, J., concurring). Therefore, Justice Kennedy concluded that "[a]bsent more specific regulations . . ., the Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries." Id. at 782 (Kennedy, J., concurring).

Despite the Supreme Court's failure to reach a majority opinion in Rapanos, the Eleventh Circuit has determined that Justice Kennedy's concurring opinion controls. United States v. Robinson, 505 F.3d 1208, 1221 (2007) ("[W]e join the Seventh and Ninth Circuits' conclusion that Justice Kennedy's 'significant nexus' test provides the governing rule of Rapanos."). Thus, the Court is bound to apply Justice Kennedy's significant-nexus test to the WOTUS Rule in this case. See id. at 1222 ("[U]nder Justice Kennedy's concurrence, a water can be considered 'navigable' under the CWA only if it possess a 'significant nexus' to waters that 'are or were navigable in fact or that could reasonably be so made.'" (quoting Rapanos, 547 U.S. at 759 (Kennedy, J., concurring))).

### B. Judicial Review of Agency Action and Deference under CWA

Before getting to the merits of Plaintiffs' challenges to the WOTUS rule under the CWA, the Court must first determine what type of judicial review to apply to these claims. The parties sharply disagree on this matter. Plaintiffs couch their arguments against the WOTUS Rule in terms of the Rule violating the CWA and exceeding the Agencies' authority under the CWA, and they contend that the Agencies' interpretation of the CWA in the Rule is not entitled to Chevron deference. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). Intervenor Defendants articulate their defense of the Rule in terms of highly deferential arbitrary and capricious review and assert that the WOTUS Rule is entitled to Chevron deference.

The Court first determines that the challenge in this case under the CWA is properly characterized as a challenge to the Agencies'

authority under the CWA and its interpretation of "waters of the United States." In other words, the issues under the CWA are those of law and statutory interpretation. As such, Plaintiffs' challenges under the CWA most aptly fall under the APA as claims that an agency action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" rather than claims that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). Therefore, the Court must determine if the Agencies' interpretation of the phrase "waters of the United States" exceeded their statutory authority by extending their jurisdiction over waters beyond those which Congress intended the CWA to cover.

Because this case involves the Agencies' interpretation of the CWA, it invokes the well-known Chevron deference standard. See Chevron, 467 U.S. at 843. The Chevron doctrine can be summarized as follows:

> First, applying the ordinary tools of statutory construction, the court must determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

City of Arlington, Tex. v. F.C.C., 569 U.S. 290, 296 (2013). However, Chevron's application in this case is not so straightforward. First, "[i]t goes without saying that if an agency action exceeds its statutory authority, the agency is entitled to no deference under Chevron." Glob. Tel*Link v. Fed. Commc'ns Comm'n, 866 F.3d 397, 417 (D.C. Cir. 2017). Therefore, while it is clear that the Agencies had authority to pass

regulations interpreting the phrase "waters of the United States," that authority is not limitless. Second, the Court is not "obliged to defer to an agency's interpretation of Supreme Court precedent under Chevron or any other principle." Akins v. Fed. Election Comm'n, 101 F.3d 731, 740 (D.C. Cir. 1996) (en banc), vacated on other grounds, 524 U.S. 11, 13 (1998); see also Employer Sols. Staffing Grp. II, L.L.C. v. Office of Chief Admin. Hearing Officer, 833 F.3d 480, 484 (5th Cir. 2016) ("[A]n agency's interpretations of caselaw are reviewed de novo."). Thus, the Agencies' interpretation of Justice Kennedy's significant-nexus test, or any other part of his opinion in Rapanos, is not entitled to deference.

To the extent that Chevron does apply to the Agencies' interpretations of the CWA in the WOTUS Rule, the plurality and Justice Kennedy in Rapanos make clear that any deference owed to those interpretations has limits. Justice Scalia, writing for the plurality, ruled that "waters of the United States . . . does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." Rapanos, 547 U.S. at 739. Based on this rule, he quoted Chevron when he concluded that "[t]he Corps' expansive interpretation of 'the waters of the United States' is thus not 'based on a permissible construction of the statute.'" Id. (quoting Chevron, 467 U.S. at 843). Furthermore, in criticizing the dissent's deference to the Corps, Justice Scalia conceded that "'waters of the United States' is in some respects ambiguous" but found that "[t]he scope of that ambiguity . . . does not conceivably extend to whether storm drains and dry ditches are 'waters,' and hence does not support the Corps' interpretation." Id. at 752 (emphasis in original).

He also criticized Justice Stevens' dissent by stating that "[h]is error consists of giving that agency more deference than reason permits." Id. at 756. Justice Roberts, in his concurrence, recognized that agencies had "generous leeway" to interpret statutes and that "[g]iven the broad, somewhat ambiguous, but nonetheless clearly limiting terms Congress employed in the [CWA], the Corps and the EPA would have enjoyed plenty of room to operate in developing some notion of an outer bound to the reach of their authority." Id. at 758 (Roberts, J., concurring). However, he found that "[r]ather than providing guidance meriting deference under our generous standards, the Corps chose to adhere to its essentially boundless view of the scope of its power." Id. Finally, Justice Kennedy believed that the plurality's limits under the CWA gave "insufficient deference . . . to the authority of the Executive to implement [the CWA]," but he also found that the dissent's deference to the Corps extended too far. Id. at 778 (Kennedy, J., concurring). Specifically, he found that "the dissent would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters," and concluded that "the deference owed to the Corps' interpretation of the statute does not extend so far." Id.

What these statements from Rapanos show is that, despite the deferential standard of Chevron, both the plurality and Justice Kennedy understood the CWA to have limits on how far the Agencies could extend their jurisdiction over waters through interpreting the CWA. Although the plurality and Justice Kennedy disagreed with what those limits were, for the purposes of this case, the limits of Justice Kennedy's

25

significant-nexus test apply.  See Robinson, 505 F.3d at 1221 (holding that Justice Kennedy's opinion in Rapanos is controlling).  As such, this Court must review the WOTUS Rule's interpretation of "waters of the United States" in light of those limits to the CWA.  In doing so, the Court determines that the WOTUS Rule extends jurisdiction over "remote and insubstantial" waters, which under Justice Kennedy's opinion in Rapanos, is not a "permissible construction of the statute."  Rapanos, 547 U.S. at 739 (citation omitted).  Thus, the Court finds, like Justice Kennedy, that "[t]he deference owed to the Corps' interpretation of the statute does not extend so far."  Rapanos, 547 U.S. at 779 (Kennedy, J., concurring).

### A. Interstate Waters

Plaintiffs first challenge the WOTUS Rule's definition of interstate waters arguing that the Agencies exceeded their statutory authority under the CWA by asserting jurisdiction over all interstate waters, including non-navigable interstate waters.  Defendants argue that Plaintiffs' challenge of the interstate waters definition is time-barred because the WOTUS Rule did not change that definition, and even if Plaintiffs' challenge is not time-barred, the Intervenor Defendants argue that the definition is lawful under the CWA.  The Court will first address the procedural time-bar issue before proceeding to the merits of the interstate waters definition.

**1. Plaintiffs' challenge to the WOTUS Rule's definition of interstate waters is timely**

Plaintiffs' challenge to the WOTUS Rule's definition of interstate waters is timely because the Agencies reopened the issue in the Proposed Rule. The general rule is that suits challenging final agency actions under the APA must be filed within six years of the right of action accruing. See 28 U.S.C. § 2401(a); Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 626-27 (2018) (explaining that challenges to final agency actions under the APA "must be filed within six years after the claim accrues"). "The right of action first accrues on the date of the final agency action." Washington All. of Tech. Workers v. United States Dep't of Homeland Sec., 892 F.3d 332, 342 (D.C. Cir. 2018). For rulemaking, the date of the final agency action is the date a final rule is promulgated. See id. ("The 1992 Rule was unquestionably final agency action."). Here, interstate waters have been included in the definition of waters of the United States since early agency regulations dating back to 1978, see 33 C.F.R. § 323.2(a)(4) (1978) ("The term 'waters of the United States' means . . . Interstate waters and their tributaries, including adjacent wetlands . . . ."), and the specific regulatory text on interstate waters has not changed since 1983, 33 C.F.R. § 323.2(a)(2) (1983) (defining waters of the United States as including "[a]ll interstate waters including interstate wetlands"). Therefore, the six-year window to challenge the statutory authority of the interstate waters definition closed, at the very latest, in 1983.

However, an agency can reopen a previously decided final action even if the statute of limitations has run.  As the D.C. Circuit has explained, the "[reopening] doctrine arises where an agency conducts a rulemaking or adopts a policy on an issue at one time, and then in a later rulemaking restates the policy or otherwise addresses the issue again without altering the original decision." Washington All. of Tech. Workers, 892 F.3d at 345 (citation omitted).  "If the reopening doctrine applies, it 'allows an otherwise stale challenge to proceed because the agency opened the issue up anew, and then reexamined and reaffirmed its prior decision.'" Id. at 346 (quoting P&V Enters. v. Army Corps of Eng'rs, 516 F.3d 1021, 1023 (D.C. Cir. 2008)).  In Ohio v. E.P.A., 838 F.2d 1325, 1328 (1988), the D.C. Circuit held that an agency had reopened a previously decided issue when four factors were present:  "the agency (1) proposed to make some change in its rules or policies, (2) called for comments only on new or changed provisions, but at the same time (3) explained the unchanged, republished portions, and (4) responded to at least one comment aimed at the previously decided issue." Pub. Citizen v. Nuclear Regulatory Comm'n, 901 F.2d 147, 150–51 (D.C. Cir. 1990) (citing Ohio, 838 F.2d at 1328).  But, a year later, the same court limited its holding in Ohio v. E.P.A. stating that the rule in that case "is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency has re-opened the issue." Am. Iron & Steel Inst. v. E.P.A., 886 F.2d 390, 398 (D.C. Cir. 1989).  Taking these two decisions together, the D.C. Circuit has explained the rule as follows:

> the crucial question . . . is whether an agency has in fact
> reopened an issue, explicitly or implicitly; the four factors
> mentioned in [Ohio v. E.P.A.] are indeed relevant evidence of
> reopening, but the court cannot stop there. It must look to
> the entire context of the rulemaking including all relevant
> proposals and reactions of the agency to determine whether an
> issue was in fact reopened.

Pub. Citizen, 901 F.2d at 150.

Considering the four factors in Ohio v. E.P.A. in light of the entire context of the rulemaking, the Court determines that the Agencies reopened the issue of the definition of interstate waters in this case. Here, all four of the factors from Ohio v. E.P.A. are met. The agencies (1) proposed to make changes to the definition of waters of the United States, (2) called for comments only on new or changed provisions, 79 Fed. Reg. at 22200, but at the same time (3) took seven pages of the Proposed Rule to explain and justify the continued inclusion of all interstate waters, regardless of navigability or flow, in the WOTUS Rule, id. at 22200-01, 22254-59, and (4) responded to comments that asserted "that interstate waters required a significant nexus to traditional navigable waters to be jurisdictional after Rapanos" by stating that the Agencies "disagreed" for the "reasons described above, Appendix B to the proposed rule, and in the Technical Support Document," 80 Fed. Reg. at 37075. However, the Court must break this analysis down further by analyzing these factors in light of the entire context of the rulemaking process of the WOTUS Rule.

On one hand, the Agencies specified in the Proposed Rule and reaffirmed in the Final Rule that the WOTUS Rule did not change the existing inclusion of interstate waters in the definition of waters of

the United States. 79 Fed. Reg. at 22200 ("The existing EPA and Corps regulations define 'waters of the United States' to include interstate waters, including interstate wetlands and the agencies' proposal today does not change that provision of the regulations."); 80 Fed. Reg. at 37074 (same); see also 79 Fed. Reg. at 22254 ("The agencies' proposal today makes no change to the interstate waters section of the existing regulations and the agencies would continue to assert jurisdiction over interstate waters, including interstate wetlands."). Moreover, the definition of interstate waters had been included in the definition of waters of the United States at least since 1983. See 33 C.F.R. § 323.2(a)(2) (1983).

However, on the other hand, the Agencies spent considerable effort defending, justifying, and advocating for the inclusion of all interstate waters in the definition of waters of the United States in the Proposed Rule. Specifically, the Agencies advocated for continuing to include all interstate waters in light of the Supreme Court's decision in Rapanos and for basing the new definitions of tributaries, adjacent waters, and case-by-case waters, in part, on interstate waters. At the beginning of the Proposed Rule, the Agencies stated that they were seeking public comment on a "proposed rule defining the scope of waters protected under the Clean Water Act (CWA), in light of the U.S. Supreme Court cases in U.S. v. Riverside Bayview, . . . Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers (SWANCC), and Rapanos v. United States (Rapanos)." 79 Fed. Reg. at 22188. In this context of Supreme Court precedent on the definition of waters of the United States, the Agencies spent significant effort arguing that the continued inclusion

of all interstate waters was justified under that precedent.  In Appendix B to the Proposed Rule, the Agencies argued that the CWA's language, structure, and legislative history justified including all interstate waters, that Supreme Court precedent justified including all interstate waters without regard to navigability, that the SWANCC and Rapanos decisions did not constrain the Agencies' jurisdiction over non-navigable interstate waters, and that the Agencies had long included interstate waters in their own interpretations of the term "navigable waters."   79 Fed. Reg. at 22254-59.   But, despite this lengthy substantive argument for including the definition of interstate waters, the Agencies maintained that this definition was not being changed by the Proposed Rule and now argue that they did not reopen the issue.

Looking at the entire context, the Agencies reopened the issue of interstate waters.  First, despite the Agencies stating that they were not changing the inclusion of interstate waters in the definition of waters of the United States, they spent significant effort justifying that decision in light of recent Supreme Court precedent—likely realizing that such precedent called into question the inclusion of such waters regardless of navigability.  In American Iron and Steele Institute, the court found that the proposed rule in that case "lacked any sustained attempt to reiterate the reasons" it had given to justify the provision at issue in the prior regulation.  886 F.2d at 398.  Here, the roughly seven-page[5] defense of the continued inclusion of interstate waters was

---

[5] "Seven pages" fails to accurately describe the extensive discussion in Appendix B advocating for the inclusion of interstate waters in the WOTUS Rule.  The discussion extends for over eight sections and subsections and fifty paragraphs. The point being, the discussion defending interstate waters in the Proposed

more than a "sustained attempt" to justify that inclusion.  Second, the
Agencies responded, albeit very briefly, to comments arguing that
interstate waters also had to have a significant nexus to navigable
waters after Rapanos.  After summarizing the legal arguments put forth
in the Proposed Rule justifying the inclusion of interstate waters, the
Agencies responded that they "disagree for the reasons described above,
in Appendix B to the proposed rule, and in the Technical Support
Document."  80 Fed. Reg. at 37075; see also, Clean Water Rule Comment
Compendium Topic 2: Traditional Navigable Waters (TNWs), Interstate
Waters, Territorial Seas, and Impoundments at 54-76,
https://www.epa.gov/sites/production/files/2015-06/documents/cwr_respo
nse_to_comments_2_tnw.pdf (stating in the "summary response" that the
rule "does not change that provision of the regulations" but then
responding to comments by saying "See Summary Response, TSD and
Preamble").  Importantly, the Agencies pointed back to the Technical
Support document and the seven-page defense of the inclusion of
interstate waters in the Proposed Rule.  Finally, interstate waters are
one of the key elements of the larger WOTUS Rule scheme.  Jurisdiction
over tributaries, adjacent waters, and case-by-case waters is based, in
part, on those three categories' connections to interstate waters.
Indeed, the Agencies justify basing these categories off of non-navigable
interstate waters in the Proposed Rule.  See 79 Fed. Reg. at 22200.  As
a result, continued inclusion of non-navigable interstate waters creates
broader federal jurisdiction when combined with those other categories.

---

Rule is enough to constitute its own law review article on the subject.  See 79
Fed. Reg. at 22254-59.

Thus, looking at the entire context, the Agencies' significant effort to justify the continued inclusion of non-navigable interstate waters in the definition of waters of the United States in light of Supreme Court precedent on the issue and their response to comments pointing to the merits of their prior justifications demonstrate that the Agencies, despite their attempt to avoid comments on the issue by saying that the definition had not changed, did in fact reopen the issue of the inclusion of all interstate waters.  The Agencies did not say that the issue is not being changed and leave it at that; rather, they spent considerable ink arguing that the continued inclusion of all interstate waters in the new definitional scheme was proper and lawful under the CWA and Supreme Court precedent.  This "sustained attempt" in the Proposed Rule and the response to comments on the issue in the Final Rule make it clear that this issue was reopened for challenge. Therefore, Plaintiffs' arguments regarding the inclusion of all interstate waters regardless of navigability is not time-barred.

### 2. The WOTUS Rule's definition of interstate waters reads navigability out of the CWA

Turning to the merits of Plaintiffs' challenge to interstate waters, the inclusion of all interstate waters in the definition of "waters of the United States," regardless of navigability, extends the Agencies' jurisdiction beyond the scope of the CWA because it reads the term navigability out of the CWA.  As Justice Kennedy points out in Rapanos, "in enacting the [CWA] Congress intended to regulate at least some waters that are not navigable in the traditional sense."  547 U.S. at 767 (Kennedy, J., concurring).  However, he also points out that "the

word 'navigable' in the Act must be given some effect." Id. at 779 (Kennedy, J., concurring). Here, just like the dissent in Rapanos that Justice Kennedy criticized, the Agencies' interpretation of the CWA to include jurisdiction over all interstate waters regardless of navigability reads out the "central requirement" that "the word 'navigable' . . . be given some importance." Id. at 778 (Kennedy, J., concurring).

The Agencies' assertion of jurisdiction over all interstate waters is not a permissible construction of the CWA because they assert jurisdiction over waters that are not navigable-in-fact and otherwise have no significant nexus to any other navigable-in-fact water. Specifically, the WOTUS Rule states that Agencies have jurisdiction over all interstate waters "even if they are not navigable" and even if they "do not connect to such [navigable] waters." 80 Fed. Reg. at 37, 074. Therefore, under this definition of interstate waters, any interstate water, regardless of navigability, flow, or effect on the chemical, physical, or biological integrity of a navigable-in-fact water (a "significant nexus") is included under the definition of waters of the United States. Under such a broad definition, a mere trickle, an isolated pond, or some other small, non-navigable body of water would be under federal jurisdiction simply because it crosses a state line or lies along a state border. Because this broad definition would include waters that have little or no connection to navigable-in-fact waters like the ponds in SWANCC, the inclusion of all interstate waters violates the significant-nexus test and therefore exceeds the Agencies' authority

under the CWA. Rapanos, 547 U.S. at 767 ("Absent a significant nexus, jurisdiction under the Act is lacking.").

The inclusion of all interstate waters in the definition of waters of the United States also exceeds the Agencies' statutory authority for another reason: the other categories of waters in the WOTUS Rule (tributaries, adjacent waters, and case-by-case waters) are based on, at least in part, interstate waters. Thus, a tributary, adjacent water, or case-by-case water with a connection to a non-navigable interstate water, such as an isolated pond along a state line, would also be under federal jurisdiction. For example, under the WOTUS Rule, the Agencies could assert jurisdiction over an isolated non-navigable water that is within 100 feet of a mere trickle across a state line or pond sitting on a state line or over a water that is within the 100-year floodplain and within 1,500 feet of that interstate trickle or pond. See Rapanos 547 U.S. at 769 (Kennedy, J., concurring) (stating that the plurality's test "makes little practical sense in a statute concerned with downstream water quality" when it would include "the merest trickle" but not other types of water). Moreover, under the case-by-case category, the Agencies can assert jurisdiction over a water that is within 4,000 feet of the OHWM of an interstate water so long as the agency finds a significant nexus to that interstate water. So, hypothetically, it appears that the Agencies could assert jurisdiction over an isolated pond, stream, drain, or ditch that is within 4,000 feet of a non-navigable, isolated interstate water, based on a significant nexus to that interstate water such as a nexus based on the "provision of life cycle dependent aquatic habitat . . . for species located in the water." 33 C.F.R. § 328.3(c)(5).

In other words, this definition could, for example, include "the isolated ponds held to fall beyond the Act's scope in SWANCC." Rapanos, 547 U.S. at 782 (Kennedy, J., concurring). Therefore, "the breadth of this standard" for interstate waters without regard to navigability or significant nexus to a navigable water, "which seems to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water . . . precludes its adoption" as a per se category of waters of the United States. Id. at 781 (Kennedy, J., concurring). Thus, the Agencies' inclusion of all interstate waters within the definition of waters of the United States in the WOTUS Rule extends beyond their authority under the CWA.

## B. Tributaries

Plaintiffs also challenge the WOTUS Rule's definition of tributaries as impermissible under the CWA. Specifically, Plaintiffs argue that the definition of tributaries is overbroad in its use of OHWM and bed and banks as physical indicators of volume and regularity of flow and in its application in places like the Arid West. The Intervenor Defendants respond that the definition of tributaries is based on extensive scientific research which found that tributaries, as defined in the Rule, have a significant effect on the physical, chemical, and biological integrity of navigable waters. Looking to Justice Kennedy's opinion in Rapanos, the Court finds that the Agencies' assertion of jurisdiction over all tributaries as defined in the WOTUS Rule is an impermissible construction of the CWA.

The WOTUS Rule defines waters of the United States to include "[a]ll tributaries" of primary waters. 33 C.F.R. § 328.3(a)(5). The

Rule defines tributaries as "a water that contributes flow, either directly or through another water" to a primary water "that is characterized by the presence of the physical indicators of a bed and banks and an [OHWM]." Id. § 328.3(c)(3). The definition states that the OHWM and the bed and banks "demonstrate there is volume, frequency, and duration of flow sufficient" to "qualify as a tributary." Id. The definition also explains that a tributary does not lose its status as a covered water if there are breaks in it—such as bridges, pipes, dams, wetlands, debris piles, boulder fields, etc.—so long as the physical indicators can be identified upstream of the break. Id. An OHWM is defined as

> that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

33 C.F.R. § 328.3.

The first two problems with the WOTUS Rule's definition of tributaries are the use of the OHWM and a bed and banks as physical indicators of sufficient volume and flow and how those indicators are determined. At the time of Rapanos, "the Corps deem[ed] water a tributary if it [fed] into a traditional navigable water (or a tributary thereof) and possesse[d] an [OHWM]." 547 U.S. at 781 (Kennedy, J., concurring). Justice Kennedy recognized that the presence of an OHWM "presumably provides a rough measure of the volume and regularity of flow." Id. He also noted that when that standard was applied consistently—although he hinted that it might not have been—"it may well

provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters'" under the CWA. Id. The Agencies continued to utilize an OHWM in the WOTUS Rule's definition of tributary in combination with the bed and banks requirement. See 80 Fed. Reg. at 37076 ("[T]he rule requires two physical indicators of flow: There must be a bed and banks and an indicator of [OHWM]."). Specifically, the Rule states that "[a] bed and banks and other indicators of [OHWM] are physical indicators of water flow and are only created by sufficient and regular intervals of flow." Id. The issue, however, is that despite the Rule's assertion that these physical indicators ensure sufficient and regular flow—and thus a significant nexus to downstream navigable waters—the Rule later explains that these indicators need not actually be physically present but can instead be determined from computer-based models, historical data, and mapping technology.

The WOTUS Rule explains that "desktop tools" are critical to identifying OHWMs and bed and banks when the physical characteristics of those physical indicators are "absent in the field." Id. at 37078. The Rule states that "[i]n such cases where physical characteristics of bed and banks and another indicator of [OHWM] no longer exist, they may be determined by using other appropriate means that consider the characteristics of the surrounding areas." Id. These other "means" of showing the "prior existence" of these physical indicators "include but are not limited to . . . lake and stream gage data, elevation data, spillway height, historic water flow records, flood predictions, statistical evidence, the use of reference conditions, or through the

38

remote sensing and desktop tools described above." Id. Thus, the physical indicators that the Agencies assert provide evidence of sufficient volume and flow to adhere to Justice Kennedy's significant-nexus test need not actually be physically present in a geographic area so long as computer programs can decipher that they exist and need not presently exist so long as those programs can conclude that they have existed at sometime in the past. This contradiction shows a departure from Justice Kennedy's test.

This definition and method of determining tributaries would allow tributaries, "however remote and insubstantial," to be included within the definition of waters of the United States. Rapanos, 547 U.S. at 778 (Kennedy, J., concurring). Justice Kennedy's opinion in Rapanos requires that minor, non-navigable tributaries have a significant nexus to other covered waters. He stated that a water that possesses an OHWM could, with a "reasonably consistent application," meet that significant-nexus test. Id. at 781 (Kennedy, J., concurring). However, the WOTUS Rule's inclusion of waters that do not presently have an OHWM or bed and banks but through computer programs could be determined to have possessed those characteristics in the past stretches the Agencies' jurisdiction to cover waters or land that, at present, in the field, bear no evidence of regularity or volume of flow—factors demonstrating a significant nexus under Kennedy's opinion. So on one hand, the Agencies rely on the physical indicators as evidence of a significant nexus (because they show regularity and volume of flow) to defend the definition of tributaries, but on the other, they say that these indicators need not be physically, or currently, present in a certain location so long as

they can be found to exist or to have previously existed using computer technology, statistics, and historical data. The "breadth of this standard . . . seems to leave wide room for regulation of drains, ditches,[6] and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it," thus extending the Agencies' jurisdiction well beyond what is allowed under Justice Kennedy's interpretation of the CWA. Id.

The next problem with the definition of tributaries is its application in the Arid West. Plaintiffs and Intervenor Defendants spar over the issue of whether infrequent or one-time extreme weather events can cause the physical indicators of a tributary to appear in parts of the Arid West despite the area being otherwise dry and unconnected from navigable waters. Justice Kennedy seemed to contemplate that irregular weather events that cause significant ephemeral flows of water on otherwise dry ground could fall within the Agencies' jurisdiction. See id. at 769-70. (Kennedy, J., concurring) (rejecting the plurality's permanent standing water or continuous flow requirement by citing to examples of irregular flows of water). However, this does not mean all such dry features with certain indicators would fall under the CWA; rather, only those with a significant nexus to navigable waters would.

---

[6] The WOTUS Rule also includes certain ditches that meet the definition of a tributary and are not otherwise excluded as tributaries. See 80 Fed. Reg. at 37078 ("Ditches are one important example of constructed features that in many instances can meet the definition of tributary."). The Rule explains that "[e]vidence, such as current or historic photographs, prior delineations, or USGS, state and local topographic maps, may be used to determine whether a ditch" is a tributary under the definition or is instead excluded. Id. at 37079.

Intervenor Plaintiffs point out that the Corps' own reports from 2006 to 2013 found that "[i]n the arid West . . . the physical features associated with OHWM are frequently the result of extreme floods or short-term, high intensity events," and that as a result, OHWM indicator delineations can be "inconsistent (over space and time) and problematic" making "[e]stablishing the extent of the OHWM . . . often difficult." Dkt. 199-15 at 10-11 (quoting five different reports from the Corps on OHWM and the Arid West). As recently as 2013, a study conducted by the Corps found "no direct association between OHWM indicators and channel type or landscape position" and that "OHWM indicators are distributed randomly throughout the landscape and are not related to specific channel characteristics." Id. (quoting Lefebvre et al., Survey of OHWM Indicator Distribution Patterns across Arid West Landscapes 17 (2013), https://erdc-library.erdc.dren.mil/xmlui/bitstream/handle/11681/5496/E RDC-CRREL-TR-13-2.pdf?sequence=1&isAllowed=y). Intervenor Defendants point out that the 2013 Corps report concluded that six indicators were found more frequently than others across the landscape and could be better described as "flow indicators rather than OHWM indicators." Id. Although these flow indicators were found to be "useful for identifying portions of the channel that have been inundated from the most recent flow event," they could not be "used to delineate the lateral extent of the OHWM." Id. Thus, despite the more frequent presence of these flow indicators across landscapes in the Arid West, the standard used for tributaries in the WOTUS Rule—the presence of an OHWM—was still inconsistently and randomly distributed. Moreover, the 2013 report does not show that these flow indicators demonstrate regularity or volume of

flow sufficient to have a significant nexus on downstream navigable waters.

Justice Kennedy stated that "subject to reasonably consistent application," OHWMs could provide a reasonable measure of minor tributaries' significant nexus to navigable waters, but here, the Corps' own reports suggest that at least in some areas of the Arid West, one of the two required physical indicators of a tributary—the OHWM—is randomly and inconsistently distributed throughout the landscape. As a result of this random distribution, this definition could very well include dry areas that have indicators of an OHWM and a bed and banks as the result of an extreme weather event but that do not otherwise have a significant nexus to any navigable water. Therefore, for this additional reason, the WOTUS Rule's definition of tributary extends federal jurisdiction beyond that allowed under the CWA.

### C. Adjacent Waters

Next, Plaintiffs challenge the WOTUS Rule's definition of adjacent waters. Specifically, they argue that because adjacent waters are based on tributaries and because tributaries are unlawfully overbroad, adjacent waters to tributaries must also be unlawful. Additionally, Plaintiffs argue that the specific geographic distance and floodplain limits for adjacent waters do not ensure that the majority of waters within those limits have a significant nexus to traditional navigable waters. Intervenor Defendants respond that the adjacent water definition and its geographic limits are lawful because they were determined based on agency expertise and science. The Court finds that both because of its combination with tributaries and the selection of overbroad

geographic limits without showing a significant nexus, the adjacent waters definition in the WOTUS Rule is unlawful under Justice Kennedy's Rapanos opinion.

First, probably the clearest violation of Justice Kennedy's opinion in Rapanos is the WOTUS Rule's inclusion of waters adjacent to non-navigable tributaries.  In Rapanos, Justice Kennedy held that the Agencies could identify certain categories of tributaries "that, due to their volume of flow (either annually or on average), their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters."  547 U.S. at 780-81 (Kennedy, J., concurring). However, he stated that the Agencies' definition of tributaries at that time provided "no such assurances."  Id. at 781 (Kennedy, J., concurring).  He explained that while the Corps' definition of a tributary—a water that "feeds into a traditional navigable water (or a tributary thereof) and possesses an [OHWM]"—could be a reasonable measure of minor tributaries having a significant nexus to other covered waters, when used as the starting point for adjacent wetlands, it was far too broad.  Id.  Specifically, Justice Kennedy held that the "breadth" of the definition of tributary seemed "to leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water volumes toward it."  Id. As a result, he found that the breadth of this definition

> precludes its adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood. Indeed, in many

> cases wetlands adjacent to tributaries covered by this
> standard might appear little more related to navigable-in-
> fact waters than were the isolated ponds held to fall beyond
> the Act's scope in SWANCC.

Id. at 781-82 (Kennedy, J., concurring). Based on this conclusion,

Justice Kennedy held that "[a]bsent more specific regulations . . . the

Corps must establish a significant nexus on a case-by-case basis when

it seeks to regulate wetlands based on adjacency to nonnavigable

tributaries." Id. at 782 (Kennedy, J., concurring).

The same fatal defects that plagued the definition of tributaries

in Rapanos plague the WOTUS Rule here. The WOTUS Rule categorically

covers all adjacent waters to all tributaries as defined in the Rule,

including "wetlands, ponds, lakes, oxbows, impoundments, and similar

waters." 33 C.F.R. § 328.3. The Intervenor Defendants defend this

categorical approach to adjacent waters of non-navigable tributaries by

asserting that the WOTUS Rule adds "more specific regulations" because

it requires that a tributary contribute flow, either directly or

indirectly, to a primary water and that it have a bed and banks in

addition to the OHWM.[7] In other words, the Intervening Defendants believe

that these "more specific" additions alleviate Justice Kennedy's

concerns about the breadth of the standard in Rapanos. The Court is not

so convinced.

Despite the additional requirement of a bed and banks, the

definition of tributary when used as a starting point for adjacent waters

---

[7] Justice Kennedy held in Rapanos that "[w]hen the Corps seeks to regulate
wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to
establish its jurisdiction." 547 U.S. at 782 (Kennedy, J., concurring). But
at issue in this discussion is the regulation of waters adjacent to non-
navigable tributaries to which Justice Kennedy applied a different rule.

is not materially different from the definition at issue in Rapanos.
First, the only "more specific" requirement is the addition of bed and
banks. The definition at issue in Rapanos required that a tributary
"feed[] into a traditional navigable water (or a tributary thereof)" and
possess an OHWM. 547 U.S. at 781 (Kennedy, J., concurring). The WOTUS
Rule's definition is essentially the same in that it requires that the
tributary "contribute flow" to a navigable water and have an OHWM—leaving
only bed and banks as a new requirement. Second, in a way, bed and
banks was already an indicator for tributaries in Rapanos because it is
an indicator of an OHWM. As the WOTUS Rule explains, a tributary must
have a bed and banks in addition to another indicator of an OHWM such
as "staining, debris deposits, or other[s]" to be a tributary. 80 Fed.
Reg. at 37076. But, unlike the definition of tributaries in Rapanos,
the WOTUS Rule changes bed and banks from being a sufficient condition
to a necessary condition. However, the record contains no evidence
demonstrating how the addition of bed and banks as a necessary component
of a tributary does anything to further limit the definition of
tributaries so as to alleviate Justice Kennedy's concerns of over-breadth
in Rapanos. The Rule explains how a bed is below the OHWM and that a
bank is normally above an OHWM, 80 Fed. Reg. at 37076, but it does not
explain how requiring a tributary to have a bed and banks will prevent
the definition from encapsulating "drains, ditches, and streams remote
from any navigable in fact water" like the OHWM did in Rapanos. Rapanos,
547 U.S. at 781 (Kennedy, J., concurring). The Intervening Defendants
argue that because the Rule added something beyond just an OHWM, it
necessarily added "more specific regulations." While this *may* be true,

they fail to explain how the addition of a bed and banks requirement would prevent remote and insubstantial waters adjacent to non-navigable tributaries from falling within the Agencies' jurisdiction under the WOTUS Rule.

For these reasons, the Court finds that the Rule's definition of tributaries is functionally the same as the definition in Rapanos, and as a result, the Agencies would have to show, on a case-by-case basis, that an adjacent water had a significant nexus to a non-navigable tributary. Otherwise, adjacent waters to such non-navigable tributaries could include "remote" waters such as "drains, ditches, and streams" that have only a "speculative or insubstantial" effect on the quality of navigable in fact waters. Id. at 778-781. Because the Rule instead categorially includes all adjacent waters to all tributaries, it is an impermissible construction of the CWA.

Intervenor Defendants attempt to justify the definition of tributaries by arguing that Justice Kennedy did not have "the benefit of 1,200 peer-reviewed scientific publications and hundreds of pages of technical support to elucidate" that tributaries, as defined in the Rule, have a significant nexus. Dkt. No. 211 at 12-13. The Court has no reason to doubt the findings of these scientific reports, but despite what the reports may have found, the Court is bound by Justice Kennedy's opinion, including his repudiation of the OHWM as a basis for non-navigable tributaries and waters adjacent to those tributaries. The Supreme Court might one day consider the new wealth of scientific research on this point, but until then, this Court is constrained by the limits and reasoning put in place by Justice Kennedy's controlling

opinion.  Because the WOTUS Rule fails to define adjacent waters to non-navigable tributaries on a case-by-case basis using the significant-nexus test, it violates that controlling opinion.

Second, some of the specific geographic limits used in the WOTUS Rule to define adjacency—more specifically to define neighboring as a part of adjacency—run afoul of Justice Kennedy's opinion because the Rule fails to show that the majority of waters within those limits have a significant nexus to navigable waters.  It is important to note that the Supreme Court in Riverside Bayview found that the Agencies could assert jurisdiction over a wetland that "directly abutted a navigable-in-fact creek."  Rapanos, 547 U.S. at 766 (Kennedy, J., concurring) (citing Riverside Bayview, 474 U.S. at 131).  Additionally, in Rapanos, Justice Kennedy held that "[w]hen the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction."  Id. at 782 (Kennedy, J., concurring). Thus, while blanket jurisdiction over waters adjacent to non-navigable tributaries—as defined in the Rule—is impermissible, adjacency alone can be used to assert federal jurisdiction when waters are adjacent to navigable-in-fact waters.  However, that does not mean that adjacency is endless; rather, adjacent waters still must have a significant nexus to the navigable-in-fact water.

Looking to the first part of the definition of neighboring, the WOTUS Rule asserts jurisdiction over all waters located within 100 feet of an OHWM of a primary water, impoundment, or tributary.  With the exception of adjacency to tributaries for the reasons discussed in the

section above, this geographic limit likely satisfies the significant-nexus test.  The WOTUS Rule explains that

> Many studies indicate that the primary water quality and
> habitat benefits will generally occur within a several
> hundred foot zone of a water. In addition, the scientific
> literature indicates that to be effective, contaminant
> removal needs to occur at a reasonable distance prior to entry
> into the downstream traditional navigable waters, interstate
> waters, or the territorial seas. Some studies also indicate
> that fish, amphibians (e.g., frogs, toads), reptiles (e.g.,
> turtles), and small mammals (e.g., otters, beavers, etc.)
> will use at least a 100 foot zone for foraging, breeding,
> nesting, and other life cycle needs.

80 FR at 37085.  Based on these findings, the Agencies concluded that "[a]ll waters within 100 feet of a jurisdictional water significantly affect the chemical, physical, or biological integrity of the waters to which they are adjacent, and those waters in turn significantly affect the chemical, physical, or biological integrity of the downstream traditional navigable waters, interstate waters, or the territorial seas."  80 Fed. Reg. at 37085.  What these statements from the Rule demonstrate is that the Agencies chose a specific geographic limit for neighboring waters of 100 feet, and they did so based on scientific evidence that specifically justified a limit within a few-hundred feet. In other words, the Agencies justified their selection of 100 feet by demonstrating that waters within that specifically chosen limit have a significant effect on the chemical, physical, and biological integrity of navigable waters—i.e., a significant nexus.  In light of the specific scientific findings highlighted by the WOTUS Rule and the Supreme Court's prior holdings on adjacent waters, the Court finds that a 100-foot limit, roughly 30 yards, from a primary navigable water is lawful because waters within that limit have a significant nexus to the primary waters.

However, the Court cannot say the same about the other geographic limits for neighboring waters in the WOTUS Rule. The second category of neighboring waters includes all waters located within the 100-year floodplain of a primary water, impoundment, or tributary, and not more than 1,500 feet from the OHWM of such water. 33 C.F.R. § 328.3(c)(2)(ii). A 100-year floodplain is defined as "the area that will be inundated by the flood event having a one percent chance of being equaled or exceeded in any given year." 80 Fed. Reg. at 37081. Rather than selecting the 100-year floodplain and 1,500 foot limit in the second category of neighboring waters based on scientific findings showing that the majority of waters in those limits had a significant nexus to primary waters, this larger category was selected for "clarity" and convenience. Intervenor Defendants' Reply Brief, Dkt. No. 224 at 12. The Court has no reason to doubt that these specific limits were selected for clarity or that such limits might be reasonable, but the question is whether the waters within those limits have a significant nexus to primary waters in accordance with Justice Kennedy's opinion in Rapanos. Based on the WOTUS Rule's justifications, the Court finds that they do not.

As for the 100-year floodplain, the Agencies chose this limit based, at least in part, on FEMA flood maps. 80 Fed. Reg. at 37,083 ("In drawing lines, the agencies chose the 100-year floodplain in part because FEMA and NRCS together have generally mapped large portions of the United States, and these maps are publicly available, well-known and well-understood."). The Agencies explained in the Final Rule that to determine the boundaries of adjacent waters, they would rely on published FEMA flood zone maps. Id. at 37,081. Moreover, Intervenor Defendants

explained that "[t]he 100-year floodplain delineates boundaries for federally subsidized flood insurance under the National Flood Insurance Program," which is a program run by FEMA, and that "[g]iven the well-documented flood absorption and attenuation properties of wetlands protected by the [CWA], defining jurisdiction along the same lines [as the National Flood Insurance Program] comports with the strong federal interest in minimizing flood insurance taxpayer subsidies." Dkt. No. 224 at 13 n.3.

Selecting a 100-year floodplain on this basis may well be practical and convenient, but it does not show how or why the waters within that floodplain, as opposed to a different flood-plain, have a significant nexus to navigable waters. While Intervenor Defendants point to evidence in the Technical Support Document showing why waters within floodplains in general can have a significant effect on the integrity of adjacent and downstream waters, they do no show why waters within a 100-year floodplain, as opposed to a 50-year or 200-year floodplain, have a significant nexus to navigable waters. Merely stating that "[b]ased on a review of the scientific literature, the agencies' technical expertise and experience, and the implementation value of drawing clear lines" this floodplain limit has a significant nexus is insufficient. See 80 Fed. Reg. at 37,085. Justice Kennedy's test requires more, and without more the Court cannot say that the majority of waters within areas with a one-percent chance of flooding to a designated elevation line within a given year, i.e., a 100-year floodplain, significantly affects the quality of navigable waters.

The same problem arises for the 1,500-foot limit to the 100-year floodplain.  To justify that 1,500-foot limit, the WOTUS Rule states that

> [t]his boundary was established in order to protect vitally important waters within a watershed while at the same time providing a practical and implementable rule. The agencies are not determining that waters in the floodplain farther than 1,500 feet from the [OHWM] never have a significant nexus. Rather, the agencies are using their technical expertise to promulgate a practical rule that draws reasonable boundaries in order to protect the waters that most clearly have a significant nexus while minimizing uncertainty about the scope of "waters of the United States."

Id.  While practical considerations may be valid and important, Justice Kennedy's opinion in Rapanos requires that the Agencies demonstrate that waters within a chosen limit have a significant nexus, and merely stating that the Agencies have decided that a significant nexus exists based on "science" and their "expertise" is not sufficient.  Moreover, a 1,500-limit encompasses much more area than the 100-foot limit discussed above.  Especially in light of the Agencies' own Scientific Advisory Board's finding that "the available science supports defining adjacency or determination of adjacency on the basis of functional relationships, rather than solely on the basis of geographical proximity or distance to jurisdictional waters,"  80 Fed Reg. at 37064, simply choosing a categorical 1,500-foot limit without showing that the majority of waters within that limit have a significant nexus to navigable waters is improper under Justice Kennedy's test in Rapanos.

For these same reasons, the Court determines that the third category of neighboring waters within 1,500 feet of a high tide line (or the OHWM of the Great Lakes) is also unlawfully overbroad.  The Court makes this determination considering that these bodies of water are

larger and thus arguably warrant greater adjacency jurisdiction. Even then, the Agencies must show justification and support for the significant-nexus finding. To summarize, just because adjacency can be a factor for jurisdiction under the CWA, that factor is not unlimited and is still subject to the limits of the significant-nexus test. With the exception of the 100-foot limit to certain waters, the WOTUS Rule's definition of adjacent and neighboring waters fails to meet the significant-nexus test and would include jurisdiction over the remote and insignificant waters that concerned Justice Kennedy in Rapanos.

### D. Case-by-case Waters

The State Plaintiffs also challenge the WOTUS Rule's case-by-case category of waters under the CWA. The States argue that the category violates Justice Kennedy's opinion in Rapanos and would extend jurisdiction over isolated ponds like those in SWANCC. Intervenor Defendants argue that the category falls squarely in line with Justice Kennedy's significant-nexus test.

The case-by-case category includes as waters of the United States "all waters located within the 100-year floodplain" of a primary water and "all waters located within 4,000 feet of the high tide line or [OHWM]" of a primary water, impoundment, or tributary when those waters are determined, on a case-by-case basis, to have a significant nexus to a primary water. 33 C.F.R. § 328.3(a)(8).[8] The WOTUS Rule defines

---

[8] The WOTUS Rule also uses a case-by-case category to identify specific types of waters as waters of the United States in 33 C.F.R. § 328.3 (a)(7). These include prairie potholes, Carolina bays and Delmarva bays, pocosins, western vernal pools, and Texas coastal prairie wetlands. These categories can be found to be similarly situated and combined for the purposes of the significant nexus analysis in a watershed that drains into a primary water. Id. However, the State Plaintiffs focus their challenge on § 328.3 (a)(8).

"significant nexus" to mean "that a water, including wetlands, either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, or biological integrity" of a primary water. Id. § (c)(5). The Rule also states that "[f]or an effect to be significant, it must be more than speculative or insubstantial." Id. The Rule lists nine functions to be considered in determining whether a water has a significant nexus to a primary water:

> (i) Sediment trapping, (ii) Nutrient recycling, (iii) Pollutant trapping, transformation, filtering, and transport, (iv) Retention and attenuation of flood waters, (v) Runoff storage, (vi) Contribution of flow, (vii) Export of organic matter, (viii) Export of food resources, and (ix) Provision of life cycle dependent aquatic habitat (such as foraging, feeding, nesting, breeding, spawning, or use as a nursery area) for species located in a water identified in paragraphs (a)(1) through (3) of this section.

Id. § (c)(5)(i)-(ix).

As an initial matter, the case-by-case category's relation to tributaries for the 4,000-foot limit and interstate waters as a type of primary water is unlawful. Because the Court found the definitions of interstate waters and tributaries to be overbroad under the CWA, by extension, the case-by-case category basing waters off of those definitions would also extend federal jurisdiction beyond the limits allowed under the CWA. But, based on Justice Kennedy's opinion in Rapanos, this seems to be the only error in the case-by-case category with respect to the CWA.

Besides its connection to interstate waters and tributaries, the case-by-case category specifically tracks the language and reasoning of Justice Kennedy's opinion in Rapanos. The Rule uses Justice Kennedy's test by requiring waters in that category to have a significant effect

on the chemical, physical, or biological integrity of a primary water.[9] The Rule makes these findings on a case-by-case basis like Justice Kennedy suggested for adjacent waters that were otherwise too remote to be categorically included in relation to non-navigable tributaries. Then, the Rule further limits these significant-nexus findings to waters within the 100-year floodplain of a primary water or 4,000 feet of a primary water, impoundment, or tributary.

This case-by-case category of waters is different from the others discussed previously because it does not categorically assert jurisdiction over all waters within a certain definition. Rather, the rule uses Justice Kennedy's significant-nexus test on an individual, case-by-case basis, and adds outer limits to when that test can be applied because of effects on primary waters. The 100-year floodplain is insufficient under the adjacency category to show a significant nexus in the majority of cases because the Rule seeks to include all waters within that floodplain within its jurisdiction without showing that the majority of those waters have a significant nexus to primary waters. The case-by-case category, on the other hand, merely uses that floodplain as a geographic limit as to where waters can be determined to individually have a significant nexus to primary waters; it does not encompass all waters within that limit by default. The same reasoning applies to the 4,000-foot limit. While quite broad—close to a mile long— this specific distance places an outer limit to how far the Agencies can find a significant nexus; it does not allow the Agencies to invoke

---

[9] Notably, the case-by-case category's significant-nexus test is limited to waters that have a significant effect on the chemical, physical, or biological integrity of a primary water, not of an impoundment or tributary.

jurisdiction over all waters within that 4,000-foot zone. This case-by-case approach is consistent with Justice Kennedy's opinion.

The State Plaintiffs argue that the Rule's definition of significant nexus violates Justice Kennedy's test in Rapanos because Justice Kennedy said a significant nexus exists where wetlands "significantly affect the chemical, physical, and biological integrity" of navigable waters, 547 U.S. at 780 (Kennedy, J., concurring) (emphasis added), while the Rule's definition of significant nexus says "the chemical, physical, or biological integrity," 33 C.F.R. § 328.3(c)(5) (emphasis added). The States' argument takes Justice Kennedy's words out of context and would lead to results inconsistent with the text and purpose of the CWA. Justice Kennedy's test was quoting the language of the CWA which states that Congress enacted the statute to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Rapanos, 547 U.S. at 779-80 (Kennedy, J., concurring) (quoting 33 U.S.C. § 1251(a)). He was not saying that all three conditions must be present for a significant nexus to exist. Such a reading would lead to absurd results inconsistent with the CWA like not allowing federal jurisdiction where a water significantly affects the chemical and biological integrity of a primary water used for a town's drinking water but does not change the physical makeup of the water. Justice Kennedy rooted his test in the purposes of the CWA, and the WOTUS Rule's use of "or" follows the purpose of that statute and Justice Kennedy's test.

Nevertheless, the State Plaintiffs also argue that the factors used by the WOTUS Rule to determine a significant nexus will lead to jurisdiction over remote waters like the isolated ponds in SWANCC that

were a habitat of migratory birds. The Court disagrees.[10] First, the Agencies assertion of jurisdiction over the ponds in SWANCC was based on the fact that the ponds were used by birds that crossed state lines, not a significant nexus to a primary water's biological integrity. See SWANCC, 531 U.S. at 164. Second, the WOTUS Rule states that "[n]on-aquatic species or species such as non-resident migratory birds do not demonstrate a life cycle dependency on the identified aquatic resources and are not evidence of biological connectivity for purposes of this rule." 80 Fed. Reg. at 37,094. Third, just because the Agencies could not assert jurisdiction over the isolated ponds in SWANCC based on migratory birds does not mean that the Agencies could not find under the new WOTUS Rule that similar ponds have a significant nexus to primary waters. It is true that the Agencies could apply the significant nexus factors in a way that is so attenuated, remote, or insubstantial that a court could determine in a specific case that such application violates Justice Kennedy's significant-nexus test,[11] but as written, the definition of significant nexus and the functions listed comply with Justice Kennedy's opinion.[12] Importantly, even if one of the relevant functions like "sediment trapping" or "nutrient recycling" is present, that function performed by the water at issue must still significantly

---

[10] However, the Court agrees that the case-by-case category is unlawful as far as it uses non-navigable interstate waters and the overly broad definition of tributaries as bases within its definition. See supra sections II.A., II.B.

[11] The significant-nexus test is, by definition, a legal test, meaning that the Agencies are not the final arbiters of determining whether a water has a significant nexus.

[12] Indeed, three of the factors are mentioned as specific examples by Justice Kennedy in Rapanos. 457 U.S. at 779 (listing "functions such as pollutant trapping, flood control, and runoff storage" as critical functions wetlands can perform for other waters); see also 33 C.F.R. § 328.3 (c)(5)(i), (iii), (iv).

affect "the chemical, physical, or biological integrity of the nearest primary water." See 33. C.F.R. § 328.3(c)(5). Therefore, with the exception of the category's use of interstate waters and tributaries, the case-by-case category is otherwise consistent with Justice Kennedy's opinion and lawful under the CWA.

### E. Substantial Encroachment on a Traditional State Power

Finally, Plaintiffs raise an additional challenge to the WOTUS Rule under the CWA—namely, that it encroaches on traditional state power. Plaintiffs argue that in addition to going beyond the authority delegated under the CWA, the WOTUS Rule also violates the CWA because its jurisdictional reach is not supported by a clear congressional authorization. In SWANCC, the Court explained that "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." 531 U.S. at 172; see also United States v. Bass, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."). This requirement stems from the Court's "assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority," and "[t]his concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." SWANCC, 531 U.S. at 173.

While the CWA allows the federal government to regulate certain waters for the purposes of protecting the chemical, physical, and biological integrity of the nation's waters, Congress also included

57

within that statute a provision which states that the policy of Congress is to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources." 33 U.S.C. § 1251 (2018). In Rapanos, Justice Scalia, writing for the plurality, stated that "[r]egulation of land use, as through the issuance of the development permits [under the CWA] . . ., is a quintessential state and local power." 547 U.S. at 738. Based on this fact, Justice Scalia found that, in that case, "[t]he extensive federal jurisdiction urged by the Government would authorize the Corps to function as a de facto regulator of immense stretches of intrastate land—an authority the agency has shown its willingness to exercise with the scope of discretion that would befit a local zoning board." Id. Like the Court stated in SWANCC, Justice Scalia concluded that in such a situation, "[w]e ordinarily expect a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority," but "[t]he phrase 'waters of the United States' hardly qualifies." Id. (citation omitted).[13]

---

[13] It is important to note that Justice Kennedy disagrees with this "fallback" argument by the plurality in Rapanos. However, Justice Kennedy's disagreement with this traditional state authority argument centered around his perceived inconsistencies in the plurality's limits that it imposed under the CWA of surface connection and continuous flow and their concerns about encroachment on state power. See Rapanos, 547 U.S. at 776 (Kennedy, J., concurring). From his view, the plurality's argument contradicted the limits it attempted to impose under the CWA. Id. In other words, Justice Kennedy's disagreement was based on what were, in his view, inconsistencies in the plurality's arguments; it was not a rule forbidding the consideration of arguments on substantial encroachment on traditional state power. Therefore, Justice Kennedy's disagreement on this point in Rapanos does not foreclose this Court from considering a similar argument of traditional state authority under the WOTUS Rule or from citing Justice Scalia's statements on that point in Rapanos as persuasive authority.

If the plurality in _Rapanos_ thought the Agencies' definition of waters of the United States in that case would regulate "immense stretches of intrastate land," then they would be even more concerned about the breadth of the WOTUS Rule's jurisdiction here.  The WOTUS Rule concedes that it would result in a 2.84 to 4.65 percent expansion of jurisdiction when "[c]ompared to a baseline of recent practice."  80 Fed. Reg. at 37,101.  The Plaintiffs characterize this increase as underinclusive, but even on its own, an almost two-percent increase in jurisdiction nationwide is a substantial intrusion into lands and waters traditionally left to state authority.  During the Motions Hearing on December 14, 2018, counsel for Intervening Defendants admitted that he was not in a position to dispute the 2.84 to 4.65 percent increase in jurisdiction.  Motions Hearing, Dkt. No. 235 at 3:41:08.  In the Agencies' notice of proposed rulemaking to repeal the WOTUS Rule, the Agencies admitted that the WOTUS Rule could allow "the vast majority of water features in the United Stated" to come within "the jurisdictional purview of the federal government."  83 Fed. Reg at 32,229, 32,248 (explaining that "[t]he agencies noted in 2015 'that the vast majority of the nation's water features are located within 4,000 feet of a covered tributary, traditional navigable water, interstate water, or territorial sea'" and concluding that "[t]he agencies' broadening of certain key concepts and terms relative to the prior regulatory regime means that the agencies can potentially review the 'vast majority' of water features in the country under the 2015 Rule, unless those features have been excluded" (citation omitted)).  Finally, the Agencies now concede in the proposed rule to rescind the WOTUS Rule that the WOTUS Rule "may have

altered the balance of authorities between the federal and State governments, contrary to the agencies' statements in promulgating the 2015 Rule in contravention of the CWA section 101(b), 33 U.S.C. 1251(b)." 83 Fed. Reg. at 32228.

What all of this shows is that contrary to the Intervenor Defendants' characterization of the Rule as narrowing the scope of federal jurisdiction,[14] the Rule actually increases that to a significant degree. Most importantly, that significant increase in jurisdiction takes land and water falling traditionally under the states' authority and transfers them to federal authority.

In light of this significant intrusion on traditional state authority, the CWA still contains the policy language of recognizing traditional state power in this area, and Congress has not made any clear or manifest statement to authorize intrusion into that traditional state power since Rapanos. Therefore, like the majority in SWANCC and the plurality in Rapanos concluded, the WOTUS Rule's vast expansion of jurisdiction over waters and land traditionally within the states' regulatory authority cannot stand absent a clear statement from Congress in the CWA. Since no such statement has been made, the WOTUS Rule is unlawful under the CWA.

---

[14] Intervenor Defendants also argue that "the promulgation of [WOTUS Rule] is a plain attempt to follow the instruction of the Supreme Court—not encroach on state law." Dkt. No. 211 at 22. While that may have been what the Agencies attempted to do, for the reasons explained above, the WOTUS Rule goes beyond the limits imposed by Justice Kennedy's opinion in Rapanos. Thus, this argument is unavailing since the Agencies in fact did not "draft a rule consistent with Supreme Court precedent." Id.

## III. APA

Plaintiffs also challenge the WOTUS Rule as being unlawfully promulgated under the procedures required by the APA. The Court finds that the WOTUS Rule violates the APA in at least two ways: (1) the Final Rule was not the logical outgrowth of the Proposed Rule and (2) the Rule, at least in some parts, is arbitrary and capricious.[15]

### A. The Final Rule Was Not the Logical Outgrowth of the Proposed Rule

Plaintiffs argue that they were denied an opportunity to comment on several elements that were nowhere to be found in the Proposed Rule but were essential components of the Final Rule in violation of the APA's notice requirement. In other words, they argue that the Final Rule was not the logical outgrowth of the Proposed Rule. Intervenor Defendants and the Agencies maintain that Plaintiffs were given an opportunity to comment and that the Final Rule was the logical outgrowth of the Proposed Rule. After analyzing the Proposed Rule, comments received on that Proposed Rule, and the language used in the Final Rule, the Court finds that the Final Rule was not the logical outgrowth of the Proposed Rule with respect to the distance limits chosen for adjacent waters, the distance limits chosen for case-by-case waters, and the lack of a farming exclusion for tributaries.

Under the APA, a "[g]eneral notice" of proposed rulemaking must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved" and give the public an

---

[15] Plaintiffs also raise additional procedural challenges to the WOTUS Rule under the APA, but because the Court finds the Rule to be in violation of the APA in these two respects, it need not address these other arguments.

opportunity to comment on that proposed rule.  5 U.S.C. § 553(b)(3), (c).  The purposes of notice requirements in notice-and-comment rulemaking under the APA are "(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." _Miami-Dade Cty. v. E.P.A._, 529 F.3d 1049, 1058 (11th Cir. 2008) (quoting _Envtl. Integrity Project v. E.P.A._, 425 F.3d 992, 996 (D.C. Cir. 2005)).  An agency satisfies the notice requirement, "and need not conduct a further round of public comment, as long as its Final Rule is a 'logical outgrowth' of the rule it originally proposed." _Id._ at 1059 (quotation and citation omitted).  "A rule is deemed a logical outgrowth if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." _Id._ (quotation and citation omitted).

However, "[t]he logical outgrowth doctrine does not extend to a final rule that is a brand new rule, since [s]omething is not a logical outgrowth of nothing, nor does it apply where interested parties would have had to divine [the Agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." _Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin._, 407 F.3d 1250, 1259-60 (D.C. Cir. 2005) (quotations and citations omitted) (alteration in original).  In other words, "[n]otice is inadequate if the interested parties could not reasonably have anticipated the final rulemaking from the draft rule." _Miami-Dade Cty._, 529 F.3d at 1059 (quotation and

citation omitted). Moreover, "[a]gency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decisionmaking." Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A., 705 F.2d 506, 549 (D.C. Cir. 1983). "Finally, although they may not provide the only basis upon which an agency claims to have satisfied the notice requirement, comments may be adduced as evidence of the adequacy of notice." Miami-Dade Cty., 529 F.3d at 1059.

## 1. Distance Limits for Adjacent Waters

Plaintiffs first argue that the 100-foot, 1,500-foot, and 100-year floodplain limits for the adjacent waters definition in the Final Rule are not the logical outgrowth of the Proposed Rule. In the Proposed Rule, neighboring waters, under the larger definitional category of adjacent waters, included "waters located within the riparian area or floodplain of a water identified in paragraphs (a)(1) through (5) of this section, or waters with a shallow subsurface hydrologic connection or confined surface hydrologic connection to such a jurisdictional water." 79 Fed. Reg. at 22,263. The Final Rule, however, defined neighboring waters based on specific distance limitations—(1) waters within 100 feet of a primary water, impoundment, or tributary; (2) waters within a 100-year floodplain and 1,500 feet of a primary water, impoundment or tributary; and (3) waters within 1,500 feet of the high-tide line of primary water, 33 C.F.R. § 328.3(c)(2)—rather than the functional factors of the riparian area or floodplain as described in the Proposed Rule.

At first blush, the Final Rule's change in the definition of neighboring waters to a purely distance-based scheme and the selection of the specific distances seems to be a signficant departure from the Proposed Rule, but the question is whether interested parties should have anticipated that change. The Court finds that they had no reason to anticipate such a change and thus no reason to comment with well-developed and scientifically supported suggestions for specific geographic distance limits. The Proposed Rule does not request comments on whether to define neighboring waters based solely on geographic distance, let alone mention a range of distances being considered for such a scheme. As aptly explained by the District Court of the District of North Dakota considering this exact issue regarding the WOTUS Rule in its preliminary injunction ruling, "[w]hen the Agencies published the final rule, they materially altered the Rule by substituting the ecological and hydrological concepts with geographical distances that are different in degree and kind and wholly removed from the original concepts announced in the proposed rule." North Dakota, 127 F. Supp. 3d at 1058. In other words, interested parties could not have reasonably anticipated this definitional overhaul of an "ecologically and hydrologically based rule to one that finds itself based in geographic distance." Id. Recently reaching that same conclusion, the District Court for the Southern District of Texas explained that this change was "significant" because it altered "the jurisdictional scope of the Act" and "[a]s a result, the Final Rule was deprived of the benefit of comment 'by those most interested and perhaps best informed on the subject of

the rulemaking at hand.'" <u>Texas</u>, 2019 WL 2272464, at *5 (quoting

<u>Phillips Petroleum Co. v. Johnson</u>, 22 F.3d 616, 620 (5th Cir. 1994)).

Defendants argue that language in the Proposed Rule did put

interested persons on notice of a possible distance-based approach.  They

point to the phrases in the request for comments of "specific geographic

limits" and "distance limitations."  However, Defendants take these

phrases out of context, and when read in context, they would not put

interested persons on notice of the need to comment about specific limits

for a geographically based neighboring waters scheme.  In the section

of the Proposed Rule discussing adjacent waters, the Rule requests

"comment on whether there are other reasonable options for providing

clarity for jurisdiction over waters with" connections through "confined

surface or shallow subsurface hydrology."  79 Fed. Reg. at 22,208.

Regarding this request, the Rule goes on to say that

> Options could include asserting jurisdiction over all waters
> connected through a shallow subsurface hydrologic connection
> or confined surface hydrologic connection regardless of
> distance; asserting jurisdiction over adjacent waters only if
> they are located in the floodplain or riparian zone of a
> jurisdictional water; considering only confined surface
> connections but not shallow subsurface connections for
> purposes of determining adjacency; or establishing <u>specific
> geographic limits</u> for using shallow subsurface or confined
> surface hydrological connections as a basis for determining
> adjacency, including, for example, <u>distance limitations</u> based
> on ratios compared to the bank-to-bank width of the water to
> which the water is adjacent.

<u>Id.</u> (emphasis added).  When read in context, these phrases were listed

as one of four options for providing clarity for jurisdiction over a

specific type of water connection, and the option was confined to limits

for using "shallow subsurface or confined surface hydrological

connections" as the basis for adjacency, not as the sole basis for all

adjacent waters under the Rule. These two phrases do nothing to put interested parties on notice of a total shift in the adjacency definition scheme or of the need to propose specific distances or floodplain intervals for the Final Rule.

The Agencies also argue that the Final Rule was a logical outgrowth because it requested comment on floodplain intervals and because it used the terms "lateral reach" and "reasonable proximity." See id. at 22,207-08. First, merely requesting comment "on whether the rule text should provide greater specificity with regard to how the agencies will determine if a water is located in the floodplain of a jurisdictional water" is not the same as asking what, if any, limits should be placed on the floodplain or what type of floodplain interval should be used. Id. at 22,209. The prior sentence says that the Agencies will use their "professional judgment" to determine which flood interval to use, and in parentheses it says "for example, 10 to 20 year flood interval zone." Id. To the extent this example was supposed to provide notice to interested parties to comment with specific floodplain intervals, it is at best misleading since the chosen interval in the Final Rule—100-year floodplain—was much larger. Second, the statement that "[a]djacent . . . has always included an element of reasonable proximity" based on Riverside Bayview only shows that proximity is a factor the Agencies generally consider for adjacent waters, not that the Agencies were considering it as the sole, defining factor. Id. at 22,207. Finally, the statement that "[t]o bring greater clarity to the meaning of 'neighboring,' the proposed rule adds scientifically-based definitions for the terms 'riparian area' and 'floodplain' to define the lateral

reach of the term 'neighboring'" also does nothing to put interested parties on notice that basis for the "lateral reach" of the term neighboring could materially shift from riparian areas and floodplains to specific distance limits. <u>Id.</u>

Defendants also argue that comments from interested parties about distance limits demonstrate a logical outgrowth. Although the Eleventh Circuit has recognized that comments may be evidence of notice, the handful of distance-related comments in this case fail to demonstrate that interested persons were on notice of the Final Rule's geographic-based adjacency definition.[16] First, the fact that a few comments generally asserted that a hydrologic connection rather than distance should be used or that there should be no distance limitation of the neighboring definition is unavailing as such comments do not show notice of an entirely distance-based scheme. Second, the fact that a few comments suggested specific limits also does not show that interested parties had notice of the distance-based scheme. In fact, the wide variety of suggestions in those comments—from 50 feet or a 5-year floodplain, Dkt. No. 215-3, Part 2 at 8, 34, to half a mile or a 100-year floodplain, Dkt. No. 215-3, Part 2 at 8, 75-76—show the lack of clear notice from the Proposed Rule. All-in-all, these few comments out of over a million strike the Court as "sparse and ambiguous at best,"

_____

[16] Moreover, comments cannot "provide the only basis upon which an agency claims to have satisfied the notice requirement." <u>Miami-Dade Cty.</u>, 529 F.3d at 1059; <u>see also</u> <u>Horsehead Res. Dev. Co. v. Browner</u>, 16 F.3d 1246, 1268 (D.C. Cir. 1994) ("While we have noted that insightful comments may be reflective of notice and may be adduced as evidence of its adequacy, we have rejected bootstrap arguments predicating notice on public comments alone. Ultimately, notice is the agency's duty because comments by members of the public would not in themselves constitute adequate notice. Under the standards of the APA, notice necessarily must come—if at all—from the Agency." (quotations and citations omitted)).

and while some happen to address specific limits, "none squarely anticipates" the dramatic shift in the neighboring waters definition. Shell Oil Co. v. E.P.A., 950 F.2d 741, 751 (D.C. Cir. 1991). Had the Proposed Rule given adequate notice, the Agencies could have expected to receive numerous comments with data, graphs, etc. articulating why certain distance-based limits should be chosen over others, but interested parties had no occasion to do that in this case based on the language of the Proposed Rule.

Finally, Intervenor Plaintiffs argue that the Court is bound by the Eleventh Circuit's opinion in Alabama Power Co. v. O.S.H.A., 89 F.3d 740 (11th Cir. 1996), which they argue "directly addresses the issue at hand." However, Alabama Power is distinguishable from the present case. Alabama Power involved an Occupational Safety and Health Administration ("OSHA") regulation for clothing worn by electric utility workers through notice-and-comment rulemaking. Id. at 742. OSHA issued a final standard that included an apparel provision that required employers to ensure that employees who were exposed to flames or electrical arcs not wear flammable clothing that could increase the extent of injury to the employee. Id. at 743. In the preamble to that section, OSHA noted that "[n]atural fabrics, such as 100 percent cotton or wool, and synthetic materials that are flame resistant or flame retardant are acceptable under the final rule." Id. (citation omitted). Then, "in response to . . . questions concerning the preamble's clarity with regard to those natural fabrics" deemed acceptable, OSHA published a "Correction of the Preamble." Id. The corrected preamble stated that

> Natural fabrics, such as 100 percent cotton or wool, are
> acceptable under the final rule, provided they are of such

68

weight and construction as not to ignite under the conditions
to which an employee might be exposed. (For example, cotton
fabrics of 11 ounces or [more] generally will not ignite when
exposed to an arc the energy of which is approximated by a
3800-ampere, 12-inch arc lasting for 10 cycles . . .).

Id.

The plaintiffs in Alabama Power challenged the corrected preamble arguing that they were denied an adequate opportunity to comment on it because it was a modification that specified only certain weights of natural fabrics it deemed acceptable. Id. at 744. The Eleventh Circuit rejected this argument holding that the correction "merely clarified that under certain conditions, heavyweight natural fabrics are necessary in order to fully protect those workers exposed to electric arcs." Id.

Here, Defendants argue that OSHA's addition of the specific eleven-ounce cotton fabric "requirement" in the corrected preamble is like the addition of the specific distance limits for adjacent waters in the Final WOTUS Rule and, because the Eleventh Circuit found that final standard including the corrected preamble to be a logical outgrowth of the proposed standard, the Court must also find the Final Rule in this case to be the logical outgrowth. However, the eleven-ounce fabric statement in Alabama Power is wholly different from the distance-based scheme in this case. OSHA listed the eleven-ounce fabric as an example of a fabric weight that would generally not ignite. Moreover, the Eleventh Circuit recognized that "[t]he employer" still had "discretion to determine whether or not 100 percent cotton or wool clothing is acceptable under the conditions to which a worker could be exposed." Id. at 745. As such, the Court held that "[s]uch statements make it clear that natural fabrics are in no way prohibited altogether, but rather, that certain

69

conditions to which a worker may be exposed call for either a heavyweight natural fabric, or a lightweight flame retardant natural fabric." Id. Here, the Final WOTUS Rule did not merely mention an example of distance limits where waters would likely or could have a significant nexus to navigable waters; rather, it created an entire distance-based scheme without giving any indication of a range of alternatives to interested parties in the proposed rule. Alabama Power does not change this Court's conclusion in this case.

## 2. Distance Limits for Case-by-case Waters

For many of the same reasons that the distance limitations for the adjacent waters in the Final Rule were not the logical outgrowth of the Proposed Rule, the 4,000-foot and 100-year floodplain limits on the case-by-case category were also not the logical outgrowth of the Proposed Rule. The Proposed Rule had no limit on the "other waters, including wetlands," that could be determined to have a significant nexus on a case-by-case basis. 79 Fed. Reg. at 22,263. The Final Rule, following the distance-limit scheme of the adjacent category, included a 100-year floodplain limit for primary waters and a 4,000-foot limit for primary waters, impoundments, and tributaries for the case-by-case category. 80 Fed. Reg. at 37,105. The Agencies argue that interested parties had notice of specific geographic limits on the case-by-case category through the Proposed Rule's use of the words "sufficiently close," but a closer examination of the Rule shows that this phrase was used to describe the definition of similarly situated waters under the rule, not to request comment on specific limits to the case-by-case category. See 79 Fed. Reg. at 22,213, 22,217, 22,264. This phrase and the statement that the

Agencies would consider location as one of many factors in determining "other waters" under the case-by-case category are not enough to show a "germ" of distance limitations sufficient to provide public notice. See 79 Fed. Reg. at 22,214; Dkt. No. 219 at 26 (citing <u>NRDC v. Thomas</u>, 838 F.2d 1224, 1242 (D.C. Cir. 1988)). Finally, the handful of comments inquiring as to what distance would be considered sufficiently close in the Agencies' analysis and those discussing whether or not or to what extent distance should or should not be a factor in the case-by-case significant-nexus analysis do not show any specific suggestions of a flood-plain interval or a specific distance cut-off for where the case-by-case category ends.

Intervenor Defendants also argue that even if Plaintiffs are correct that the Proposed Rule failed to give sufficient notice for the limits to the case-by-case category, Plaintiffs cannot show any redressable injury because the changes limited the scope of the category thereby limiting the scope of federal jurisdiction in Plaintiffs' favor. "To show prejudicial error, a petitioner must indicate with reasonable specificity, the aspect of the rule to which it objects and how it might have responded if given the opportunity. At base, the petitioner must demonstrate that on remand, [it] can mount a credible challenge . . . and [was] thus prejudiced by the absence of an opportunity to do so before the agency." <u>Miami-Dade Cty.</u>, 529 F.3d at 1061 (quotations and citations omitted) (alterations in original).

Plaintiffs have sufficiently demonstrated a harm here. Despite Plaintiffs' preference for a case-by-case category with a distance and flood-interval cap—as opposed to no limit at all—that preference does

not take away from the harm Plaintiffs have experienced.  As explained

by the State Plaintiffs, the Proposed Rule failed to provide notice that

"the Agencies were considering a shift to a fundamentally different

regime for defining" the waters in the adjacency and case-by-case

categories.  Dkt. No. 239 at 6.  As a result, the interested parties

could not offer "the kind of rigorous or targeted analysis of the

specific distance-based limits set out in the final rule—whether via

maps, surveys, or other kinds of data—that a proposal of specific

distances or a potential range of distances would have prompted."  Id.

at 2.  The State Plaintiffs explained that this sort of rigorous research

was not possible with interested parties' limited resources and on

"nothing more than a hunch that the Agencies might adopt a certain kind

of or set of limits."  Id.  In other words, had the State Plaintiffs and

other interested parties been given the opportunity, they would have

submitted comments with detailed analysis supported by "maps, surveys,

or other kinds of data" arguing for appropriate geographic limits of the

adjacent and case-by-case water categories.  Id.  Specifically for case-

by-case waters, interested parties could have suggested and explained

why the distance limit should be 2,000 feet, 1,000 feet, or even 500

feet or why the limit should not have been greater than 4,000 feet if

such a possibility was on the table.  The same goes for suggestions about

the 100-year floodplain interval.  This ability to know what is at issue

in a proposed regulation and provide substantive comments on those issues

is the entire purpose behind giving notice.  The Agencies' actions in

this case—which denied interested parties a chance at submitting detailed

comments about the appropriate limits for a distance-based definitional scheme—failed to adhere to that purpose.

### 3. Farming Exclusion for Adjacent Waters

The last portion of the Proposed Rule that the Plaintiffs challenge is that the Final Rule, without notice to interested persons, included a farming exemption for adjacent waters but not tributaries. The Proposed Rule had no exclusion for land used for farming whatsoever; it mentioned only that the Rule did not change certain farming-based exemptions listed in the CWA. See 79 Fed. Reg. at 22,189, 22,263. The Final Rule included an exception to adjacent waters that stated "[w]aters being used for established normal farming, ranching, and silviculture activities . . . are not adjacent." 80 Fed. Reg. at 37,105. The Final Rule explained that such waters would be subject to case-by-case review. Id. at 37,080. The Final Rule explained that the Agencies created this exemption to reflect the CWA's exemption of certain farming activities from Section 404's permitting requirements, "[r]ecognizing the vital role of farmers in providing the nation with food, fiber, and fuel." Id. Lastly, in explaining the farming exemption, the Final Rule clarifies that "[i]t is important to recognize that 'tributaries,' including those ditches that meet the tributary definition, are not 'adjacent' waters and are jurisdictional by rule." Id.

State Plaintiffs argue that the lack of notice as to a contemplated farmland exemption deprived the States of the opportunity to propose the exclusion of farmland from the tributaries category as well, and as a result, vast amounts of "farm acreage . . . [would be] swept in to federal jurisdiction." Dkt. No. 222 at 22. Indeed, the Court finds

that not proposing any farmland-based exemption to the definitional-scheme in the Proposed Rule and then creating such an exemption in the Final Rule for one subpart without allowing further comment is not a logical outgrowth.  Passing mentions to the CWA's farming exemptions for permitting requirements unrelated to the definitional scheme for waters of the United States does not count toward providing notice.

However, Defendants again argue that this notice defect was harmless error.  The Agencies point to comments made by other interested parties arguing that these comments show the lack of prejudicial harm "because all that is necessary in such a situation is that the agency had an opportunity to consider the relevant views."  Dkt. No. 219 at 28 (quoting Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  Specifically, the Agencies point to a handful of comments that discuss problems facing farmers generally under the Rule, see dkt. no. 215-4, Ex. 2, Pt. 3, at 126, or discuss the CWA's farmland-permitting exemptions that are unchanged in the Rule, see id. at 134, 170, 190. They also point to one response to one comment assuring that the exclusions in paragraph (b) of the definition of tributary will alleviate most of the comment's concerns regarding farmland.  Dkt. No. 215-6 at 30-31.  Yet, none of these comments or responses show that the Agencies received or considered a farmland exemption to tributaries like the exemption for adjacent waters.  Moreover, considering that the Agencies based the exemption for adjacent waters on the importance of farmers to the economy, had the State Plaintiffs and other interested parties been aware that the Agencies were considering such exemptions, they could have submitted comments applying those same policy concerns to farmland

covered under the tributaries definition.  Like the other two distance-limit changes, the partial farmland exemption was not a logical outgrowth of the Proposed Rule and it was not harmless error.[17]

## B. Portions of the WOTUS Rule are Also Arbitrary and Capricious

Plaintiffs also argue that in addition to violating the APA's notice requirement, the WOTUS Rule is arbitrary and capricious under section 706(2)(A) of the APA.  Specifically, Plaintiffs argue that the Agencies arbitrarily selected the distance limitations for the adjacent and case-by-case waters definitions and that the Agencies failed to treat similar cases in a similar manner by applying the farming exclusion to the adjacent waters definition but not tributaries.  Defendants argue that these decisions in the WOTUS Rule are grounded in science and their expertise.  After reviewing the record, the Court finds that even giving great deference to the Agencies, some of the WOTUS Rule's definitions are arbitrary and capricious.

The APA states that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . .

---

[17] In disputing the Plaintiffs' argument that they lacked the opportunity to comment on the WOTUS Rule, the Agencies mention that "[s]ince 2015, the challengers and other interested parties have had further opportunity to—and did—present their objections through the Agencies' reconsideration proceedings," and that in the Agencies new rulemaking efforts to repeal and rescind the WOTUS Rule, "the challengers now have the opportunity, in that rulemaking, to comment on the final regulatory text and all the support for the 2015 Rule." Dkt. No. 219 at 18-19.  However, this Court is evaluating the WOTUS Rule as promulgated in 2015.  While statements made by the Agencies in their new rulemaking efforts or other facts from that post-2015 rulemaking may be instructive to the Court's consideration of this case in some respects, as far as the Agencies' fulfilment of the notice requirement for the 2015 Rule, the question is whether interested persons had an opportunity to comment on *that* rule at *that* time prior to the final promulgation of *that* rule.  For the reasons explained above, the Court finds that they did not have that opportunity.

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (2018). "The arbitrary and capricious standard is a highly deferential one, and [the Court] cannot substitute [its] judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers, 833 F.3d 1274, 1285 (11th Cir. 2016). The Court's "inquiry is limited by law to whether the agency's decision was based on a consideration of the relevant factors and, ultimately, whether it made a clear error of judgment." Id. To put it another way, the Court may find a rule arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1254 (11th Cir. 2007) (citation omitted). While the Court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned . . . [w]e may not supply a reasoned basis for the agency's action that the agency itself has not given." Black Warrior Riverkeeper, 833 F.3d at 1285 (quotations and citations omitted). "This inquiry is 'searching and careful, [but] the ultimate standard of review is a narrow one.'" Conservation All. of St. Lucie Cty., Inc. v. U.S. Dep't of Transp., 847 F.3d 1309, 1320 (11th Cir. 2017) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

First, the WOTUS Rule's inclusion of the farming exemption for adjacent waters but not tributaries is arbitrary and capricious. "An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." Indep. Petroleum Ass'n of Am. v. Babbitt, 92 F.3d 1248, 1258 (D.C. Cir. 1996); see also Black Warrior Riverkeeper, 833 F.3d at 1289 ("A long line of precedent has established that an agency action is considered arbitrary when the agency has offered insufficient reasons for treating similar cases differently." (citation omitted)). As explained above, the WOTUS Rule states that the Agencies included the farming exemption for adjacent waters to reflect the CWA's permitting requirement framework, which recognizes "the vital role of farmers in providing the nation with food, fiber, and fuel" by exempting from permitting requirements activities like "seeding, harvesting, cultivating, planting, soil and water conservation practices, and other activities." 80 Fed. Reg. at 37080. This exemption and its purpose are reasonable, and the Agencies could have also explained why they applied this exemption only to the adjacent waters category. The problem is that they did not. They merely emphasize that this exemption does not apply to tributaries without explaining why. See id. ("It is important to recognize that 'tributaries,' including those ditches that meet the tributary definition, are not 'adjacent' waters and are jurisdictional by rule."). The policy justifications for excluding farming activities apply equally to the tributaries category, and the definition of tributaries in the rule is likely to cover significant areas of farmland. The Agencies might have had a valid and reasonable basis for treating these two definitions

differently with regard to the farming exemption, but in addition to not notifying the public of the possible exemption, they also did not give any reasons for applying it to one and not the other. Cf. Black Warrior Riverkeeper, 833 F.3d at 1289-90 (finding that the Corps provided a "reasonable basis" for why certain limits applied to one provision of a regulation but not another).

Second, the WOTUS Rule's use of the 100-year floodplain based on FEMA flood maps to define adjacent and case-by-case waters is arbitrary and capricious. The WOTUS Rule explains that the Agencies selected a 100-year floodplain interval based, in part, on the fact that FEMA and NRCS have "generally mapped large portions of the United States, and these maps are publicly available, well-known and well-understood." 80 Fed. Reg. at 37,083. Intervenor Defendants explain that this interval was also chosen in part for "clarity" reasons, and they argue that defining adjacent waters along the same lines as boundaries for federally subsidized flood insurance "comports with the strong federal interest in minimizing flood insurance taxpayer subsidies." Dkt. No. 224 at 13. While the WOTUS Rule provides reasons for using floodplains generally to define jurisdiction, it does not provide any other basis for choosing a 100-year interval as opposed to a different interval (such as a 50-year or 200-year floodplain).

Basing the 100-year floodplain choice principally on the FEMA flood maps is problematic for two reasons. First, the WOTUS Rule itself admits that while it will determine such floodplain limits using FEMA maps, those maps have significant problems. The Rule explains that much of the United States has not been mapped by FEMA and that some maps are out

of date, which means that they are no longer accurate. 80 Fed. Reg. at 37,081. The Rule states that if such maps are determined to be inaccurate, the Agencies will use other maps, surveys, data, modeling, or historical evidence to determine the 100-year floodplain. Id. But the point remains that the Agencies' justification for the 100-year floodplain interval was based on an incomplete and in some cases inaccurate flood-map scheme. Second, while practicality, clarity, and public availability are valid factors to consider in selecting a limit for a regulation generally, they are insufficient in establishing a baseline definition of waters of the United States under the CWA. While these factors may be relevant under the arbitrary and capricious standard, the WOTUS Rule entirely failed to consider other more important factors—namely whether the 100-year floodplain is a proper limit for encompassing waters that have a significant nexus to primary waters. In other words, the Agencies failed to give reasons for why a 100-year floodplain interval was the proper limit with regard to connection to downstream waters and significant effects on those waters based on scientific findings and evidence compared to other possible intervals.

Third, and finally, the 1,500-foot limit for adjacent waters is arbitrary and capricious because the Agencies did not give reasons beyond mere conclusory statements for why this limit was selected. The Agencies stated that they determined waters within this 1,500-foot limit had a significant nexus to downstream navigable waters and established it as a boundary "[b]ased on a review of the scientific literature, the agencies' technical expertise and experience, and the implementation value of drawing clear lines." Id. at 37,085. In other words, this

limit was chosen as a "practical rule that draws reasonable boundaries." Id. While practicality is a valid factor, the Agencies failed to give specific reasons grounded in science and the significant-nexus analysis under the CWA for why this limit was chosen as opposed to any other distance. This dearth of reason-giving is distinguishable from other limits. For example, to justify the 100-foot limit for adjacent waters, the WOTUS Rule explained that "many studies indicate that the primary water quality and habitat benefits will generally occur within a several hundred foot zone of a water" and that "some studies also indicate that fish, amphibians . . . reptiles . . . and small mammals . . . will use at least a 100 foot zone for foraging, breeding, nesting, and other life cycle needs." Id. at 37085. For the 4,000-foot limit on case-by-case waters, the Rule states that "[t]he agencies' experience has shown that the vast majority of waters where a significant nexus has been found, and which are therefore important to protect to achieve the goals of the Act, are located within the 4,000 foot boundary." Id. The 1,500-foot limit has no such justification or reason-giving. Therefore, the WOTUS Rule is arbitrary and capricious with respect to at least these three parts of the definition of waters of the United States.

## IV. Constitutional Claims

Because the Court finds that the WOTUS Rule is unlawful under both the CWA and the APA, it need not reach the questions of whether the Rule also violates the Commerce Clause or the Tenth Amendment or whether the Rule is unconstitutionally vague. United States v. Smith, No. 17-12412, 2018 WL 6434386, at *1 n.1 (11th Cir. Dec. 7, 2018) ("The Court will not pass upon a constitutional question although properly presented by the

record, if there is also present some other ground upon which the case may be disposed of." (quoting _Ashwander v. Tennessee Valley Auth._, 297 U.S. 288, 347, (1936))).

**CONCLUSION**

As explained by Chief Justice Roberts in his concurrence in _Rapanos_, "[g]iven the broad, somewhat ambiguous, but nonetheless clearly limiting terms Congress employed in the Clean Water Act, the Corps and the EPA would have enjoyed plenty of room to operate in developing some notion of an outer bound to the reach of their authority." 547 U.S. at 758 (C.J. Roberts, concurring). However, in developing such rules to the reach of their authority, the Agencies must adhere to the plain language of the CWA and Supreme Court precedent interpreting that language. Moreover, the Agencies must also adhere to the procedural requirements imposed by the APA to promulgate a lawful rule. Here, the Agencies failed in both of these respects. The WOTUS Rule's definition of "waters of the United States" fails to comply with Justice Kennedy's significant-nexus test defining the reach of the Agencies' authority under the CWA, and it substantially interferes with an area of traditional state authority without a clear indication from Congress allowing such interference in the CWA. Moreover, the Agencies failed to promulgate a final rule that was the logical outgrowth of the proposed rule, and portions of the Final Rule were promulgated arbitrarily and capriciously.

Congress has delegated the important role of protecting the nation's waters to the Agencies, but in fulfilling that role, the Agencies must comply with the law. Here, they have failed to do just

that. However, having concluded that the Agencies violated the law in promulgating the WOTUS Rule, the Court is tasked with ordering the appropriate remedy under the circumstances of this case. While the normal remedy under the APA is vacatur, it is not the only remedy available. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers, 781 F.3d 1271, 1290 (11th Cir. 2015) ("While we do not dispute that 'vacatur . . . is the ordinary APA remedy, neither can we conclude that it is the only one.") In certain circumstances, a court may also remand an agency action to the agency without vacating the rule. See id. (finding remand without vacatur to be an appropriate remedy based on the unique facts of the case and within the court's broad discretion to fashion an equitable remedy); Sierra Club, Inc. v. St. Johns River Water Mgmt. Dist., No. 614CV1877ORL40DAB, 2016 WL 1317775, at *2 (M.D. Fla. Apr. 5, 2016) (remanding an agency action to the Corps without vacatur); Lane v. United States, 338 F. Supp. 3d 1324, 1341 (S.D. Ga. 2018) (remanding a case back to the administrative law judge to determine appropriate sanctions in light of the Court's ruling). Indeed, in recently finding that the WOTUS Rule violated the notice and comment requirements of the APA, the district court in the Southern District of Texas did just that. Texas v. U.S. E.P.A., No. 3:15-CV-00162, 2019 WL 2272464, at *6 (S.D. Tex. May 28, 2019). In light of the circumstances surrounding this case, this Court likewise finds that remand without vacatur is the appropriate remedy.

In recognizing the availability of the remedy of remand without vacatur, the Eleventh Circuit has explained that a court "must balance the equities." Black Warrior Riverkeeper, 781 F.3d at 1271. To do so,

the Eleventh Circuit adopted the D.C. Circuit's test for when remand without vacatur is appropriate, which considers "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." Id. (quoting <u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n</u>, 988 F.2d 146, 150 (D.C. Cir. 1993)); <u>see also</u> <u>Sierra Club v. Van Antwerp</u>, 526 F.3d 1353, 1369 (11th Cir. 2008) ("[I]t is appropriate to consider the balance of equities and the public interest, along with the magnitude of the agency's errors and the likelihood that they can be cured." (Kravitch, J., concurring in part and dissenting in part)). Balancing the equities of this case, the Court finds that although the WOTUS Rule violates the CWA and the APA, administrative efforts are already underway to repeal and replace the WOTUS Rule with a new rule that abides by both statutes. As such, an order vacating the Rule may cause disruptive consequences to the ongoing administrative process. The more prudent course of action here is to allow the Agencies to continue their efforts to change the WOTUS Rule in light of the serious defects identified in this Order while leaving this Court's existing preliminary injunction in place. <u>See</u> <u>Texas</u>, 2019 WL 2272464, at *6 ("[T]he Court finds that vacatur 'would be disruptive,' and there is a 'serious possibility' that the Agencies will be able to resolve the notice-and-comment defects with the Final Rule if 'given an opportunity to do so.'" (quoting <u>Cent. & S. W. Servis. v. E.P.A.</u>, 220 F.3d 683, 692 (5th Cir. 2000))).[18]

---

[18] Although the Eleventh Circuit, in recognizing the availability of this remedy, stated that it did not decide "whether remand without vacatur is permissible when the agency has erred to such an extent as to indicate that its ultimate

Therefore, for the foregoing reasons, the Plaintiffs' Motions for Summary Judgment, dkt. nos. 199, 203, are **GRANTED**, and Intervenor Defendants' Motion for Summary Judgment, dkt. no. 211, is **DENIED**. The WOTUS Rule is hereby **REMANDED** to the Agencies for further proceedings consistent with this Order. Intervenor Plaintiffs' Motion to Amend the Court's Preliminary Injunction, dkt. no. 208, is **DENIED** at this time. The Court's Preliminary Injunction, dkt. no. 174, will **REMAIN** in place pending the outcome of the ongoing administrative proceedings regarding the WOTUS Rule.

**SO ORDERED**, this 21st day of August, 2019.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

decision was unlawful," Black Warrior Riverkeeper, 781 F.3d at 1271, this Court nonetheless finds this to be an appropriate remedy, after balancing the equities, in a case such as this where vacatur has the potential to disrupt the administrative process. Because the Agencies are currently working to pass a new regulation to replace the WOTUS Rule that has already entered the notice-and-comment phase, this remedy will further clarify for the Agencies what aspects of the WOTUS Rule are unlawful while allowing the administrative process to proceed without disruption.